**GUTRIDE SAFIER LLP**
ADAM J. GUTRIDE (State Bar No. 181446)
SETH A. SAFIER (State Bar No. 197427)
TODD KENNEDY (State Bar No. 250267)
ANTHONY PATEK (State Bar No. 228964)
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469
adam@gutridesafier.com
seth@gutridesafier.com
todd@gutridesafier.com
anthony@gutridesafier.com

**MIGLIACCIO & RATHOD LLP**
Nicholas Migliaccio, pro hac vice forthcoming
Jason Rathod, pro hac vice forthcoming
Esfand Nafisi (State Bar No. 320119)
412 H Street NE, Suite 302
Washington, D.C. 20002
Telephone:  (202) 470-3520
enafisi@classlawdc.com


Attorneys for Plaintiffs Colgate, McKnight

UNITED STATES DISTRICT COURT

DISTRICT OF NORTHERN CALIFORNIA

| | |
|---|---|
| BRADLEY COLGATE, AN INDIVIDUAL, AND KAYTLIN MCKNIGHT, AN INDIVIDUAL, ON BEHALF OF THEMSELVES, THE GENERAL PUBLIC AND THOSE SIMILARLY SITUATED,<br><br>PLAINTIFFS,<br><br>V.<br><br>JUUL LABS, INC.; PAX LABS, INC.<br><br>DEFENDANTS. | CASE NO.  3:18-cv-2499<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |

Bradley Colgate and Kaytlin McKnight, by and through their counsel, bring this Class Action Complaint ("Class Action Complaint") against Defendants, on behalf of themselves and those similarly situated, for violation of the consumer protection laws of the 50 states, including sections 17200 et seq. and 17500 et seq. of the California Business and Professions Code and the California Consumers Legal Remedies Act; common law fraud, deceit and/or misrepresentation; and unjust enrichment. The following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

## INTRODUCTION

1.      This case arises out of Defendants' false and deceptive advertising of JUUL e-cigarettes and JUUL pods, including their unfair, unlawful, and fraudulent practices of marketing those products as safe, candy-like products that are attractive to minors and nonsmokers, when they in fact contain more potent doses of nicotine than cigarettes, making them particularly addictive, and without disclosing any of the myriad problems that are likely to occur from the use of the products, including long-term nicotine addiction; increased risk of heart disease and stroke; changes in brain functionality that lead to increased susceptibility to anxiety, depression and other addictions; decreased functionality of the endocrine system; heightened risk of cancer; and negative effects on fertility.

2.      Released in 2015, JUUL now dominates the $3 billion e-cigarette market in the United States, beating out established competitors like Philip Morris. The secret to JUUL's success is simple: JUUL e-cigarettes' patented nicotine formulation is more addictive than anything else on the market, including the most potent cigarettes. Instead of disclosing this material fact to consumers, JUUL launched a multi-million dollar marketing campaign targeting children and young adults in an effort to brand the JUUL e-cigarette as a fashion accessory sold in "limited edition" colors and candy-like flavors. Having accomplished its goal of creating a massive user base of addicts—many of whom are children—whose intense nicotine cravings can only be satiated by JUUL's ultra-potent nicotine formulation, JUUL recently rebranded itself. Gone from its website are the youthful colors and images glamorous young models seductively exhaling clouds of vapors. JUUL's website now pictures middle-aged adults in non-glamorous

settings and suggests that JUUL exists solely for the benefit of adult smokers looking for an alternative. Defendants' attempt to distance themselves from their wrongful conduct is superficial and does not undo the damage they have caused or change their fundamentally unscrupulous business model. JUUL's e-cigarettes are still as addictive as they ever were, are still sold in candy-like flavors, and can now be ordered with a subscription service on JUUL's website. JUUL was and is in the business of addicting consumers to its product.

3.      Defendants advertise JUUL e-cigarettes as "the satisfying alternative to cigarettes." Defendants' web site at juulvapor.com touts the JUUL e-cigarette as "the i-Phone of E-cigs," thereby framing them as a cool, fashionable item to own and use. Defendants advertise and market the JUUL and JUUL pods in a variety of bright, primary colors, with the nicotine pods advertised and marketed in child friendly flavors such as mango, "cool mint," "fruit medley," "crème brulee," and "limited edition classic menthol," and "limited edition cool cucumber." Third parties—licensed by Defendants, to manufacture their patented products—also sell similar youth- and non-smoker-oriented flavors such as "gypsy tantrum" (a combination of watermelon, kiwi, and "strawberry & cream"), "citrus burst," "paladin" (a combination of apple, raspberry, blueberry, and dragonfruit), "high wire" (a combination of watermelon, honeydew, strawberry, and mango), "caffe latte," and "pinkie" (described as "pink frosted yellow cakes"). These colors, flavors, and names are intentionally designed to attract minors and nonsmokers. Defendants paired these traits with a "vaporize" advertising campaign that focused on bright, attractive images of people in their 20's and 30's going out for a night on the town, thereby framing the JUUL e-cigarette as a hip, young activity and product.

4.      Defendants have continuously omitted, downplayed or misrepresented the nicotine content of JUUL e-cigarettes, the risks of addiction its products pose, and the health risks of nicotine. A recent study of 15 to 24-year-olds found that 65% of the participants who used JUUL e-cigarettes were unaware that the JUUL e-cigarette contained nicotine. A different study found that children who use e-cigarettes are four times more likely to become smokers than children who do not use e-cigarettes.

5.      Defendants' web site at juullabs.com states "[u]nlike other alternatives on the

market, JUUL accommodates nicotine levels akin to a cigarette's in order to satisfy smokers switching." This is false. JUUL's product delivers 25% more nicotine into the blood than the strongest cigarettes available. The disparity is likely far greater when a JUUL is compared to the "light" cigarettes preferred by the teenagers and young adults that constitute JUUL's core demographic. For smokers seeking an alternative to cigarettes, JUUL's omissions and misrepresentations about the nicotine content of its products muddy the waters when it comes to making an informed decision about smoking cessation options. In fact, the JUUL e-cigarette system delivers a potent dose of a nicotine salt, which is a particularly addictive form of nicotine that is absorbed by the body at a much higher rate than smoking a cigarette or e-cigarettes that use nicotine liquid.

6.      Further, Defendants specifically offer and advertise "Autoship" as a service that provide "pods at your door and savings in your pocket. 15% off every order. Cancel anytime." This misleads the JUUL consumer into thinking that they can stop purchasing JUUL pods at any time, when the JUUL pods are, in fact, so addictive that most users, particularly adolescent users, cannot stop purchasing them "anytime."

7.      Although Defendants have made various public statements that their products are designed only for adults who already smoke cigarettes, to provide them a safer alternative to their already dangerous habit, those statements are false, and Defendants know them to be false. Defendants know that the pool of cigarette smokers in California, and throughout the United States, has been substantially declining over the last several decades, due to sustained investment in public health education about the dangers of smoking. If Defendants only focused on the market of existing smokers who want to quit, they would not only have to deal with the demography of a shrinking market, but would also have to compete against entrenched habits, loyalty to existing tobacco brands, and other smoking cessation products such as nicotine gum. Although JUUL claims its JUUL products smoking cessation devices, it has not received FDA approval as an aid in smoking cessation, and has not participated in any FDA approval process.

8.      Defendants therefore have built their brand and advertising and marketing strategy around creating, and addicting, an entirely new group of customers who are not regular smokers.

Despite their public denials, Defendants intentionally market their products to appeal to these young nonsmokers in the hopes that they will try the products and, because of the products highly addictive nature, become life-long customers. In this regard, Defendants have been wildly successful.

9.      JUUL has built a commercial empire on fraud, misrepresentations and omissions. Its sleek ad campaigns have turned children and non-smokers into addicts. Defendants have also worsened the plight of smokers who turned to JUUL as a means of ending their addiction to nicotine. This case seeks to put an end to JUUL's unscrupulous practices and provide relief to consumers for the economic losses caused by JUUL's deceptively addictive products.

**PARTIES**

10.      Bradley Colgate ("Colgate") is, and at all times alleged in this Class Action Complaint was, an individual and a resident of La Jolla, San Diego County, California.

11.      Kaytlin McKnight ("McKnight") is, and at all times alleged in this Class Action Complaint was, an individual and a resident of Arroyo Grande, San Luis Obispo County, California.

12.      Defendant PAX Labs, Inc. ("PAX") is, and at all times alleged in this Class Action Complaint was, a Delaware corporation, having its principal place of business in San Francisco, California.

13.      Defendant Juul Labs, Inc. ("JUUL") is, and at all times alleged in this Class Action Complaint was, a Delaware corporation, having its principal place of business in San Francisco, California. JUUL was originally a part of PAX, but was spun out as a separate company in 2017. A substantial portion of the conduct cited here occurred while JUUL was a part of PAX.

14.      At all times alleged in this Class Action Complaint, each of the Defendants was an agent, servant, representative, officer, director, partner or employee of the other Defendant and, in doing the things herein alleged, was acting within the scope and course of his/her/its authority as such an agent, servant, representative, officer, director, partner or employee, and with the permission and consent of each Defendant.

15.      At all times alleged in this Class Action Complaint, Defendants, and each of them,

were members of, and engaged in, a joint venture, partnership and common enterprise, and acted within the course and scope of, and in pursuance of, said joint venture, partnership and common enterprise.

16.     At all times alleged in this Class Action Complaint, Defendants, and each of them, ratified each and every act or omission complained of herein.

17.     At all times alleged in this Class Action Complaint, the acts and omissions of Defendants, and each of them, concurred and contributed to the various acts and omissions of each and all of the other Defendants in proximately causing the injuries and damages as herein alleged.

**JURISDICTION AND VENUE**

18.     This action is brought by Plaintiffs pursuant to, inter alia, the California Business and Professions Code Section 17200, et. seq., and similar state laws of other states.  Plaintiff and Defendants are "persons" within the meaning of the California Business and Professions Code Section 17201. Plaintiffs seek to represent in this action similarly situated persons throughout the United States.  Jurisdiction exists under the Class Action Fairness Act, 28 U.S.C. Sections 1332(d), 1453, and 1711–1715, because the claim for damages is greater than $5,000,000.

19.     The injuries, damages and/or harm upon which this action is based, occurred in or arose out of activities engaged in by Defendants within, and affecting, the State of California.

20.     Defendants have engaged, and continue to engage, in substantial and continuous business practices in the State of California, including in the City and County of San Francisco.

21.     Accordingly, Plaintiffs allege that jurisdiction and venue are proper in this Court.

**SUBSTANTIVE ALLEGATIONS**

**Defendants Market, Advertise and Sell E-Cigarettes**

22.     JUUL is a leading provider of e-cigarettes and nicotine pods in the United States and abroad. The JUUL e-cigarette went on sale in 2015. As of 2018, according to market reports from Nielsen and Wells Fargo, JUUL accounts for approximately 50% of all e-cigarette sales in the United States. JUUL products are available via 8,800 retail locations in 150 countries. Originally founded as a product line or division within PAX Labs, Inc., a manufacturer of

vaporizing products, JUUL Labs was spun out as an independent company in 2017.

23.    The JUUL e-cigarette is about the size and shape of a pack of chewing gum. It consists of a rectangular enclosure containing a rechargeable battery and heating element (the "JUUL device"), and a pre-filled pod of JUUL's patented nicotine solution (the "JUUL pod"), which slides into the end of the JUUL device.

24.    Sold in packs of 4, JUUL manufactures and sells JUUL pods in a variety of flavors that have no tobacco cigarette analog, including mango, "cool" cucumber, fruit medley, cool mint, and crème brulee.

25.    When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUUL pod, the battery in the JUUL device activates the heating element, which in turn converts the nicotine solution in the JUUL pod into a vapor consisting principally of nicotine, glycerine, and propylene glycol that is inhaled into the lungs.

26.    JUUL represents that each JUUL pod is the equivalent to a pack of cigarettes, both in terms of nicotine content and in terms of the number of puffs provided. JUUL does not disclose the brand or strength of cigarettes used for this comparison.

27.    A pack of JUUL pods initially cost about $25 a pack. Packs of JUUL pods now sell for approximately $15.

28.    The product labels for the JUUL e-cigarette and JUULpods (the "JUUL product labels") contain no warning that nicotine is addictive. The JUUL product labels have a California Proposition 65 warning indicating that the product contains a substance known to cause cancer, but contains no warnings specifically about the known effects, or unknown long-term effects, of vaping/inhaling nicotine salts.

29.    JUUL Labs, Inc. owns and operates www.juullabs.com and www.juulvapor.com (the "JUUL Websites"), where it markets, advertises and sells its e-cigarettes and JUUL-branded nicotine pods, marketed as "JUULpods."

30.    The JUUL Websites are a leading online marketing and distribution channel for e-cigarettes. JUUL partners with other online and brick-and-mortar providers to market, advertise and sell, via the JUUL Websites, e-cigarettes.

31.     When a consumer purchases a JUUL e-cigarette and/or JUUL pods utilizing any of the JUUL Websites, he or she first chooses his or her desired e-cigarette style and color and nicotine pod flavor and color. After the consumer has input that information into the JUUL Websites, the JUUL Websites advertise to the consumer different e-cigarette styles and colors and/or a variety of nicotine pod flavors and colors. From Defendants' advertised e-cigarette and pod styles, consumers select a desired e-cigarette decorated in a style most appealing to the consumer, and/or one or more desired pod flavors, each of which has its own distinctive color.

32.     The JUUL Websites allow the purchaser to arrange automatic shipping of refill nicotine pods.

33.     Defendants aggressively advertised their products to young consumers. When JUUL was spun out from PAX Labs, JUUL initiated a "vaporize" campaign aimed at differentiating its products from traditional cigarettes. For example, JUUL placed a brightly colored, 12-unit billboard display above Times Square, and purchased the front spread of the July 2015 issue of Vice magazine, a news publication aimed at younger readers. JUUL also implemented a series of pop-up "JUUL bars" in Los Angeles, New York, and the Hamptons, imitating pop-up restaurants and bars typically aimed at attracting young, hip urban consumers. JUUL's chief marketing officer, Richard Mumby said "while other campaigns tend to be 'overtly reliant on just the product,' its effort features diverse 20-to-30-year-olds using the product." The ads used attractive, young models dressed in outfits designed to convey that they were going out for a night of partying or clubbing. This reliance on images of young, diverse users was specifically aimed at convincing young people who were not previously cigarette smokers to purchase JUUL, to make the use of JUUL appear fun and without long-term negative consequences, to position the JUUL e-cigarette as the e-cigarette of choice for young adults, and to attract even younger persons who were not adults to the "hipness" of using the JUUL products.

34.     On information and belief, many of JUUL's retail locations are non-age restricted gas stations, which are frequently in close proximity to high schools and colleges. As one example, the following image of JUUL retailers in Berkeley, California shows that the majority of JUUL retailers in the region surround the University of California, Berkeley, and Berkeley

High School.  The blue circles in the image below mark the location JUUL sellers, and the orange dot represents Berkeley University, which is adjacent to the largest high school in the region, Berkeley High School.



35.     The proximity of JUUL retailers to areas where children and young adults congregate is no accident. JUUL entered the e-cigarette market with a multimillion dollar "Vaporized" campaign. This campaign targeted children and young adults with advertisements that portrayed JUUL e-cigarettes as a fashion accessory and provided no warnings about the health risks of addiction or even the existence of nicotine in JUUL devices. A sampling of images from the Vaporized campaign are attached as an appendix to this Complaint. *See* Appendix A. These images were displayed in places, including large screens over New York's Times Square, where children were likely to see them.

36.     A recent study of e-cigarette advertising on mobile devices found that 74% of total advertising impressions were for JUUL products, and that several of JUUL's advertisements highlighted JUUL's high-tech design, featured young people using JUUL products, or featured financial incentives for purchasing JUUL products. https://www.slideshare.net/YTHorg/mobile-

marketing-of-electronic-cigarettes.

37.     JUUL also heavily promotes its products through social media platforms, including Twitter and Instagram.



38.     JUUL marketed and continues to market its products as fashion accessories by selling "limited edition" products in trendy colors as pictured in 2018 advertisements included in Appendix B.

39.     JUUL also sells its highly addictive JUUL pods in "limited edition" flavors.

40.     JUUL further diminishes the few warnings it does provide about its products by suggesting that JUUL pods should be paired with foods.



41.     JUUL's representations that it is designed to help smokers stop smoking is wholly inconsistent with its marketing efforts, which minimize the health risks and addictiveness of its

products, if those risks are mentioned at all.

42.     Because Defendants' JUUL marketing campaign targeted the category of individuals that adolescents want to emulate, it had the foreseeable effect of causing a large spike in adolescent use of e-cigarettes. Immediately following JUUL's "vaporize" campaign, the Centers for Disease Control and FDA's Center for Tobacco Products saw adolescent use of e-cigarettes roughly triple in one year, from 780,000 users in 2013 to 2.45 million users in 2014.

43.     John Schachter, director of state communications for Campaign for Tobacco-Free Kids, has been cited as expressing "concern about the Juul campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design." Mr. Schachter said "the organization has noticed obvious trends that appeal to adolescents in e-cigarette campaigns such as celebrity endorsements, sponsorships and various flavors."

44.     Juul's selection of flavors that appeal to teens has a marked effect on e-cigarette adoption by underage "vapers." A national survey found that that 81 percent of youth aged 12-17 who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that 85.3 percent of current youth e-cigarette users had used a flavored e-cigarette in the past month. Moreover, 81.5 percent of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like." See Ambrose, BK, et al., "Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014," Journal of the American Medical Association, published online October 26, 2015. The use of attractive flavors foreseeably increases the risk of nicotine addiction, as traditional cigarette product designs aimed at reducing the unpleasant characteristics of cigarette smoke (e.g., addition of menthol to mask unpleasant flavors) have previously been shown to contribute to the risk of addiction. See https://www.ncbi.nlm.nih.gov/books/NBK53018/ #ch4.s92. Another peer-reviewed study concluded that "Young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their nonvaping peers, a new study has found." Primack, B.A., et al., "Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults," Volume 131, Issue 4, Pages 443.e1–443.e9, available at https://www.amjmed.com/article/S0002-9343(17)31185-3/fulltext (last visited April 26, 2017).

45.     Defendants' marketing strategy is in many ways an updated version of, and analogous to, the use by R.J. Reynolds of the "Joe Camel" character to market its Camel brand cigarettes, which R.J. Reynolds eventually discontinued in 1997 under the pressure of an impending civil trial in San Francisco, Congressional investigation, and public pressure.  See https://en.wikipedia.org/wiki/Joe_Camel#cite_note-8 (last visited Apr. 25, 2018).  In 1991, the Journal of the American Medical Association published a study showing that by age six nearly as many children could correctly respond that "Joe Camel" was associated with cigarettes as could respond that the Disney Channel logo was associated with Mickey Mouse, and it alleged that the "Joe Camel" campaign was targeting children, despite R. J. Reynolds' claim (similar to the claim of Defendants here) that the campaign was directed only to adults who were already smokers of other brands. Paul M. Fischer, MD, et al, Brand Logo Recognition by Children Aged 3 to 6 Years, Journal of the American Medical Association, Dec. 11, 1991. At that time researchers estimated that 32.8% of all cigarettes sold illegally to underage buyers were Camels. DiFranza JR, et al., RJR Nabisco's cartoon camel promotes camel cigarettes to children. Journal of the American Medical Association, Dec. 11, 1991.  (The JUULs represent an even higher percentage of all cigarettes and e-cigarettes sold to minors.)  A lawsuit was brought in San Francisco against R.J. Reynolds to stop the Joe Camel ads, entitled Mangini v. R. J. Reynolds Tobacco Company, San Francisco County Superior Court No. 959516.  Internal documents produced to the court in that case interest in targeting children as future smokers. https://web.archive.org/web/20070706083001/http://legacy.library.ucsf.edu/resources/Mangini_report.pdf (last visited Apr. 25, 2018)

46.     The importance of the youth market was illustrated in a 1974 presentation by RJR's Vice-President of Marketing who explained that the "young adult market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume - for at least the next 25 years." https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091 (last visited Apr. 25, 2018). A 1974 memo by the R. J. Reynolds Research Department also pointed out that capturing the young adult market is vital because "virtually all [smokers] start by the age of 25"

and "most smokers begin smoking regularly and select a usual brand at or before the age of 18." https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=gfyb0086 (last visited Apr. 25, 2018).  (The Defendants have taken these same facts to heart in designing their campaigns.)

47.     Further, although Defendants advertise the JUUL e-cigarette as delivering a nicotine dose comparable to that of a traditional cigarette, data indicate that JUUL's e-cigarette actually delivers a higher, faster dose of nicotine than traditional cigarettes. JUUL has patented its nicotine salt formulations in U.S. patent No. 9,215,895 ("the '895 patent"). In the '895 patent, JUUL discloses blood plasma studies of nicotine delivery using nicotine salts compared to a Pall Mall cigarette and vaporized solutions of freebase nicotine. JUUL reported that the rate of nicotine uptake in the plasma of blood of users is higher in certain nicotine salt formulations than that of the traditional cigarette. In fact, rates of nicotine uptake were actually up to four times higher for nicotine salt formulations than they were for traditional cigarettes (approximately 4 ng/mL/min compared to approximately 1 ng/mL/min). JUUL's data also indicates that the nicotine salts produced a higher heart rate in a shorter amount of time (a 50 beats/minute increase within 2 minutes for nicotine salt, versus a 40 beats/minute increase in 2.5 minutes for a Pall Mall cigarette). Nicotine salts also caused a faster and more significant rise in heart rate than placebo or vaporized freebase nicotine.

48.     The following image, taken from the '895 patent, shows that a 4% benzoic acid solution combined with nicotine salt absorbs faster in the blood than nicotine from a Pall Mall cigarette and, critically, causes more than 20% more nicotine to enter the blood than a Pall Mall cigarette, which causes a cMax of approximately 11 micrograms of nicotine into every milliliter of blood in the body ("ng/mL"). In order to enhance clarity, JUUL's 4% benzoic acid nicotine salt formulation is highlighted in red, and the Pall Mall cigarette is highlighted in blue.



49.     Though the '895 patent refers to a 4% benzoic acid solution, it appears that JUUL uses an even stronger formulation in its commercial products. One study found that JUUL pods contained a benzoic acid solution of 4.5%, indicating that JUUL's cMax is even higher than the '895 patent suggests. Pankow JF, et al., Benzene formation in electronic cigarettes. PLoS ONE 12(3): e0173055 (2017). See https://doi.org/10.1371/journal.pone.0173055.

50.     Although JUUL represents that each JUUL pod contain 5% nicotine or 50 mg/mL of nicotine per JUUL pod, independent studies have found that each JUUL pod contains 6% nicotine or 60 mg/mL of nicotine per JUUL pod. *Id.*

51.     To put 60 mg/mL of nicotine salt solution in context, a popular e-cigarette vending website's guide to nicotine salt solutions indicates that a 12 mg/mL solution of nicotine salt is an appropriate concentration for a smoker who smokes a pack a day. *See* https://www.ruthlessvapor.com/blogs/ruthless-e-liquid/vape-nicotine-level. JUUL's formulation is five times stronger than that.

52.     The National Institutes of Health report that the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." See https://www.ncbi.nlm. nih.gov/books/NBK53018/#ch4.s92. Because JUUL's nicotine salts actually increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is higher for JUUL e-cigarettes than traditional

cigarettes. Thus, far from helping smokers quit, the JUULs simply increase their level of addiction to nicotine.

53.     Although framed as a safer alternative to smoking, Defendants' JUUL e-cigarettes and JUULpods still deliver dangerous toxins and carcinogens to teenage users. Nicotine itself is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems. See Mishra, A., et al., HARMFUL EFFECTS OF NICOTINE, Indian J. Med. Paediatr. Oncol., 36(1): 24–31 (Jan.-Mar. 2015), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/. Nicotine adversely affects the heart, eyes, reproductive system, lung, and kidneys. Id. Exposure to nicotine from sources such as nicotine gum still produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders. Id. There is also evidence that it can affect neurological development in adolescents, and that exposure to nicotine during adolescence can produces an increased vulnerability to nicotine addiction. Arain, M., et al., MATURATION OF THE ADOLESCENT BRAIN, Neuropsychiatric Disease and Treatment, 9, 449–461 (Apr. 25, 2013), http://doi.org/10.2147/NDT.S39776. Aside from its use as a stimulant, the only other known use of nicotine is as an insecticide. See Mishra, supra. Moreover, because vaping still introduces foreign substances into the lungs, prolonged use of vaping products is likely to produce chronic obstructive pulmonary disease, just like traditional cigarette smoke. Vaping also triggers immune responses associated with inflammatory lung diseases.

54.     A number of recent news reports show an oncoming government inquiry into Defendants' business model and product. For example, on April 24, 2018, the New York Times published "F.D.A. Cracks Down on 'JUULing' Among Teenagers." The Times wrote: "The Food and Drug Administration on Tuesday [April 24, 2018] announced a major crackdown on the vaping industry, particularly on the trendy JUUL devices, aimed at curbing sales to young people." According to the same article, the FDA "also demanded that JUUL Labs turn over company documents about the marketing and research behind its products, including reports on focus groups and toxicology, to determine whether JUUL is intentionally appealing to the youth market despite its statements to the contrary and despite knowing its addictive potential."

55.     The Wall Street Journal reported the following the very same day:

> The JUUL device, which resembles a USB flash drive, delivers a powerful dose of nicotine, derived from tobacco, in a patented salt solution that smokers say closely mimics the feeling of inhaling cigarettes. The JUUL liquid's 5% nicotine concentration is significantly higher than that of most other commercially available e-cigarettes. JUUL flavors include "Creme Brulee" and "Fruit Medley," which critics have said make it more attractive to minors.

Wall Street Journal, JUUL E-Cigarettes Face FDA Probe. April 24, 2018

(https://www.wsj.com/articles/fda-seeks-documents-from-maker-of-juul-e-cigarettes-popular-with-teens-1524591640).

56.     Several weeks earlier, on April 20, 2018, the Wall Street Journal featured another article, in its health section, entitled "Schools and Parents Fight a JUUL E-Cigarette Epidemic." See "https://www.wsj.com/articles/schools-parents-fight-a-juul-e-cigarette-epidemic-1522677246. In that article, the Wall Street Journal wrote:

> At Northern High School in Dillsburg, Pa., Principal Steve Lehman's locked safe, which once contained the occasional pack of confiscated cigarettes, is now filled with around 40 devices that look like flash drives.
>
> The device is called a JUUL and it is a type of e-cigarette that delivers a powerful dose of nicotine, derived from tobacco, in a patented salt solution that smokers say closely mimics the feeling of inhaling cigarettes. It has become a coveted teen status symbol and a growing problem in high schools and middle schools, spreading with a speed that has taken teachers, parents and school administrators by surprise.
>
> ***
>
> After two decades of declining teen cigarette use, "JUULing" is exploding. The JUUL liquid's 5% nicotine concentration is significantly higher than that of most other commercially available e-cigarettes. JUUL Labs Inc., maker of the device, says one liquid pod delivers nicotine comparable to that delivered by a pack of cigarettes, or 200 puffs—important for adult smokers trying to switch to an e-cigarette. It is also part of what attracts teens to the product, which some experts say is potentially as addictive as cigarettes and has schools and parents scrambling to get a grip on the problem.

*Id.*

57.     On March 26, 2018, The Washington Post wrote, in "The JUUL's So Cool, Kids Smoke It In School," as follows:

"Because it's referred to as JUULing, not smoking or vaping, some students may think what they're doing is harmless," said Pamela Ling, a professor at the University of California-San Francisco School of Medicine. "They may not even know it contains nicotine."

But it does — and a significant amount. One JUUL "pod," the nicotine cartridge inserted in-to the smoking device and heated, delivers about 200 puffs, about as much nicotine as a pack of cigarettes, according to the product website.

Assuming a teen smokes one pod a week, "in five weeks, that's like 100 cigarettes," Ling said. "By that point, you're considered an established smoker."

*See* https://www.washingtonpost.com/national/health-science/the-juuls-so-cool-kids-smoke-it-in-school/2018/03/26/32bb7d80-30d6-11e8-b6bd-0084a1666987_story.html?utm_term= .32e50e435e82.

### Defendants Falsely Market, Advertise and Sell E-Cigarette "Autoship" Services as "Cancel Anytime" Service, Without Disclosing the Products' Highly Addictive Nature.

58.     Defendants never disclose to consumers that JUUL e-cigarettes and JUULpods are more addictive than other e-cigarettes, and at least as addictive as if not more addictive than traditional cigarettes. Instead, Defendants market the JUUL products as an "alternative to cigarettes," thereby giving the false impression that they are less addictive than traditional cigarettes and safe to use.

59.     JUUL also offers "Autoship" as a service that provide "pods at your door and savings in your pocket. 15% off every order. Cancel anytime."

60.     While it is true that consumers are not obligated to purchase additional JUULpods, there is no disclosure of the fact that use of the JUUL e-cigarettes and JUULpods is likely to result in nicotine addiction, thereby interfering with the user's ability to stop purchasing JUULpods. Defendants, in fact, know (and prey upon the fact) that once a consumer begins using JUUL products, they will become addicted to those products and continue to purchase them, often in increasing amounts in order to achieve the same "high" as their tolerance to nicotine increases. Defendants intentionally misrepresent and omit the above information from the initial purchase process (and advertisements) because they know that consumers will have an impaired ability to cease using JUUL e-cigarettes and JUULpods once they are addicted, making their ability to

"cancel anytime" illusory.

61.     Defendants also do not disclose the serious negative health consequences that result from using nicotine products. The label contains no warnings about the addictive nature of nicotine. Although the product label contains a generic Prop 65 warning, it does not identify any of the health risks associated with nicotine, as distinct from cigarette smoking. See ¶¶ 22 & 35, above.

62.     The highly addictive nature of the JUUL products also means that the consumers of the JUUL products, including Plaintiffs and Class Members, will continued to suffer economic injury far into the future, as they will have to keep buying additional JUUL products if they want to avoid the physically and mentally difficult effects of nicotine withdrawal. Defendants intend for Plaintiffs and Class Members to suffer this economic injury, which inures to Defendants' benefit, that is, to "hook" their consumers, including children, into becoming long-term or life-long customers.

63.     Although Defendants contend that they need not disclose these facts because the products are only designed for existing cigarette smokers, and that their products are purportedly safer than regular cigarettes, the contention is belied by Defendants' own knowledge, marketing plan and intentions, which is to grow a new group of consumers of nicotine products, not just to market to the shrinking number of existing cigarette smokers.

**Defendants Misled Class Members, including Minors, Into Becoming Addicted to Nicotine Salts.**

64.     On or about 2017, Class representative Kaytlin McKnight purchased a JUUL e-cigarette and JUUL pods. McKnight subsequently became addicted to nicotine salts. McKnight now vapes several JUULpods each week.

65.     On or about 2017, Class representative Bradley Colgate purchased a JUUL e-cigarette and JUUL pods. Class Representative Colgate originally purchased the JUUL products in an attempt to quit cigarette smoking. Rather than helping to wean Colgate off of nicotine, the intense dosage of nicotine salts delivered by the JUUL products resulted in an increased nicotine addiction, and an increased consumption of nicotine by Colgate.

66.     Had Plaintiffs known the truth of the matter, they would not have purchased Defendants' JUUL products.

67.     Because Plaintiffs do not know the formula for Defendants' products and cannot test how addictive the products are before purchasing, Plaintiffs will be unable to rely on Defendants' labels when shopping for nicotine products in the future absent an injunction that requires Defendants to disclose the addictive effects and true health consequences of the product. Plaintiffs, and others similarly situated, are likely to be repeatedly presented with false or misleading information, making it difficult to make informed purchasing decisions.

68.     Defendants Have Similarly Scammed Other Adolescent and Adult Customers.

69.     Plaintiffs' experiences were not isolated incidents. Rather, all of JUUL's other customers have been identically misled into purchasing JUUL's addictive nicotine products. Some of them have publically complained about the undisclosed addictiveness of JUUL's nicotine products.

70.     For example, one teen wrote:

"At [Lawrence Free State High School], underage use of vapes is quite typical. Out of 95 students surveyed, 50% of them said that the illegal use of vape products is very common. Students are able to get their hands on vape products with ease, as there are many effective methods of buying them unlawfully."

"In the past, users could purchase vaping products on the internet without being asked for any identification. That rule has since been altered and all consumers are now required to provide an I.D., but underage users can easily buy fake I.D.'s to avoid this. If minors are slick enough, they can go into vape stores, act of age and not be questioned when buying a device, an anonymous senior said."

"One of the reasons why vaping has become so popular is the "cloud" the user makes after exhaling the substance. The vapor is cooler than a traditional cigarette, and some students are fascinated with the many different things you can do with it, an anonymous senior said."

. . .

"Another attractive characteristic of vaping is the buzz that the user gets after inhaling the substance. It can be described as a short-term head high."

"'It's almost like being drunk—you feel it in your head and you just kind of wobble,' senior Isaiah Jacobs said. 'It's a dizzy feeling. It feels nice.'"

"The buzz is caused by nicotine which the vape juice contains. To a new user,

vaping is an easy way to get a strong high. After continual use, users build up an immunity and must ingest more nicotine to reach their desired state. This is called a nicotine addiction and all consumers, especially minors, are susceptible to this craving according to the U.S. National Library of Medicine. Some students have become habitual users, causing them to spend time and money feeding their habit. Students who vape recognize that many of their peers have an addiction but still choose to partake in the activity, disregarding the risk."

"'Some [people who vape] will admit it,' senior Isaiah Jacobs said. 'You can tell they are addicted when they spend all their money and time on it, just like people who smoke cigarettes or drink alcohol.'"

"Once hooked, users inhale the many toxins that compose vape juice. Very little research has been conducted on the long-term effects that vaping has on a person's body according to pulmonologist Aman Kahn."

. . .

"With so little information available, students are unable to make an informed decision about whether or not to partake in vaping. Until further research has been conducted, underage users will continue to consume vape products without understanding the impacts that these substances can have on their health."

https://www.fsfreepressonline.com/features/2018/02/13/too-juul-for-school/ (last visited April 3, 2018).

71.    A reporter at Kent State University wrote:

"'Of course,' Freed said. 'Nothing should be going through your lungs but air. Being 21 years old, it's hard to watch 15-year-olds carry them around. I mostly use my JUUL for a quick buzz, but because that buzz is so short, I find myself using it too often.'"

" Senior fashion merchandising major Avery Niernberger expressed concern for the new fad on Kent's campus."

"'JUULs are just another 'trend' right now unfortunately,' Niernberger said. 'The scary thing is that since they're so new, no one truly knows the side effects they will bring to people. And right now my generation loves them, so I can only hope they won't affect my peers deeply.'"

. . .

" While traditional cigarette usage has dropped in recent years, newer electronic cigarettes exploded in popularity. A 2016 Surgeon General's report concerning electronic cigarette use among youth and adults indicated that e-cigarette use among American youth increased 900 percent between 2011 and 20."

http://www.kentwired.com/latest_updates/article_637d8f2e-1f49-11e8-a245-

87a74d0e50a2.html (last visited April 3, 2018).

**Federal Law Governing Marketing of Tobacco Products**

72.     The FCLAA, enacted by Congress in 1965, prohibits manufacturing, packaging, or importing for sale or distribution any cigarettes whose package fails to bear specified Surgeon General's warnings. (15 U.S.C. § 1333.) The phrase " 'sale or distribution' includes sampling or any other distribution not for sale." (Id., § 1332(6).).

73.     In the Family Smoking Prevention and Tobacco Control Act (Pub.L. No. 111-31, div. A (June 22, 2009) 123 Stat. 1776), Congress specified that the FDA's authority did not include the authority to ban all cigarettes. (21 U.S.C. § 387g(d)(3).) At the same time, Congress specified that nothing in that subchapter (with an exception not relevant here) "shall be construed to limit the authority of a Federal agency (including the Armed Forces), a State or political subdivision of a State, or the government of an Indian tribe to enact, adopt, promulgate, and enforce any law, rule, regulation, or other measure with respect to tobacco products that is in addition to, or more stringent than, requirements established under this subchapter, including a law, rule, regulation, or other measure relating to or prohibiting the sale, distribution, possession, exposure to, access to, advertising and promotion of, or use of tobacco products by individuals of any age … ." (21 U.S.C. § 387p(a)(1).)

74.     The Tobacco Control Act puts in place specific restrictions on marketing tobacco products to children and gives the FDA authority to take further action in the future to protect public health. These provisions ban:

- sales to minors;
- vending machine sales;
- the sale of packages of fewer than 20 cigarettes;
- tobacco-brand sponsorships of sports and entertainment events or other social or cultural events; and
- free giveaways of sample cigarettes and brand-name non-tobacco promotional items.

75.     The FDA has also promulgated rules re Rules for Sales of E-Cigarettes and Other

Electronic Nicotine Delivery Systems (ENDS). Some examples of ENDS include e-cigarettes, vape pens, e-hookahs, e-cigars, personal vaporizers, and electronic pipes. The FDA has issued a final rule titled "Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products" (the "Final Rule"). 81 Fed. Reg. 28974 (May 10, 2016) (codified at 21 C.F.R. pts. 1100, 1140, 1143). The Final Rule concludes that e-cigarettes are deemed "tobacco products" and fall under the FDA's authority to regulate tobacco products. See Final Rule, 81 Fed. Reg. 28974, 28976. As of the effective date of the Final Rule (August 8, 2016) the newly deemed products, including e-cigarettes, are subject to certain Food, Drug, and Cosmetic Act requirements related to cigarettes and other tobacco products, as well as "additional provisions." Id. These "additional provisions" include a minimum age for purchase requirement, a prohibition (subject to certain conditions) on vending machine sales, and, most importantly for this order, a requirement for health warnings for product packages and advertisements. Id.

76.     The Final Rule requires a particular warning label. According to the Final Rule, "[p]ackaging and advertising for all newly deemed products other than cigars must display an addictiveness warning that states: 'WARNING: This product contains nicotine. Nicotine is an addictive chemical.'" Final Rule, 81 Fed. Reg. 28974, 28988; see also 21 C.F.R. § 1143.3(a)(1). The FDA mandates that the warnings must appear on at least 30 percent of the two principal display panels of the package, and 20 percent of the area of advertisements. Final Rule, 81 Fed. Reg. 28974, 28988; see also 21 C.F.R. § 1143.3(a)(2), (b). The heading of this part of the regulation is "Minimum Required Warning Statements." 21 C.F.R. pt. 1143. The FDA has stated that the heading was implemented "in order to clarify that part 1143 is not intended to prevent tobacco product manufacturers from including truthful, non-misleading warnings on their products' packaging or advertisements voluntarily or as a result of FDA guidance." Final Rule, 81 Fed. Reg. 28974, 28990.

77.     The Final Rule also addresses preemption. During the comment period, competing comments wanted an explicit statement by the FDA that the Final Rule's warning requirements

did, or did not, preempt state and local warning requirements. See Final Rule, 81 Fed. Reg. 28974, 28989. The FDA referred the commenters to 21 U.S.C. § 387.  It also stated: "No State or local laws in effect at the close of the public comment period were identified that FDA determined would be preempted by this final rule." Id.

78.     The following Rules for Sales of E-Cigarettes and Other Electronic Nicotine Delivery Systems (ENDS) apply to e-cigarette sales:

- Only sell e-cigarettes and other ENDS to customers age 18 and older.
- Do NOT sell e-cigarettes or other ENDS in a vending machine unless in an adult-only facility.
- Do NOT give away free samples of e-cigarettes or other ENDS to consumers, including any of their components or parts

79.     Beginning August 10, 2018, the following rules apply to all "covered tobacco products":

- Do NOT sell or distribute e-cigarettes or other ENDS without a health warning statement on the package.
- Do NOT display advertisements for e-cigarettes or other ENDS without a health warning statement.

80.     The following are the Rules for Sales of Nicotine Gels:

- Check photo ID of everyone under age 27 who attempts to purchase nicotine gel.
- Only sell nicotine gels to customers age 18 and older.
- Do NOT sell nicotine gels in a vending machine unless in an adult-only facility.
- Do NOT give away free samples of nicotine gels to consumers, including any of their components or parts

81.     Beginning August 10, 2018, the following rules apply to sales of nicotine gels:

- Do NOT sell or distribute nicotine gel without a health warning statement on the package.
- Do NOT display advertisements for nicotine gel without a health warning statement.

82.     The following are the Rules for Sales of Dissolvables:

- Check photo ID of everyone under age 27 who attempts to purchase dissolvable tobacco products.

- Only sell dissolvable tobacco products to customers age 18 and older.

- Do NOT sell dissolvable tobacco products in a vending machine unless in an adult-only facility.

- Do NOT give away free samples of dissolvable tobacco products to consumer

83.     Beginning August 10, 2018, the following rules apply to sales of dissolvable tobacco products:

- Do NOT sell or distribute dissolvable tobacco products without a health warning statement on the package.

- Do NOT display advertisements for dissolvable tobacco products without a health warning statement

**California Regulations Governing E-Cigarettes**

84.     Beginning August 10, 2018, the following rules apply to sales of dissolvable tobacco products:

85.     Section 118950, subdivision (b), provides: "It is unlawful for any person, agent, or employee of a person in the business of selling or distributing smokeless tobacco or cigarettes from engaging in the nonsale distribution of any smokeless tobacco or cigarettes to any person in any public building, park or playground, or on any public sidewalk, street, or other public grounds … ." (Italics added.) A "'[p]ublic building, park, playground, sidewalk, street, or other public grounds' " is defined as "any structure or outdoor area that is owned, operated, or maintained by any public entity, including," among other things, "streets and sidewalks, parade grounds, fair grounds, … [and] public recreational facilities." (Id., subd. (c)(3).)

86.     Section 118950, subdivision (f), the so-called safe harbor provision, operates as an exception to the prohibition of section 118950, subdivision (b). Subdivision (f) states that the prohibition on nonsale distribution of tobacco products does not apply to any public property "leased for private functions where minors are denied  access by a peace officer or licensed

security guard on the premises."

87.    Subdivision (d) of section 118950 provides that anyone violating this section is liable for "a civil penalty of not less than two hundred dollars ($ 200) for one act, five hundred dollars ($ 500) for two acts, and one thousand dollars ($ 1,000) for each subsequent act constituting a violation.

**Numerous Investigations Confirm that Despite JUUL's Purported Prohibition On Under-Age Purchases, Adolescents are Able to Purchase JUUL Products.**

88.    As the articles and sources cited above in paragraphs 1-69 demonstrate, Defendants have, and still are, engaged in an ongoing campaign to market and sell JUUL products to minors, young adults, and people who do not smoke, with the intent of creating a market for their products in new "vapers." This campaign has targeted adolescents and young adults by using images, colors, and flavors designed to appeal to young people. Defendants' campaign has produced a 900% increase in adolescent nicotine use, and reversed the reduction in nicotine use created by anti-smoking campaigns prior to introduction of the JUUL products.

89.    Notwithstanding any other allegation of this Complaint, Plaintiffs do not plead, and hereby disclaim, causes of action under the Food Drug and Cosmetic Act and regulations promulgated there under, nor any other law or regulation that does not provide a private right of action. Plaintiffs provide the legal and regulatory framework only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

**CLASS ALLEGATIONS**

90.    Plaintiffs bring this action against Defendants on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed class is defined as follows:

> All persons who purchased, in the United States, a JUUL e-cigarette and/or JUULpods.

Plaintiffs reserve the right to narrow the class definition based on the evidence adduced in discovery and to propose one or more subclasses, as necessary and appropriate.

91.     This action has been brought and may properly be maintained as a class action against the Defendants pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed classes are easily ascertainable.

92.     Numerosity: Plaintiffs do not know the exact size of the Classes and the Subclasses, but it is estimated that they are each composed of more than 500 persons.  The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

93.     Common Questions Predominate: This action involves common questions of law and fact to the potential classes because each Class Member's claim derives from the false, deceptive, unlawful and/or unfair statements and omissions that led Class Members to believe that: (a) JUUL E-cigarettes and JUULpods were less addictive than traditional cigarettes; (b) JUUL products could be used without negative health consequences, and (c) they would be able to stop using and purchasing JUUL products "anytime." Class Member claims also derive from common questions of law and fact related to JUUL products falsely advertised as non-addictive. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each Class Member to recover.  Among the questions of law and fact common to the class are:

a.     Whether Defendants' advertising and marketing regarding the JUUL E-cigarette and JUULpods were likely to deceive Class Members or were unfair;

b.     Whether Defendants intentionally omitted material information from their advertising and marketing materials;

c.     Whether Defendants unfairly, unlawfully and/or deceptively induced Class Members to purchase JUUL E-cigarettes and/or JUULpods using the promise that they would be able to stop purchasing JUULpods "anytime";

d.     Whether Defendants engaged in the alleged conduct knowingly, recklessly, or negligently;

e.      The amount of revenues and profits Defendants received and/or the amount of monies or other obligations lost by Class Members as a result of such wrongdoing;

f.      Whether Class Members are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief; and

g.      Whether Class Members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief

94.     Typicality: Plaintiffs' claims are typical of the class because each Plaintiff was misled into: (a) purchasing a highly addictive nicotine product due to Defendants' false advertising and unfair business practices; and/or (b) substituting addiction to vaporized nicotine salts in place of addiction to nicotine from cigarette smoking. Thus, Plaintiffs and Class Members sustained the same injuries and damages arising out of Defendants' conduct in violation of the law. The injuries and damages of each Class Member were caused directly by Defendants' wrongful conduct in violation of law as alleged.

95.     Adequacy: Plaintiffs will fairly and adequately protect the interests of all Class Members because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also has no interests that are in conflict with or antagonistic to the interests of Class Members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the Classes. No conflict of interest exists between Plaintiffs and Class Members hereby, because all questions of law and fact regarding liability of Defendants are common to Class Members and predominate over any individual issues that may exist, such that by prevailing on his/her own claim, Plaintiffs necessarily will establish Defendants' liability to all Class Members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class Members.

96.     Superiority: There is no plain, speedy, or adequate remedy other than by

maintenance of this class action. The prosecution of individual remedies by members of the Classes will tend to establish inconsistent standards of conduct for the Defendants and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions world engender. Furthermore, as the damages suffered by each individual Class Member may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

97.     Nexus to California:  The State of California has a special interest in regulating the affairs of corporations that do business here and persons who live here.  Defendants JUUL and PAX are both based in San Francisco, California. Defendants designed and implemented the unlawful and deceptive conduct described in this Complaint from their headquarters in the San Francisco Bay Area. Additionally, Defendants have more JUUL e-cigarette consumers in California than in any other state. Accordingly, there is a substantial nexus between Defendants' unlawful behavior and California such that the California courts should take cognizance of this action on behalf of a class of individuals who reside in California and the United States.

98.     Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## CAUSES OF ACTION

## PLAINTIFFS' FIRST CAUSE OF ACTION

**(False Advertising, under California Business and Professions Code § 17500, et seq. and/or the similar laws of the other States and the District of Columbia)**

99.     Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

100.     Beginning at an exact date unknown to Plaintiffs, but within three (3) years preceding the filing of the Class Action Complaint, Defendants have made untrue, false,

deceptive and/or misleading statements in connection with the advertising and marketing of JUUL E-cigarettes and JUULpods in California.

101.    Defendants have made false representations and statements that lead reasonable consumers to believe that JUUL E-cigarettes and JUULpods are a less addictive alternative to cigarettes, and/or a no more addictive alternative to other e-cigarettes. Defendants additionally withheld material information from their consumers regarding the addictiveness and other negative health consequences of JUUL E-cigarettes and JUULpods.

102.    Plaintiffs, and those similarly situated, relied to their detriment on Defendants' false, misleading and deceptive advertising and marketing practices. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendants, they would have acted differently by not purchasing a JUUL E-cigarette and JUULpods.

103.    Defendants engaged in these false, misleading and deceptive advertising and marketing practices to increase their profits. Accordingly, Defendants have engaged in false advertising, as defined and prohibited by section 17500, et seq. of the California Business and Professions Code.

104.    The aforementioned practices, which Defendants have used, and continue to use, to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

105.    Plaintiffs seek, on behalf of themselves and those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, and/or those similarly situated by means of the false, misleading and deceptive advertising and marketing practices complained of herein, plus interest thereon.

106.    Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the false, misleading and deceptive advertising and marketing practices complained of herein.  The acts complained of herein occurred, at least in part, within three (3) years preceding the filing of this Class Action Complaint.

107.    Further Plaintiffs seek, on behalf of themselves and those similarly situated, and are entitled to receive, both a declaration that the above-described practices constitute false, misleading and deceptive advertising, and injunctive relief restraining Defendants from engaging in any such advertising and marketing practices in the future.  Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that the Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same.  This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled.  Plaintiffs, those similarly situated, and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code alleged to have been violated herein.

108.    As a direct and proximate result of such actions, Plaintiffs, and those similarly situated, have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

**PLAINTIFFS' SECOND CAUSE OF ACTION**

**(Violation of the Consumers Legal Remedies Act, California Civil Code § 1750, et seq. and/or the similar laws of the other States and the District of Columbia)**

109.    Plaintiffs reallege and incorporate the above paragraphs of this Class Action Complaint as if set forth herein.

110.    This cause of action is brought pursuant to the California Consumers Legal Remedies Act, California Civil Code § 1750, et seq. (the "CLRA") and similar laws of other states.

111.    Defendants' actions, representations and conduct have violated, and continue to violate the CLRA and similar laws of other states, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

112.    Plaintiffs, and those similarly situated, are "consumers" as that term is defined by

the CLRA in California Civil Code § 1761(d) and similar laws of other states.

113.   The provision of JUUL E-cigarettes and JUULpod nicotine salt cartridges that Plaintiffs, and those similarly situated, purchased from Defendants were "goods" within the meaning of California Civil Code § 1761 and similar laws of other states.  Additionally, the provision of "Autoship" subscriptions for delivery of JUULpod nicotine salt cartridges that Plaintiffs, and those similarly situated, purchased from Defendants were "services" within the meaning of California Civil Code § 1761 and similar laws of other states.

114.   By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendants have violated, and continue to violate, § 1770(a)(5), § 1770(a)(7), § 1770(a)(9), § 1770(a)(14) and § 1770(a)(16)  of the CLRA, and parallel provisions of similar laws of other states.  In violation of California Civil Code §1770(a)(5) and other similar state laws, Defendants' acts and practices constitute improper representations that the goods or services that they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have.  In violation of California Civil Code §1770(a)(7) and similar laws of other states, Defendants' acts and practices constitute improper representations that the goods or services that they sell are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they were not.  In violation of California Civil Code §1770(a)(9), Defendants' advertised goods or services with intent not to sell them as advertised.   In violation of California Civil Code §1770(a)(14) and similar laws of other states, Defendants' acts and practices constitute improper representations that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law.   In violation of California Civil Code §1770(a)(16) and similar laws of other states, Defendants' acts and practices constitute improper representations that the subject of a transaction has been supplied in accordance with a previous representation when it has not.  Specifically, Defendants acts and practices lead consumers to falsely believe that: (a) JUUL E-cigarettes and JUULpods were less addictive than traditional cigarettes; (b) JUUL products could be used without negative health consequences, and (c) Class Members would be able to stop using and purchasing JUUL products "anytime" when Defendants knew that to be false.

115.    Plaintiffs request, on behalf of themselves and those similarly situated, that this Court enjoin Defendants from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code § 1780(a)(2) and similar laws of other states.  If Defendants are not restrained from engaging in these types of practices in the future, Plaintiffs, and those similarly situated, will continue to suffer harm.

116.    **CLRA § 1782 NOTICE.  Irrespective of any representations to the contrary in this Class Action Complaint, Plaintiffs specifically disclaim, at the time of the filing of this Class Action Complaint, any request for damages under any provision of the CLRA.** Plaintiffs, however, hereby provide Defendants with notice and demand that within thirty (30) days from the date of the filing of this Class Action Complaint, Defendants correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein.  Defendants' failure to do so will result in Plaintiffs amending this Class Action Complaint to seek, pursuant to California Civil Code § 1780(a)(3), on behalf of himself and those similarly situated, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendants' acts and practices.

117.    Plaintiffs also request that this Court award them their costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d) and similar laws of other states.

<u>**PLAINTIFFS' THIRD CAUSE OF ACTION**</u>

<u>**(Fraud, Deceit and/or Misrepresentation Under the Common and Statutory Law of California and/or each of other States and the District of Columbia)**</u>

118.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

119.    On the dates set forth in this Complaint, and within the three years prior to the filing of this lawsuit, Defendants fraudulently and deceptively sold JUUL products to Plaintiffs as non-addictive nicotine delivery systems, or less addictive nicotine products than cigarettes, when Defendants knew it to be untrue. On those same dates, Defendants fraudulently and deceptively failed to disclose to Plaintiffs that the JUUL nicotine salts they were purchasing were highly

addictive in nature, making it extremely difficult for Plaintiffs to cease purchasing JUULpod refills. On the same dates, Defendants fraudulently and deceptively informed Plaintiffs that they would be able to cease purchasing JUULpods "anytime," when they knew it to be untrue.  On those same dates, Defendants fraudulently and deceptively failed to disclose to Plaintiff that the nicotine benzoate salts in JUULpods delivered nicotine to blood plasma at a rate four times higher than a smoked Pall Mall cigarette, which was likely to make the nicotine addiction associated with JUUL products stronger and more severe than that associated with cigarettes or other E-cigarette products. Defendants made each of these misrepresentations and omissions to those similarly situated as Plaintiffs.

120.   Each of these misrepresentations and omissions were material at the time they were made. In particular, each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs, and those similarly situated, as to whether to purchase a JUUL E-cigarette and JUULpod. Defendants had a fiduciary duty to accurately provide this information to Plaintiffs, and those similarly situated. In not so informing Plaintiffs, and those similarly situated, Defendants breached their duty to each of them. Defendants also gained financially from, and as a result of, their breach.

121.   Plaintiffs, and those similarly situated, relied to their detriment on Defendants' fraudulent omissions. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendants, they would have acted differently by, without limitation: (1) not purchasing a JUUL E-cigarette or JUULpod; (2) not subscribing to Defendants' "autoship" service; or (3) purchasing and using different, less addictive E-cigarettes and nicotine pods.

122.   By and through such fraud, deceit, misrepresentations and/or omissions, Defendants intended to induce Plaintiffs, and those similarly situated, to alter their positions to their detriment.

123.   Plaintiffs, and those similarly situated, justifiably and reasonably relied on Defendants' misrepresentations and/or omissions, and, accordingly, were damaged by the Defendants.

124.     As a direct and proximate result of Defendants' misrepresentations and/or omissions, Plaintiffs, and those similarly situated, have suffered damages in an amount equal to: (a) the amount that Defendants charged them; and (b) the amount they paid in excess of what they would have paid for a less addictive e-cigarette and refill cartridges containing nicotine in a non-salt formulation.

125.     Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendants knew that it would cause loss and harm to Plaintiff, and those similarly situated.

## PLAINTIFF'S FOURTH CAUSE OF ACTION

### (Unfair, Unlawful and Deceptive Trade Practices, Business and Professions Code § 17200, et seq., and/or the similar laws of the other States and the District of Columbia) )

126.     Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

127.     Within four (4) years preceding the filing of this Class Action Complaint, and at all times alleged herein, Defendants have engaged, and continue to engage, in unfair, unlawful and deceptive trade practices in California by engaging in the unfair, unlawful, and deceptive business practices outlined in this Class Action Complaint.   In particular, Defendants have engaged, and continue to engage in, unfair, unlawful and deceptive trade practices by, without limitation:

a.     falsely and deceptively marketing, advertising and selling JUUL E-cigarettes and JUULpods for use in California without disclosing to consumers the extent of addiction associated with use of JUUL's nicotine salts;

b.      falsely and deceptively marketing, advertising and selling JUUL's "autoship" service for use in California as something consumer's could cancel "anytime" without disclosing to consumers how addiction associated with use of JUUL's nicotine salts would interfere with their ability to cancel the JUULpod subscription;

c.      violating California False Advertising Law, California Business & Professions Code, § 17500, et seq.; and

d.      violating California Consumer Legal Remedies Act, California Civil Code, § 1750, et seq.

f.      violating other legal and regulatory standards set forth above.

128.    Plaintiffs, and those similarly situated, relied to their detriment on Defendants' unfair, unlawful, and deceptive business practices.  Had Plaintiff, and those similarly situated, been adequately informed rather than intentionally deceived by Defendants, they would have acted differently by, without limitation: (1) not purchasing a JUUL E-cigarette or JUULpod; (2)  not subscribing to Defendants' "autoship" service; or (3) purchasing and using different, less addictive E-cigarettes and nicotine pods.

129.    Defendants engage in these unfair practices to increase their profits.  Accordingly, Defendants have engaged in unlawful trade practices, as defined and prohibited by section 17200, et seq. of the California Business and Professions Code and similar laws of other states.

130.    The aforementioned practices, which Defendants have used, and continue to use, to their significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendants' competitors as well as injury to the general public.

131.    Plaintiffs seek, on behalf of themselves and of those similarly situated, full restitution of monies, as necessary and according to proof, to restore any and all monies acquired by Defendants from Plaintiffs, the general public, and/or those similarly situated by means of the unfair and/or deceptive trade practices complained of herein, plus interest thereon.

132.    Plaintiffs seek, on behalf of themselves and those similarly situated, an injunction to prohibit Defendants from continuing to engage in the unfair trade practices complained of herein.  The acts complained of herein occurred, at least in part, within four (4) years preceding the filing of this Class Action Complaint.

133.    Further Plaintiffs seek, on behalf of themselves and those similarly situated, and are entitled to receive, both a declaration that the above-described trade practices are unfair, unlawful and/or fraudulent and injunctive relief restraining Defendants from engaging in any of

such deceptive, unfair and/or unlawful trade practices in the future.   Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact to the general public and the loss of money and property in that the Defendants will continue to violate the laws of California, unless specifically ordered to comply with the same. This expectation of future violations will require current and future consumers to repeatedly and continuously seek legal redress in order to recover monies paid to Defendants to which Defendants are not entitled.  Plaintiffs, those similarly situated and/or other consumers nationwide have no other adequate remedy at law to ensure future compliance with the California Business and Professions Code and other similar state laws alleged to have been violated herein.

134.    As a direct and proximate result of such actions, Plaintiffs, and those similarly situated, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive, unfair and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

135.    As a direct and proximate result of such actions, Defendants have enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.


**PLAINTIFF'S FIFTH CAUSE OF ACTION**

**(Unjust Enrichment Under the Common and Statutory Law of California and/or each of other States and the District of Columbia)**

136.    Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

137.    By means of Defendants' wrongful conduct alleged herein, Defendant knowingly sold JUUL Products to Plaintiffs and members of the Classes in a manner that was unfair, unconscionable, and oppressive.

138.    Defendants knowingly received and retained wrongful benefits and funds from Plaintiffs and members of the Classes. In so doing, Defendants acted with conscious disregard for

the rights of Plaintiffs and members of the Classes.

139.    As a result of Defendants 'wrongful conduct as alleged herein, Defendants have been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Classes.

140.    Defendants' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

141.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendants to be permitted to retain the benefits it received, without justification, from selling JUUL Products to Plaintiffs and members of the Classes in an unfair, unconscionable, and oppressive manner. Defendants' retention of such funds under such circumstances making it inequitable to do so constitutes unjust enrichment.

142.    The financial benefits derived by Defendants rightfully belong to Plaintiffs and members of the Classes. Defendants should be compelled to return in a common fund for the benefit of Plaintiffs and members of the Classes all wrongful or inequitable proceeds received by them.

143.    Plaintiffs and members of the Classes have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

    A.    On Causes of Action Numbers 1, 4, and 5 against Defendants and in favor of Plaintiff and the other members of the California Subclasses:

        1.    For the greater of actual or compensatory damages according to proof;

        2.    For restitution pursuant to, without limitation, the California Business & Professions Code §§ 17200, et seq. and 17500, et seq.; and

        3.    For injunctive relief pursuant to, without limitation, the California Business & Professions Code §§ 17200, et seq. and 17500, et seq.

    B.    On Cause of Action Number 2 against Defendants and in favor of Plaintiffs

and the other members of the California Subclasses:

      1.    For restitution and injunctive relief pursuant to, without limitation, California Civil Code §1780;

      2.    [RESERVED]; and

      3.    [RESERVED].

    C.    On Cause of Action Number 3 against Defendants and in favor of Plaintiffs and the other members of the Classes:

      1.    An award of compensatory damages, the amount of which is to be determined at trial; and

      2.    An award of punitive damages, the amount of which is to be determined at trial.

    D.    On all causes of action against Defendants and in favor of Plaintiffs, Classes, California Subclasses, and the general public:

      1.    For reasonable attorneys' fees according to proof pursuant to, without limitation, the California Legal Remedies Act and California Code of Civil Procedure § 1021.5;

      2.    For costs of suit incurred; and

      3.    For such further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury


Dated:  April 26, 2018          **GUTRIDE SAFIER LLP**

                       Adam J. Gutride, Esq.
                       Seth A. Safier, Esq.
                       Todd Kennedy
                       Anthony J. Patek
                       100 Pine Street, Suite 1250

San Francisco, California 94111

**MIGLIACCIO & RATHOD LLP**
Nicholas Migliaccio, pro hac vice forthcoming
Jason Rathod, pro hac vice forthcoming
Esfand Nafisi (State Bar No. 320119)
412 H Street NE, Suite 302
Washington, D.C. 20002


Attorneys for Plaintiffs