**GUTRIDE SAFIER LLP**
Adam J. Gutride (State Bar No. 181446)
Seth A. Safier (State Bar No. 197427)
Todd Kennedy (State Bar No. 250267)
Anthony Patek (State Bar No. 228964)
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 639-9090
Facsimile:  (415) 449-6469
adam@gutridesafier.com
seth@gutridesafier.com
todd@gutridesafier.com
anthony@gutridesafier.com

**MIGLIACCIO & RATHOD LLP**
Nicholas Migliaccio, admitted *pro hac vice*
Jason Rathod, admitted *pro hac vice*
Esfand Nafisi (State Bar No. 320119)
388 Market Street, Suite 1300
San Francisco, CA 94111
Telephone: (202) 470-3520
Facsimile: (202) 800-2730
nmigliaccio@classlawdc.com
jrathod@classlawdc.com
enafisi@classlawdc.com

(additional counsel on signature page)
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: JUUL LABS, INC. PRODUCT LITIGATION | CASE NO.  3:18-cv-2499 |
| | Honorable William H. Orrick |
| | CONSOLIDATED AMENDED CLASS ACTION COMPLAINT (CORRECTED) |
| | JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................ 5

II. PARTIES ....................................................................................................................... 7

   **A.** Plaintiffs ............................................................................................................... 7

   **B.** Defendant ............................................................................................................. 7

III. JURISDICTION AND VENUE .................................................................................... 8

IV. ALLEGATIONS OF FACT .......................................................................................... 8

   **A.** Using Big Tobacco Practices as a Guide, JUUL Labs, Inc. Developed the JUUL e-Cigarette to Recreate the "Luxury" of Tobacco. ........................................................... 8

      **1.** Like Cigarettes, the JUUL's Purpose is to Foster and Maintain Nicotine Addiction. ..... 12

      **2.** Young Adults Are at Greater Risk of Both Nicotine Addiction and Lifelong Consequences of that Addiction. ................................................................................ 13

      **3.** JUUL Manipulates Its Nicotine Formulation To Make It Attractive to Youth and Non-Smokers and More Potent and Addictive than Cigarettes. ................................... 14

   **B.** JUUL Has Deceptively Marketed Its JUUL E-Cigarette as an Alternative to Cigarettes, When It is More Potent and More Addictive Than Cigarettes. ........................ 22

      **1.** JUUL Falsely Represents that Each JUULpod Contains the Nicotine Equivalent of a Pack of Cigarettes, when They Actually Deliver a Particularly Potent Dose of Nicotine. ..... 22

      **2.** JUUL Intends to Continue to Deceive Consumers As to Nicotine Content. ................. 24

      **3.** JUUL's "Switch" campaign suggests that JUUL is a smoking cessation device and that JUUL use is a cost-effective alternative to smoking. ........................................... 26

      **4.** Defendant Falsely Markets, Advertises and Sells E-Cigarette "Autoship" Services as "Cancel Anytime" Service, Without Disclosing the Products' Highly Addictive Nature. ..... 27

   **C.** JUUL Deployed a Viral Marketing Campaign That Continued the Tobacco Industry's Long-Standing Campaign of Deceptive Advertising and Unfair Business Practices. ............... 28

      **1.** Overview of Viral Marketing Campaigns and Online Marketing ................................. 28

      **2.** The Tobacco Industry Has Long Relied on Youth-Focused Viral Marketing and Flavors To Hook New Underage Users On Its Products. ................................................. 30

      **3.** Because of The Role of Advertising in Youth Smoking, Tobacco Companies are Prohibited from Viral Marketing Practices and Use of Flavors. ................................... 34

Consolidated Amended Class Action Complaint

**4.** JUUL's Marketing Leveraged Banned Strategies Perfected by Tobacco Companies to Induce Minors and Young Non-Smokers to Purchase JUUL Products .............................. 35

    **i.** JUUL Advertising Used Imagery that Exploited the Psychological Vulnerabilities of Youth........................................................................................................................ 37

    **ii.** JUUL's Launch Campaign Was Targeted to Create Buzz Among Young Consumers. 37

    **iii.** JUUL Gave Away Free Products to Get New Consumers Hooked .......................... 40

    **iv.** JUUL Portrayed Its Products as Status Symbols. ...................................... 41

    **v.** JUUL Used Flavors and Food Imagery to Attract Non-Smoking Teenagers and Adults 43

    **vi.** JUUL Developed Point-of-Sale Advertising That Emphasized the Products' Positive Image Without Adequately Disclosing Its Nature and Risks............................................. 48

**5.** JUUL Used Social Media to Inundate Target Consumers, Particularly Youth, With Messaging Promoting Its Nicotine Products........................................................................ 49

    **i.** JUUL Paid Third Party Influencers and Affiliates to Amplify Its Message to a Teenage Audience................................................................................................... 52

    **ii.** JUUL Utilized Viral Marketing Tools to Turn Consumers, Especially Teenagers, Into JUUL Promoters....................................................................................................... 59

    **iii.** JUUL Used Non-Age-Restricted Emails to Promote and Track Its Products .......... 62

    **iv.** JUUL Allowed Third Parties to Use Its Trademark to Promote the Products to Underage Consumers ........................................................................................... 62

    **v.** JUUL Tracked the Efficacy of Its Youth Marketing. ................................... 64

    **vi.** JUUL Amplified Its Message using Off-Line Advertising to Ensure Consumers Were Blanketed With Non-Stop Messaging About Its Products.............................................. 64

    **vii.** JUUL Utilized a Pricing and Distribution Model Designed to Put the Product Within Reach of Youth. ................................................................................................. 65

        (1) JUUL's Pricing Model Entices New Users, Including Youth and Non-Smokers. 65

        (2) JUUL Sought Out Retail Locations That Were Frequented by Its Target Audience And Displayed the Products in Arms' Reach. ........................................................... 66

        (3) JUUL Failed to Monitor Its Distributors, Fostering Unrestricted Sales to Minors 67

        (4) JUUL Sold Its Products Through Its Website and Offered Enticing Discount Subscription Services. ......................................................................................... 68

**6.** JUUL's Actions Have Created a Youth Vaping Epidemic. ........................................... 69

Consolidated Amended Class Action Complaint

    i.   JUUL Was Able to Undo Decades of Progress Reducing Teen Smoking by Exploiting Regulatory Loopholes ................................................................................................ 77

**D.** JUUL's Deal With Altria Reveals that JUUL's Goal Was Always About Increasing the Rates of Nicotine Addiction. ....................................................................................... 78

**E.** Defendant Misled Class Members, Including Minors, Into Becoming Addicted to Nicotine Salts. ....................................................................................................................... 79

V.    CLASS ALLEGATIONS ........................................................................................ 79

VI.   CAUSES OF ACTION ..................................................................................... 84~~85~~

Consolidated Amended Class Action Complaint

1.     Plaintiffs listed in Appendix A (collectively, "Plaintiffs") hereby bring this Second Amended Class Action Complaint against Defendant JUUL Labs, Inc. ("Defendant" or "JUUL"), on behalf of themselves and those similarly situated. Except for the allegations set forth in Appendix A, the following allegations are based upon information and belief, including the investigation of Plaintiffs' counsel, unless stated otherwise.

## I.     INTRODUCTION

2.     The JUUL e-cigarette and JUULpods—a product introduced in 2015—is so addictive that it created the "*largest ever recorded [increase in substance abuse] in the past 43 years for any adolescent substance use outcome in the U.S.*"[1] In a mere two years, Defendant undid over a decade of reduction in teenage nicotine addiction, increasing the prevalence of nicotine use in teenagers to levels not seen since the early 2000s. The FDA has described the increase in e-cigarette consumption as an "epidemic."

3.     This epidemic is driven by Defendant's illegal conduct, which it based on decades of research by the tobacco industry about how to manipulate nicotine to maximize addiction and how to market tobacco products to youth—the sole source of new business for the tobacco industry.  Tobacco industry documents became available to JUUL's founders because they were ordered to be made public in 1997 through the Master Settlement Agreement between dozens of states' attorneys general and the four largest U.S. cigarette manufacturers.  When the tobacco industry continued to violate the settlement by marketing to minors, a federal district court issued a RICO judgment in *U.S. v. Phillip Morris* and Congress enacted of the Family Smoking Cessation & Tobacco Control Act of 2009, which imposed additional restrictions on youth advertising and banned flavored cigarettes.  The litigation and regulation of the tobacco industry caused the youth smoking rate to plummet from 28% in 1997 to 5.5%.

4.     JUUL's founders knew that these regulatory changes had caused the rapid decline of cigarette smoking among youth. But they also knew that the cigarette is one of the "most successful products" ever created, so they set out to reinvent the cigarette and restore its status as

---

[1] http://monitoringthefuture.org/pressreleases/18drugpr.pdf (emphasis added).

a "luxury" product that had broad consumer appeal and to hook an entire new generation of users. Using tobacco industry documents made available in the tobacco litigation as a playbook, JUUL recreated the industry's well-honed (and subsequently banned) methods to seduce new smokers, by using candy-like flavors and advertising that exploited the psychological vulnerabilities of adolescents.

5.      Knowing that cigarettes' cough-inducing "throat hit" deters new users, Defendant chemically manipulated its JUUL Pods to deliver almost no throat hit while also delivering massive doses of nicotine. The lack of "throat hit" was not necessary for those who already smoke, as they already are tolerant of the sensation and associate it with smoking and nicotine satisfaction.  JUUL then packaged its nicotine delivery system in an easily concealable small device that was branded to appeal to tech-savvy youth, and hired young models to tout the device on social media, restoring the image of "coolness" and style that cigarettes once enjoyed. The combination of JUUL's chemically manipulated nicotine and device results in a product that provides higher doses of nicotine than the most potent cigarettes. Indeed, JUUL's pre-filled cartridges of nicotine solution, called "JUULpods," contain three times more nicotine than the legal limit in the European Union.

6.      When Defendant launched the JUUL e-cigarette, it said nothing about any of the myriad problems that are likely to occur from the use of the products, particularly by youth and nonsmokers, including long-term nicotine addiction; increased risk of heart disease and stroke; changes in brain functionality that lead to increased susceptibility to anxiety, depression and other addictions; decreased functionality of the endocrine system; heightened risk of cancer; and negative effects on fertility. As one of the San Francisco engineers who invented the JUUL e-cigarette stated: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[2] Released in 2015, JUULs are now pervasive in the nation's schools and adolescent use is rampant. JUUL not only dominates the $3 billion e-cigarette market, it has expanded the size of that market significantly—

_____

[2] https://www.theverge.com/2015/4/21/8458629/pax-labs-e-cigarette-juul

mostly on the backs of adolescent, non-smokers. And the tobacco company Altria (formerly known as Philip Morris) a few months ago acquired a 35% stake in JUUL for $12.8 billion (giving JUUL a $35 billion valuation) giving Altria access to the new generation of customers JUUL has groomed.

7. In 2018, after the FDA opened an investigation and this lawsuit was filed, JUUL set out to rewrite its history. It has removed from its website and much of the internet images of glamorous young models seductively exhaling clouds of vapors.[3] JUUL's website now pictures middle-aged adults in non-glamorous settings and suggests that JUUL exists solely for the benefit of adult smokers looking for an alternative. Although JUUL markets its product as a smoking cessation device ("Switch to JUUL"), it has not received FDA approval as modified risk tobacco product or as a nicotine replacement therapy, and the JUUL e-cigarette has not participated in any FDA approval process.[4] Defendant's attempt to distance itself from its wrongful conduct is superficial; indeed the viral marketing campaign and memes that JUUL instigated continue to live on and to seduce new users. Nor has JUUL actually changed its fundamentally unscrupulous business model. JUUL's e-cigarettes are still as addictive as they ever were, are still sold in candy-like flavors, and can still be ordered with a subscription service on JUUL's website, and JUUL continues to hide the truth about the actual nicotine content and addictiveness of its devices.

## II. PARTIES

### A. Plaintiffs

8. Details of the residences and experiences of each plaintiff are listed in Appendix A.

### B. Defendant

---

[3] The JUUL advertising images below, and the associated image galleries referenced herein, represent only the social media content that survived multiple waves of content deletion by JUUL.

[4] The FDA's 2018 decision to delay the premarket approval process last year appears to be a direct result of JUUL's lobbying efforts.

9.      Defendant JUUL Labs, Inc. ("JUUL") is, and at all times alleged in this Class Action Complaint was, a Delaware corporation, having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc., and a new company was spun out as Pax Labs, Inc. A substantial portion of the conduct discussed herein occurred while JUUL was operating as PAX Labs, Inc.

## III.    JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one Plaintiff and Defendant are citizens of different states. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because one or more claims herein arise under federal law. This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.      Venue is proper in this Court under 28 U.S.C. § 1391 because (1) Defendant is headquartered in this District; and (2) Defendant regularly transacts and solicits business in this District.

## IV.    ALLEGATIONS OF FACT

### A.    Using Big Tobacco Practices as a Guide, JUUL Labs, Inc. Developed the JUUL e-Cigarette to Recreate the "Luxury" of Tobacco.

12.      Defendant JUUL Labs, Inc. and former Defendant PAX Labs, Inc. began as Ploom, Inc. in 2007. The company's founders, Adam Bowen ("Bowen") and James Monsees ("Monsees"), both product designers by education and experience, invented the Ploom, a cigarette-shaped device into which pre-filled pods of ground tobacco were inserted and vaporized at lower-than-combustion temperatures using an electrical heating element.

13.      In 2014, Bowen, Monsees and others applied for a patent for the JUUL device, a self-regulating vaporization device and cartridge, which used a nicotine solution derived from tobacco.

14.      Around 2015, PAX announced the JUUL e-cigarette and raised nearly $50 million

in funding from Fidelity Investments and other investors, presumably to aid in the manufacturing and marketing of JUUL e-cigarettes.

15.     In 2017, PAX Labs, Inc. was renamed JUUL Labs, Inc., which retained the tobacco-related business and spun off its marijuana-related business into a new entity, also called PAX Labs, Inc.

16.     Bowen and Monsees remained at JUUL, where Bowen is now JUUL's Chief Technology Officer and Monsees is JUUL's Chief Product Officer. That same year, JUUL became the dominant e-cigarette company in the United States, growing revenues by 700%. As of March 2018, market reports from Nielsen indicate that JUUL represents 54.6% of the e-cigarette traditional retail market. See Appendix B, Chart 1.

17.     Statements by JUUL's founder and employees make clear JUUL's intent to develop a highly addictive product to sell to a new audience of non-smokers. James Monsees, one of JUUL's founders, described the cigarette as "the most successful consumer product of all time . . . . an amazing product." Because of "some problems" inherent in the cigarette, JUUL's founders set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category." (emphasis added)

18.     Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products." With a focus on recreating the "ritual and elegance that smoking once exemplified," Monsees and Bowen set out to "meet the needs of people who want to enjoy tobacco but don't self-identify with — or don't necessarily want to be associated with — cigarettes."[5]

19.     JUUL used the tobacco industry's prior practices as a playbook. Monsees has publicly admitted that JUUL began by looking at tobacco industry documents, including board meeting minutes, made public under the Master Settlement Agreement that had been reached between the tobacco industry, governmental officials, and injured smokers. "It became a very intriguing space for us to investigate because we had so much information that you wouldn't

---

[5] http://onboardly.com/entrepreneur-interviews/an-interview-with-james-monsees/

normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."

20. JUUL's research included documents about how tobacco companies had chemically manipulated nicotine content to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry." Among the documents JUUL would have found were those documenting how to manipulate nicotine pH to maximize the delivery of nicotine in a youth-friendly vapor that delivers minimal "throat hit"—a combination that creates unprecedented risks of nicotine abuse and addiction, as detailed further below.

21. JUUL also used tobacco industry advertisements—which were created to lure non-smoking youth--as a guide to JUUL's own advertising campaigns. In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been quite useful to them." Robert K. Jackler, M.D. et al, *JUUL Advertising Over Its First Three Years on the Market* (Jan. 21, 2019), attached hereto as Exhibit A.

22. Defendant's JUUL e-cigarette is about the size and shape of a pack of chewing gum. The thin, rectangular JUUL e-cigarette device consists of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. Each JUULpod is a plastic enclosure containing 0.7 milliliters of JUUL's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in the JUUL device activates the heating element, which in turn converts the nicotine solution in the JUULpod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device serves as a battery level indicator and lights up in a "party mode" display of rainbow of colors when the device is waved around.

23. The physical design of the JUUL device (including its circuit board) and JUULpod determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, Defendant can finely tune the amount of

nicotine vapor the JUUL delivers.

24.     The JUUL e-cigarette's defective design poses unprecedented risks of abuse and addiction. The JUUL device does not have a manual or automatic "off" switch. On information and belief, neither the JUULpod nor the programming of the JUUL device's temperature or puff duration settings limit the amount of nicotine JUUL delivers each puff to the upper bound of a cigarette. Thus, in contrast to a traditional cigarette, which self-extinguishes as each cigarette is consumed, the JUUL allows non-stop nicotine consumption, which is limited only by the device's battery. As a result, the JUUL is able to facilitate consumption of levels of nicotine that a cigarette cannot match. This makes it easier for the user to become addicted to nicotine.

25.     JUUL manufactures and distributes its nicotine formulation as JUULpods, which contain JUUL's nicotine liquid. JUUL exclusively sells its pods in four-packs, in a variety of flavors, many of which have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brulee. According to a recent survey of more than 1,000 12 to 17 year-olds, 6.5% admitted to using a JUUL e-cigarette. Of those, 86% of users most recently used fruit medley, mango, cool mint, or crème brulee.[6]

26.     As set forth below, despite its founder's clear intent to create a "luxury" consumer product for people who do not smoke that is as addictive as cigarettes, JUUL has consistently marketed itself as an "alternative" to cigarettes, causing people to choose JUUL on the belief that it is less addictive and less dangerous than cigarettes. JUUL failed to disclose that: (1) contrary to JUUL's representations, there is a higher concentration of nicotine per pod than a pack of cigarettes; (2) even if the nicotine concentration were comparable, the unique way in which a JUUL vaporizer dispenses nicotine renders it more harmful and more addictive than cigarettes, which is problematic for everyone, but particularly for minors; and (3) for non-smokers who take up JUUL use, a significant likelihood exists of later migrating to cigarette smoking.[7]

_____

[6] http://www.publichealthlawcenter.org/sites/default/files/JUUL-Webinar-Slides-Apr262018.pdf
[7] *See, e.g.*, Office of the United States Surgeon General, *Surgeon General's Advisory on E-Cigarette Use Among Youth*, 2 (December 18, 2018), available at https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf (last visited January 25, 2019).

### 1. Like Cigarettes, the JUUL's Purpose is to Foster and Maintain Nicotine Addiction.

27. All leading health authorities support the three major conclusions of a 1988 report by the Surgeon General of the United States regarding nicotine and tobacco:

    a. Cigarettes and other forms of tobacco are addictive;

    b. Nicotine is the drug in tobacco that causes addiction;

    c. The physiological and behavioral processes that determine tobacco addiction are similar to those that determine heroin and cocaine addiction.

28. Nicotine fosters addiction through the brain's "reward" pathway. A stimulant and a relaxant, nicotine affects the central nervous system; increases in blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin, and causes muscle relaxation. When nicotine is inhaled it enters the bloodstream through membranes in the mouth and upper respiratory tract and through the lungs. Once nicotine in the bloodstream reaches the brain, it binds to receptors, triggering a series of physiologic effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. These effects are caused by the release of dopamine, acetylcholine, epinephrine, norepinephrine, vasopressin, serotonin, and beta endorphin. With regular nicotine use, however, these feelings diminish and the user must consume increasing amounts of nicotine to achieve the same pleasurable effects.

29. The neurological changes caused by nicotine create addiction. Repeated exposure to nicotine causes neurons in the brain to adapt to the action of the drug and return brain function to normal. This process, called neuroadaptation, leads to the development of tolerance in which a given level of nicotine begins to have less of an effect on the user.

30. Once a brain is addicted to nicotine, the absence of nicotine causes compulsive drug-seeking behavior, which, if not satisfied, results in withdrawal symptoms including anxiety, tension, depression, irritability, difficulty in concentrating, disorientation, increased eating, restlessness, headaches, sweating, insomnia, heart palpitations and tremors – and intense cravings for nicotine. Though smokers commonly report pleasure and reduced anger, tension, depression

and stress after smoking a cigarette, many of these effects are actually due to the relief of unpleasant withdrawal symptoms that occur when a person stops smoking and deprives the brain and body of nicotine. Studies have found that most smokers do not like smoking most of the time but do so to avoid withdrawal symptoms.

31.     Although framed as a safe alternative to smoking, Defendant's JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users, especially teenage users. Nicotine itself is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems.[8] Nicotine adversely affects the heart, eyes, reproductive system, lung, and kidneys. Exposure to nicotine from sources such as nicotine gum still produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders.  Aside from its use as a stimulant, the only other known use of nicotine is as an insecticide.[9] Moreover, because vaping introduces foreign substances into the lungs, prolonged use of vaping products is believed to produce chronic obstructive pulmonary disease, just like traditional cigarette smoke. Vaping also triggers immune responses associated with inflammatory lung diseases.

32.     With respect to JUUL products in particular, one recent study found that "the concentrations of nicotine and some flavor chemicals (e.g. ethyl maltol) are high enough to be cytotoxic in acute in vitro assays, emphasizing the need to determine if JUUL products will lead to adverse health effects with chronic use."[10]

**2.     Young Adults Are at Greater Risk of Both Nicotine Addiction and Lifelong Consequences of that Addiction.**

33.     Nicotine affects neurological development in adolescents, and exposure to nicotine

---

[8] See Mishra, A., et al., HARMFUL EFFECTS OF NICOTINE, Indian J. Med. Paediatr. Oncol., 36(1): 24–31 (Jan.-Mar. 2015), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/.
[9] See Mishra, supra.
[10] Esther E. Omaiye, MS et al., *Toxicity of JUUL Fluids and Aerosols Correlates Strongly with Nicotine and Some Flavor Chemical Concentrations* (Dec. 2018), available at: https://www.biorxiv.org/content/biorxiv/early/2018/12/09/490607.full.pdf.

during adolescence produces an increased vulnerability to nicotine addiction.[11] Adolescent nicotine addiction causes "substantial neural remodeling" including those parts of the brain governed by dopamine or acetylcholine, which play central roles in reward functioning and cognitive function, including executive function mediated by the prefrontal cortex. A "clear-cut relationship" between adolescent smokers and diminished neural responses has been observed such that addicts exhibit diminished sensitivity to non-drug rewards (e.g., financial rewards). This relationship becomes even more severe in adolescents who smoke more than 5 cigarettes a day. In sum, "the use of extremely rewarding drugs, such as nicotine, may decrease the pleasure obtained from non-drug rewards." *Id.* These changes occur in "early phases of smoking." *Id.* Other brain changes from nicotine include increased sensitivity to other drugs and heightened impulsivity.[12]

34.    "Brain imaging on adolescents suggest that those who begin smoking regularly at a young age have markedly reduced activity in the prefrontal cortex and perform less well on tasks related to memory and attention compared to people who don't smoke."

### 3.    JUUL Manipulates Its Nicotine Formulation To Make It Attractive to Youth and Non-Smokers and More Potent and Addictive than Cigarettes.

35.    According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[13] The cigarette industry has long known that "nicotine is the addicting agent in cigarettes"[14] and that "nicotine satisfaction is the dominant desire" of nicotine addicts.[15]

36.    For this reason, tobacco companies spent decades manipulating nicotine in order to

---

[11] Arain, M., et al., MATURATION OF THE ADOLESCENT BRAIN, Neuropsychiatric Disease and Treatment, 9, 449–461 (Apr. 25, 2013), http://doi.org/10.2147/NDT.S39776.

[12] Erin Brodwin, Business Insider, *Experts are calling out a vape pen with 'scary' nicotine levels that teens love — here's how it affects the brain*, (Apr. 19, 2018, 7:46 am) (citing Musso F. et al., *Smoking impacts on prefrontal attentional network function in young adult brains*, 191(1) Psychopharmacology 159-69 (Mar. 2007).

1.       [13] See https://www.ncbi.nlm. nih.gov/books/NBK53018/#ch4.s92

[14] Brown & Williamson official A.J. Mellman, 1983 https://www.ok.gov/okswat/documents/Tobacco%20Industry%20Quotes%20on%20Nicotine%20Addiction.pdf

[15] R.J. Reynolds Tobacco Co. marketing memo, 1972.

foster and maintain addiction in their customers. For example, R.J. Reynolds Tobacco Company ("RJR") developed and patented nicotine salt additives such as nicotine benzoate to increase nicotine delivery in cigarette smoke. As detailed in an RJR memorandum titled "*Cigarette concept to assure RJR a larger segment of the youth market*," manipulating the pH of nicotine was expected to give cigarettes an "additional nicotine 'kick'." [16] This kick was attributed to increased nicotine absorption associated with lower pH.[17]

37. JUUL knowingly used the RJR research and conclusions to produce a similar nicotine kick, and thereby promoting increased use and sales of JUUL e-cigarettes. In U.S. patent No. 9,215,895 ("the '895 patent"), assigned to "Pax Labs, Inc." and listing JUUL executive Adam Bowen as an inventor, JUUL describes a process for combining benzoic acids with nicotine to produce nicotine salts, a formulation that mimics the nicotine salt additive developed by RJR decades earlier.

38. In a 2015 interview, Ari Atkins, a JUUL research & development engineer and one of the inventors of the JUUL device said this about the role of acids: "In the tobacco plant, there are these organic acids that naturally occur. And they help stabilize the nicotine in such a way that makes it …" He pauses. "I've got to choose the words carefully here: Appropriate for inhalation."[18]

39. JUUL's manipulation of nicotine pH directly affects the palatability of nicotine inhalation by reducing the "throat hit" users experience when vaping. Benzoic acid reduces the pH of solutions of nicotine, an alkali with a pH of 8.0 in its unadulterated, freebase form. This reduction in pH converts naturally-occurring unprotonated nicotine, which causes irritation in the throat and respiratory tract, to protonated nicotine, which is not be absorbed in the throat or upper respiratory tract and, therefore, does not irritate the throat. A recent study found that JUUL's e-

---

[16] 1973 R.J. Reynolds Tobacco Co. memo titled, "Cigarette concept to assure RJR a larger segment of the youth market."
[17] Neal Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, Nicotine Psychopharmacology, 22-29, Handbook of Experimental Pharmacology, vol 192.
[18] D. Pierce, "This Might Just Be the First Great E-Cig," Wired (Apr. 2015), https://www.wired.com/2015/04/pax-juul-ecig/

liquid had a pH of under 6.0, suggesting that the JUUL contains almost no freebase (i.e., non-salt form) nicotine. J.H. Lauterbach, *One More Time: Unprotonated Nicotine in E-Cigarette Aerosols: Is It Really There?*, https://www.coresta.org/sites/default/files/abstracts/2018_TSRC83_Lauterbach.pdf. Other studies have confirmed the low ratio of freebase nicotine in JUUL products. See Duell, James F. Pankow, and David H. Peyton, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431, 431 (2018). The Duell study indicates that the vapor from JUUL's e-liquid contains about the same ratio of free-base nicotine—and hence causes the same amount of irritation—as a non-salt e-liquid with one-twentieth the amount of nicotine as a JUUL (3 mg/mL compared to the JUUL's 59 mg/mL). *Id.* The Duell study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability." *Id.*, 431–434.

40. Chart 6 in Appendix B illustrates the vapor from JUUL's e-liquid contains about the same ratio of free-base nicotine—and hence causes the same amount of irritation—as a nearly nicotine-free 3 mg/mL e-liquid. See Appendix B, Chart 6 (Duell, Fig. 3).

41. The same chart further shows that the Duell Study authors found that the low free-base fraction in its aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability." Anna K. Duell, James F. Pankow, and David H. Peyton, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431, 431-434 (2018). At the same time, JUULpods actually contain far higher concentrations of nicotine than the other nicotine solutions tested. The Duell study concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth." *Id.* 433 (citing Willett, J. G., et al., *Recognition, use and perceptions of JUUL among youth and young adults*, Tobacco Control, 054273 (2018)). The authors further concluded that JUUL's creation of a non-irritating vapor that delivers unprecedented amounts of nicotine is "particularly problematic for public health." *Duell,* at 431. Finally, the authors noted that "tobacco company documents suggest that products [like JUUL] with high nicotine levels but a low [percentage of freebase nicotine] will yield vape aerosols of

much reduced harshness as compared to products with even only moderate nicotine levels" but high percentages of freebase nicotine. *Id.*

42.     JUUL's creation of a product with low levels of harshness and minimal throat "hit" is consistent with the goal of producing a product for non-smokers. The non-irritating vapor product is easier for non-smokers to consume without negative side effects like coughing or irritation.  The design also shows that JUUL's intention was to recruit nonsmokers, not existing smoker, because smokers are already tolerant of the throat hit and have even been habituated into associating the "throat hit" with getting their nicotine fix.  Minimizing the throat "hit" of JUUL e-cigarettes is therefore unnecessary to providing an alternative for adult smokers, but is crucial to luring a new generation of users.

43.     JUUL's lack of throat hit increases the risk of using the product, because it masks the amount of nicotine being delivered, by eliminating the throat sensory feedback normally associated with a large dose of nicotine. The "throat hit" is part of the body's alert system, letting a person know he is inhaling something harmful.  Eventually, the irritation to the throat will cause even the most compulsive addict to wait before the next inhalation. Reducing or removing this feedback impairs the user's ability to ascertain that she is consuming a toxin. As a result, the cravings for nicotine can be satisfied nonstop, fostering addiction or aggravating an existing addiction.

44.     JUUL sells products that contain relatively low amounts of throat-irritating freebase nicotine, yet contain and deliver far higher concentrations of nicotine than cigarettes or other electronic nicotine delivery systems ("ENDS") containing freebase nicotine. Chart 2 in Appendix B provides a visual comparison of: (1) the nicotine concentration of American cigarettes (expressed in milligrams of nicotine per gram of nicotine), (2) the EU 20 mg/mL cap on ENDS nicotine concentration; (3) JUUL's "5% labeling" claim; and (4) independent tests of JUUL's nicotine content.

45.     Blood plasma studies in the '895 patent show that vaping nicotine benzoate increases nicotine delivery compared to cigarettes or vaporized solutions of freebase nicotine. In fact, nicotine uptake was up to four times higher for nicotine salt formulations than traditional

cigarettes (approximately 4 ng/mL/min compared to approximately 1 ng/mL/min). JUUL's data also indicates that nicotine salt solutions produce a higher heart rate in a shorter amount of time (a 50 beats/minute increase within 2 minutes for nicotine salt, versus a 40 beats/minute increase in 2.5 minutes for a Pall Mall cigarette). Nicotine salts also cause a faster and more significant rise in heart rate than placebo or vaporized freebase nicotine.

46.     JUUL's '895 patent shows that a 4% solution of benzoic acid nicotine salt causes a peak nicotine-blood concentration ("Cmax") of approximately 15 ng/mL, compared to a Cmax of 11 ng/mL for a Pall Mall cigarette. (To make it more readable, JUUL's 4% nicotine benzoate data is highlighted in red, and the Pall Mall data is highlighted in blue.) See Appendix B, Chart 3.

47.     As high as the reported nicotine dose reported for JUULpods is, the actual dose is likely higher. Though the strongest benzoic acid concentration mentioned in the '895 patent is 4% (i.e., 40 mg/mL of benzoic acid), one study tested four flavors of JUULpods and found a 4.5% benzoic acid ($44.8 \pm 0.6$) solution.[19] That study found that JUULpods contained a concentration of 6.2% nicotine salt (about 60 mg/mL), rather than the 5% nicotine (about 50 mg/mL) advertised. JUULpods containing an absolute nicotine concentration 1.2% higher than the stated 5% on the label (a relative increase of over 20%) coupled with more benzoic acid than listed in the '895 patent produce higher nicotine absorption than expected for the advertised formulation. Other studies, such as the Reilly study cited above, have reported even higher actual concentrations of nicotine in JUULpods.

48.     In any event, JUUL is delivering doses of nicotine that are materially higher than delivered by combustible cigarettes. As a paper published by the European Union citing the United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg

---

[19] Pankow JF, et al., Benzene formation in electronic cigarettes, PLoS ONE 12(3): e0173055 (2017). See https://doi.org/10.1371/journal.pone.0173055 (last visited June 4, 2018).

of nicotine)."[20] With at least 59 mg/mL of nicotine delivered in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/mL amount), a JUULpod will easily exceed the nicotine dose of a traditional cigarette. As Israel's Deputy Health Minister has noted, "a product that contains a concentration of nicotine that is almost three times the level permitted in the European Union constitutes a danger to public health and justifies immediate and authoritative steps to prevent it from entering the Israeli market."[21] As a result, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and Israel is seeking to do the same.[22]

49.    Comparison of available data regarding per puff nicotine intake corroborates the other JUUL studies (mentioned above), indicating that JUUL delivers about 30% more nicotine per puff. Specifically, a recent study of JUULpods found that "[t]he nicotine levels delivered by the JUUL are similar to or even higher than those delivered by cigarettes." Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 3 (the "Reilly study"). The Reilly study tested JUUL's Tobacco, Crème Brulee, Fruit Punch, and Mint flavors found that a puff of JUUL delivered $164 \pm 41$ micrograms of nicotine per puff. Reilly et al. Free Radical. See Appendix B, Chart 7. Reilly's findings were based on a puff volume of 75/mL. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152—193 μg/puff. M.J. Schroeder and A.C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, Tobacco Control 2014; 23:ii30-ii35. Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggests that, at 75ml/puff, a Marlboro would deliver between 114 and 144 μg/puff. In other words, empirical data suggests that JUUL delivers up to 36% more nicotine per puff than a Marlboro.

[20] E-Cigarettes, https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (last visited June 4, 2018) (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).
[21] Ronny Linder Ganz, HAARETZ, *JUUL Warns it Will Fight Israel Over Its Potential Ban on E-Cigarettes* (June 3, 2018, 9:52 p.m.), https://www.haaretz.com/israel-news/business/juul-warns-it-will-fight-israel-over-potential-ban-on-its-e-cigarettes-1.6140058 (last visited June 7, 2018).
[22] Julia Belluz, Vox, *JUUL, the Vape Device Teens are Getting Hooked On, Explained* (June 6, 2018), https://www.vox.com/science-and-health/2018/5/1/17286638/juul-vaping-e-cigarette (last visited June 8, 2018).

50.     Because "nicotine yield is strongly correlated with tobacco consumption,"[23] a JUULpod with more nicotine *will* strongly correlate with higher rates of consumption of JUULpods, generating more revenue for JUUL. A study of smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels." UCSF Library, 1003285443-5443 (US 85421).

51.     Despite the above data, Defendant has failed to disclose to consumers that the JUULpods' nicotine salt formulation delivers an exceptionally potent dose of nicotine.

52.     For example, prior to the JUUL's release in June 2015, several press outlets were given JUUL products and provided information about the JUUL device and its nicotine content. TechCrunch, a popular technology website, and a handful of other sites providing pre-release articles about the JUUL, posted the following chart (the "PAX Chart") of a PAX (i.e., JUUL, under its original name) "commissioned study" comparing JUUL's blood-nicotine levels to traditional combustion cigarette and other e-cigarettes. The chart—provided to TechCrunch by Defendant—compares the results for two versions of the JUUL device, one of which used computer-modeled results, a generic "combustion cigarette" and a generic "traditional e-liquid." https://beta.techcrunch.com/wp-content/uploads/2015/04/pax-evaluation.png. See Appendix B, Chart 4. When JUUL's website debuted in 2015, it included a similar chart (the "JUUL chart") See Appendix B, Chart 5:

53.     Both charts are inconsistent with the results reported in JUUL's '895 Patent. The patent indicates that a 4% benzoic acid concentration coupled with a 5% concentration of nicotine salts causes nicotine-blood levels approximately 30% higher than a Pall Mall cigarette. In contrast, both the PAX chart and the JUUL chart claim that, at its peak, the JUUL delivers approximately 25% less nicotine to the blood than a cigarette, creating the false impression that the JUUL is less addictive than a combustible cigarette.

54.     In sum, Defendant has either misrepresented the pharmacokinetic effect of its

---

[23] Martin J. Jarvis et al., *Nicotine Yield From Machine-Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, JNCI: Journal of the National Cancer Institute, 134–138 Volume 93, Issue 2, 17 (January 2001), available at: https://academic.oup.com/jnci/article/93/2/134/2906355

products or altered the composition and, hence, pharmacokinetic effects of its products without disclosing that material fact to consumers.

55.     Because JUUL's nicotine salts actually increase the rate and magnitude of blood plasma nicotine compared to traditional cigarettes, the risk of nicotine addiction and abuse is higher for JUUL e-cigarettes than traditional cigarettes. Thus, far from helping smokers quit, the JUULs simply increase their level of addiction to nicotine. Further, JUULpods are foreseeably exceptionally addictive when used by persons without prior exposure to nicotine—a fact not disclosed by Defendant.

56.     At the same time, as discussed above, the throat "hit" from nicotine salts is much lower than that for combustible tobacco products, making it more easy to inhale.  According to researchers, the "high total nicotine level (addictive delivery)" of a JUUL coupled with its easily inhalable nicotine vapor is "likely to be particularly problematic for public health." Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 431 (2018).

57.     JUUL has fraudulently concealed material information about the addictive nature of its e-cigarettes. Defendant necessarily is in possession of all of this information. Plaintiffs' claims arise out of Defendant's fraudulent concealment of material facts concerning the JUUL e-cigarette and Defendant's representations about the JUUL e-cigarettes' nicotine content, potency, benzoic acid content, and physiological effects of JUUL e-cigarettes. To the extent that Plaintiffs' claims arise from Defendant's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs bases their claims.

58.     Plaintiffs allege that at all relevant times, including specifically at the time they purchased or used JUUL e-cigarettes, Defendant knew that JUUL e-cigarettes' were not safe under any circumstances for non-smokers, and posed a risk of aggravating nicotine addiction in those already addicted to cigarettes.  Defendant also knew that JUUL's nicotine solution could deliver more nicotine into the bloodstream than a cigarette, and did so more quickly than a cigarette. Defendant was under a duty to disclose this material information based upon its exclusive knowledge of it, and its concealment of it; and Defendant never disclosed the Defect to

Plaintiff or the public at any time or place or in any manner.

**B.**   **JUUL Has Deceptively Marketed Its JUUL E-Cigarette as an Alternative to Cigarettes, When It is More Potent and More Addictive Than Cigarettes.**

**1.**   **JUUL Falsely Represents that Each JUULpod Contains the Nicotine Equivalent of a Pack of Cigarettes, when They Actually Deliver a Particularly Potent Dose of Nicotine.**

59.   JUUL repeatedly represented that a single JUULpod contains an amount of nicotine equivalent to about a pack of cigarettes. For example, some JUUL advertisements and JUUL's website currently provides that each "JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs." This falsehood is recast in JUUL advertisements, and on JUUL's website, into the claim that a JUUL delivers about as much nicotine as a cigarette.

60.   This statement is false and seriously misleading because, as JUUL knows, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and therapeutic use. Defendant knows that benzoic acid affects pH and "absorption of nicotine across biological membranes."[24]

61.   Assuming a concentration of 59 mg/mL, JUUL's reported nicotine content corresponds to about 40 mg of nicotine per 0.7 mL JUULpod. If, as JUUL claims, this is equivalent to one pack of cigarette (or 20 cigarettes), that implies 2 mg of nicotine per cigarette. JUUL's equivalency claim further assumes 10 puffs per cigarette (i.e., 200 puff per pack), or 0.2 mg (200 µg) of nicotine per puff.

62.   Typically, a cigarette that delivers around one milligram of nicotine in smoke retains "about 14-20 milligrams of nicotine in the unsmoked rod," *USA v. Philip Morris*, p. 597, for an overall delivery of 5-7% of the cigarette's actual nicotine content. A study by the Center for Disease Control found that in "commercial cigarette brands, nicotine concentrations ranged

---

[24] Neil L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, Handbook of Experimental Pharmacology 1982: 29-60 (Oct. 13, 2010), available at: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.

from 16.2 to 26.3 mg nicotine/g tobacco (mean 19.2 mg/g; median 19.4 mg/g)."[25] Assuming an

average of 19 milligrams of nicotine per cigarette, an average pack of cigarettes contains 380

milligrams of nicotine, or six times as much nicotine as the 62 milligrams reported for each

JUULpod. Yet the average pack would be expected to deliver only 5-7% (19-27 mg) of its

nicotine content to the user. In line with this expectation, a study of thousands of smokers found

smokers intaking between 1.07 to 1.39 milligrams per cigarette (21.4-27.8 mg per pack).[26] This is

less than half of the amount of nicotine contained in a JUULpod (i.e., 2 mg per "cigarette" based

on JUUL's stated concentration, or 200 µg per puff assuming 100% delivery). Even with the

slightly lower efficiency of delivery demonstrated in studies like Reilly (about 82%, for averages

of 164 µg per puff), this amounts to a substantially higher amount of nicotine that a human will

absorb from a JUULpod than from smoking a pack of cigarettes.

63. JUUL's statement in its advertisements that each JUULpod contains about as

much nicotine as a pack of cigarettes is therefore literally false and likely to mislead, because the

amount of nicotine *contained* in the JUULpod is perhaps six times less than in a pack of

cigarettes, but actual amount of nicotine *consumed* via JUULpod is as much as twice as high as

that via cigarettes.

64. Further, while a pack of cigarettes contains 20 cigarettes which each have to be

separately lit, the JUUL can be inhaled continuously, and often can be used indoors without

detection by others, a feature that JUUL promoted heavily in its advertisements, eliminating the

need for smoking breaks. Thus, the device design leads users to intake far more nicotine than

would occur with cigarettes.

65. The above data indicate that each JUULpod delivers significantly more nicotine

than a pack of cigarettes, both per pack and per puff. JUUL's products thus have the foreseeable

effect of luring youth, who like a strong nicotine "kick," and exacerbating nicotine addiction and

---

[25] Tameka Lawler et al., *Surveillance of Nicotine and pH in Cigarette and Cigar Filler*, 3 (Supp. 1) Tob. Regul. Sci., 101-116 (Apr. 2017).
[26] Martin J. Jarvis et al., *Nicotine Yield From Machine-Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, JNCI: Journal of the National Cancer Institute, Volume 93, Issue 2, 17 January 2001, Pages 134–138.

other adverse health effects associated with nicotine consumption when compared to cigarettes.

**2.    JUUL Intends to Continue to Deceive Consumers As to Nicotine Content.**

66.    From JUUL's pre-release announcements to this day, JUUL has continuously represented that each pod contains as much nicotine as a pack of cigarettes. These claims, which JUUL repeats widely in advertisements, press releases, and its web site, have been echoed by reputable and widely reliable sources. See https://truthinitiative.org/news/6-important-facts-about-juul, https://www.businessinsider.com/juul-e-cigarettes-are-taking-over-high-schools-2018-3; https://www.buzzfeednews.com/article/carolinekee/juul-ecigarette-vape-health-effects; https://www.nytimes.com/2018/11/16/health/vaping-juul-teens-addiction-nicotine.html; https://www.washingtonpost.com/outlook/2018/09/23/like-tobacco-industry-e-cigarette-manufacturers-are-targeting-children/?utm_term=.56732db226e8; https://www.doh.wa.gov/YouandYourFamily/Tobacco/VaporProducts.

67.    Despite making numerous revisions to its packaging since 2015, JUUL did not add nicotine warnings until forced to do so in August of 2018. The original JUUL product labels had a California Proposition 65 warning indicating that the product contains a substance known to cause cancer, and a warning to keep JUULpods away from children and pets, but contained no warnings specifically about the known effects, or unknown long-term effects, of nicotine or vaping/inhaling nicotine salts. Many of JUUL's advertisements, particularly prior to November 2017, also lacked a nicotine warning.

68.    Furthermore, JUUL misrepresents the nicotine content of JUULpods by representing it as 5% strength.  As discussed above, JUULpods contain more than 5% nicotine by volume, and deliver it in a form that is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at odds with industry standard of reporting concentration by volume, leading consumers to believe it contains less nicotine than other formulations advertised as 6% nicotine, when JUULpods in fact contain slightly more nicotine than a solution that is 6% nicotine by volume.

69.    JUUL's "5% strength" statement misrepresents the most material feature of its

product—the nicotine content—and has misled consumers to their detriment. JUUL's "5% strength" statement has also confused resellers of JUULpods, who assume that "5% strength" means "50mg/mL" nicotine by volume. These resellers then compound confusion among by consumers by stating that JUULpods contain "50 mg/mL," which they do not.[27]

70.     If JUUL did not know when it released JUULpods in 2015 that its "5% strength" representation was misleading, it quickly learned that there was widespread confusion about the pods' nicotine content. JUUL did nothing to stop or correct this confusion about the nicotine content of its JUULpods.

71.     JUUL's "5% strength" statement is also misleading because JUULpods routinely contain more than even the 59 mg/mL JUUL claims on its website. At least two independent studies testing multiple varieties of JUULpods have found significantly higher concentrations of nicotine than JUUL's label represents.

---

[27] *See, e.g.* https://www.tracyvapors.com/collections/starter-kit/products/juul-starter-kit (JUUL is "manufactured with 50mg nicotine salts"); https://ecigarettereviewed.com/juul-review("The nicotine content of the JUUL pods is always the same: 5% or 50 mg/ml"); https://ecigone.com/e-cigarette-reviews/juul-e-cigarette-review/ ("the e-liquid contains 50 mg of nicotine per ml of e-liquid"); https://westcoastvapesupply.com/products/juul-pods-cool-mint-4-pack ("50MG or 0.50%"); Vapor4Life, How Much Nicotine is In a JUUL? ("Each official JUUL pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter)."), https://www.vapor4life.com/blog/how-much-nicotine-is-in-a-JUUL/.

Nicotine content (mg/mL)

| Category | Value |
|---|---|
| JUUL's label: "5% strength" | 50 |
| Four JUULpod average, Pankow (2017) | 61.6 |
| Crème Brulee, Reilly (2018) | 63.7 |
| Fruit Punch, Reilly (2018) | 66.17 |
| Tobacco, Reilly (2018) | 78.33 |
| Mint, Reilly (2018) | 94.21 |

72.

### 3. JUUL's "Switch" campaign suggests that JUUL is a smoking cessation device and that JUUL use is a cost-effective alternative to smoking.

73.     The JUUL has not been approved as a smoking cessation therapy nor has it been approved as a modified risk tobacco product.

74.     Through the Switch campaign, JUUL urges smokers to switch to JUUL. Though the Switch advertisements do not say as much, the tacit message of the Switch campaign is "switch because, unlike cigarettes, JUUL is harmless to your health."

75.     The Switch campaign suggests that smoking and JUULing are mutually exclusive and that purchasing a JUUL will "switch" a smoker to a non-smoker.

76.     JUUL knows that a large number of smokers who use JUUL products do not end up switching but end up smoking *and* JUULing, worsening their preexisting addiction.

77.     JUUL has advertised cost-savings calculators as part of its switch campaign. Those calculators assume that a smoker who switches will continue consuming the same amount of nicotine as he or she did as a smoker (i.e., a pack a day smoker is presumed to consume one JUULpod a day).  JUUL knows that its calculator is misleading because smokers who switch to JUUL typically increase their nicotine intake or end up consuming cigarettes and JUUL products, rendering JUUL's calculator misleading at best.

78.     The Switch campaign does not disclose or warn about the risks of multiple tobacco product use or that the JUUL is not a smoking cessation product.

79.     In addition to the heightened risks of addiction multiple tobacco product use poses, one recent study found that persons who use ENDS and smoke have blood toxin levels far higher than one would expect given the blood toxin levels that ENDS and cigarettes generate individually.

**4.     Defendant Falsely Markets, Advertises and Sells E-Cigarette "Autoship" Services as "Cancel Anytime" Service, Without Disclosing the Products' Highly Addictive Nature.**

80.     Defendant intentionally misrepresents and omits information about the highly addictive nature of nicotine from the JUUL purchase process (and advertisements) because they know that consumers will have an impaired ability to cease using JUUL e-cigarettes and JUULpods once they are addicted, making their ability to "cancel anytime" illusory. Defendant never discloses to consumers that JUUL e-cigarettes and JUULpods are at least as addictive as if not more addictive than traditional cigarettes. Instead, Defendant markets the JUUL products as an "alternative to cigarettes," thereby giving the false impression that they are less addictive than traditional cigarettes and safe to use.

81.     JUUL also offers "Autoship" as a service that provide "pods at your door and savings in your pocket. 15% off every order. Cancel anytime."

82.     The "Cancel anytime" representation is materially misleading. While it is true that consumers are not obligated to purchase additional JUULpods, there is no disclosure of the fact that use of the JUUL e-cigarettes and JUULpods is likely to result in nicotine addiction, thereby interfering with the user's ability to "cancel anytime."' Defendant, in fact, knows (and preys upon the fact) that once a consumer begins using JUUL products, they will become addicted to those products and continue to purchase them, often in increasing amounts in order to achieve the same "high" as their tolerance to nicotine increases.

83.     The highly addictive nature of the JUUL products also means that the consumers of the JUUL products, including Plaintiffs and Class Members, will continued to suffer economic

injury far into the future, as they will have to keep buying additional JUUL products if they want to avoid the physically and mentally difficult effects of nicotine withdrawal. Defendant intends its products to "hook" its consumers, including children, into becoming long-term or life-long customers, which inures to Defendant's benefit.

84.     Although Defendant contends that it need not disclose these facts because the products are only designed for existing cigarette smokers, and that its products are purportedly safer than regular cigarettes, the contention is belied by Defendant's own knowledge, marketing plan and intentions, which is to grow a new group of consumers of nicotine products, not just to market to the shrinking number of existing cigarette smokers..

### C.     JUUL Deployed a Viral Marketing Campaign That Continued the Tobacco Industry's Long-Standing Campaign of Deceptive Advertising and Unfair Business Practices.

85.     As described further below, Defendant has used the same strategies perfected by big tobacco to sell JUUL products to minors and young adults, to great success.  In particular, JUUL has both exploited regulatory loopholes and relied heavily on social media and other viral advertising tools to hook people, and in particular minors, on its addictive e-cigarettes.

86.     To accomplish this, JUUL adopted the same themes used by Philip Morris and other Big Tobacco companies in the cigarette industry's long-standing, extensive advertising campaign to glamorize cigarette smoking while downplaying its addictiveness and deleterious health effects.

### 1.     Overview of Viral Marketing Campaigns and Online Marketing

87.     "Viral marketing" is defined as "marketing techniques that seek to exploit pre-existing social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic."[28] Viral marketing is a form of word-of-mouth

---

[28] N. Deepa, *Viral Marketing as an On-Line Marketing Medium*, http://www.iosrjournals.org/iosr-jbm/papers/ncibppte-volume-2/1115.pdf; Datta, P.R., Chowdhury, D.N. & Chakraborty, B. R. (2005). "Viral Marketing: New form of word-of-mouth through Internet." *Business Review (Federal Reserve Bank of Philadelphia)*, 3(2), 75.

recommendation that harnesses the network effect of the internet to rapidly reach a large number of people. Because the goal in a viral marketing campaign is to turn customers into salespeople who repeat a company's representations on its behalf, a successful viral marketing campaign may look like millions of disconnected, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaign.

88.     Companies may use different media to transmit their viral messaging, but generally, all viral marketing campaigns tend to share similar features, including (1) a simple message—typically implied by an image—that elicits an emotional response; (2) the strategic use of marketing platforms, especially social media, to reach and engage the target audience; (3) use of content that invites participation and engagement; and (4) use of third parties to magnify the impact of a message.

89.     Typically, a viral marketing campaign will begin with a "push" by the company seeking to advertise the product, and since the advent of social media, that push is typically done through the creation of new content on a social media platform, such as Instagram, YouTube, Twitter, Facebook or other similar platform ("Social Medial Platforms").[29] A company that wants to push an ad on Social Media Platforms has a few options available to it. First, the company can solicit followers to its social media pages, so that when the company posts to its feed, the content would be delivered to those followers and to those who visited the company page.  Second, the company can purchase paid advertisements that were delivered to specified target audiences. Then, to amplify a message, companies can utilize other tools, such as paid influencers and strategic use of promotions and hashtags, to blanket the targeted demographic with advertisements across social media.

---

[29] By way of background, most Social Media Platforms work as follows: Any consumer, even those under age 18, can create an account, and then select other accounts to "follow." Consumers typically follow the accounts set up by their friends and families, celebrities and bloggers that interest them, and companies that sell products they like. Anyone with an account can create a post, i.e. put up information or a photo to share with their followers. Followers can engage with a post by "liking" it, posting a comment on it, or sharing it with their networks. When consumers log into a Social Media Platform, they see the information and photos that their followers shared, along with advertising. They can also visit the account page for any person or business on the Social Media Platform to see that accountholder's recent posts.

90.     Companies seeking to advertise new products or reach a new demographic have discovered the power of the "like" and "share" features on social media, which allow users to promote content to their own audiences. As Mark Zuckerberg, founder and Chief Executive Officer of Facebook explained: "Nothing influences people more than a recommendation from a trusted friend…A trusted referral is the Holy Grail of advertising." https://www.ft.com/content/01341240-8cbd-11dc-b887-0000779fd2ac (last accessed Dec. 13, 2018). *See also Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1210 (N.D. Cal. 2014) ("One of the principal reasons such viral marketing is superior to other forms of marketing is the source: viral marketing comes from a friend or contact with whom the recipient is familiar and trusts as opposed to an unfamiliar or untrusted source.").

91.     With the advent of social media, viral marketing campaigns have become a particularly effective way to reach young people, particularly teenagers. Teenagers tend to use social media far more than adults, and tend to be more susceptible to peer pressure. 95% of teens report having use of a smart phone.  http://www.pewinternet.org/2018/05/31/teens-technology-appendix-a-detailed-tables/. 45% report being online "constantly." *Id.* 85% use YouTube. *Id.* 72% use Instagram, and 69% use Snapchat. *Id.* Adolescents also have a far stronger herding instinct than adults. The desire to fit in and look cool means that adolescents drive new trends online. As many businesses know, young people are often skeptical of traditional advertising and the tactics of large corporations. Thus, by pushing a viral marketing campaign, these businesses can reach consumers who might ignore typical advertising and are more likely to respond to an advertisement that does not look or feel like an advertisement, but instead is a message shared by a friend, a peer, or some other person influential to the viewer.

92.     Companies can also take viral messaging off-line. By running simple, catchy ads with minimal text and graphic visuals, and displaying those ads in various forms, companies generate buzz and discussion, which is reinforced through social media.

    **2.**    **The Tobacco Industry Has Long Relied on Youth-Focused Viral Marketing and Flavors To Hook New Underage Users On Its Products.**

93.     To remain profitable, the tobacco industry must continue to woo new customers: some existing customers wean themselves from addiction and the others eventually die, so replacement customers are needed.  In recent years, tobacco usage in the United States has fallen dramatically, with particularly large decreases in the youth smoking rates, which tobacco companies have been vigorously trying to counteract.  The tobacco industry knows that the younger a person starts smoking, the longer they will have a customer. Historically, tobacco companies fought to increase share penetration among the 14-24 age group because "young smokers have been the critical factor in the growth" of tobacco companies, and "the 14-18 year old group is an increasing segment of the smoking population."[30] The importance of the youth market was illustrated in a 1974 presentation by RJR's Vice-President of Marketing who explained that the "young adult market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume - for at least the next 25 years."[31]

94.     Though no single-source causative factor can describe the complex link between marketing and youth smoking, the overwhelming consensus from public health authorities, independent studies, and credible expert witnesses is that "marketing is a substantial contributing factor to youth smoking initiation." *USA v. Philip Morris*, 449 F. Supp. 2d 1, 570 (D.D.C. 2006). Because teenagers are at a stage in their psychosocial development when they are struggling to define their own identities, they are particularly vulnerable to image-heavy advertisements providing cues for the "right" way to look and behave amongst peers. *Id*. at 578. Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation. *Id.*, 570 and 590. By making smoking a signifier of a passage into adulthood, tobacco companies turned smoking into a way for teenagers to enhance their image in the eyes of their peers. *Id.* at 1072

95.     The landmark *USA v. Philip Morris* case revealed that tobacco companies targeted

---

[30] http://legacy.library.ucsf.edu/tid/lve76b00 (last visited June 5, 2018)
[31] https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091 (last visited Apr. 25, 2018).

adolescents for decades by: "(1) employ[ing] the concept of peers in order to market to teenagers; (2) us[ing] images and themes in their marketing that appeal to teenagers; and (3) employ[ing] advertising and promotion strategies to knowingly reach teenagers." No. 99-cv-2396, ECF 5732, ¶ 2682 (D.D.C. 2008). In terms of images and themes that cater to adolescents, the court found "overwhelming" evidence that tobacco companies intentionally exploited adolescents' vulnerability to imagery by creating advertising emphasizing themes of "independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being 'cool.'" *Id,* ¶ 2674.

96.     Thus, the industry has long used viral marketing campaigns to push its products on children, teens, and young adults. Prior to the advent of the Internet, tobacco companies engaged in "viral advertising" or "influential seeding" by paying "cool people" to smoke in select bars and clubs, with the "idea being that people will copy this fashion, which would then spread as if by infection." *Golden Holocaust,* 119 (citing Ted Bates and Co., *Copy of a Study of Cigarette Advertising Made by J.W. Burgard; 1953*, (Lorillard), n.d., Bates 04238374-8433. By simply paying some attractive, stylish third parties to use the product in trendy public places, tobacco companies were able to create buzz and intrigue. As word spread, the public would develop a strong association in people's minds that smoking was what young, cool adults were doing.

97.     Today, cigarette manufacturers like Altria are limited in their ability to advertise in the United States, but actively use viral marketing techniques outside of the United States. For example, Japan Tobacco International, one of JUUL's early investors, launched social media campaigns including a "Freedom Music Festival" promoting Winston cigarettes in Kazakhstan, Kyrgyzstan, and Jordan.  Similarly, Phillip Morris International, a spin-off of Altria, JUUL's largest stakeholder, has used influencer campaigns in multiple countries. A campaign in Indonesia called "I Decide To" has been viewed more than 47 million times online. A hashtag marketing campaign called #NightHunters in Uruguay used paid influencers to pose with menthol cigarettes and was seen by nearly ten percent of Uruguay's population.

98.     An influencer paid to promote Philip Morris brands stated that Philip Morris targets a "super young profile" for its influencers . . . . the people they selected are always the

youngest. They look for young people that have large groups of friends so [the social media promotional message] gets expanded more and more." *Id*. Another influencer allegedly stated that "we had a training session with the person of charge of marketing in Marlboro, she talked to us about how difficult it was for them to advertise due to all the laws in place. She also talked to us about . . . [linking] the brand to certain colors or situations." *Id.* (brackets in original).

99.    A study carried out by the campaign for tobacco-free kids, reported that "tobacco companies are secretly paying social media stars to flood your newsfeed with images of their cigarette brands." *Id.* In a nutshell, "young social media stars are paid to make smoking look cool." *Id.* A gallery of influencer posts is available at:

https://www.takeapart.org/wheretheressmoke/gallery/.

100.    Similarly, in 1988 the R.J. Reynolds Tobacco Company introduced the infamous Joe Camel cartoon campaign, which faced instant criticism due to how appealing the cartoon animal was to children and teens. Joe Camel was drawn as sleek, metropolitan figure, typically wearing sunglasses or a tuxedo, or was depicted driving convertibles, gambling, or playing pool. The ads often used the phrase "Smooth Character," which to teenagers, meant he had a slick, cool personality. That in turn led to an association between smoking and coolness in the minds of young people. To ensure that message stuck, R.J. Reynolds put up billboards featuring Joe Camel near schools, and printed Joe Camel shirts, hats, and other paraphernalia, ensuring the campaign would be carried far and wide, and that kids would constantly be exposed to it.  Only three years after the campaign began, in 1991, the Journal of the American Medical Association published a study showing that by age six nearly as many children could correctly respond that "Joe Camel" was associated with cigarettes as could respond that the Disney Channel logo was associated with Mickey Mouse, and it alleged that the "Joe Camel" campaign was targeting children, despite R. J. Reynolds' claim (similar to the claim of Defendants here) that the campaign was directed only to adults who were already smokers of other brands. Paul M. Fischer, MD, et al, Brand Logo Recognition by Children Aged 3 to 6 Years, Journal of the American Medical Association, Dec. 11, 1991. At that time researchers estimated that 32.8% of all cigarettes sold illegally to underage buyers were Camels. DiFranza JR, et al., RJR Nabisco's cartoon camel promotes camel cigarettes

to children. Journal of the American Medical Association, Dec. 11, 1991. (The JUULs represent an even higher percentage of all cigarettes and e-cigarettes sold to minors.) The Joe Camel campaign ended under the pressure of an impending civil trial brought by the City Attorney in San Francisco, Congressional investigation, and public pressure. See https://en.wikipedia.org/wiki/Joe_Camel#cite_note-8 (last visited Apr. 25, 2018).

101. Tobacco companies have also known for decades that flavored products are key to nicotine adoption by youth. A 1972 Brown & Williamson internal memorandum titled "Youth Cigarette – New Concepts," observed that "it's a well known fact that teenagers like sweet products." A 1979 Lorillard memorandum found "younger" customers would be "attracted to products with 'less tobacco taste,'" and suggested investigating the "possibility of borrowing switching study data from the company which produces 'Life Savers' as a basis for determining which flavors enjoy the widest appeal" among youth. A 2004 study found that 17-year-old smokers were more than three times as likely as those over the age of 25 to smoke flavored cigarettes, *and they viewed flavored cigarettes as safer.* Tobacco companies also used advertisements that paired cigarettes with foods, to make it seem like cigarettes were part of a healthy meal.

### 3. Because of The Role of Advertising in Youth Smoking, Tobacco Companies are Prohibited from Viral Marketing Practices and Use of Flavors

102. Most of the activities described in the section above are now recognized as against public policy, and thus forbidden for tobacco companies.

103. Under the Tobacco Master Settlement Agreement ("MSA"), reached in 1998, participating manufacturers agreed not to "take any action, directly or indirectly, to target Youth within any Settling State in the advertising, promotion or marketing of Tobacco Products, or take any action the primary purpose of which is to initiate, maintain or increase the incidence of Youth smoking within any Settling State." MSA, § III(a). They are also prohibited from

      a. using outdoor advertising such as billboards,

b. sponsoring events,

c. giving free samples,

d. paying any person "to use, display, make reference to or use as a prop any Tobacco Product, Tobacco Product package . . . in any "Media," which includes "any motion picture, television show, theatrical production or other live performance," and any "commercial film or video,"[32]; and

e. paying any third party to conduct any activity which the tobacco manufacturer is prohibited from doing.

104. In 2009, the FDA banned flavored cigarettes pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. Then-FDA commissioner Dr. Margaret A. Hamburg announced the ban because "flavored cigarettes are a gateway for many children and young adults to become regular smokers."[33]

105. The Tobacco Control Act of 2009 also prohibited sales of cigarettes to minors, tobacco-brand sponsorships of sports and entertainment events or other social or cultural events, and free giveaways of sample cigarettes and brand-name non-tobacco promotional items.

106. A study of the cigarette flavor ban in 2017 found that the flavor ban was effective in lowering the number of smokers and the amount smoked by smokers, but also was associated with an increased use of menthol cigarettes.[34] The same study reported that 85% of adolescents who use e-cigarettes use flavored varieties.

**4. JUUL's Marketing Leveraged Banned Strategies Perfected by Tobacco Companies to Induce Minors and Young Non-Smokers to Purchase JUUL Products**

107. Following the successful model of its predecessors, since 2015, JUUL has been

---

[32] The MSA provides exceptions, but only for media that is educational, not for public display, or guaranteed to be limited to adult-only facilities.

[33] Gardiner Harris, New York Times, *Flavors Banned From Cigarettes to Deter Youths*, (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html (last visited Jan. 20, 2019).

[34] Charles J. Courtemanche, PhD, *Influence of the Flavored Cigarette Ban on Adolescent Tobacco Use*, 52(5) Am J Prev Med. e139–e146 (May 2017).

operating a long term viral marketing campaign aimed at teenagers and young adults. This campaign extends and expands upon deceptive advertising tropes used by tobacco companies to exploit the psychological needs of consumers—especially youth—to convert them into smokers.

108.    JUUL's admitted reliance on tobacco industry documents is apparent in a collection of 82 JUUL advertisements compared to historical cigarette advertisements on Stanford's Research into Impact of Tobacco Advertising ("SRITA") website.  The side-by-side comparison of numerous JUUL advertisements shows that its imagery directly parallels that adopted by cigarette manufacturers, including imagery relating to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.  See Appendix C, Ads 9-50.

109.    Because of social media, JUUL has been able to operate an even more pervasive, insidious, and successful viral marketing campaign than its predecessors in this industry. As set forth below, JUUL developed and oversaw a long-term viral marketing campaign with the intent to convince minors to purchase its products. JUUL's advertisements presented images depicting an idealized future self that adolescents could achieve by taking up JUUL products.

110.    JUUL carried this campaign out by (i) intentionally designing a campaign that was simple and would trigger an emotional response, particularly with young people; (ii) intentionally designing flavored products that would appeal to teenagers and young adults; (iii) directing its advertising to teenagers and young adults on social media; (iv) utilizing third party influencers to amplify its message around the internet; (v) utilizing other social media tools, such as hashtags, to encourage participation and word-of-mouth messaging by its customers; (vi) amplifying the message through off-line advertising; and (vii) using a pricing and distribution model designed to put the product within reach of youth. JUUL's advertisements consistently withheld material information about the dangers of the product. Through this long term advertising campaign, JUUL was able to persuade consumers, and in particular teenagers and young adults that its product was cool, while hiding from them the dangers associated with using the product. And because of the viral nature of JUUL's marketing, JUUL promotions continue to reach youth, despite JUUL's deactivation of its social media accounts.

### i. JUUL Advertising Used Imagery that Exploited the Psychological Vulnerabilities of Youth.

111. Throughout the class period, JUUL ran a consistent, simple message on social media that communicated to people, and in particular, teenagers and young adults that JUUL's products were used by popular, attractive, and stylish young adults (i.e., an idealized version of an adolescent's future self) while failing to adequately and conspicuously disclose the nature or risks of the products.

112. In designing the campaign, JUUL knew that to increase the chances that content goes viral amongst the teen demographic, it needed to design a campaign that was simple, would generate an emotional response that would resonate with teenagers, and obscured the fact that the product was unsafe and addictive.

113. To help it design these ads, JUUL relied on various social media marketing companies. In 2015, JUUL worked with Cult Collective, instructing Cult Collective to design an ad campaign that would catch fire and reach customers who had "heard it all before." At the time, JUUL was a young company, competing with big, established tobacco companies with large advertising budgets and high brand loyalty. The solution JUUL and Cult Collective reached was to position JUUL as a modern product that represented a better way of life for young people. That campaign was highly effective.

### ii. JUUL's Launch Campaign Was Targeted to Create Buzz Among Young Consumers.

114. To announce the JUUL's release in June 2015, JUUL launched the "Vaporized" advertising campaign that was aimed at a youth audience.[35] The campaign used young, stylish models, bold colors, and memorable imagery. The models were often using hand gestures or poses that mimicked underaged teenagers. One such example appears in Appendix C, Advertisement 1. JUUL's advertisements presented images depicting an idealized future self that adolescents could achieve by taking up JUUL products

---

[35] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, ADAGE (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/ (last visited June 5, 2018).

115.    The Vaporized campaign advertisements featured young, stylish models and images of attendees at JUUL's launch parties and highlighted themes of sexual attractiveness, thinness, independence, rebelliousness and being "cool." In other words, the Vaporized campaign targeted youth using the exact template established by Big Tobacco decades earlier.

116.    Often the Vaporized ads contained the phrase "Smoking Evolved," so that consumers, and in particular youth, would associate JUUL with high tech and the latest generation of cool products, like iPhones and MacBooks. (More examples of these ads appears in images 1, 3, 12, and 14 of Appendix C.)

117.    The color scheme chosen was similar to colors used by Natural Americans Spirit Cigarettes, a leading brand of cigarettes among teenagers. See Appendix C, Advertisements 15-18.

118.    Nowhere in the Vaporized ads did JUUL include any visible or prominent disclaimers about the dangers of nicotine described above.

119.    As the Cult Collective creative director explained, "We created ridiculous enthusiasm for the hashtag 'Vaporized,' and deployed rich experiential activations and a brand sponsorship strategy *that aligned perfectly with those we knew would be our best customers*." Cult Creative JUUL case study. http://cultideas.com/case-study/juul (accessed September 21, 2018) (emphasis added).

120.    As part of the Vaporized campaign, JUUL advertised on a 12-panel display over Times Square. Appendix C, image 14. Billboard advertising of cigarettes has for years been unlawful under the Master Settlement Agreement reached between 46 states' attorneys general and tobacco companies, but JUUL took advantage of that agreement's failure to foresee the rise of vaping products to advertise its nicotine products in a manner that had already been deemed against public policy for other nicotine products.

121.    To ensure that its message would spread, JUUL utilized several other tools to put its product in front of young people. First, it ran the Vaporized campaign in the front spread of Vice magazine's cover issue. Notably, Vice bills itself as the "#1 youth media brand" in the

world[36] and is known for running edgy content that appeal to youth.  JUUL also implemented a series of pop-up "JUUL bars" in Los Angeles, New York, and the Hamptons, imitating pop-up restaurants and bars typically aimed at attracting young, hip urban consumers.  Again, this is an activity which would have been prohibited by law for a cigarette company on the ground that it was against public policy.

122.    JUUL's chief marketing officer, Richard Mumby said "while other campaigns tend to be 'overtly reliant on just the product,' [JUUL's] effort features diverse 20-to-30-year-olds using the product." Declan Harty, AdAge, JUUL Hopes to Reinvent Cigarette Ads with 'Vaporized' Campaign, (June 23, 2015), https://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/ (last accessed Jan. 24, 2018). This reliance on images of young, diverse users was specifically aimed at convincing young people who were not previously cigarette smokers to purchase JUUL products, to make the use of JUUL appear fun and without long-term negative consequences, to position the JUUL e-cigarette as the e-cigarette of choice for young adults, and to introduce youth to the "illicit pleasure" of using the JUUL products.

123.    Images from JUUL's Vaporized campaign are attached hereto in Appendix C, and additional images and videos are available at the following link: https://inrejuul.myportfolio.com (also available at http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_mt068.php) (last accessed January 25, 2019).

124.    JUUL promoted the Vaporized campaign on Facebook, Instagram, and Twitter. The Vaporized campaign included the largest ENDS smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year and generated over 400 unique promotions.

125.    JUUL also sponsored at least 25 live social events for its products in California, Florida, New York and Nevada.  As pictured in Appendix C, Advertisements 78-81, the invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers,

---

[36] https://upload-assets.vice.com/files/2016/01/15/1452894236compressed.pdf.

contained nicotine or was addictive. Instead, the invitations traded on PAX's reputation as a manufacturer of marijuana vaporizers and promised attendees "free #JUUL starter kit[s]," live music, or slumber parties. Photographs from these events indicate that they drew a youthful crowd. Use of sponsored events was a long-standing practice for tobacco companies, but is now forbidden.

126. John Schachter, director of state communications for Campaign for Tobacco-Free Kids, expressed "concern about the JUUL campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design." Mr. Schachter said "the organization has noticed obvious trends that appeal to adolescents in e-cigarette campaigns such as celebrity endorsements, sponsorships and various flavors."

127. To the extent that the Vaporized advertisements disclosed that JUUL products contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook. By way of comparison, if the same ads had been touting cigarettes, they would have been required to display a health warning in high contrast black and white in a box comprising 30% of the image.

### iii.    JUUL Gave Away Free Products to Get New Consumers Hooked

128. JUUL distributed free starter packs at the live social events described above in paragraph 125—conduct forbidden for a tobacco company under the Tobacco Master Settlement Agreement due to its role in fostering cigarette and nicotine addiction. BeCore, one of the firms responsible for designing and implementing JUUL's live events reported that "on average, BeCore exceeded the sampling goals set by JUUL . . . average number of samples/event distributed equals 5,000+." (emphasis added). At these events, BeCore distributed the appropriately-named JUUL "Starter Kits," which contain a JUUL and 4 JUULpods of varying flavors. If BeCore indeed gave away 5,000 Starter Kits per event, JUUL effectively distributed the nicotine equivalent of 20,000 packs of cigarettes at each of the 25 events described above--or the equivalent of 500,000 packs of cigarettes at all 25 events.

129. Though JUUL publicly acknowledged in October 2017 that it is unlawful to

distribute free samples of its products at live events, JUUL continued to do so, sometimes through $1 "demo events." Notably, promotions of this kind are prohibited for tobacco companies by the MSA.

130. The effect—and purpose—of JUUL's Vaporized giveaways was to flood major cities with free product which by its addictive nature would hook tens or hundreds of thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JUUL's message to their friends via word of mouth and social media. Similar campaigns have long been used by drug cartels. This campaign unconscionably flooded cities with free samples of an addictive product, with distribution focusing on the youth market. As a foreseeable result, JUUL products ended up in the hands of non-smokers and youth, who used the products and became addicted to nicotine.

### iv. JUUL Portrayed Its Products as Status Symbols.

131. As tobacco companies have long known, young people—and adolescents in particular—find security and a sense of identity in status symbols. Even after the "Vaporized" campaign, JUUL's later advertisements mimicked the look and feel of the "Vaporized" ads to foster the image of JUUL e-cigarettes and JUULpods as sleek, stylish, status symbol. For example, JUUL developed and ran a series of advertisements that were simple images of stylish young people using JUUL: See Appendix C, Advertisement 2.

132. More examples are featured in Appendix C, Advertisements 7, 8, 12, 20, 36, 38, 42, 44, 48. All of these ads communicated to teenagers that JUUL was a product being used by cool, modern young people, which JUUL, like all tobacco companies, knows is a powerful message. None of these ads prominently disclosed the dangers of using JUUL.

133. Other JUUL advertisements relied on graphic images with the look and feel of advertisements by Apple, Google, and similar tech companies with progressive and modern reputations. See Appendix C, Advertisement 3.

134. More examples are featured in Appendix C, Advertisements 4, 9, 28. Again, these ads resonated with teenagers as well, as they made JUUL, and especially the flavored pods, look

like cool gadgets or software, something akin to an iPhone or a hot new app to download. Like the other ads, none prominently disclosed the dangers of using JUUL.

135.    JUUL also consistently compared the JUUL to the iPhone through statements like "the iPhone of e-cigarettes," which JUUL posted on its website, distributed through social media, and disseminated through its email campaign.  The iPhone is the most popular smartphone among adolescents, with 82% of teenagers preferring Apple's phone over the competition.  JUUL's advertising images frequently include pictures of iPhones and other Apple devices, including iPads, Beats Headphones, MacBook laptops. Through these images, JUUL presented its image a "must have" technology product and status symbol, instead of a nicotine delivery system.  See Appendix C, Advertisement 51.

136.    Beyond triggering an emotional response in teenagers, all of JUUL's social media advertising had three additional things in common. First, through the use of clean lines, artistic arrangements, minimal text, and eye-catching graphics, JUUL ensured that the advertisements would jump out to distracted teenagers who scrolled crowded social media pages on their phones and browsers.

137.    Second, all of JUUL's advertisements reflect an understanding that social media users in general, and teenagers in particular, do not typically read long blocks of text on social media, and rely more heavily on imagery instead of text to convey a message. As shown in Appendix C, many of the ads did not include any warning about the dangers of JUUL or suggest to teenagers that the product contained nicotine.

138.    Moreover, where JUUL's advertisements appeared to contain such a disclaimer, this disclaimer was not typically seen when viewing social media due to the way the posts appear in phones and browsers. In particular, Facebook and Instagram typically only present to users the image and a couple lines of text, and viewers who want to see the entire post must click on it to open it up and read the rest.  See, e.g., Appendix C, Advertisement 3.

139.    JUUL's Instagram advertisements obscure those nicotine warnings by placing them in a location that requires the user to open up the post and read it. As can be seen in JUUL's Instagram ads, the company consistently used brief text at the beginning of a post so that it would

appear to be a complete sentence with no further content. (see, e.g., Appendix C, Advertisements 59; https://inrejuul.myportfolio.com/instagram). Thus, the disclaimer was never visible to anyone viewing the posts in their main feed, and it was only seen by a limited number of people who elected to open the post and then read what was there. Notably, on Twitter, a Social Media Platform that is geared towards reading text, and on Facebook, where some users do read text, JUUL typically did not include the disclaimer in its advertisements. *See, e.g.*, Appendix C, Advertisement 65; https://inrejuul.myportfolio.com/twitter-1.

140. Third, JUUL's advertisements were typically creative, giving them the look and feel of "art." Thus, teenagers were drawn to the advertisements, holding their gaze on the ads for longer periods of time, and being more inclined to share the advertisement with others in their networks, thus accomplishing JUUL's goal: turning consumers into salespeople.

141. Even JUUL's newer "alternative for adult smokers" tagline suggests to adolescents that JUUL-use is a symbol of status as an adult, which happens to be an advertising theme cigarette companies peddled to youth for decades.

**v. JUUL Used Flavors and Food Imagery to Attract Non-Smoking Teenagers and Adults**

142. JUUL sells its JUULpods in a variety of sweetened flavors. It even advertised some of its flavors as though they were desserts in themselves. For example, it advertised its crème brulee flavor using tag lines like "save room for JUUL" and "indulge in dessert without the spoon." JUUL used imagery that looked like ads for a trendy coffee shop or restaurant, such as the one at Appendix C, Advertisement 4.

143. More examples appear at Advertisements 22, 24, and 32 of Appendix C. Again, none of these advertisements prominently disclosed that JUUL was addictive and unsafe.

144. The tobacco industry has long known that sweetened cigarettes attracted young smokers. As discussed above, the FDA banned flavored cigarettes for that reason.

145. The use of flavors that appeal to youth has a marked effect on e-cigarette adoption by underage "vapers." A national survey found that that 81 percent of youth aged 12-17 who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried the product, and that

85.3 percent of current youth e-cigarette users had used a flavored e-cigarette in the past month. Moreover, 81.5 percent of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like." See Ambrose, BK, et al., "Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014," Journal of the American Medical Association, published online October 26, 2015. Another peer-reviewed study concluded that "Young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their nonvaping peers, a new study has found." Primack, B.A., et al., "Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults," Volume 131, Issue 4, Pages 443.e1–443.e9, available at https://www.amjmed.com/article/S0002-9343(17)31185-3/fulltext (last visited April 26, 2017).

146.    Research also shows that when youth see flavored ENDS liquids advertisements, they believe the advertisements and products are intended for them.  *See e.g.,* McKelvey K et al., *Youth say ads for flavored e-liquids are for them*, Addict Behav. 2018 Aug 29. pii: S0306-4603(18)30957-2. doi: 10.1016/j.addbeh.2018.08.029.

147.    The use of attractive flavors foreseeably increases the risk of nicotine addiction, as traditional cigarette product designs aimed at reducing the unpleasant characteristics of cigarette smoke (e.g., addition of menthol to mask unpleasant flavors) have previously been shown to contribute to the risk of addiction. See https://www.ncbi.nlm.nih. gov/books/NBK53018/ #ch4.s92.  Worse still, adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was tobacco-flavored.

148.    JUUL's kid-friendly flavors included Mango, "Cool" Mint, and Menthol. 74% of youth surveyed in a recent study indicated that their first use of a JUUL was of a flavored pod. Karma McKelvey, PhD; Mike Baiocchi, PhD; Bonnie Halpern-Felsher, PhD, *Adolescents and young adults use in perceptions of pod-based electronics cigarettes.* More than half of teens in a nationwide survey by the Wall Street Journal stated that they use ENDS because they like the flavors.

149.    In 2017, JUUL released what are now the two most popular flavors among youth: Mango and "Cool" Mint ("Cool Mint").  JUUL then promoted those flavors on Instagram,

Twitter, YouTube and Facebook—all of which are skewed toward young audiences.

150.    JUUL's Mango pods quickly became the runaway favorite among youth. The Mango pods are so popular that, incredibly, they noticeably increased the use of the word "mango" on the internet as a whole. Starting in early 2017, Google Trends reports a nearly five percent increase in year-over-year use of the word "mango" online. https://trends.google.com/trends/explore?date=2014-06-01%202018-12-05&geo=US&q=mango.

151.    "Cool" Mint became youths' second youth favorite flavor. The 2018 Duell Study found 94 mg/mL nicotine in a JUUL "Cool" Mint pod – nearly double the amount on JUUL's "5% strength" label would suggest. In addition to its nicotine content, the "Cool" Mint pods pose additional risks. The FDA's Tobacco Products Scientific Advisory Committee in March 2011 issued a report on menthol cigarettes, concluding that the minty additive was not just a flavoring agent but had drug-like effects, including "cooling and anesthetic effects that reduce the harshness of cigarette smoke." Stephen Proctor, *Golden Holocaust: Origins of the Cigarette Catastrophe and the Case for Abolition*, 500. Mint could also "facilitate deeper and more prolonged inhalation," resulting in "greater smoke intake per cigarette." *Id*. 500-501.

152.    JUUL's advertising emphasized the flavors of its sweetened nicotine pods. Leveraging the flavors, JUUL advertised JUULpods as part of a meal, to be paired with other foods.  In late 2015, JUUL began a food-based advertising campaign called "Save Room for JUUL." A play on the expression "save room for dessert," JUUL's campaign focused on the JUULpods' sweet flavors, and pairing them with foods. JUUL described its crème brulee nicotine pods as "the perfect evening treat," using tag lines like "save room for JUUL" and "indulge in dessert without the spoon."  In one 2016 email, JUUL bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth? Try Brulee." JUUL similarly promoted the Fruit Medley pods using images of ripe berries.  JUUL described its "Cool" Mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to  "Beat The August Heat With Cool Mint," and in a Facebook advertisement dated July 10, 2017, JUUL urged customers to "start your week with cool mint juulpods." https://airtable.com/tblkPVYIp5AFNLrTy/viwFFlmOJSzXHskhz/recEYkrXbuSCdZB0h. Along

with the bright green caps of the "Cool" Mint JUULpods, the Facebook ad included an image of a latte and an iPad. *Id*.

153.    JUUL even hired celebrity chefs to provide pairing suggestions for JUUL flavors. See Appendix C, Advertisement 5. On Instagram and Twitter, JUUL boasted about "featured chef" Bobby Hellen creating a "seasonal recipe to pair with our bruule pod." On Facebook, JUUL posted a link to an article on porhomme.com about "what our featured chefs created to pair with our pod flavors." Facebook_10, https://airtable.com/tblkPVYIp5AFNLrTy/viwFFlmOJSzXHskhz/rec0vT9owbjQeVUuY. JUUL tweeted repeatedly about its flavors and encouraged its social media followers to share their preferred pairings.

154.    In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture. See Appendix C, Advertisements 4, 24, and 53. JUUL's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee. But unlike coffee, which can create a "mild physical dependence" but is not addictive, JUUL use can cause compulsive behaviors as well as physical withdrawal symptoms.

155.    JUUL's use of flavors unfairly targeted not only youth, but unsuspecting adults as well. By positioning JUULpods as a delicious treat rather than a system for delivering a highly addictive drug, JUUL unfairly led consumers to the conclusion that JUULpods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

156.    By modeling its nicotine pods' flavor profiles on sweets, naming its nicotine pods after those sweets, and using images of the sweets in JUULpod advertisements, JUUL conditioned viewers of its advertisements to associate JUUL with those foods. Through this conditioning process, Defendant sought to link the sight or mention of JUUL products to mental images of the fruits and desserts in JUUL's advertising, which would in turn trigger food-based physiological arousal including increased salivation and heart rate. These physiological responses, in turn, would make JUUL use appealing for reasons relating to flavor—and not

switching from smoking—while simultaneously clouding viewers' ability to assess the risks of JUUL's flavored pods.

157.    At least as early as 2017, JUUL knew without any question that the foreseeable risks posed by fruit and candy-flavored e-liquids had materialized. A significant fraction of JUUL's customers included adolescents who overwhelmingly preferred Fruit Medley and Crème Brulee over Tobacco or Menthol. *See* Truth Initiative, *JUUL fails to remove all of youth's favorite flavors from stores*, (Nov. 15, 2018), available at: https://truthinitiative.org/news/juul-fails-remove-all-youths-favorite-flavors-stores (last visited Jan. 23, 2018). Instead of taking corrective action or withdrawing the sweet flavors, JUUL capitalized on youth enthusiasm for its products.

158.    JUUL disingenuously asserts that it did not intend its flavors to appeal to underage consumers.  After 11 senators sent a letter to JUUL questioning its marketing approach and kid-friendly e-cigarette flavors like Fruit Medley, Creme Brulee and Mango, JUUL visited Capitol Hill and told senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Sen. Dick Durbin (D-Ill.).  JUUL's statements to Congress—which parallel similar protests of innocence by tobacco company executives—were false.

159.    In November 2018, in response to litigation such as this one and other mounting public pressures, JUUL announced that it had "stopped accepting retail orders" for many of its flavored JUULpods, such as mango, crème brulee, and cucumber.[37] But JUUL's promise is misleading. JUUL has only refused to sell them directly to retailers, but it still manufactures and sells the JUULpods. The pods can be purchased on its website, and JUUL still sells them in retail shops in Canada.  JUUL also continues to sell "Cool" Mint in gas stations knowing that the flavor is incredibly popular with youth and will become the de facto favorite if access to other flavors is removed.

160.    While JUUL maintains that it has strict age verification procedures on its website

---

[37] https://newsroom.juul.com/2018/11/13/juul-labs-action-plan/ (last accessed January 17, 2019).

and limits purchases to users who are 21 and older, *it continues to permit consumers to purchase up to 60 flavored JUULpods every month*, which is, at a minimum, the equivalent of sixty packages of cigarettes, and likely much more. JUUL knows that its JUULpods are likely to make their ways into the hands of teenagers, either through entrepreneurial young people purchasing the JUULpods and in excess and re-selling them, or from the JUULpods making their way into the United States from Canada.

161.     The only solution to prevent flavored JUULpods from getting into the hands of children is to stop manufacturing them.

> **vi.     JUUL Developed Point-of-Sale Advertising That Emphasized the Products' Positive Image Without Adequately Disclosing Its Nature and Risks.**

162.     The tobacco industry spends $8.6 billion a year in point-of-sale ("POS") promotions—or almost $990,000 every hour. See https://truthinitiative.org/sites/default/files/Point-of- Sale-2017_0.pdf, 2. In a 2009 study of adult daily smokers, unintended cigarette purchases were made by 22 percent of study participants, and POS displays caused nearly four times as many unplanned purchases as planned purchases. *Id*. at 4.  Younger smokers, in particular, are more likely to make unplanned tobacco purchases in the presence of POS advertising. *Id*.

163.     Studies show that tobacco use is associated with exposure to retail advertising and relative ease of in-store access to tobacco products. Some studies have shown that youth who were frequently exposed to POS tobacco marketing were twice as likely to try or initiate smoking than those who were not as frequently exposed. Frequent exposure to tobacco product advertising and marketing at retail normalizes tobacco and smoking for youth over time and makes them more likely to smoke.  POS marketing is also associated with youth brand preference. Research shows that young adult smokers prefer the tobacco brands marketed most heavily in the convenience store closest to their schools.

164.     Before its launch in 2015, JUUL and Cult Collective developed innovative packaging and creative in-store displays that would carry their message through into stores.  In

particular, they designed bright, white packages. The packaging looked similar to iPhone packaging, which JUUL knew would resonate with young people, and because it was solid white, the packaging stood out and caught people's eyes when displayed in store shelves. This packaging buttresses Defendant's online marketing of JUUL e-cigarette as "the i-Phone of E-cigs," thereby framing them as a cool, fashionable item to own and use.  JUUL posters and signs at the point of sale also promoted JUUL's flavors.

165.    From 2015 through late 2018, JUUL promoted JUUL products and JUUL flavors at the point of sale without disclosing that the products contained nicotine or warning that the products could lead to addiction. Instead, JUUL's promotions displayed the colorful JUULpod caps and their food-based names while omitting the most material feature of the JUUL – that it delivers nicotine.

166.    For many, JUUL's POS materials provided an introduction to the brand. Because JUUL's POS materials omitted the most material features of JUUL's product—that it is an addictive nicotine delivery system—adolescents who saw JUUL's POS and were later offered a JUUL would have no reason to think that what they were being offered JUUL contained nicotine or posed risks of addiction.

**5.    JUUL Used Social Media to Inundate Target Consumers, Particularly Youth, With Messaging Promoting Its Nicotine Products**

167.     JUUL not only designed its advertising with an eye to what might be appealing to young people but set about disseminating those ads to ensure that young people see them. JUUL set out to advertise on at least three major Social Media Platforms: Instagram, Facebook, and Twitter, and disseminated the information in various ways across the platforms.

168.    On information and belief, JUUL maintains active accounts on most social media platforms, including Instagram, Facebook, and Twitter, where JUUL tweeted nearly 5,000 times in 2017 alone. As of 2016, 76 percent of American teens age 13-17 used Instagram, 66 percent of teens use Facebook, and 44 percent of teens use Twitter.[38] While JUUL continues to maintain its

---

[38] http://apnorc.org/projects/Pages/HTML%20Reports/instagram-and-snapchat-are-most-popular-social-networks-for-teens.aspx

Twitter page, it deleted nearly all content from its Instagram and Facebook pages around November of 2018, in response to this lawsuit.

169.    JUUL was able to deliver content directly on social media using two approaches. First, it could post its advertisements, such as those in Appendix C, directly to its own page, where it would be viewed by those who followed JUUL, and those who shared its posts ("Unpaid Advertising"). And it could engage in paid advertising, whereby it could target specific demographics of people to ensure they received its advertisements ("Paid Advertising").

170.    With respect to Unpaid Advertising, Instagram was the centerpiece of JUUL's teen-focused advertising blitz. Instagram is used overwhelmingly by teenagers. At least 72% of teenagers in the United States have an Instagram account, and at least 63% of teenagers between the ages of 13 and 17 use Instagram every day. See http://www.pewinternet.org/2018/05/ 31/teens-social-media-technology-2018/; https://blog.hootsuite.com/instagram-statistics/ (last accessed Dec. 17, 2018). While increasingly more adults are using Instagram, this has been a recent development, and as such, advertisers typically only use Instagram if they are interested in marketing to young people, especially teenagers.

171.    Because of the way Instagram delivers content, Instagram allowed for fast, effective delivery and sharing of its graphic, simple messages. Users would see these images simply by scrolling through their feeds.

172.    JUUL also disseminated Unpaid Advertising across social media through its use of hashtags. Hashtags are simple phrases preceded by a #, and they operate as a way of cataloguing posts. Authors of posts use hashtags if they want their posts to be discovered and seen by people outside of their networks. On most social media platforms, users can find information by doing a search for a hashtag with that key word. Thus, people interested in JUUL, could enter into the search bar on most Social Media Platforms "#JUUL" to find posts that include that hashtag. Instagram takes it one step farther and allows users to set up their accounts so that posts with a certain hashtag are automatically delivered to their feed.

173.    JUUL's hashtag marketing played a central role in the viral spread of JUUL between teenagers. The use of hashtags in social media advertisements "can be used to get your

content in front of a bigger audience, raise awareness about your brand, target a very specific group of people, boost your SEO, and use hot trends and topics to your advantage." Olivia Ryan, Hashtag Marketing: How to Use Hashtags for Better Marketing Campaigns, https://mention.com/blog/hashtag-marketing-how-to-use-hashtags-for-better-marketing-campaigns/. Hashtags are "the best weapon in your arsenal, aside from influencer marketing" for getting content "in front of its intended audience." *Id*. Through hashtag marketing, brands can join in on trending topics, engaging "an insane amount of readers" by using "hashtags which aren't closely related to your industry" by, e.g., using holiday-related hashtags. *Id*. By using "branded hashtags" that include the company's name or a specific product, advertisers can monitor the performance of specific campaigns. Another advantage of branded hashtags is user-generated content: "Every time a user puts one of your branded hashtags inside one of their posts, they are increasing your presence on social media" by promoting the branded hashtag, and the related content, to the user's followers. *Id*. (emphasis added). Through successful hashtag marketing campaign, brands can create communities through which "followers will not only be able to communicate via chat or messages, but also connect with each other by using your hashtag." *Id*. (emphasis in original).

174.    From 2015 through 2018, JUUL used hashtag marketing consistently on Twitter, Instagram, and Facebook to promote its products. In various posts, JUUL would slip in hashtags so that their posts would be found by young people. For example: See Appendix C, Advertisement 6. This post is not a paid advertisement, but a post to JUUL's Instagram feed. JUUL used #TBT, which is an acronym for "Throwback Thursday." Throwback Thursday is a popular meme on social media, and teenagers are especially likely to understand it and use it. Thus, any teenager who had elected to follow the hashtag TBT would see this post when they logged into Instagram that day. Moreover, no one would see the warning regarding nicotine unless they actually opened the post. As can be seen in Appendix C, JUUL frequently used other hashtags that would be used by teenagers to push their product to them across social media, such as #icymi ("in case you missed it"). (JUUL's use of hashtags to turn customers into salespeople is discussed in more detail in section IV.C.5.)

175. In disseminating Paid Advertising, the Social Media Platforms allow companies like JUUL to engage in micro-targeting, i.e., to select precisely what demographics of people should be exposed to its advertising. Social Media Platforms create internal profiles for the consumers that use them, tracking their online activity to determine their likes, habits, and purchasing power. When advertisers pay to disseminate ads, they can choose to target those ads so that they are received only by people whose digital footprint suggests an interest or predisposition to the product. JUUL would have had the option to exclude teenagers. It also could have elected to narrow its target audience to people with an interest in tobacco products, if it wanted to reach and convert non-smokers. Or it could target a broader audience of people whose digital footprints did not reveal that they were smokers.

176. While JUUL's precise targeting methods are unknown, on information and belief, minors are known to have been exposed to JUUL's Paid Advertising while on social media, suggesting that JUUL did not narrow its target audience to adult smokers. The Plaintiffs in this matter have subpoenaed Facebook and Instagram for JUUL's demographic targeting information.

177. Moreover, regardless of to whom JUUL targeted paid advertisements, JUUL's use of Paid Advertising was aggressive, and had the inevitable result of reaching teenagers. Paid advertising can be shared and liked just as Unpaid Advertising. JUUL relentlessly advertised to its targeted audience, across all Social Media Platforms. As described in more detail in Appendix A, many of the Plaintiffs in this matter saw the advertising on a near daily basis, regardless of what platform they used. The continual use of Paid Advertising increased the pressure to buy, and it made quitting harder due to the fact that those trying to quit were exposed to the advertising all day long unless they simultaneously chose to quit social media.

**i. JUUL Paid Third Party Influencers and Affiliates to Amplify Its Message to a Teenage Audience.**

178. To broaden the reach of its campaign, JUUL used "influencers" to push the product to young people. Influencers are "high-social net worth" individuals who have developed large social media followings – i.e., the "cool kids" of the social media world. People follow influencers because they tend to deliver lots of high quality, interesting photos and content, and

because they are known to be trend-setters.

179.     Viewed as tastemakers and trendsetters by their followers, influencers are prized sources of brand promotion on social media networks. Companies seeking to market products often will pay influencers to advertise their products, similar to the ways in which they utilize "product placement" in movies. They seek out influencers with large amounts of followers in their target demographic, and will offer these influencers money or other deals to promote their products. The influencer then will create various posts on social media using the product. Typically, these posts are images of them using the product, but sometimes these posts will include videos, longer written reviews, or other information about the product. Influencers often include in these posts company-endorsed hashtags or links to the company's website to try to direct their followers to learn more. The company gets the benefit of having word-of-mouth advertising, and the influencer is able to attract more followers because those followers want to stay in the loop about new products and deals. While influencers operate on all Social Media Platforms, most of them rely primarily on Instagram.

180.     JUUL relied on influencers to carry out its viral marketing campaign. JUUL's reliance on influencers appears to have begun around June 2015, when JUUL listed a position on its website for a three-month Influencer Marketing Intern. See https://www.internships.com /marketing/influencer-marketing-intern-i7391759 (accessed Nov 14, 2018).  JUUL described the position as follows: "The Influencer Marketing Intern will create and manage blogger, social media and celebrity influencer engagements. . . to build and nurture appropriate relationships with key influencers in order to drive positive commentary and recommendations through word of - mouth and social media channels, etc."  (Id.). JUUL's efforts to solicit influencers appears to have been underway for years; until December 2018, JUUL's website still called for individuals to "Join the JUUL influencers." Applicants were required to disclose their profile information for Instagram, Twitter, and Facebook, as well as various other blog and vlog platforms, suggesting that JUUL was interested in understanding whether the influencers could help JUUL reach its targeted youth demographic.

181.     JUUL's outreach had its desired impact, as it was able to line up influencers to

promote its products to teenagers, while spreading pictures of cool, young people using JUUL. For example, Christina Zayas (@christinazayas on Instagram) is a Brooklyn-based influencer with over 57,700 followers, many of whom are under 18. Under JUUL's direction, a marketing firm invited Zayas to join a JUUL campaign in September 2017, asking her to "try JUUL's premium e-cigarette and share your experience" with her many followers. (https://www.cnn.com/2018/12/17/health/juul-social-media-influencers/index.html). JUUL no doubt knew that Zayas could be a powerful advertiser for its brand; her Instagram feed and blog show reveal that she is a stylish young woman, who showcases fashionable clothing, makeup trends, and a hip urban lifestyle. Indeed, Zayas herself stated that her primary appeal to JUUL was that she attracted a younger market, in line with JUUL's previously aggressive targeting of underage individuals. And Zayas also lists herself as vegan, and includes "Spiritual Wellness" in her bio, and thus was a logical target for JUUL marketing teams looking to distance the company from the harms typically associated with smoking and convince young people that the product was safe. Zayas was paid $1,000 for one blog post and one Instagram post, seen here: See Appendix C, Advertisement 7. Zayas reported that she wanted to talk about her struggle with addiction in her JUUL-promoted posts but and was told to instead promote the positive characteristics of the JUUL.

182. Like JUUL's own advertising on its own site, the Instagram post did not contain any information about the safety of JUUL and worked to convince young people that using JUUL was a thing that cool, Brooklyn fashionistas were doing. The Instagram post would have been seen by many, if not all, of Zayas' 57,000 thousand followers, as well as by any users searching the hashtag "#JUULmoment." At least 1,509 people "liked" the post and 46 more commented on it. As Instagram provides a way for users to see posts that their friends engaged with, for each person who "liked" or commented on the post, the number of people who would see it increased exponentially.

183. JUUL also worked with Maggie Scenna (@maggiescenna on Instagram), a 2015 graduate of Boston University, and who works as a Senior Marketing Associate for Her Campus, an online community for women in college (https://www.hercampus.com/author/maggie-scenna).

While Scenna has only 1,805 Instagram followers, her young age and professional connection to a college age community means that a good deal of her followers are under 18. In October 2018, Scenna posted a picture of herself leisurely lying on Miami Beach holding a JUUL pod, with the tag line "sponsored by @juulvapor #juulmoment" as her tagline. See Appendix C, Advertisement 8.

184.    As Scenna admits her ad was sponsored by JUUL, JUUL or an affiliate of JUUL likely approached Scenna on or around the same time as Zayas, above, and offered to pay her for making such a post. And again, JUUL's work was successful.  Unsurprisingly, several of the users interacting with the above photo were underage at the time it was posted. While Scenna's photo garnered 233 likes and 9 comments, it would have been seen by many more of her followers, as well as many of the friends of those who engaged with the post.

185.    JUUL benefited from influencers on other Social Media Platforms as well. On information and belief, JUUL encouraged its distributors, wholesalers, and other resellers—either explicitly or implicitly— to hire affiliates and influencers to promote JUUL's brand and products ("Third Party JUUL Promoters"). Even if  not paid directly by JUUL, these Influencers profited from the promotion of JUUL products either because they were paid by JUUL resellers, JUUL accessory sellers, or sellers of JUUL-compatible products. JUUL knew of these third party promotional practices, and it monitored the specific JUUL promotions being distributed by these Third Party JUUL Promoters.

186.    For example, on YouTube, user Donnysmokes (Donny Karle, age 21) created a JUUL "unboxing" YouTube video in 2017, in which he opened up a box of JUUL products and described them for his audience, garnered roughly 52,000 views, many of which were from users under 18. (Jackler p. 12). Since that time, Karle has begun making a series of videos in which he tries various e-cigarette products, especially JUUL products. While Karle recently claimed that he that "knows for a fact that JUUL is way too cheap to pay what I charge for a review," Karle has admitted to earning approximately $1200 a month from unspecified sources simply from posting vaping videos, especially of JUUL products, online, suggesting that JUUL has, at a minimum, approached him, and may have at one point paid him, or that he is paid by third-party resellers of

JUUL products, to which resellers he regularly links in his posts.

https://www.vice.com/en_us/article/8xvjmk/this-21-year-old-is-making-thousands-a-month-vaping-on-youtube.

187.    Like the JUUL influencers described above, Karle is young and attractive, and uses teenage slang. He looks and sounds like a cool kid with whom teens would identify.  His latest video, as of December 18, 2018, features him smoking a JUUL "wax pod," and has 106,269 views. In the description of the video, Karle writes, "I got mad lit in this video and really enjoyed filming it, I hope you guys enjoyed watching it and seshing along!!! Btw these wax pods are fire." https://www.youtube.com/watch?v=kc8WvvbfgdQ (last accessed Dec, 20, 2018). Tens of thousands of teenagers are likely among the people who watched this video. It is no surprise why JUUL would seek to hire this person to influence even more people.

188.    DonnySmokes also created a number of JUUL videos on YouTube, including the JUUL Challenge, which is a play on the viral Ice Bucket Challenge. In the JUUL Challenge, the goal is to suck down as much nicotine as possible within a predetermined amount of time. The JUUL Challenge, which promotes nicotine abuse and adolescent use of JUUL products, like the Ice Bucket Challenge it mimicked, went viral. Soon, youth across the country were posting their own JUUL Challenge videos – a practice that continues to this day on YouTube, Instagram, Snapchat and other social media platforms. In one recent JUUL Challenge on YouTube, which has received nearly 500,000 views, the two teenagers filming themselves discuss the hundreds of thousands of views their prior JUUL Challenge received and comment upon the "virality" of their JUUL Challenge content. Nate420, *JUUL Challenge* (Apr. 22, 2018), https://youtu.be/gnM8hqW_2oo (last visited Dec. 13, 2018).

189.    Another popular YouTube Influencer, OG Nick, promotes JUUL on YouTube. The graphical component of many of his videos consists of recorded video gram footage, presumably so that the adolescent viewer can put on headphones and conceal the nature of content being consumed from adults within eyeshot. OG Nick maintains accounts on YouTube, Instagram and Snapchat. OG Nick's JUUL videos have generated well in excess of one million views.

190.     Collectively, OG Nick and DonnySmokes' JUUL-promoting videos and posts have generated millions of views, and the viral content their posts have spawned have almost certainly generated many millions of additional views. Even if not directly affiliated with JUUL, OG Nick and DonnySmokes are frequently sponsored by websites that sell JUUL products. DonnySmokes personal website also links to a webstore that sells JUULpods. JUUL thus profits not only from the brand awareness of Third Party JUUL Promoters like DonnySmokes and OG Nick, but also from JUUL sales generated directly through JUUL-selling retailers that sponsor these young influencers..

191.     JUUL knowingly accepted the benefits of these promotional activities, both in terms of brand awareness and in terms of sales generated through sponsored links on Third Party JUUL Promoters' advertisements. JUUL generated significant profits from the promotional activities of young Third Party JUUL Promoters like OG Nick and DonnySmokes. At no time did JUUL take independent action to remove the Third Party JUUL Promoters' unlawful advertising content or to discipline the JUUL-selling sponsors of Third Party JUUL Promoters. Only in response to FDA scrutiny in 2018 did JUUL take action to remove the unlawful JUUL promotions such as the JUUL Challenge. By that time, the viral content had spread, nullifying the effect of removing the original post.

192.     As discussed earlier in section IV.C.3 and in respect to affiliate and influencer ads, tobacco companies are prohibited from conducting any of the practices described above under the Tobacco Master Settlement Agreement.  Activities such as product placement in performances and professional videos have been identified as against public policy for nicotine products.

193.     To further spread its message, JUUL also offered to influencers and other bloggers on social media the option to make additional money by posting links to JUUL's website. JUUL used at least two companies to manage its affiliate marketing programs, Commission Junction and Impact Radius (the "Affiliate Services"). Under the terms of these programs, bloggers and influencers could receive payment if they referred individuals to JUUL's website, who in turn purchased the products. The programs had the effect of encouraging even more people to post and advertise about JUUL on the internet and social media, exposing even more teenagers to the

campaign.

194.    Each affiliate received a unique hyperlink to embed in the affiliate's promotions. The Affiliate Services also provided the affiliates with analytics services, sales tracking, and a bank of graphics, logos, and other promotional materials for use in affiliate promotions, including the Pax pharmacokinetic chart.  See Appendix B, Chart 4.  On information and belief, affiliates and other third party promoters used the Pax pharmacokinetic chart in online promotions of JUUL's product.

195.    In or around 2017, Impact Radius began managing JUUL's affiliate program.  The Impact Radius application indicated that JUUL "auto-approve[d]" applications.  The Impact Radius application did not ask the affiliate's age or require affiliates to confirm that they are at least 18 years old. JUUL actively courted would-be affiliates through its Twitter account, inviting nearly 20 individuals to join the program through public messages.

196.    JUUL's affiliates promoted JUUL on social media platforms including YouTube, Instagram, Facebook, Snapchat, and Twitter. JUUL's affiliates routinely failed to disclose or adequately disclose that the affiliate had a commercial relationship with JUUL and was being paid to promote JUUL products.

197.    Many of the apparently user-generated advertisements JUUL posted to its accounts pictured models or influencers being paid by JUUL without disclosure of the commercial relationship between JUUL and the model.

198.    Many of JUUL's model-driven posts, including an January 25, 2018 Instagram post (see Appendix C, Advertisement 52), encouraged users to share their own #JUULmoment in furtherance of JUUL's viral marketing campaign.

199.    These posts were misleadingly presented without disclosure of the payment to the party posting them.  By presenting JUUL advertisements featuring compensated models as unsolicited "#JUULmoment" posts, JUUL led its target audience to believe that JUUL use was more widely used than it was, that attractive, popular people used JUUL, and that these same attractive, popular people endorsed creating and posting JUUL-related social media content on Instagram and other platforms. JUUL also led consumers to believe these endorsements were

unsolicited, when they were in fact bought and paid for. To the extent that JUUL's affiliates and influencers disclosed that they were being paid, JUUL subverted these disclosures by reposting the images to JUUL's timeline without disclosing that the image was from a paid advertiser.

200. JUUL also used celebrities to promote JUUL use. In 2016, JUUL's social media accounts promoted multiple images of pop star Katy Perry with a JUUL. By including Perry's Twitter handle in its post, JUUL sought to introduce the JUUL, and Ms. Perry's apparent affinity for the JUUL, to Ms. Perry's 107,000,000 followers on Twitter, and to JUUL's followers on its social media accounts. Ms. Perry has a large youth audience.

201. In September 2018, Vapor Vanity posted that JUUL was canceling payments to vape reviewers. Vanity Vapor posted an email it had purportedly received from JUUL indicating that as of October 21, 2018 "JUUL Labs" affiliate program which is operated by Impact Radius and any other affiliate efforts will be on hold indefinitely until further notice."

https://www.vaporvanity.com/juul-labs-cancels-payments-vape-reviewers-email-they-sent/.

202. While JUUL publicly announced that it was officially halting all social media activity in late 2018, it continued to call for applications for social media influencers for at least one month after its public cessation of internet advertising. It was not until a day or two after CNN published a negative news article about JUUL's advertising practices on December 15, 2018 that JUUL removed from its website its advertisement seeking influencers.

203. As discussed earlier in section IV.C.3, tobacco companies are prohibited from conducting any of the affiliate and influencer practices described above under the Tobacco Master Settlement Agreement. These activities have been identified as against public policy for nicotine products.

      **ii.**    **JUUL Utilized Viral Marketing Tools to Turn Consumers, Especially Teenagers, Into JUUL Promoters**

204. Another key feature of JUUL's viral marketing campaign is the way in which JUUL effectively turned its customers into salespeople, multiplying exponentially the number of teenagers it was able to influence.

205. Within a few months of the JUUL's commercial release in June 2015, a former

JUUL executive reportedly told the New York Times that JUUL "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."

206.    To drive consumer participation in its ad campaign, JUUL peppered its advertising and social media posts with hashtags, including those referencing JUUL and vaping (e.g. #juul, #juulvapor, #switchtojuul, #vaporized, #juulnation, #juullife, #juulmoment); and trending topics unrelated to JUUL, as well as topics #mothersday, #goldenglobes, #nyc, etc.

207.    While JUUL typically used a few different hashtags in all of its posts on Instagram and Twitter, JUUL nearly always included #juul as one of those hashtags. JUUL also encouraged or instructed its influencers and those in its affiliate program to use the #juul hashtag when posting about JUUL. Thus, by consistently using that hashtag in all parts of its viral marketing campaign, JUUL not only branded its posts, but invited its consumers to do the same.

208.    One prominent campaign promoted by JUUL from 2015 through 2018, #JUULmoment, featured what facially appeared to be user-generated content relating to JUUL products and invited users to generate their own content. Many of these social media posts were actually placed by models and/or influencers acting at JUUL's behest, including the January 25, 2018 Instagram post above. See Appendix C, Advertisement 52.

209.    By inviting the creation of user-generated content related to JUUL's age restricted product, JUUL invited the indiscriminate promotion of its ENDS on youth-filled social media platform. An 18-year-old who posted a #JUULmoment, for example, would likely have followers who were under the legal age to purchase tobacco products, resulting in the sharing of a #JUULmoment—and the promotion of JUUL—to minors.

210.    JUUL created hashtag marketing campaigns for each nicotine flavor it sells.  For example, in 2017, JUUL launched its Mango nicotine pods and its "Make it a Mango Monday" campaign, which JUUL promoted with "#MangoMonday." That same year, JUUL launched a #coolmint hashtag campaign for JUUL's "Cool" Mint pods.

211.    JUUL's plan worked.  JUUL users began taking photos of themselves using JUUL and putting them on social media, with the hashtag #juul.  As JUUL intended by designing this

viral campaign, their customers turned themselves into salespeople. They were creating JUUL ads that looked and felt like real JUUL ads; they featured young people having fun, and using JUUL. And they triggered the same emotional response that the JUUL ads and the JUUL influencer ads triggered; people saw their friends participating in a trendy activity and they became interested.

212. For example, the flavor-based #MangoMonday and #coolmint campaigns generated hundreds of thousands of user-generated posts. During the same period, Mango and Mint pods quickly became the most popular flavors among 12 to 17 year olds.

213. Because JUUL was almost certainly monitoring the uses of its hashtags, JUUL would have seen the tens of thousands of posts being made by minors using things like #juul and #juulmoment since 2015. JUUL knew that kids were picking up on its campaign and mimicking it, and thus, advertising JUUL to their underage friends. But at no time however did JUUL take any serious steps to discourage the use of the JUUL hashtag by teenagers.

214. Because JUUL is a trademark, JUUL could have stepped in and attempted to stop the use of its mark in posts directed to underage audiences, including the use of all the hashtags that contain the word "JUUL" with respect to such posts, and it could have shut down infringing accounts such as @doit4juul and @JUULgirls. It did not do so.

215. In a similar vein, Defendant used the #JUUL branded hashtag in a significant number of its hashtagged posts on Instagram and Twitter, leading #JUUL to become the most popular JUUL-related hashtag. Though JUUL has stopped marketing on social media platforms, the #JUUL branded hashtag it launched continues to spread and be used by JUUL users on social media platforms. Today, the #JUUL hashtag spreads images of youth using JUULs and youth-oriented JUUL content and is used to promote sellers of JUUL products and JUUL accessories.

216. JUUL also created a community called JUUL Talk for its customers. According to an email JUUL sent to Plaintiff Jack Roberts, who is 18 years old, JUUL Talk is "an exclusive insights community," and "any information or innovation shown is confidential (subject to the non-disclosure agreement) and not to be shared with others." When JUUL announced its "action plan" to cut back on youth sales of its products, it asked its JUUL Talk members, including Plaintiff Roberts, who was 18 at the time, to respond to a survey about "how some of these

changes may impact you."

iii.

### iii. JUUL Used Non-Age-Restricted Emails to Promote and Track Its Products

217.   Between 2015 and 2018, JUUL sent around 200 email promotions to customers and potential customers. JUUL's email subscription list was not age-restricted and, until recently, users who failed the age verification requirements on JUUL's purchase page were nevertheless added to JUUL's mailing list and emailed a coupon for a discount on a Starter Kit.  The JUUL emails promoted retail locations, flavors, discounts, and "refer a smoker" programs.  The emails also promoted JUUL's find-a-store locator.

218.   JUUL also used emails to distribute surveys. Because JUUL's emails were not age-restricted, neither were their surveys.  On information and belief, JUUL thus collected data from minors.  JUUL paid customers, including youth, up to $30 to complete some surveys. ttps://www.reddit.com/r/juul/comments/8c7tzf/juul_30_visa_card_surveys/.

### iv. JUUL Allowed Third Parties to Use Its Trademark to Promote the Products to Underage Consumers

219.   In 2017, an account named @JUULnation was established on Instagram. "JUULnation" includes Defendant's trademark "JUUL."

220.   @JUULnation's Instagram posts included tips on how to conceal JUUL devices in school supplies. The account also ridiculed efforts to combat JUUL use in schools, promoted videos of JUUL influencers, promoted videos glorifying drug-like behaviors with JUUL devices, including the JUUL Challenge (inhaling as much JUUL nicotine vapor as possible in a fixed period of time).  See Appendix C, Advertisement 54.

221.   @JUULnation also promoted the sale of JUULpods directly through Instagram.

222.   @JUULnation used a branded hashtag to promote its posts: "#JUULnation." Like the account name "JUULnation," this hashtag contains the JUUL trademark.

223.   Because Defendant closely monitored its own hashtags and hashtag marketing, Defendant knew that @JUULnation was promoting its hashtags. Defendant therefore also knew that @JUULnation was overtly promoting the unlawful purchase and use of JUUL products by

minors, and that a significant portion of @JUULnation's followers were under the legal age to
purchase tobacco.

224.    Instead of putting an end to JUULnation's youth-targeting activity, Defendant
repeatedly promoted @JUULnation's hashtag, "#JUULnation," on Instagram in JUUL content.

225.    For example, on August 4, 2017, JUUL included "#JUULnation" on a post
promoting JUUL's Cool Mint pods.

226.    On August 8, 2017, JUUL again promoted "#JUULnation" in a post highlighting
the JUUL device's "party mode" lighting through the use of time-lapse photography.

227.    A few days after these promotions, JUUL announced that it was increasing the age
of purchase on its website to 21, consistent with its goal of helping adult smokers.

228.    By promoting #JUULnation, JUUL effectively directed its followers to an entity
that would continue to deliver youth marketing and youth access to JUULpods at a time when
JUUL was being pressured to tone down its marketing and take steps to restrict youth sales.

229.    @JUULnation and a handful of JUUL-promoting accounts generated under
@JUULnation's control generated over 650,000 followers on Instagram, which @JUULnation-
controlled accounts bombarded with content and images that unlawfully promoted the use of
tobacco products by minors and promoted unlawful sales of JUUL products to minors, either
through @JUULnation's account or other sites selling JUUL products and furthered JUUL's
campaign of distorting and concealing the risks JUUL's products posed.

230.    Although @JUULnation has been deleted from Instagram, the #JUULnation
hashtag campaign continues to promote JUUL use, unlawful sales of JUULpods, and drug-like
uses of JUUL products, as #JUULnation posts from January 20, 2019 demonstrate:  See
Appendix C, Advertisements 53-54.

231.    Through its promotion of "#JUULnation" hashtag, Defendant ratified
JUULnation's conduct, creating a principal-agency relationship in which Defendant was the
principal and @JUULnation was the agent. As a principal of @JUULnation, JUUL had a duty to
ensure that @JUULnation did not unlawfully promote or sell JUUL products. JUUL breached
this duty.

### v. JUUL Tracked the Efficacy of Its Youth Marketing.

232.    Tracking the behaviors and preferences of youth under twenty-one, and especially those under eighteen, has long been essential to the successful marketing of tobacco products. Whether the activity is called "tracking" or "targeting," the purpose has always been the same: getting young people to start smoking and keeping them as customers. *USA v. Philip Morris*, 1006.

233.    As early as 1953, Philip Morris was gathering survey data on the smoking habits of "a cross section of men and women 15 years of age and over."  Commenting on these data, George Weissman, then-Vice President of Philip Morris, observed that "we have our greatest strength in the 15-24 age group." *Philip Morris*, 449 F. Supp. 2d at 581.

234.    Traditional approaches to youth tracking (e.g., interviews conducted face-to-face or over the telephone) were limited, however, in that often failed to capture data from certain subsets of the target market. As a Philip Morris employee noted in a June 12, 1970 memorandum, Marlboro smokers were "among the types of young people our survey misses of necessity (on campus college students, those in the military *and those under 18 years of age*)." (emphasis added).  *USA v. Philip Morris*, 1007.

235.    Taking a page from the Big Tobacco playbook, JUUL has consistently tracked and monitored its target youth market, including those below the minimum legal age to purchase or use JUUL products.  Moreover, modern technology has removed many of the hurdles that made youth tracking a difficult matter in decades past.  With e-mail, social media and online forums, JUUL can track and monitor its target audience anywhere and at any time.

### vi. JUUL Amplified Its Message using Off-Line Advertising to Ensure Consumers Were Blanketed With Non-Stop Messaging About Its Products.

236.    JUUL did not limit its aggressive viral marketing to the internet. To ensure that consumers – teenagers and adults – were constantly exposed to its ad campaign, JUUL placed its simple, consistent ads in numerous public spaces.

237.    For example, JUUL bought advertisements in magazines such as Vice, including

the one described in paragraph 121. JUUL placed advertisements in public places, such as Times Square, as described in paragraph 120. (See also Appendix C, image 14; https://inrejuul.myportfolio.com/vaporized.)   Under the Tobacco Master Settlement Agreement, outdoor advertisements such as these would have been forbidden as promotion of a harmful, addictive product in a manner that is against public policy.

238.    JUUL also provided retailers with large posters to display in their store windows. Because JUUL took steps to ensure its products would be sold at gas stations and convenience stores, people would be presented with massive posters mimicking the simple, clean advertisements JUUL displayed on social media when engaging in routine activities, like buying gas or snacks. Examples of these advertisements can be seen in Appendix C, Image 67 and at https://pro2-bar-s3-cdn-cf4.myportfolio.com/f2c3d1fd1347f0b6d20914f68366d629/5a897c8f-c445-4440-8782-9c7b2f902d76_rw_1200.jpg?h=58612d8696b3f4354dce484f486c99c4.

239.    By saturating public spaces with its advertisements, JUUL not only increased the buzz around its product, but it made it more difficult for those addicted to quit. In other words, by plastering public spaces with JUUL advertisements, JUUL ensured that those trying to quit would not be able to stop being reminded of the product, which in turn would trigger cravings, and increase the likelihood they would purchase the product again.

<h3>vii.    JUUL Utilized a Pricing and Distribution Model Designed to Put the Product Within Reach of Youth.</h3>

<h3>(1)    JUUL's Pricing Model Entices New Users, Including Youth and Non-Smokers</h3>

240.    Tobacco companies for years sold youth-brand cigarettes at lower prices that underage smokers could afford and used discounts and other promotions to ensnare underage smokers. JUUL is no different. It not only designed a marketing campaign to reach young people and entice new smokers, but it priced its products in such a way to ensure they would buy them.

241.    A pack of four JUULpods, which, according to JUUL, is the equivalent of four packs of cigarettes, costs approximately $13-$20. JUUL's website charges $15.99 for a pack of JUULpods, or about $4 per JUULpod.  By contrast, a single pack of cigarettes in California costs

approximately $8.

242. Moreover, JUUL offers discounts to purchasers who refer others to purchase JUULpods or JUUL devices from JUUL.

243. JUUL also offers discounts on JUULpods to individuals who sign up for JUUL's subscription service.[39] Included among those discounts are both straight price discounts (e.g., 15% off), and bulk/loyalty discounts (buy 5, get 1 free).

244. JUUL's subscription service favors the sale of higher strength, more addictive JUULpods. For years, JUUL offered only a 5% strength version of its JUULpods. After years of delay, it finally released a less potent, 3% strength version as well. But while purchasers can buy any quantity of 5% strength JUULpods, JUUL places a limit on the number of 3% strength JUULpods that any single customer can purchase. But JUUL allows purchasers to buy as many 5% strength JUULpods as they want.

> **(2)** **JUUL Sought Out Retail Locations That Were Frequented by Its Target Audience And Displayed the Products in Arms' Reach.**

245. For years, JUUL made it difficult for smoke shops, vape shops and other age-restricted stores to carry its products, instead directing all of its product to gas stations, which historically are the worst offenders with respect to underage sales. JUUL knows that teenagers, those new to smoking, and those trying to quit their nicotine addiction are likely to frequent gas stations and convenience stores rather than smoke shops. By distributing in those kinds of stores, JUUL would increase the chances that these people would purchase the product.

246. To further drive curiosity and interest, and make it so its target audience, and especially teenagers, would purchase JUUL, JUUL instructed retailers to display the product in an unusual fashion. Whereas cigarettes and other tobacco products have long been kept behind the counter, JUUL designed display cases that would sit on store shelves. JUUL intentionally designed the clear display cases so that the bright white, sleek packaging and the flavors would catch consumers' eyes and make them interested in purchasing the product. Examples of these

---

[39] https://www.juul.com/auto-ship.

cases can be seen in Appendix C, images 77-78 and at https://inrejuul.myportfolio.com/point-of-sale.

247.    JUUL knew that by asking retailers to display JUUL products separate from other tobacco products, and within arms' reach, it would also suggest to consumers that JUUL was more safe than traditional cigarettes and that it was not an addictive drug.

248.    Moreover, on information and belief, not only are many of JUUL's retail locations are non-age restricted gas stations, but it appears that the retailers are frequently in close proximity to high schools and colleges. As one example, the following image of JUUL retailers in Berkeley, California shows that the majority of JUUL retailers in the region surround the University of California, Berkeley, and Berkeley High School.  The blue circles in the image below mark the location JUUL sellers, and the orange dot represents the University of California Berkeley, which is nearly adjacent to the largest high school in the region, Berkeley High School.



249.    On information and belief, JUUL's retail locations provide no signs warning or other indicators concerning the existence, danger, or amount of nicotine in JUUL products.

250.    On information and belief, JUUL products are not sold in pharmacies, which have the lowest rates of underage tobacco sales.

### (3)    JUUL Failed to Monitor Its Distributors, Fostering Unrestricted Sales to Minors

251.    JUUL's distributors and wholesalers actively promote bulks sales of JUUL products online, including on social media platforms such as Instagram.

252.    In November 2018, one Instagram post offered up large quantities of Mango pods

to wholesalers or stores, despite the fact that JUUL had just promised that it would stop selling Mango pods anywhere except its website. Notably, the poster is using a series of hashtags developed by or promoted by JUUL, including #juulnation. A hyperlink embedded in the post above directs the reader to a website where wholesale transactions of JUULpods are offered without any age verification or confirmation that the would-be purchaser has a business license: https://hotpodz.com/wholesale/, a page offering wholesale and bulk pricing on JUUL products without any age verification requirements. *See, e.g.*, Appendix C, Advertisement 55.

253.     A Google search for "JUUL wholesale" returns several vendors offering to sell vast quantities of JUUL Starter Kits, devices, and pods—including in flavors JUUL claims it only sells through its official website such as Mango--anywhere in the country with little due diligence. See, e.g., https://www.ionewholesale.com/juul-pod-systems, https://www.vapeinthebox.com/products/juul-pod-flavors?variant=13610126147659, https://infinitywholesalegroup.com/index.php?cPath=183&osCsid=df6e8406dcfeb045a9f916d44 beb9dda.

254.     JUUL's lax monitoring has have also create a youth resale market, where teenagers purchase large amounts of JUUL e-cigarettes and/or JUULpods and then sell them to other students, often to support their own addiction.

### (4)     JUUL Sold Its Products Through Its Website and Offered Enticing Discount Subscription Services.

255.     JUUL owns and operates [www.juullabs.com](http://www.juullabs.com) and [www.juulvapor.com](http://www.juulvapor.com) (the "JUUL Websites"), where it markets, advertises and sells its e-cigarettes and JUULpods.

256.     The JUUL Websites are a leading online marketing and distribution channel for e-cigarettes. JUUL partners with other online and brick-and-mortar providers to market, advertise and sell, via the JUUL Websites, e-cigarettes.

257.     When a consumer purchases a JUUL e-cigarette and/or JUULpods utilizing any of the JUUL Websites, he or she first chooses his or her desired e-cigarette style and color and nicotine pod flavor and color. After the consumer has input that information into the JUUL Websites, the JUUL Websites advertise to the consumer different e-cigarette styles and colors

and/or a variety of nicotine pod flavors and colors. From Defendant's advertised e-cigarette and pod styles, consumers select a desired e-cigarette decorated in a style most appealing to the consumer, and/or one or more desired pod flavors, each of which has its own distinctive color.

258. The JUUL Websites allow the purchaser to arrange automatic shipping of refill nicotine pods. Since 2015, JUUL has known that straw purchases of, e.g., 10 JUUL devices were being made for the purpose of resale to youth. JUUL also knew that its lax online age verification procedures allowed youth to purchase products directly from JUUL's website. By August 2017, when JUUL announced that it was increasing the age of purchase on its website to 21, JUUL had already entered agreements with numerous online vendors who would sell JUUL products with no such age requirement. Thus, JUUL was able to outwardly present an air of corporate responsibility, knowing full well that youth sales would continue unabated.

259. JUUL represents that it uses state-of-the-art age verification for website purchases. But its verification has not been effective or properly implemented, as numerous underage purchasers have used JUUL's website to purchase products or obtain warranty service. This is reflected in the actual experiences of the Plaintiffs, as set forth in Appendix A.

**6. JUUL's Actions Have Created a Youth Vaping Epidemic.**

260. JUUL's marketing and product design efforts have been successful. Since its launch, JUUL is now the fastest growing e-cigarette in the country. Because the JUUL delivers more nicotine in a shorter amount of time than any other product, delivers that nicotine in a sweetened vapor that causes no irritation, and does so through a concealable device that can be consumed discretely in class, at home, and in the car, nicotine naïve users frequently spiral into patterns of addiction with no historical precedent. It is not uncommon for 15-year-old students who live at home with their parents to consume three to four JUULpods a day, the nicotine equivalent of at least as many packs of cigarettes.

261. Because JUUL's marketing turned the JUUL into a status symbol for teens, the acute nicotine addiction a JUUL fosters is frequently reinforced by the idea—which JUUL spread—that JUUL use is what "cool" popular kids do in high school. As a result, the medical

community has found itself ill-equipped to develop a treatment for JUUL-addicted youth, as evidenced by a January 2019 FDA-sponsored meeting concerning the role of drug therapies in treating e-cigarette use.

262.    The vaping epidemic caused by JUUL has swept the entire nation in a short period of time.  On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent Electronic Nicotine Delivery System ("ENDS") vaping from 2017 to 2018 were the "*largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S.*"[40]

263.    The percentage of 12th grade students who reported vaping nicotine almost doubled between 2017 and 2018, rising from 11% to 21%. The ten-percentage-point increase in 12th grade students who reported vaping nicotine (an indicator of nicotine addiction) is "twice as large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade." *Id.*   "One in five 12th graders vaped nicotine in the last 30 days in 2018." *Id.*  And because JUUL controls over 50% of the e-cigarette market, and was released immediately prior to the jump in vaping prevalence from 11% of teens to 21%, **the entire increase in vaping prevalence since 2016 is attributable to JUUL.**



Source: "National Adolescent Drug Trends in 2018"

---

[40] http://monitoringthefuture.org/pressreleases/18drugpr.pdf (emphasis added).

264.    FDA Commissioner Dr. Scott Gottlieb has described the increase in e-cigarette consumption as an "almost ubiquitous – and dangerous – trend" that is responsible for an "epidemic" of nicotine use among teenagers. https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620788.htm. The rapid – indeed infectious- adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products." *Id.* The Commissioner identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products." *Id.*

265.    Within days of the FDA's declaration of an epidemic, Surgeon General Dr. Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks." Https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf. The Surgeon General's 2018 Advisory states that JUUL, with its combination of non-irritating vapor and potent nicotine hit, "is of particular concern for young people, because it could make it easier for them to initiate the use of nicotine . . . and also could make it easier to progress to regular e-cigarette use and nicotine dependence."

266.    As detailed by Plaintiffs, the JUUL epidemic spreads uniformly across high schools in the United States. JUUL surges in popularity, largely through social media networks, and creates patterns of youth usage, illegal youth transactions, and addiction, that are consistent with this account from Reddit in 2017:

> Between classes the big bathroom in my school averages 20-25 kids, and 5-10 JUULs. Kids usually will give you a dollar for a JUUL rip if you don't know them, if you want to buy a pod for 5$ you just head into the bathroom after lunch. We call the kids in there between every class begging for rips 'JUUL fiends.' Pod boys are the freshman that say 'can I put my pod in ur juul?' and are in there every block. I myself spent about 180$ on mango pods and bought out a store, and sold these pods for 10$ a pod, making myself an absolutely massive profit in literally 9 days. Given

because I'm 18 with a car and that's the tobacco age around here, I always get offers to get pod runs or juuls for kids. people even understand the best system to get a head rush in your 2 minutes between classes, is all the juuls at once. So someone yells "GIVE ME ALL THE JUULS" and 3-7 are passed around, two hits each. This saves us all juice, and gives you a massive head rush. Kids also scratch logos and words onto their juuls to make in their own, every day you can find the pod covers in my student parking lot. I know this sounds exaggerated, but with a school with 1400 kids near the city and JUULs being perceived as popular, it's truly fascinating what can happen.

https://www.reddit.com/r/juul/comments/61is7i/whats_juul_in_school/ (last visited Dec. 19, 2018).

267.    In response to the post above, several others reported similar experiences:

a.    "this is the exact same thing that happens at my school, we call [JUUL fiends] the same thing, kind of scary how similar it is." *Id.*

b.    "Same thing at my school. JUUL fiend is a term too." *Id.*

c.    "Yeah nicotine addiction has become a huge problem in my high school because of juuls even the teachers know what they are." *Id.*

d.    "same [expletive] at my school except more secretive because it's a private school. It's crazy. Kids hit in class, we hit 3-5 at once, and everyone calls each other a juul fiend or just a fiend. Funny how similar it all is." Id.

e.    "the same [expletive] is happening in my school. kids that vaped were called [expletive] for the longest time, that all changed now." *Id.*

f.    "Made an account to say that it's exactly the same way in my school! LOL. I'm from California and I think I know over 40 kids that have it here just in my school. We do it in the bathrooms, at lunch etc. LMAO. 'Do you have a pod man?'" *Id.*

g.    "It's the same at my school and just about every other school in Colorado." *Id.*

h.    "2 months into this school year, my high school made a newspaper article about the 'JUUL epidemic'." *Id.* (citing https://imgur.com/a/BKepw).

i. "Wow do you go to high school in Kansas because this sounds EXACTLY like my school. I'll go into a different bathroom 4 times a day and there will be kids in there ripping JUUL's in every single one." *Id.*

j. "At my high school towards the end of lunch everyone goes to the bathroom for what we call a 'juul party.' People bring juuls, phixes, etc. It's actually a great bonding experience because freshman can actually relate to some upperclassmen and talk about vaping." *Id.*

268. "To everyone thinking that this is just in certain states, it's not. This is a nationwide trend right now. I've seen it myself. If you have one you're instantly insanely popular. Everyone from the high-achievers to the kids who use to say 'e-cigs are for [expletives]' are using the juul. It's a craze. I love it, I've made an insane amount of money. *It's something that has swept through our age group and has truly taken over. And it happened almost overnight.*" *Id.* (emphasis added).

269. A recent study of JUUL's sales and presence on social media platforms found that JUUL grew nearly 700% yet spent "no recorded money" in the first half of 2017 on major advertising channels, and spent only $20,000 on business-to-business advertising. .[41] By comparison, VUSE, one of JUUL's competitors, spent $16 million on television advertisements alone. Despite JUUL's apparently minimal advertising spend in 2017, the study found a significant increase in JUUL-related tweets in 2017.

270. After the Vaporized campaign caught fire, retail stores began selling out of JUUL products and JUUL had a difficult time trying to meet demand coming in from its online ordering platform.

271. On Instagram, the study found seven JUUL-related accounts, including DoIt4JUUL and JUUL.girls, which accounted for 4,230 total JUUL-related posts and had more than 270,000 followers.

---

[41] Jidong Huang et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, TOBACCO CONTROL (May 31, 2018), http://tobaccocontrol.bmj.com/content/early/2018/05/31/tobaccocontrol-2018-054382.

272.    In addition to JUUL's explosive growth on individual social media platforms, the study found JUUL products being marketed across social media platforms in an apparently coordinated fashion, including smaller targeted campaigns and affiliate marketing, all of which caused the authors to question whether JUUL was paying for positive reviews and JUUL-related social media content.

273.    Some Twitter users have reported what appear to be JUUL bots. [42] Other Twitter users appear to either be bot accounts or native advertisers, in that they have a small number of followers, follow few other users, and post exclusively about JUUL content. See, e.g., @HenrytheJUUL[43]

274.    The lead author of the study concluded that JUUL was "taking advantage" of the reach and accessibility of multiple social media platforms to "target the youth and young adults . . . because there are no restrictions," on social media advertising.[44]

275.    A separate study of e-cigarette advertising on mobile devices found that 74% of total advertising impressions were for JUUL products, and that several of JUUL's advertisements highlighted JUUL's high-tech design, featured young people using JUUL products, or featured financial incentives for purchasing JUUL products. See Appendix B, Chart 8; https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes

276.    Chart 8 in Appendix B shows JUUL's viral expansion on Twitter between 2015 and 2017. JUUL-related posts on Twitter increased quadratically, exactly as one would expect from a blue-shaded area represents the number of JUUL-related Twitter posts, and the green line traces the quadratic growth curve that viral marketing creates. Its growth on Instagram was likely even more rapid.

277.    As a result of JUUL's aggressive advertising to teenagers, there is a new epidemic

---

[42] One example of what appear to be JUUL bots in action on Twitter is available at: https://twitter.com/search?q=juul%20bot&src=typd.
[43] https://twitter.com/hennrythejuul.
[44] Laura Kelley, THE WASHINGTON TIMES, *JUUL Sales Among Young People Fueled by Social Media, Says Study* (June 4, 2018), https://www.washingtontimes.com/news/2018/jun/4/juul-sales-among-young-people-fueled-by-social-med/ (last visited June 4, 2018).

of teen addiction. Approximately 3.6 million middle and high school students are vaping regularly. *See* https://www.nytimes.com/2018/12/18/health/vaping-nicotine-teenagers.html (last accessed December 20, 2018). With JUUL holding approximately two thirds of the e-cigarette market, and is the company that has marketed itself most aggressively to youth, it's likely that millions of those teenagers are using JUUL.

278.    Use of JUUL is rising exponentially, in line with the way in which its social media presence has grown. A recent study found that approximately 21 percent of high school seniors had engaged in nicotine vaping at least once in a 30 day period, an enormous rise over the survey's 2017 results, which found just 11 percent had. That spike was the largest spike for any substance recorded by the study in 44 years. *Id.*

279.    In a statement issued by the FDA in November, 2018, the FDA noted that in 2016 and 2017, e-cigarette usage among high school students had been around 11 percent, but that in 2018, more than a quarter of high school students were regularly using e-cigarettes.[45]

280.    Even more troubling are the challenges associated with getting kids to quit JUUL once they start. JUUL's aggressive social media campaign puts JUUL advertisements before them every day, all day. Those that want to stop thinking about it are faced with advertising when engaging in their regular activities. And even while JUUL has purportedly stopped advertising on social media in recent months, its hashtags, imagery, and impact live on, as there remain nearly 300,000 posts and counting on Instagram featuring the #juul hashtag as of December 20, 2018. Moreover, many medications for breaking nicotine addictions are approved only for adults.

281.    As discussed in Appendix A, the Plaintiffs (or the minors they represent) have become addicted to nicotine as a result of using JUUL products.  Plaintiffs' experiences were not isolated incidents. Rather, all of JUUL's other customers have been identically misled into purchasing JUUL's addictive nicotine products.  Some of them have publicly complained about the undisclosed addictiveness of JUUL's nicotine products.

282.    For example, one teen wrote:

---

[45] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/UCM625884.htm (lat accessed January 17, 2019).

"At [Lawrence Free State High School], underage use of vapes is quite typical. Out of 95 students surveyed, 50% of them said that the illegal use of vape products is very common. Students are able to get their hands on vape products with ease, as there are many effective methods of buying them unlawfully."

"In the past, users could purchase vaping products on the internet without being asked for any identification. That rule has since been altered and all consumers are now required to provide an I.D., but underage users can easily buy fake I.D.'s to avoid this. If minors are slick enough, they can go into vape stores, act of age and not be questioned when buying a device, an anonymous senior said."

. . .

"Another attractive characteristic of vaping is the buzz that the user gets after in-haling the substance. It can be described as a short-term head high."

"It's almost like being drunk—you feel it in your head and you just kind of wobble,' senior Isaiah Jacobs said. 'It's a dizzy feeling. It feels nice.'"

"The buzz is caused by nicotine which the vape juice contains. To a new user, vaping is an easy way to get a strong high. After continual use, users build up an immunity and must ingest more nicotine to reach their desired state. This is called a nicotine addiction and all consumers, especially minors, are susceptible to this craving according to the U.S. National Library of Medicine. Some students have become habitual users, causing them to spend time and money feeding their habit. Students who vape recognize that many of their peers have an addiction but still choose to partake in the activity, disregarding the risk."

"'Some [people who vape] will admit it,' senior Isaiah Jacobs said. 'You can tell they are addicted when they spend all their money and time on it, just like people who smoke cigarettes or drink alcohol.'"

"Once hooked, users inhale the many toxins that compose vape juice. Very little research has been conducted on the long-term effects that vaping has on a person's body according to pulmonologist Aman Kahn."

. . .

"With so little information available, students are unable to make an informed decision about whether or not to partake in vaping. Until further research has been conducted, underage users will continue to consume vape products without understanding the impacts that these substances can have on their health."

https://www.fsfreepressonline.com/features/2018/02/13/too-juul-for-school/ (last visited April 3, 2018).

Consolidated Amended Class Action Complaint

283.    A reporter at Kent State University wrote:

"'Of course,' Freed said. 'Nothing should be going through your lungs but air. Being 21 years old, it's hard to watch 15-year-olds carry them around. I mostly use my JUUL for a quick buzz, but because that buzz is so short, I find myself using it too often.'"

" Senior fashion merchandising major Avery Niernberger expressed concern for the new fad on Kent's campus."

"'JUULs are just another 'trend' right now unfortunately,' Niernberger said. 'The scary thing is that since they're so new, no one truly knows the side effects they will bring to people. And right now my generation loves them, so I can only hope they won't affect my peers deeply.'"

. . .

" While traditional cigarette usage has dropped in recent years, newer electronic cigarettes exploded in popularity. A 2016 Surgeon General's report concerning electronic cigarette use among youth and adults indicated that e-cigarette use among American youth increased 900 percent between 2011 and 2015."

http://www.kentwired.com/latest_updates/article_637d8f2e-1f49-11e8-a245-87a74d0e50a2.html (last visited April 3, 2018).

284.    The uniformity of language, drug-like behaviors (e.g., inhaling multiple JUULs at once), and other uniform characteristics of JUUL use in each school are the result of viral marketing campaigns put in motion by JUUL and promoted by JUUL.

### i. JUUL Was Able to Undo Decades of Progress Reducing Teen Smoking by Exploiting Regulatory Loopholes

285.    The teen vaping epidemic was by design, not by accident.

286.    When JUUL was first developed, the FDA's regulations on tobacco products were vague as to whether they applied to vaping devices. Because the regulations did not explicitly identify electronic vaping devices that dispensed tobacco and nicotine as a regulated product, JUUL interpreted those regulations to mean that it could sell its dangerous products to anyone, regardless of their age, and that it did not have to comply with the advertising and labeling restrictions that restricted other tobacco companies.

287.    As other vaping companies began to enter the market, JUUL no doubt knew that this gray area was unlikely to stay gray for long. Knowing that the clock was ticking, JUUL went

on a wild spree to get as many young people addicted as possible while it still viewed itself as "unregulated." The aggressive advertising described above was designed not just to sell the products to teenagers, but to sell the product to as many teenagers as possible while it still had a plausible defense to any assertion that it was violating FDA regulations. By hooking teens, JUUL not only ensured it would have loyal consumers for decades, but those teens would influence their friends.

288. Moreover, by pumping social media platforms full of images of cool, young people having fun while JUULing, JUUL ensured that everyone from adults to young children, would JUULing was a cool, fun, and safe activity. Just as RJR Reynolds learned with Joe Camel, even very young children would in turn be more likely to form strong, positive associations with the tobacco product and be more susceptible to trying it in the future.

289. In 2017, the FDA announced that it would be taking steps to regulate vaping devices such as JUUL and other ENDS. Regulations were proposed and ultimately went into effect in late 2018. But the damage was done. Between 2017, use of vaping had shot up from 11% of high school users to 27.7%,[46] no doubt due to the way in which JUUL's viral marketing campaign had multiplied—exactly as JUUL had intended in 2015.

**D.** **JUUL's Deal With Altria Reveals that JUUL's Goal Was Always About Increasing the Rates of Nicotine Addiction.**

290. In December 2018, it was announced that tobacco giant Altria, which owns the Philip Morris company, took a 35% share in JUUL, which was valued at $38 billion.

291. Altria, which is a party to the Master Settlement Agreement, must abide by strict rules to ensure that it is not directing its tobacco products to children. But JUUL is not a party to that agreement. Thus, by providing Altria a controlling share, JUUL has single-handedly blown up that agreement and put even more kids at risk.

292. As a result of the acquisition, Altria now has access to JUUL's years of social media metrics, youth survey responses, and a vast amount of other data, which Altria would not

---

[46] https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/UCM625884.htm (last accessed January 17, 2019).

have been able to acquire on its own due to the Master Settlement Agreement. And Altria will almost certainly have JUUL's customer list, built up from years of selling its products on its website.

293. Moreover, the deal ensures that even though JUUL is now subject to regulations, it will gain access to Altria's lobbying and marketing expertise, which it has honed through decades of mining regulatory loopholes to push its nicotine products.

294. JUUL will also benefit from Altria's market dominance. For example, as part of the deal, Altria agreed to give JUUL top-shelf space so that Juulpods will be displayed next to Marlboro, the market leader.

**E.    Defendant Misled Class Members, Including Minors, Into Becoming Addicted to Nicotine Salts.**

295. The individual Plaintiffs' circumstances are described in attached Appendix A. Because Plaintiffs did not, and do not, know the formula for Defendant's products and cannot test how addictive the products are before purchasing, Plaintiffs will be unable to rely on Defendant's labels when shopping for nicotine products in the future absent an injunction that requires Defendant to disclose the addictive effects and true health consequences of the product. Plaintiffs, and others similarly situated, are likely to be repeatedly presented with false or misleading information, making it difficult to make informed purchasing decisions.

## V.    CLASS ALLEGATIONS

296. Plaintiffs bring this action against Defendant on behalf of themselves and all others similarly situated, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The proposed **Class** is defined as follows:

> All persons who purchased, in the United States, a JUUL e-cigarette and/or JUULpods.

297. Plaintiffs further propose the following **Youth Subclass**:

> All class members who at the time of at least one purchase were under the age of 18.

298. Plaintiffs also seek certification of the following **Consumer Deception Statute**

**Subclasses**:

299. **Consumer Deception Statute Subclass**: All class members who purchased the JUUL products in the following states, subject to the state's statute of limitations: Alabama, Alaska, Arkansas, California, Colorado, Delaware, District of Columbia,  Georgia, Idaho, Illinois, Indiana, Kansas, Maryland, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire,  New Mexico, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Tennessee, Texas, Utah, Virginia, West Virginia, Wyoming.

300. **Consumer Unfairness/Unlawfulness Subclass**: All Class members whose purchases were made in Alabama, Arizona, California, Connecticut, Delaware, the District of Columbia, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Mississippi, Missouri, Montana, Nebraska, New Hampshire, New Mexico, North Carolina, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Vermont, Washington, West Virginia, or Wyoming.

301. **Warranty Subclass**: All class members whose purchases were made in a state other than Louisiana.

302. **Express Warranty Reliance Class:** All members of the Warranty Subclass whose purchases were made in Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Iowa, Kentucky, Maine, Maryland, Massachusetts, Michigan, Mississippi, Montana, Nebraska, New York, North Carolina, Ohio, Oklahoma, Oregon, Rhode Island, South Dakota, Tennessee, Texas, Utah, Washington, or Wyoming (together, the "Express Warranty Reliance Class

303. **Implied Warranty Privity Subclass**: All members of the Warranty Subclass whose purchases were made in Alabama, Arizona, California, Connecticut, Florida, Georgia, Idaho, Illinois, Kentucky, New York, North Carolina, Ohio, Tennessee, Washington, or Wisconsin.

304. **Licensure Subclass**: All members of the Class whose purchases were made in Alaska, Arkansas, California, Connecticut, the District of Columbia, Hawaii, Iowa, Kansas, Louisiana, Maine, Maryland, Missouri, Montana, Pennsylvania, Rhode Island, Texas, Utah,

Vermont, or Washington.

305. **Negligent Marketing Youth Subclass**: All members of the Youth Subclass whose purchases were made in a state other than Michigan and Pennsylvania.

306. Plaintiffs reserve the right to propose further subclasses of the above class and subclasses or to narrow the above class and subclass definitions, to be limited to persons who, prior to their purchases of JUUL products, were nonsmokers.

307. Plaintiffs further reserve the right to propose further subclasses of the above classes and subclasses, or to narrow the above class and subclass definitions, to be limited to persons who reside in or made their purchases in one or more identified states (e.g., a single-state subclass of purchasers from California), including without limitation the states of residence of the plaintiffs named herein and states whose laws are materially the same.

308. Plaintiffs also reserve the right to propose additional or further subclasses or narrowing of the above class and subclass definitions, based on the evidence adduced in discovery, or as necessary and appropriate.

309. Plaintiffs also reserve the right to propose additional or further youth subclasses or narrowing of the above class and subclasses to youth, based on the evidence adduced in discovery, or as necessary and appropriate.

310. In each of the causes of action pled below, a statement that the count is alleged on behalf of a particular class or subclass includes all subclasses thereof, including subclasses that may later be proposed as described in the prior paragraphs.

311. This action has been brought and may properly be maintained as a class action against the Defendant pursuant to the provisions of Rule 23 of the Federal Rules of Civil Procedure because there is a well-defined community of interest in the litigation and the proposed classes are easily ascertainable.

312. Numerosity: Plaintiffs do not know the exact size of the Classes and the Subclasses, but they are each composed of more than 500 persons. The persons in the Classes are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

313.    Common Questions Predominate: This action involves common questions of law and fact to the potential classes because each Class Member's claim derives from the false, deceptive, unlawful and/or unfair statements and omissions that led Class Members to believe that: (a) JUUL E-cigarettes and JUULpods were less addictive than traditional cigarettes; (b) JUUL products could be used without negative health consequences, and (c) they would be able to stop using and purchasing JUUL products "anytime." Class Member claims also derive from common questions of law and fact related to JUUL products falsely advertised as non-addictive. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each Class Member to recover.  Among the questions of law and fact common to the class are:

a.    Whether Defendant's advertising and marketing regarding the JUUL E-cigarette and JUULpods were likely to deceive Class Members or were unfair;

b.    Whether Defendant intentionally omitted material information from its advertising and marketing materials;

c.    Whether Defendant unfairly, unlawfully and/or deceptively induced Class Members to purchase JUUL E-cigarettes and/or JUULpods using the promise that they would be able to stop purchasing JUULpods "anytime";

d.    Whether the JUUL e-cigarette is defective;

e.    Whether Defendant knew or should have known about the JUUL's defect, and, if yes, how long Defendant has known of the defect;

f.    Whether the defective nature of the JUUL e-cigarette constitutes a reasonable fact consumers would have considered in deciding whether to use or purchase JUUL products;

g.    Whether JUUL had a duty to disclose the defective nature of JUUL e-cigarettes to Plaintiffs and Class Members;

h.    Whether Plaintiffs and the other Class Members are entitled to a declaratory judgment stating that the JUUL e-cigarettes are defective and/or not merchantable;

i.    Whether JUUL had a duty to warn of the risks its products pose;

j.  Whether Defendant breached its duty to warn of the risks its e-cigarettes pose;

k.  Whether the JUUL e-cigarette is unfit for the ordinary purpose for which they were used, in violation of the implied warranty of merchantability;

l.  Whether Defendant engaged in the alleged conduct knowingly, recklessly, or negligently;

m.  The amount of revenues and profits Defendant received and/or the amount of monies or other obligations lost by Class Members as a result of such wrongdoing;

n.  Whether Class Members are entitled to injunctive and other equitable relief and, if so, what is the nature of such relief; and

o.  Whether Class Members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief

314.  Typicality: Plaintiffs' claims are typical of the class because each Plaintiff was misled into: (a) purchasing a highly addictive nicotine product due to Defendant's false advertising and unfair business practices; and/or (b) substituting addiction to vaporized nicotine salts in place of addiction to nicotine from cigarette smoking. Thus, Plaintiffs and Class Members sustained the same injuries and damages arising out of Defendant's conduct in violation of the law. The injuries and damages of each Class Member were caused directly by Defendant's wrongful conduct in violation of law as alleged.

315.  Adequacy: Plaintiffs will fairly and adequately protect the interests of all Class Members because it is in their best interest to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiffs also has no interests that are in conflict with or antagonistic to the interests of Class Members. Plaintiffs have retained highly competent and experienced class action attorneys to represent their interests and that of the Classes. No conflict of interest exists between Plaintiffs and Class Members hereby, because all questions of law and fact regarding liability of Defendant are common to Class Members and predominate over any individual issues that may exist, such that by prevailing on his/her own claim, Plaintiffs necessarily will establish Defendant's liability to all

Class Members. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiffs and their counsel are aware of their fiduciary responsibilities to the Class Members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for Class Members.

316. Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the Classes will tend to establish inconsistent standards of conduct for the Defendant and result in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions world engender. Furthermore, as the damages suffered by each individual Class Member may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

317. Nexus to California: The State of California has a special interest in regulating the affairs of corporations that do business here and persons who live here. Defendant JUUL is based in San Francisco, California. Defendant designed and implemented the unlawful and deceptive conduct described in this Complaint from its headquarters in the San Francisco Bay Area. Additionally, Defendant has more JUUL e-cigarette consumers in California than in any other state. Accordingly, there is a substantial nexus between Defendant's unlawful behavior and California such that the California courts should take cognizance of this action on behalf of a class of individuals who reside in California and the United States.

318. Plaintiffs are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(False Advertising/Violation of the Deception Prong of Deceptive Trade Practices Statutes)**

*On behalf of the Class and the Consumer Deception Subclass*

319.    Plaintiffs reallege and incorporate the above paragraphs of this Class Action Complaint as if set forth herein.

320.    This cause of action is brought on behalf of the Consumer Deception Subclass (and further subclasses thereof).

321.    Defendant's actions, representations and conduct have violated, and continue to violate the CLRA and similar laws of other states, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

322.    Plaintiffs and class members who purchased JUUL e-cigarettes and JUULpod nicotine salt cartridges are "consumers" under these states' unfair and deceptive practices statutes, which are identified with specificity for this count in Appendix D.

323.    The provision of JUUL E-cigarettes and JUULpod nicotine salt cartridges that Plaintiffs, and those similarly situated, purchased are "goods" within the meaning of these states' unfair and deceptive practices statutes. Additionally, the provision of "Autoship" subscriptions for delivery of JUULpod nicotine salt cartridges that Plaintiffs, and those similarly situated, purchased are covered "services" within the meaning of these states' unfair and deceptive practices statutes. Defendant's actions, representations and conduct have violated, and continue to violate the deception prong of these statutes because they extend to transactions that are intended to result, or which have resulted, in the sale or distribution of goods or services to consumers.

324.    Plaintiffs, and those similarly situated, relied to their detriment on Defendant's false, misleading and deceptive advertising and marketing practices. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendant, they would have acted differently by not purchasing a JUUL E-cigarette and JUULpods. Specifically, the plaintiffs viewed and relied upon the following advertisements and representations by JUUL:

325.    Plaintiffs relied on specific advertisements and representations by JUUL as set forth in Appendix A.

326.     In addition to the specific JUUL advertising described above, each of the plaintiffs was exposed to JUUL's deceptive advertising message as a result of JUUL's adaptation of the tobacco industry's long-standing and extensive deceptive advertising campaign to a pervasive viral marketing campaign delivered via social media and email.  From the introduction of the JUUL e-cigarette through at least 2018, JUUL used social media to inundate consumers with ads that—like those of the tobacco industry with respect to cigarettes—characterized JUUL e-cigarettes and JUULpods as a hip, stylish, fun activity that made one cool, rather than a means of delivering a highly addictive substance with long-term health effects.

327.     Each of the plaintiffs saw at least one advertisement in JUUL's long, pervasive advertising campaign, and each was exposed to the false messages conveyed by the campaign (i.e., that JUUL was less—or at least no more—addictive than traditional cigarettes; that JUUL e-cigarettes and JUULpods were a healthy, hip, fun activity, not a means of delivering extremely potent and addictive doses of nicotine).  JUUL's campaign lasted approximately three years and was pervasive on social media.  This was a "longstanding" campaign, particularly when compared with the lifespan of the target audience—teens—and as shown by the effectiveness of the Joe Camel advertising of similar length.  It was even more effective than a normal three-year advertising campaign because it co-opted the imagery and messaging of the tobacco industry's decades-long advertising of cigarettes as a stylish, cool activity.  Because of the length and pervasiveness of the campaign, it is not reasonable for each Plaintiff to identify in this Complaint every ad seen, but a representative sample of advertisements seen is shown above and in Appendix C.  A more complete gallery of marketing materials is available at https://inrejuul.myportfolio.com. Although the individual advertisements within JUUL's campaign vary in their details, groups of them share common elements such as their use of young, attractive models to convey the idea that JUUL would make one hip and attractive; use of active, healthy individuals to convey the idea that using JUUL was not unhealthy; and depiction of JUUL nicotine salt solutions as a flavorful "treat" rather than an addictive substance with long-term health effects. If known, further details of the timing and manner of each plaintiff's exposure to portions of JUUL's long, pervasive advertising campaign is identified in Appendix A.  Each

plaintiff was exposed to JUUL's campaign and its messaging prior to their purchase of JUUL e-cigarettes and JUULpods, and continued to be exposed to it even when they tried to quit vaping.

328. Plaintiffs have complied with all pre-suit requirements for bringing damages claims under the deception prong of the unfair and deceptive practices statutes by timely seeking informal resolution of the claims prior to filing suit. Defendant refused to resolve the claims.

329. Defendant's practices, acts, policies and course of conduct violated these states' prohibition on deceptive practices in that Defendant engaged in deceptive acts and practices in or affecting commerce, through their advertisements and labeling of JUUL e-cigarettes and JUULpod nicotine salt cartridges. JUUL engaged in a longstanding and extensive marketing campaign that deceived consumers.

330. Defendant specifically violated the deception prong of these statutes by:

    a. Omitting, concealing, and suppressing material facts in the labeling and advertising of its goods and services;

    b. Misrepresenting the sources, sponsorship, approval, endorsement or certification of goods or services;.

    c. Misrepresenting the affiliation, connection, or association with, or certification by, another for its goods or services;

    d. Misrepresenting that the goods or services that they sell have characteristics, ingredients, uses, benefits, or quantities, which they do not have;

    e. Misrepresenting that the goods or services that they sell are of a particular standard, quality, or grade, or that goods are of a particular style or model, when they are not;

    f. Advertising goods or services with intent not to sell them as advertised;

    g. Misrepresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not;

    h. Using innuendo or ambiguity as to material facts when such failure tends to mislead;

    i. Engaging in unconscionable conduct;

j.  Directing conduct at disabled persons, namely minors (traditionally recognized under these states' laws as having the "disability of nonage," "disability of infancy," or similar term) with diminished mental capacity to resist Defendant's advertising, product flavors and addictive nicotine products; caused the loss of assets essential to the health or welfare of the disabled persons (minors); and caused actual physical, emotional, or economic damage to disabled persons (minors), who are substantially more vulnerable than other members of the public to the Defendant's conduct because of their age, impaired understanding and diminished mental capacity;

k.  Using coercion in a transaction with respect to minors;

l.  Failing to honor a warranty;

m.  Soliciting to engage in a consumer transaction without the appropriate permits or licenses;

n.  Misleading about a substance or failing to identify the contents of the package or the nature of the substance contained inside the package;

o.  Misleading or causing misunderstanding as to the effects that a substance causes when ingested, injected, inhaled, or otherwise introduced into the human body;

p.  Making an assertion of scientific, clinical or quantifiable fact in an advertisement which would cause a reasonable person to believe that the assertion is true, even when, at the time the assertion is made, the person making lacks sufficient factually objective scientific, clinical or quantifiable evidence which substantiates the assertion; and

q.  Engaging in other conduct which similarly creates a likelihood of deception, confusion, or misunderstanding.

331.  Until the present, Defendant has knowingly accepted the benefits of its deceptive conduct in the form of profits from the sale of JUUL E-cigarettes and JUULpod nicotine salt cartridges.

332. As a proximate result of the above-described deceptive acts, Plaintiffs and members of the Class and subclasses: (a) purchased and used JUUL nicotine products when they would not otherwise have done so; (b) suffered economic losses consisting of the cost of purchase of JUUL nicotine products; (c) suffered and/or will suffer additional economic losses in purchasing JUUL nicotine products to maintain their addiction; and (d) suffered and will suffer additional economic losses incidental to their addiction..

333. As a direct and proximate result of these deceptive practices, Plaintiffs and the members of the Class and subclasses have been damaged and are entitled to recover actual damages, restitution, statutory damages and punitive damages to the extent permitted by law, including class action rules, in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Fraud)

*On behalf of the Class*

334. Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

335. On the dates set forth in this Complaint, and within the three years prior to the filing of this lawsuit, Defendant fraudulently and deceptively sold JUUL products to Plaintiffs as non-addictive nicotine delivery systems, or less addictive nicotine products than cigarettes, when Defendant knew it to be untrue. On those same dates, Defendant fraudulently and deceptively failed to disclose to Plaintiffs that the JUUL nicotine salts they were purchasing were highly addictive in nature, making it extremely difficult for Plaintiffs to cease purchasing JUULpod refills. On the same dates, Defendant fraudulently and deceptively informed Plaintiffs that they would be able to cease purchasing JUULpods "anytime," when they knew it to be untrue. On those same dates, Defendant fraudulently and deceptively failed to disclose to Plaintiff that the nicotine benzoate salts in JUULpods delivered nicotine to blood plasma at a rate four times higher than a smoked Pall Mall cigarette, which was likely to make the nicotine addiction associated with JUUL products stronger and more severe than that associated with cigarettes or other E-cigarette products. Defendant made each of these misrepresentations and omissions to those

similarly situated as Plaintiffs.

336.     Each of these misrepresentations and omissions were material at the time they were made. In particular, each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiffs, and those similarly situated, as to whether to purchase a JUUL E-cigarette and JUULpod. Defendant had a fiduciary duty to accurately provide this information to Plaintiffs, and those similarly situated. In not so informing Plaintiffs, and those similarly situated, Defendant breached its duty to each of them.  Defendant also gained financially from, and as a result of, its breach.

337.     Plaintiffs, and those similarly situated, relied to their detriment on Defendant's fraudulent omissions. Had Plaintiffs, and those similarly situated, been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation not purchasing a JUUL E-cigarette or JUULpod(s) and not subscribing to Defendant's "autoship" service.

338.     Plaintiffs  the following specific fraud allegations with as much specificity as possible absent access to the information necessarily available only to Defendant:

339.     *Who:* Defendant actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes from Plaintiffs and Class Members while simultaneously disclosing false or misleading evidence concerning nicotine content. Defendant also actively concealed the benzoic acid content of the JUUL e-cigarettes, while knowing that benzoic acid played a central role in determining the physiological effects of JUUL e-cigarettes. Defendant also manipulated the formulations of JUUL devices and JUULpods in ways that could and would impact their potency and addictiveness, and Defendant did so without notifying Plaintiffs. Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at JUUL or PAX responsible for such decisions.

340.     *What:* Defendant knew, or was negligent or reckless in not knowing, that the JUUL e-cigarettes were likely to aggravate nicotine addiction in smokers and posed extreme risks of addiction to children and made misrepresentations about the risks, effects, operation, content, and other attributes of JUUL e-cigarettes.  These misrepresentations include both omissions of

nicotine warning, omission of facts regarding the increased potency and addictiveness of nicotine salts, misrepresentations about the amount of nicotine in JUULpods and the absorption thereof through use of JUUL, and misrepresentations of using JUUL as a fun, healthy activity for the young, without disclosing the long-term health effects and the actual feeling of being addicted to nicotine.

341. *When*: Defendant concealed material information regarding the effect of JUUL e-cigarettes at all times and made representations from the time when the JUUL e-cigarette was announced to this day. Defendant still has not disclosed the truth about JUUL e-cigarettes. Defendant has amplified and cemented these misrepresentations in the minds of the public through its unprecedented social media efforts, the full scope of which is not yet fully known.

342. *Where:* Defendant concealed material information and made misrepresentations regarding the true nature of JUUL e-cigarettes' nicotine formula on JUUL's websites, interviews with the media, promotional materials, and through social media. Plaintiff is aware of no document, communication, or other place or thing in which Defendant discloses consistent or truthful statements about JUUL e-cigarettes' potency or its actual nicotine content. Such information is not disclosed on JUUL's website or in any marketing materials or advertising materials.

343. *How*: Defendant concealed critical information from Plaintiff and Class Members concerning the potency and effects of JUUL use, or made representations about the nicotine content and potency of the JUUL e-cigarettes that were false or misleading. Defendant actively concealed the truth about the real impact of JUUL e-cigarette use from Plaintiffs and Class Members at all times, even though it knew such information would be important to a reasonable consumer, and Defendant promised in JUUL's marketing materials that the JUUL e-cigarettes have qualities that they do not have.

344. *Why:* Defendant actively concealed material information about the potency of JUUL e-cigarettes for the purpose of inducing Plaintiffs and Class Members to purchase and/or use JUUL e-cigarettes. Had Defendant disclosed the truth—that the JUUL e-cigarette was, by design, more physically addictive than cigarettes, for example in its advertisements or other

materials or communications, Plaintiffs and Class Members (all reasonable consumers) would have been aware of this fact, and would not have bought JUUL e-cigarettes or would have used them in a way that posed fewer risks of creating or aggravating nicotine addiction.

345. More information about each of these elements is provided in greater detail in the body of this complaint, above.

346. By and through such fraud, deceit, misrepresentations and/or omissions, Defendant intended to induce Plaintiffs, and those similarly situated, to alter their positions to their detriment.

347. Plaintiffs, and those similarly situated, justifiably and reasonably relied on Defendant's misrepresentations and/or omissions, and, accordingly, were damaged by the Defendant.

348. As a direct and proximate result of Defendant's misrepresentations and/or omissions, Plaintiffs, and those similarly situated, have suffered damages in an amount equal to: (a) the amount that Defendant charged them; and (b) the amount they paid in excess of what they would have paid for a less addictive e-cigarette and refill cartridges containing nicotine in a non-salt formulation.

349. Defendant's conduct as described herein was willful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiff, and those similarly situated.

### THIRD CAUSE OF ACTION

### (Unjust Enrichment)

*On behalf of the Class*

350. Plaintiffs reallege and incorporate by reference the paragraphs of this Class Action Complaint as if set forth herein.

351. By means of Defendant's wrongful conduct alleged herein, Defendant knowingly sold JUUL Products to Plaintiffs and members of the Class in a manner that was unfair, unconscionable, and oppressive.

352. Defendant knowingly received and retained wrongful benefits and funds from

Plaintiffs and members of the Class. In so doing, Defendant acted with conscious disregard for the rights of Plaintiffs and members of the Class.

353. As a result of Defendant's wrongful conduct as alleged herein, Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs and members of the Class.

354. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

355. Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, without justification, from selling JUUL Products to Plaintiffs and members of the Class in an unfair, unconscionable, and oppressive manner. Defendant's retention of such funds under such circumstances making it inequitable to do so constitutes unjust enrichment.

356. The financial benefits derived by Defendant rightfully belong to Plaintiffs and members of the Class. Defendant should be compelled to return in a common fund for the benefit of Plaintiffs and members of the Class all wrongful or inequitable proceeds received by them.

357. Plaintiffs and members of the Class have no adequate remedy at law.

**FOURTH CAUSE OF ACTION**

**(Strict Product Liability – Failure to Warn)**

***On Behalf of the Class and the Youth Subclass***

358. Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

359. Defendant designed, manufactured, distributed and sold JUUL devices and JUUL pods.

360. Defendant was aware that the JUUL devices, when used in conjunction with JUUL pods, had risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL devices and JUUL pods.

361. The use of JUUL devices and JUUL pods presented a substantial danger of nicotine exposure and addiction as described herein when a JUUL device was used with a JUUL

pod.  This danger was even greater with regard to youths and adolescents.

362.     Plaintiffs and members of the Class were not aware and would not have recognized the risks of using a JUUL device with a JUUL pod because Defendant intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.

363.     Plaintiffs and members of Youth Subclass also were not aware that the JUUL device and JUUL pods pose to youths and adolescents. Plaintiffs and members of the Youth Subclass were unable to appreciate the potential dangers, risks, and consequences of using a JUUL device with a JUUL pod because of their youth, inexperience and/or immaturity of judgment.

364.     In all forms of advertising as well as social media communications, Defendant failed to adequately warn or instruct foreseeable users, including youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction as explained herein. Defendant failed to adequately warn in its advertising, social media communications, or anywhere on the product label that the product was not safe for minors and should not be used or consumed by them. Instead, as described herein, Defendant marketed its products to minors and made them available in youth-friendly colors and flavors.  Defendant also designed its products to be more palatable to youth and nonsmokers by reducing "throat hit" and increased the level of nicotine that is absorbed by users, making them even more addictive.

365.     JUUL also failed to warn that its products were defective and did not conform to JUUL's representations about JUUL pods' nicotine content, the pharmacokinetics of JUUL use, and JUUL pods' cigarette equivalence. JUUL products contain and deliver significantly more nicotine than JUUL represents. As described herein, JUUL pods actually contain 6.3% nicotine salt rather than 5% nicotine as advertised, JUUL delivers up to 52-72% more nicotine per puff than a traditional cigarette and the nicotine content of JUUL pods is closer to 24 cigarettes, or at least 20% more than one pack. These defects cause, maintain, or aggravate nicotine addiction and subject consumers to harm caused by increased exposure to nicotine as described herein.

366. The defects in JUUL Products, including the lack of warnings, existed at the time the JUUL pods and devices were sold and/or when the JUUL pods and devices left JUUL's possession or control.

367. The JUUL devices and pods were expected to be used by Plaintiffs and Members of the Class and Youth Subclass without substantial change in their condition from the time of their manufacture or sale.

368. By selling JUUL products to consumers like Plaintiffs and Class and Youth Subclass members when it already knew of the defects and dangerous qualities through internal testing and published reports, JUUL is strictly liable for the injuries that JUUL pods and devices have caused and will cause to Plaintiffs and Members of the Class and Youth Subclass.

369. Defendant's lack of sufficient instructions or warnings were a substantial factor in causing harm to Plaintiffs identified above.

370. Plaintiffs and the members of the Class and Youth Subclass were injured as a direct and proximate result of Defendant's breach because: (a) they would not have purchased JUUL products, they would have paid less for them, or they would have used them differently if they had known the true facts; (b) they paid a premium price for the JUUL products as a result of Defendant's failure to warn and misrepresentations; (c) they purchased JUUL products that did not have the characteristics, qualities, or value affirmed and promised by Defendant; and (d) they have become addicted to nicotine and will need to undertake nicotine cessation treatments.

**FIFTH CAUSE OF ACTION**
**NEGLIGENT FAILURE TO WARN**
*On Behalf of the Class and Youth Subclass*

371. Plaintiffs re-allege and incorporate the preceding paragraphs as if fully set forth herein.

372. Defendant owed a duty to all persons, including youths and adolescents, who were reasonably foreseeable users of Defendant's products, to design, develop, formulate, test, and manufacture a product reasonably free of defect. JUUL had a duty to disclose to consumers, including youths and adolescents, the foreseeable risks associated with the use of JUUL devices

and pods, including that the JUUL devices and pods were particularly unsafe for youths and adolescents due to their increased vulnerability to nicotine addiction.

373. At the time Defendant manufactured, distributed and sold JUUL devices and JUUL pods, Defendant was aware that the JUUL devices, when used in conjunction with JUUL pods, had risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of the products, including that the JUUL devices and pods were particularly harmful to youths and adolescents.

374. Defendant was negligent in that it knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious to nonsmokers, youths and adolescents, including the Plaintiffs and members of the Class and Youth Subclass, but failed to use reasonable care to warn Plaintiffs and members of the Youth Subclass of the potentially harmful and injurious effects in the manner that a reasonable person would under the same or similar circumstances.

375. The use of JUUL devices and JUUL pods presented a substantial danger of causing persons, particularly youths and adolescents, the harms of nicotine exposure and addiction as described herein when a JUUL device was used or misused with a JUUL pod in an intended or reasonably foreseeable way by youths and adolescents.

376. Plaintiffs and members of the Class and Youth Subclass were not aware and would not have recognized the risks of using a JUUL device with a JUUL pod because Defendant intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction that the JUUL device and JUUL pods pose, particularly to youths and adolescents. Plaintiffs and members of the Class were unable due to Defendant's conduct to appreciate the potential dangers, risks, and consequences of using a JUUL device with a JUUL pod; the members of the Youth Subclass were particularly unable to so appreciate because of their youth, inexperience, and/or immaturity of judgment.

377. JUUL failed to exercise reasonable care and give adequate warnings or instructions to consumers, particularly youths and adolescents, including Plaintiffs and Members

of the Class and Youth Subclass, about the reasonably foreseeable dangers that could result from using JUUL's devices and pods under reasonably foreseeable conditions. JUUL knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks.

378.    In all forms of advertising as well as social media communications, Defendant failed to adequately warn or instruct foreseeable users, particularly youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction as explained herein. Defendant failed to adequately warn in its advertising, social media communications, or anywhere on the product label that the product was not safe for minors and should not be used or consumed by them. Instead, as described herein, Defendant marketed its products to minors and made them available in youth-friendly colors and flavors.

379.    As described herein, JUUL products are also inherently defective and fail to conform to JUUL's affirmations of fact about JUUL pods' nicotine content, the pharmacokinetics of JUUL use, and JUUL pods' cigarette equivalence. JUUL products contain and deliver significantly more nicotine than JUUL represents. As described herein, JUUL pods actually contain 6.3% nicotine salt rather than 5% nicotine as advertised, JUUL delivers up to 52-72% more nicotine per puff than a traditional cigarette, and the nicotine content of JUUL pods is closer to 24 cigarettes, or 20% more than one pack. These defects cause, maintain, or aggravate nicotine addiction and subject consumers, including Plaintiffs, to harms caused by increased exposure to nicotine.

380.    By selling JUUL products containing defects to consumers like Plaintiffs and members of the Class and Youth Subclass when it already knew of the unreasonable dangers and defects through internal testing and published reports, JUUL failed to change the formulation of JUUL products and breached its duty to warn Plaintiffs that the JUUL products were inconsistent with its affirmations of fact.

381. Plaintiffs relied on JUUL's representations and advertising during the class period.

382. Plaintiffs identified above were harmed by Defendant's failure to warn. Defendant's lack of sufficient instructions or warnings were a substantial factor in causing harm to Plaintiffs and members of the Class and Youth Subclass.

383. Plaintiffs and the members of the Class and Youth Subclass were injured as a direct and proximate result of Defendant's breach because: (a) they would not have purchased JUUL products, they would have paid less for them, or they would have used them differently if they had known the true facts; (b) they paid a premium price for the JUUL products as a result of Defendant's failure to warn and misrepresentations; (c) they purchased JUUL products that did not have the characteristics, qualities, or value affirmed and promised by Defendant; and (d) they have become addicted to nicotine and will need to undertake nicotine cessation treatments.

## SIXTH CAUSE OF ACTION

### (Strict Liability – Design Defect)
*On Behalf of the Class and the Youth Subclass*

384. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

385. This claim is brought by Plaintiffs on behalf of the Class and the Youth Subclass.

386. Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL devices and JUUL pods, which were intended by Defendant to be used as a method of ingesting nicotine and the other aerosolized constituents of JUUL's nicotine solution.

387. Defendant knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious, particularly to youths and adolescents, including the Plaintiffs and members of the Class and Youth Subclass.

388. Nevertheless, as described herein, Defendant designed its products to appeal to nonsmokers, youths and adolescents and to encourage them to buy and use the product, such as by designing fruit- and candy-flavored JUUL pods, reducing throat hit, and by designing youthful and trendy packaging.

389.     As a result, Defendant's products as designed were unreasonably dangerous, particularly to youths and adolescents, including Plaintiffs and members of the of the Class and Youth Subclass, and therefore defective. Defendant is strictly liable for the injuries that JUUL pods and devices have caused and will cause to Plaintiffs and Members of the Class and Youth Subclass.

390.     Defendant could have utilized cost effective, reasonably feasible alternative designs to prevent these harms, such as by designing products without fruit and candy flavors, not reducing throat hit, or by designing less youthful and trendy packaging.

391.     As described herein, JUUL products are also inherently defective because they contain and deliver significantly more nicotine than JUUL represents. As described herein, JUUL pods actually contain 6.3% nicotine salt rather than 5% nicotine as advertised, JUUL delivers up to 52-72% more nicotine per puff than a traditional cigarette, and the nicotine content of JUUL pods is closer to 24 cigarettes, or 20% more than one pack. These defects cause, maintain, or aggravate nicotine addiction and subject consumers, including Plaintiffs and members of the Class and the Youth Subclass, to harms caused by increased exposure to nicotine, which is particularly injurious to youths and adolescents.

392.     As a result, Defendant's products as designed were unreasonably dangerous, particularly to youths and adolescents, including Plaintiffs and members of the Class and the Youth Subclass, and therefore defective. Defendant is strictly liable for the injuries that JUUL pods and devices have caused and will cause to Plaintiffs and Members of the Class and the Youth Subclass.

393.     Defendant could have utilized cost effective, reasonably feasible alternative designs to prevent these harms, such as by designing products that delivered less nicotine per puff, or used less potent and addictive forms of nicotine and without reduction of the "throat hit" that helps deter new users.

394.     The risks inherent in the design of the JUUL device and JUUL pods outweigh significantly any benefits of such design

395.     Plaintiffs were not aware of the aforementioned defects at any time prior to recent

revelations regarding problems with JUUL products and devices. Further, JUUL knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks..

396. Plaintiffs and Class and Youth Subclass Members suffered harm as a result, in the form of addiction to nicotine or aggravated addiction to nicotine.

397. The defective design of Defendant's products was a substantial factor in causing Plaintiffs' harm.

398. As a legal and proximate result of the aforementioned defects of the subject products, Plaintiffs sustained the injuries and damages set forth herein while using the subject JUUL devices and JUUL pods in a reasonably foreseeable manner.

399. Plaintiffs are, therefore, entitled to damages in an amount to be proven at the time of trial.

## SEVENTH CAUSE OF ACTION

### (Strict Liability – Manufacturing Defect)
*On Behalf of the Class*

400. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

401. This claim is brought by Plaintiffs on behalf of the Class.

402. In manufacturing the JUULpods, Defendant routinely added more nicotine salt to the JUULpods than represented on the JUULpods labels or Defendant's advertising materials.

403. In manufacturing the JUULpods, Defendant routinely added more benzoic acid than the 4% solution specified in the '895 patent, which was the basis of the JUULpods formulation.

404. The variations in the nicotine salt content and/or benzoic acid in Defendant's products caused harm to Plaintiffs and the Class by exacerbating the narcotic effects of Defendant's JUUL e-cigarettes, increasing the risks of nicotine addiction or worsening existing nicotine addictions, causing harm to Plaintiffs and the Class.

405. The manufacturing defects in Defendant's products were a substantial cause of Plaintiffs' nicotine addiction or aggravation of their nicotine addiction.

406.

## EIGHTH CAUSE OF ACTION

### (Product Liability - Negligent Design Defect)
*On Behalf of the Youth Subclass*

407. Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

408. This claim is brought by Plaintiffs on behalf of the Youth Subclass.

409. Defendant designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL devices and JUUL pods, which were intended by Defendant to be used as a method of ingesting nicotine and the other aerosolized constituents of JUUL's nicotine solution.

410. Defendant owed a duty to youths and adolescents, who were reasonably foreseeable users of Defendant's products, to design, develop, formulate, test, and manufacture a product reasonably free of defect..

411. At the time Defendant manufactured, distributed and sold JUUL devices and JUUL pods, Defendant was aware that the JUUL devices, when used in conjunction with JUUL pods, had risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of the products, including that the JUUL devices and pods were particularly harmful to youths and adolescents. Defendant had a duty to refrain from designing its products in a way that would appeal to youths and adolescents due to their increased vulnerability to nicotine addiction.

412. Defendant was negligent in that it knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious to youths and adolescents, including the Plaintiffs and members of the Youth Subclass, but failed to use reasonable care to design its products in a way to prevent youths and adolescents from buying and

using them.

413.    Instead, as described herein, Defendant negligently designed its products in ways that appeal to youths and adolescents and encourage them to buy and use the product, such as by designing fruit- and candy-flavored JUUL pods, reducing throat hit, and by designing youthful and trendy packaging.

414.    Defendant could have utilized cost effective, reasonably feasible alternative designs to prevent these harms, such as by designing products without fruit and candy flavors, without reduction of the "throat hit," and by designing less youthful and trendy packaging.

415.    As described herein, Defendant was also negligent in that it knew or, by the exercise of reasonable care, should have known that its products contain and deliver significantly more nicotine than JUUL represents. As described herein, JUUL pods actually contain 6.3% nicotine salt rather than 5% nicotine as advertised, JUUL delivers up to 52-72% more nicotine per puff than a traditional cigarette, and the nicotine content of JUUL pods is closer to 24 cigarettes, or 20% more than one pack.  These defects cause, maintain, or aggravate nicotine addiction and subject consumers, including Plaintiffs and members of the Youth Subclass to harms caused by increased exposure to nicotine, which is particularly injurious to youths and adolescents.

416.    Defendant could have utilized cost effective, reasonably feasible alternative designs to prevent these harms, such as by designing products that delivered less nicotine per puff, or used less potent and addictive forms of nicotine.

417.    The risks inherent in the design of the JUUL device and JUUL pods outweigh significantly any benefits of such design.

418.    Plaintiffs were not aware of the aforementioned defects at any time prior to recent revelations regarding problems with JUUL products and devices. Further, JUUL knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks.

419.    Plaintiffs and members of the Youth Subclass suffered harm as a result, in the

form of addiction to nicotine or aggravated addiction to nicotine.

420. The defective design of Defendant's products was a substantial factor in causing Plaintiffs' harm.

421. As a legal and proximate result of the aforementioned defects of the subject products, Plaintiffs sustained the injuries and damages set forth herein while using the subject JUUL devices and JUUL pods in a reasonably foreseeable manner.

422. Plaintiffs are, therefore, entitled to damages in an amount to be proven at the time of trial.

## **NINTH CAUSE OF ACTION**

### **(Negligent Marketing)**

*On behalf of the Negligent Marketing Youth Subclass*

423. Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs as though fully set forth herein..

424. JUUL owes numerous duties to Plaintiffs and the other members of the Class. These duties include:

    a. to exercise reasonable care in ensuring that its marketing does not target minors;

    b. to exercise reasonable care in ensuring that its electronic cigarette devices and JUULpods are not sold and/or distributed to minors and are not designed in a manner that makes them unduly attractive to minors;

    c. to use reasonable and adequate procedures that are compliant with industry-standard practices in ensuring that distributors and retailers of its electronic cigarette devices and JUULpods do not sell and/or distribute them to minors; and

    d. to implement processes to quickly detect whether its electronic cigarette devices and JUULpods are sold and/or distributed to minors and to timely act on this information to eliminate the sale and/or distribution of electronic cigarette devices and JUULpods to minors.

425.     Under several states' laws, JUUL owes a statutory duty to Plaintiffs and Negligent Marketing Subclass members to not sell and/or distribute its electronic cigarette devices and JUULpods to minors and to undertake appropriate measures to comply with this mandate, including the following laws: ALA. CODE § 28-11-13(a); ALASKA STAT. § 11.76.109; ARIZ. REV. STAT. § 13-3622(A); ARK. CODE ANN. § 5-27-227(a)(1); CAL. BUS. & PROF. CODE §§ 22958(a) and 22963(a); CAL. PENAL CODE § 308(a)(1)(A); CAL. BUS. & PROF. CODE §§ 22963 (a), (b); COLO. REV. STAT. §§ 18-13121(1)(a) and 44-7-103; CONN. GEN. STAT. § 53-344b(b); DEL. CODE ANN. tit. 11, §§ 1116(a) and 1118(a); D.C. Code § 7-1721.02; FLA. STAT. § 877.112(2)–(3); GA. CODE ANN. § 16-12-171(a)(1)(A); HAW. REV. STAT. § 7121258(1) and § 245-(a); IDAHO CODE ANN. §§ 39-5705(1) and39-5714(1); 720 ILL. COMP. STAT. 675/1.5(b) and 720 ILL. COMP. STAT. 675/1.5(c)(2); IND. CODE §§ 35-46-1-10(a), 35-46- 1-10.2(a); §§ 7.1-7-5.5-1; 7.1-7-5.5- 5; 7.1-7-5.5- 3; 7.1-7-5.5-2; IND. CODE § 7.1-7-4-6(b); IOWA CODE ANN. § 453A.2(1); KAN. STAT. ANN. § 79-3321(l); KY. REV. STAT. ANN. §§ 438.310(1); 438.313(1) 438.315(1); LA. REV. STAT. ANN. §§ 14:91.8(C); 26:911(A)(1); and 14:91.6(A); ME. REV. STAT. ANN. tit. 22 § 1555-B (2); MD. CODE ANN., HEALTH GEN. § 24- 305(b); MD. CODE ANN., CRIM LAW §§ 10- 107(b)(2), (c)(1); MASS. GEN. LAW ch. 270 § 6 (b), 940 MASS. CODE REGS. 21.04(3), and 940 MASS. CODE REGS. 21.04(1)(c), (4)(a); MINN. STAT. §§ 609.685(1)(a), (2)(a); MISS. CODE ANN. § 97-32-51(2); MO. REV. STAT. §§ 407.926.1 and 407.931.1; NEB. REV. STAT. §§ 28-1419;  28-1425; NEV. REV. STAT. ANN. § 202.2493.2; N.H. REV. STAT. ANN. §§ 126-K:4(I); 126K:8(I); N.J. STAT. §§ 2A:170-51.4(a)(2) and 2C:33-13.1(a); N.M. STAT. ANN. §§ 30-493(A),(E); 30-49-8(A); N.Y. PUB. HEALTH LAW §§ 1399-cc(2), 1399-bb(4), and 1399-bb(5); N.C. GEN. STAT. § 14-313(b) and N.C. GEN. STAT. § 14-313(b2); N.D. CENT. CODE § 12.1-3103(1)(a); OHIO REV. CODE ANN. § 2927.02(B)(1); OKLA. STAT. tit. 37 §§ 600.3(A) and 600.13(A); OR. REV. STAT. ANN. §§ 167.755(1); R.I. GEN. LAWS ANN. §§ 11-9-13, 11-9-13.10 and 11-9-13.8(1); S.C. CODE ANN. §§ 16-17-500(A); 16-17- 502(A); S.D. CODIFIED LAWS § 34-46-2(1); TENN. CODE ANN. § 39-17-1504(a) and § 39-17-1504(d); TEX. HEALTH & SAFETY CODE ANN. §§ 161.082, 161.087 and 161.452(c); UTAH CODE ANN. § 76-10-104(1); 7 VT. STAT.

ANN § 1003(a); VA. CODE ANN. § 18.2-371.2(A), VA. CODE ANN. § 18.2- 371.2(C); WASH. REV. CODE ANN. § 26.28.080(1) and § 70.345.090(1)-(7); W. VA. CODE ANN. § 16-9A-2(b)(3); WIS. STAT. ANN. § 134.66(2)(a); and WYO. STAT. ANN §§ 14-3-302(a),(c).

426. JUUL knew the risks that minors would be attracted to its electronic cigarette devices and JUULpods and knew or should have known the importance of ensuring that the products were not sold and/or distributed to minors.

427. JUUL knew or should have known that its marketing, distribution, and sales practices did not adequately safeguard Plaintiffs and the other Class members from the sale and/or distribution of electronic cigarette devices and JUULpods and, in fact, induced minors to purchase JUUL products.

428. JUUL breached the duties it owes to Plaintiff and Class members in several ways, including by:

a. designing and manufacturing a product that, due to its ease of inhalation, deceptive flavoring and nicotine potency, is hazardous to foreseeable users, namely minors;

b. permitting the implementation of inadequate systems, protocols and practices by itself and by its distributors and retailers that allowed minors to purchase and/or receive its electronic cigarette devices and JUULpods, creating a foreseeable risk of harm;

c. inducing the purchase of JUUL e-cigarettes and JUULpods by minors through marketing its products to youth and adolescents, such as through the use of "viral" social media campaigns, and by fostering a "cool," youthful image;

d. failing to comply with the minimum industry standards with respect to its distributors and retailers; and

e. failing to take timely, affirmative steps to eliminate the sale and/or distribution of e-cigarettes to minors when it knew that minors were purchasing and receiving its e-cigarettes.

429. But for JUUL's wrongful and negligent breach of the duties it owed to Plaintiffs

and the other Class members, they would not have been induced to purchase JUUL products and unable to acquire them.

430.     The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of JUUL's negligent conduct.

## TENTH CAUSE OF ACTION

### (Negligent Misrepresentation)

*On behalf of the Class*

431.     Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

432.     This claim is brought by Plaintiffs on behalf of the Class.

433.     As alleged above, Defendant has misrepresented the nicotine content of JUULpods on its label.  And as alleged above, Defendant has also misrepresented the potency and addictiveness of its nicotine salt formulation, the suitability of JUULpods as a "treat" to be enjoyed with meals, the nicotine content of JUULpods, and the use of JUULpods as a cool, fun, healthy activity rather than a means of delivering a highly addictive dose of nicotine.

434.     When making these statements, Defendant was aware that these representations were false or made them without knowledge of their truth or veracity.

435.     The negligent misrepresentations and omissions made by Defendant, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiffs and all Class members to purchase the products at issue.

436.     Plaintiffs would not have purchased JULL e-cigarettes, or would not have purchased the products on the same terms, if Plaintiffs had known the truth of the facts misrepresented by Defendant.

437.     Plaintiffs and Class members are entitled to damages and other legal and equitable relief as a result.

## TWELFTH CAUSE OF ACTION

### (Negligent Per Se – Lack of Licensure)
*on behalf of the Licensure Subclass*

438.     Plaintiffs repeat and re-allege the allegations contained in the foregoing paragraphs

as though fully set forth herein.

439. JUUL owes statutory duties to Plaintiffs and the other members of their Subclasses to exercise reasonable care in ensuring that its electronic cigarette devices and JUULpods are not sold in these states because JUUL lacks the adequate licensing. The following state laws required JUUL to have a license for retail sale of electronic cigarettes: ALASKA STAT. § 43.70.075(a); ARK. CODE ANN. §§ 26- 57-214 and 26-57- 215(b); CAL. BUS. & PROF. CODE §§ 22972; CONN. GEN. STAT. § 21a415(a); D.C. CODE § 47- 2404(a); HAW. REV. STAT. § 28-164; IND. CODE §§ 7.1-3- 18.5-1 and 7.1-7-5- 1.1(a); IOWA CODE ANN. §§ 453A.47A(1 ); 453A.13(1); and 453A.36 (7)(a); KAN. STAT. ANN. § 793303(a); LA. REV. STAT. ANN. § 26:902(1); ME. REV. STAT. ANN. tit. 22 § 1551-A(1); MD. CODE ANN., BUS. REG.§§ 16.7-201, 16.7-211(a), 16.7-213(a); MO. REV. STAT. § 407.934.1; MONT. CODE ANN. § 16-11303(1); 72 PA. CONS. STAT. § 8220-A(a); R.I. GEN. LAWS ANN. § 23-1-56(a); TEX. HEALTH & SAFETY CODE ANN. § 161.456 and 34 TEX. ADMIN. CODE 3.1206(b); TEX. HEALTH & SAFETY CODE ANN. § 161.452(c); UTAH CODE ANN. § 5914-803(1) UTAH CODE ANN. § 2662-201; 7 VT. STAT. ANN. § 1002(a); WASH. REV. CODE ANN. § 70.345.030(1)(a)

440. JUUL knew or should have known that it lacked adequate licensing to sell and distribute its electronic cigarette devices and JUULpods in these states.

441. The licensing laws are intended to protect Plaintiffs and Class Members from the unlawful sale of electronic cigarette devices and nicotine pods.

442. JUUL breached the duties it owed to Plaintiffs and Subclass members by selling and distributing electronic cigarette devices and JUULpods in these states without, on information and belief, adequate licensure.

443. But for JUUL's wrongful and negligent breach of the duties it owed to Plaintiffs and the other Subclass members, they would not have been able to acquire the electronic cigarette devices and JUULpods.

444. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of JUUL's negligent conduct.

445.

**TWELFTH CAUSE OF ACTION**
**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. §§ 2301, *et seq.*)**

*On behalf of the Class*

446.    Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

447.    Plaintiffs bring this action on behalf of themselves and the Class against Defendant JUUL Labs, Inc.

448.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

449.    Plaintiffs and members of the Class are "consumers" within the meaning of 15 U.S.C. § 2301(3).

450.    Defendant is a "supplier" and "warrantor" within the meaning of 15 U.S.C. § 2301(4) and (5), respectively.

451.    The Products are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

452.    Plaintiffs have met all requirements for pre-suit notice.

453.    Plaintiffs have met all requirements for pre-suit notice.15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

454.    The amount in controversy of Plaintiffs' individual claims meets or exceeds $25.00 in value. In addition, the amount in controversy meets or exceeds $50,000 in value (exclusive of interest and costs) on the basis of all claims to be determined in this lawsuit.

455.    Defendant provided Plaintiffs and each member of the Class with "written warranties" and "implied warranties," as identified herein, which are covered under 15 U.S.C. § 2301(6) and (7), respectively.

456.    Defendant's written warranty includes written affirmations of fact made in connection with the sale of JUUL products on its website, print advertising, marketing materials, and on its packaging materials that state "1 JUULpod contains ~.7ml with 5% nicotine by

weight" and is "approximately equivalent to about 1 pack of cigarettes," and that each JUULpod is "5% Strength." As described herein, these statements are false and significantly misrepresent the amount of nicotine in JUUL's products.

457. Defendant's implied warranties include affirmations that the percentage of nicotine in JUULpods match the represented amount of nicotine on JUUL's containers, and that JUUL e-cigarettes are fit for their intended purposes of offering an alternative to cigarettes, despite the fact that JUUL products, when used as intended or as reasonably foreseeable, merely continue, worsen or aggravate users' underlying nicotine addiction while exposing the consumer to new and increased harm posed by JUUL products, as set forth herein..

458. The terms of these warranties became part of the basis of the bargain when Plaintiffs and each member of the Class purchased their Products.

459. Defendant breached these written and implied warranties as described in detail herein. Without limitation, the Products share common defects in that they contain and deliver significantly more nicotine than: (a) was expressly and impliedly represented, and (b) was revealed to approving regulators, consumers, and the public.

460. Plaintiffs and each member of the Class have had sufficient direct dealings with either Defendant or its agents (including directly online and through retailers) to establish privity of contract between Defendant, on the one hand, and Plaintiffs and each member of the Class, on the other hand. Nonetheless, privity is not required here because Plaintiffs and each member of the Class are intended third-party beneficiaries of contracts between Defendant and its retailers, and specifically, of Defendant's implied warranties. The retailers were not intended to be the ultimate consumers of the Products and have no rights under the warranties provided with the Products; the warranty agreements were designed for and intended to benefit consumers only.

461. Affording Defendant a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile. At the time of sale or each Product, Defendant knew, or should have known, of its misrepresentations and/or material omissions concerning the Products' inability to function as warranted, but nonetheless failed to rectify the situation and/or disclose the defects. Under the circumstances, the remedies available under any informal

settlement procedure would be inadequate and any requirement that Plaintiffs or members of the Class resort to an informal dispute resolution procedure and/or afford Defendant a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

462.    In addition, given the conduct described herein, any attempts by Defendant, in its capacity as a warrantor, to limit the implied warranties in a manner that would exclude coverage of the defects in JUUL products is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defects is null and void.

463.    As a direct and proximate result of Defendant's breach of the written and implied warranties, Plaintiffs and each member of the Class have suffered damages.

464.    Plaintiffs, individually and on behalf of the Class, seek all damages permitted by law, including compensation for the cost of purchasing the Products, along with all other incidental and consequential damages, statutory attorney fees, and all other relief allowed by law.

## THIRTEENTH CAUSE OF ACTION
### BREACH OF EXPRESS WARRANTY
### U.C.C. § 2-313
### (On behalf of the Warranty Subclass)

465.    Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

466.    For the court's convenience, attached to this complaint as Appendix F is a table identifying each state statute adopting the U.C.C.'s provision, U.C.C. § 2 313, on express warranties. Plaintiffs have met all requirements for pre-suit notice.

467.    JUUL has expressly warranted to Plaintiffs and Class members through written statements, descriptions, and affirmations of fact on its website, print advertising, marketing materials, and its packaging materials that "1 JUULpod contains ~.7ml with 5% nicotine by weight" and is "approximately equivalent to about 1 pack of cigarettes."

468.    JUUL also expressly warranted that JUULpods are "5% Strength" as stated on the front of JUUL's product packaging.

469.    JUUL also expressly warranted that one JUULpod is equivalent to "1 pack of cigarette or 200 puffs" as stated on JUUL's website and marketing materials.

470. JUUL also expressly warranted that JUUL use causes less, or at least no more, nicotine to enter the bloodstream than a cigarette and that one JUULpod is equivalent to "1 pack of cigarette or 200 puffs" as stated on JUUL's website and marketing materials.

471. These affirmations of fact became the basis of the bargain between JUUL and Plaintiffs and all Class members, thereby creating express warranties that JUUL products would conform to JUUL's affirmations of fact, representations, promises, and descriptions.

472. As described herein, JUULpods actually contain 6.2% nicotine salt rather than 5% nicotine as advertised, and JUUL delivers more nicotine per puff than a traditional cigarette. JUULpods contain significantly more nicotine than one pack of cigarettes.

473. JUUL products are defective and fail to conform to JUUL's affirmations of fact about JUULpods' nicotine content, the pharmacokinetics of JUUL use, and JUULpods' cigarette equivalence in violation of JUUL's express warranties. JUUL products contain and deliver significantly more nicotine than JUUL represents. These defects cause, maintain, or aggravate nicotine addiction and subject consumers to harm caused by increased exposure to nicotine as described herein.

474. By selling JUUL containing these defects to consumers like Plaintiffs and Class members when it already knew of the defects through internal testing and published reports, JUUL failed to adjust the nicotine content in JUUL products and breached its express warranty to provide JUUL products that were consistent with its affirmations of fact.

475. Plaintiffs and the members of the Class were injured as a direct and proximate result of Defendant's breach of its express warranty because: (a) they would not have purchased JUUL products, they would have paid less for them, or they would have used them differently if they had known the true facts; (b) they paid a premium price for the Product as a result of Defendant's misrepresentations and breach of its express warranties; and (c) they purchased Products that did not have the characteristics, qualities, or value affirmed and promised by Defendant.

476. JUUL's breach of its expressed warranties damaged Plaintiffs and the Class Members in an amount to be proven at trial.

477.   ***Plaintiffs also allege the following*** on behalf of the Express Warranty Reliance *Subclass:*

478.   Plaintiffs and the proposed Class members relied upon JUUL's affirmations of fact regarding the nature of nicotine content and delivery provided by JUUL devices and JUUL pods in deciding to purchase the JUUL products.

**FOURTEENTH CAUSE OF ACTION**
**BREACH OF IMPLIED WARRANTY**
**U.C.C. §2-314**
**(On behalf of the Warranty Subclass)**

479.   Plaintiffs repeat and reallege the allegations above as if fully set forth herein.

480.   This claim is brought by Plaintiffs on behalf of the Warranty Subclass.

481.   For the court's convenience, attached to this complaint as Appendix G is a table identifying each state statute adopting the U.C.C.'s provision, U.C.C. § 2 314**,** on express warranties. Plaintiffs have met all requirements for pre-suit notice.

482.   Defendant, through the acts and omissions alleged herein, in the sale, marketing, and promotion of JUUL products impliedly warranted that JUUL e-cigarettes and cigarettes were equivalent in terms of nicotine content, pharmacokinetics, and puff-count.

483.   Defendant is a merchant with respect to the good which were sold to Plaintiff and the Class.

484.   A warranty that the JUUL products were in merchantable condition and fit for the ordinary purpose for which a smoking alternative or smoking cessation device would be used is implied by law pursuant to U.C.C. § 2 314.

485.   Defendant, through the acts and omissions alleged herein, in the sale, marketing, and promotion of JUUL products, impliedly warranted that JUUL e-cigarettes were safe, safer than cigarettes, and that they were equivalent to cigarettes in terms of nicotine content, pharmacokinetics, and puff-count.

486.   JUUL e-cigarettes are not fit for their intended purposes of offering an alternative to cigarettes because JUUL e-cigarettes, when used as intended or reasonably foreseeable, worsen or aggravate users' underlying nicotine addiction. Furthermore, by worsening users' addiction,

JUUL products have served as a gateway to increased cigarette use.

487. JUUL also warranted to Plaintiffs and Class members through written statements, descriptions, and affirmations of fact on its website, print advertising, marketing materials, and its packaging materials that "1 JUULpod contains ~.7ml with 5% nicotine by weight" and is "approximately equivalent to about 1 pack of cigarettes." JUUL also warranted that JUULpods are "5% Strength" as stated on the front of JUUL's product packaging.

488. JUUL products are in fact defective and fail to conform to JUUL's implied and express representations about JUULpods' safety, nicotine content, the pharmacokinetics of JUUL use, and JUULpods' cigarette equivalence.

489. JUUL products are dangerously addictive and contain and deliver significantly more nicotine than JUUL represents. These defects cause, maintain, or aggravate nicotine addiction and subject consumers to harms caused by increased exposure to nicotine as described herein.

490. By selling JUUL containing these defects to consumers like Plaintiffs and Class members when it already knew of the defects through internal testing and published reports, JUUL breached its implied warranties. Despite having received notice of these defects, JUUL continues to misrepresent the nature of its products and breach its implied warranties.

491. Plaintiffs and the members of the Class were injured as a direct and proximate result of Defendant's breach of its implied warranties, which was a substantial factor in the harm they endured because: (a) they would not have purchased JUUL products, they would have paid less for them, or they would have used them differently if they had known the true facts; (b) they paid a premium price for the Product as a result of Defendant's misrepresentations and breach of its implied warranties; (c) they purchased Products that did not have the characteristics, qualities, or value affirmed and promised by Defendant, and (d) they were harmed by the defects and increased exposure to nicotine.

492. ***Plaintiffs allege the following additional allegation*** *for the Implied Warranty Privity Subclass:*

493. Plaintiffs and each member of the Class have had sufficient direct dealings with

either JUUL via its website or its agents (including distributors and dealers authorized by JUUL) to establish privity of contract between JUUL, on the one hand, and Plaintiffs and each member of the Class, on the other hand.

## FIFTEENTH CAUSE OF ACTION

### (Violation of the Unfair and Unlawful Prongs of Unfair and Deceptive Trade Practices Statutes)

*On behalf of the Consumer Unfairness/Unlawfulness Subclass*

494.    Plaintiffs reallege and incorporate by reference the above paragraphs of this Class Action Complaint as if set forth herein.

495.    Plaintiffs bring this claim individually and on behalf of the Consumer Unfairness/Unlawfulness Subclass.

496.    Plaintiffs and class members who purchased JUUL e-cigarettes and JUULpod nicotine salt cartridges are "consumers" under their states' unfair and deceptive practices statutes, which are identified with specificity for this count in Appendix E.

497.    The provision of JUUL E-cigarettes and JUULpod nicotine salt cartridges that Plaintiffs, and those similarly situated, purchased are "goods" within the meaning of these states' unfair and deceptive practices statutes.  Additionally, the provision of "Autoship" subscriptions for delivery of JUULpod nicotine salt cartridges that Plaintiffs, and those similarly situated, purchased are covered "services" within the meaning of these states' unfair and deceptive practices statutes

498.    Defendant has engaged, and continues to engage, in unfair, unlawful and deceptive trade practices in California and other states by engaging in the unfair, unlawful, and deceptive business practices outlined in this Class Action Complaint.   JUUL participated in a long-standing and extensive marketing campaign that deceived consumers.  In particular, Defendant has knowingly and willfully engaged, and continues to engage in, unfair, unlawful and deceptive trade practices by, without limitation:

a.   developing and marketing a product that contained nicotine levels far in excess of what smokers need to comfortably switch from cigarettes, with the intention

of creating and fostering long-term addiction to JUUL products;

b. falsely and deceptively marketing, advertising, and selling JUUL e-cigarettes and JUULpods by misrepresenting their nicotine content, nicotine pharmacokinetics, and suitability as an "alternative" to cigarettes, and falsely implying that they were useful as a smoking or nicotine-use cessation device, when in fact, JUUL is likely to aggravate cigarette and nicotine addiction;

c. falsely and deceptively marketing, advertising and selling JUUL's "autoship" service for use in California as something consumers could cancel "anytime" without disclosing to consumers how addiction associated with use of JUUL e-cigarettes would interfere with their ability to cancel the JUULpod subscription;

d. falsely and deceptively marketing, advertising and selling JUULpods and JUUL e-cigarettes using affiliate and native advertising that deliberately deceived Plaintiffs and members of the Class into believing that objective, neutral sources were endorsing JUUL nicotine products when, in reality, those sources were merely delivering a paid advertisement on behalf of JUUL;

e. creating and disseminating advertising (and allowing third parties to create and disseminate advertising) that lured underage smokers and non-smokers into using JUUL e-cigarettes, and disseminating (and allowing third parties to disseminate) that advertising through unregulated social media platforms that primarily targeted underage persons;

f. setting the price of JUULpods at an artificially low price that is intended to and does attract underage users to purchase JUUL products, and using discounts, product giveaways, and sponsored social events to induce purchase of nicotine in violation of public policy; and

g. violating other legal standards set forth above.

499. Defendant's unfair acts and practices led consumers to falsely believe that: (a) JUUL e-cigarettes and JUULpods delivered less nicotine, or the same amount of nicotine, as

traditional cigarettes; (b) JUUL were less addictive than combustible cigarettes; and (c) with the autoship services, that Plaintiffs and Class Members would be able to stop using and purchasing JUUL products "anytime" even though JUUL knew that addiction associated with use of JUUL e-cigarettes would interfere with their ability to cancel the JUULpod subscription. Defendant knew it was leaving these impressions and knew that they were false. Defendant developed and marketed a product that delivered nicotine levels far in excess of what smokers need to comfortably switch from cigarettes, with the intention of creating and fostering long-term addiction to JUUL products.

500. Defendant's acts and omissions are unfair in that they (1) offend public policy[47]; (2) are immoral, unethical, oppressive, or unscrupulous; and (3) cause substantial injury to consumers.

501. Defendant's acts and omissions are also unfair in that they cause substantial injury to consumers far in excess of any conceivable benefit; and are injuries of a nature that they could not have been reasonably avoided by consumers.

502. Defendant's acts and omissions are unlawful because they violate various local, state, and federal laws and regulations;[48] Plaintiffs and class members are the intended beneficiaries of these laws and regulations; and Defendant's unlawful acts caused injury to Plaintiffs and class members.

503. Until the present, Defendant has knowingly accepted the benefits of its unfair and unlawful conduct in the form of profits from the sale of JUUL e-cigarettes and JUULpod nicotine salt cartridges.

504. As a proximate result of the above-described unfair and unlawful acts, Plaintiffs and members of the Consumer Unfairness/Unlawfulness Subclass: (a) purchased and used JUUL nicotine products when they would not otherwise have done so; (b) suffered economic losses

---

[47] Defendant's conduct violates public policy pursuant to, among other sources of law, the statutes set forth in the negligence per se sections of this Complaint, statutes identified in Appendices F-G, and pursuant to Federal Trade Commission regulations, including the prohibition on misleading affiliate and native advertising.
[48] *See* prior footnote.

consisting of the cost of purchase of JUUL nicotine products; (c) suffered and/or will suffer additional economic losses in purchasing JUUL nicotine products to maintain their addiction; and (d) suffered and will suffer additional economic losses incidental to their addiction.

505.   Plaintiffs, and those similarly situated, relied to their detriment on Defendant's unfair, unlawful, and deceptive business practices.  Had Plaintiff, and those similarly situated, been adequately informed rather than intentionally deceived by Defendant, each would have acted differently by, without limitation: not purchasing a JUUL E-cigarette or JUULpod and not subscribing to Defendant's "autoship" service.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment as follows:

1.  For the greater of actual or compensatory damages according to proof;

2.  For restitution;

3.  For injunctive relief;

4.  An award of statutory damages, including as appropriate double or treble damages authorized by statute;

5.  An award of compensatory damages, the amount of which is to be determined at trial;

6.  An award of punitive damages, the amount of which is to be determined at trial;

7.  For reasonable attorneys' fees according to proof;

8.  For costs of suit incurred; and

9.  For such further relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

*Plaintiffs hereby demand a trial by jury*

Dated:  January 25, 2019      **GUTRIDE SAFIER LLP**

_____
Adam J. Gutride, Esq.
Seth A. Safier, Esq.

117

Todd Kennedy
Anthony J. Patek
Kristen Simplicio
100 Pine Street, Suite 1250
San Francisco, California 94111

**MIGLIACCIO & RATHOD LLP**
Nicholas Migliaccio, admitted pro hac vice
Jason Rathod, admitted pro hac vice
Esfand Nafisi (State Bar No. 320119)
412 H Street NE, Suite 302
Washington, D.C. 20002

**BERGER MONTAGUE, P.C.**
Sherrie R. Savett, pro hac vice forthcoming
Russell D. Paul, admitted pro hac vice
Neil Makhija, admitted pro hac vice
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.: (215) 875-3000
Fax: (215) 875-4604
Email: ssavett@bm.net
Email: rpaul@bm.net
Email: nmakhija@bm.net

Attorneys for Plaintiffs

Consolidated Amended Class Action Complaint