## APPENDIX A – INDIVIDUAL PLAINTIFF ALLEGATIONS

A.      Hasnat Ahmad...................................................................................... 3

B.      Liliana Andrade..................................................................................... 6

C.      Jose Angullo ......................................................................................... 9

D.      B.C., a minor, through his Parent and Natural Guardian Mary Baker ....12

E.      Adam Banner ...................................................................................... 13

F.      Tommy Benham ................................................................................... 16

G.      D.C. through his parent and natural guardian Kisha Chandler............... 19

H.      Bradley Colgate ................................................................................... 20

I.      Kaytlin McKnight ................................................................................ 22

J.      Q.C. through his parent and natural guardian Anjie Comer..................... 23

K.      A.U., and her mother and natural guardian, Lisa Commitante................ 24

L.      D.C. and his mother and Natural Guardian Renee Deeter........................ 24

M.      D.D. and C.D., minors, through their Parent and Natural Guardian
        Joseph DiGiacinto ............................................................................... 25

N.      K.S. though his parent and Natural Guardian Rachelle Dollinger........... 28

O.      J.D. through his parent and natural guardian Nicole Dramis .................. 30

P.      Jillian Furey ........................................................................................ 32

Q.      M.H., and her mother and natural guardian, Jennifer Hellman .............. 33

R.      Austin Hester ...................................................................................... 35

S.      Edgar Kalenkevich .............................................................................. 37

T.      David Kugler........................................................................................ 42

U.      Tracie Kugler, on behalf of her son, Z.K, a minor.......................... 44

V.      Kacie Ann Lagun (née Durham)........................................................... 46

W.      David Langan....................................................................................... 49

X.      Jonathan Mardis .................................................................................. 51

Y.      M.C. through his Parent and Natural Guardian Jeannine Manning......... 52

Z.      David Masessa...................................................................................... 54

AA.     Ron Minas............................................................................................ 59

BB.     L.B., and her mother and natural guardian Jill Nelson .............................. 60

CC.    S.G., a Minor, through her Parent and Natural Guardian Ashley Noble. 62

DD.    D.O. through her mother and natural guardian Atoyia Orders................ 64

EE.    Jack Roberts............................................................................................... 66

FF.    W.T. and A.R.T., both minors, through their parent and Natural
       Guardian Tonya Rowan ....................................................................... 70

GG.    Amber Royce ............................................................................................. 72

HH.    D.S., a minor, through his Parent and Natural Guardian Amber Selfridge
       .................................................................................................................... 73

II.    Laura Staller ............................................................................................ 75

JJ.    Anthony Smith .......................................................................................... 77

KK.    Corey Smith............................................................................................... 79

LL.    T.B.T. through his parent and Natural Guardian Marlene Thomseth-
       Belcher ...................................................................................................... 79

MM.    Michael Viscomi ....................................................................................... 81

NN.    O.V. through her parent and natural guardian Tanya Viti..................... 84

OO.    S.W. through his parent and natural guardian Joe Weibel ..................... 86

PP.    J.Y., a Minor, through his Parent and Natural Guardian Barbara Yanucci
       ....................................................................................................................
       ................................................................................................................ 87

**A.  Hasnat Ahmad**

1.      Plaintiff Hasnat Ahmad ("Ahmad") attends university in Chicago, Illinois but resided in Euless, Texas when the transactions described below occurred.

2.      Before using a JUUL for the first time in October 2017, at the age of 17, Ahmad had seen JUUL advertisements and promotions on Instagram and Twitter. These advertisements promoted JUUL's flavors, discounted Starter Kits and Auto-ship service.  In stores, Ahmad also saw JUUL point of sale materials promoting JUUL's discounted Starter Kits, flavors, and high-tech design. Prior to using a JUUL, none of the advertisements or in-store promotions Plaintiff saw disclosed the nature or addiction risks of JUUL's products, the existence or amount of nicotine in JUUL's products, or that the JUUL was engineered to deliver nicotine to the bloodstream more rapidly and in greater quantities than a cigarette. Nor did they indicate that the JUUL was an age-restricted product. Instead, these advertisements portrayed JUUL as a stylish, high-tech way to "beat the August heat" or "enjoy dessert without the spoon."



3.      When Ahmad was offered a mango-flavored JUUL by one of his many high school friends who had taken up JUUL use, he had never smoked a cigarette or

used any other tobacco product. Ahmad decided to try the JUUL because everything he had seen had led him to believe that JUUL use was fun and harmless. Though Ahmad would have known to avoid a Tobacco or Menthol flavored e-cigarette offered to him, he did not think a mango-flavored JUUL could be dangerous or addictive.  Had Ahmad known the risks, he would not have used a JUUL.

4.     Ahmad enjoyed the feeling and social acceptance of JUULing. He soon started purchasing JUUL products from friends at school and, on rare occasions, from sellers on eBay using his parents' credit card, explaining to his parents that the resulting charges were school-related. This deception caused him a great deal of guilt, but he was so desperate to obtain nicotine that he could not restrain himself.

5.     After Ahmad visited JUUL's website for the first time in 2017, JUUL began sending him promotional e-mails offering discounts and promoting JUUL flavors, including what would become his preferred flavor, Cool Mint. None of those promotions disclosed the nicotine content of Mint pods or that Mint pods could contain up to 94 mg/mL nicotine. If they had, Ahmad would not have used Mint pods.

6.     On February 27, 2018, when Ahmad was still 17, he purchased a "Basic Kit" directly from JUUL's website using his parent's credit card and identification.

7.     On social media, Ahmad saw a significant amount of JUUL promotional content from third parties, including the Instagram accounts @Doit4JUUL and @JUULTricks.  On YouTube, Ahmad saw numerous videos from Donny Smokes, including the JUUL Challenge.  On Snapchat, Ahmad saw similar JUUL content created by his own friends and classmates. The social media content Ahmad saw and which drove the surge in popularity among his friends was overtly youth-oriented and promoted nicotine abuse, downplayed or normalized addiction

risks, encouraged JUUL use in school, provided guidance on how to conceal a JUUL, created the impression that JUUL use was more common than it was, and that JUULing was the "cool" thing to do. These accounts also encouraged viral content creation by encouraging viewers to post their own JUUL-related content, including selfies, nicotine abuse "tricks" like inhaling ten JUULs at once, memes normalizing addiction and adolescent use of JUUL products, and imagery suggesting that JUUL use might improve a person's dating prospects. Ahmad did not know that much of the content he saw was being created, distributed, and promoted by JUUL vendors whose aim was to promote JUUL use to adolescents and profit from their addiction. Had Ahmad known that he was being bombarded by marketing as part of a scheme to addict him to nicotine, he would have rejected offers to use a JUUL or would have attempted to stop using a JUUL far sooner than he did.

8.      Copying the behavior that had been modeled for him by cool, attractive social media influencers and accounts, Ahmad mimicked many of the behaviors he saw on social media and posted his own JUUL-related content to Snapchat. For example, Ahmad posted pictures of a JUUL on March 23 and 26, 2018.

9.      Soon after he started using a JUUL, Ahmad was consuming one to two JUUL pods per day, which cost him about $35 each week.

10.     A little over a year after his first JUUL use, Ahmad began smoking combustible cigarettes on a trip abroad. He now smokes Marlboro cigarettes and uses a JUUL.

11.     Currently a freshman in college, Ahmad is badly addicted to nicotine but has been unable to quit either JUUL or cigarettes. When he goes more than a day without nicotine, he suffers from severe headaches, dizziness and blurred vision.

12.     Ahmad still consumes one to two JUUL pods per day along with up to half a pack of cigarettes. He starts using JUUL within 5 minutes of waking up, and he

JUULs and smokes throughout the day.  He considers the decision to start JUULing as one of the worst mistakes of his life.

**B.  Liliana Andrade**

13.     Plaintiff Liliana Andrade ("Andrade") is a resident of Sanford, Florida.

14.     Andrade started using JUUL in 2015 when she was 15 years old.  Prior to her first JUUL experience, she had tried cigarettes a few times but had never been a regular smoker.

15.     Before Andrade used a JUUL for the first time, she had seen JUUL advertisements in local gas stations and JUUL posts on Twitter. The in-store advertisements promoted JUUL's flavors and offered discounts on the JUUL device and "Starter Kit."  The Twitter posts portrayed fashionable young people using JUUL while engaging in playful poses. None of the JUUL content Andrade saw disclosed that JUUL was an age-restricted product, that it contains nicotine, and delivers nicotine to the bloodstream at least as efficiently as cigarettes and presents a risk of nicotine addiction.



16.     Andrade also visited JUUL's website before using a JUUL. She remembers that the website presented the JUUL as a lifestyle product instead of a highly addictive nicotine delivery system. She does not remember seeing any warnings about nicotine or addiction on JUUL's homepage.

17.     She does remember seeing the JUUL chart in 138 below, comparing a cigarette to a JUUL and showing the JUUL to be less harmful than a cigarette.

18.     During one visit to JUUL's website, Andrade signed up to receive e-mail updates.  Since then, JUUL has sent her numerous e-mail promotions and surveys.

19.     Although Andrade was not a smoker looking to switch from cigarettes, when her friend offered her a Fruit Medley JUUL, she decided to try it because she thought the "fruit medley" flavor sounded appealing and she did not understand the risks JUUL posed. She would not have tried a JUUL if it was not fruit flavored.

20.     Andrade found that she liked the fruit flavor, the vapor's lack of harshness, and the "buzz," or nicotine impact, of the Fruit Medley pods.  After her first JUUL experience, she would use her friends' JUULs every time she could.  Within a few weeks, she purchased her own JUUL device from a friend and began purchasing JUULpods from classmates.

21.     Once she had a JUUL device of her own, Andrade's JUUL consumption quickly escalated.  Within a short time, she was consuming one JUULpod every day.

22.     Like many of her friends in high school, Andrade was very active on social media platforms including Facebook, Twitter, and Instagram.  On these platforms, Andrade saw posts from JUUL suggesting that she "beat the August heat with Cool Mint" and that she take the time to "enjoy a JUUL moment."  Other posts presented JUUL as an "essential" device to have on hand when traveling or simply leaving the house for the day.  This messaging convinced Andrade that JUUL was an indulgence that she should make a part of her daily routine. Andrade followed or otherwise closely observed JUUL's social media accounts starting in late 2015 and was exposed to the themes, images and hashtag marketing campaigns described in the complaint.

23.     On Facebook, Andrade saw JUUL's promotion of images of Katy Perry and Orlando Bloom sharing a JUUL, multiple flavor promotions for JUUL's "Make it a

Mango Monday" campaign, Cool Mint JUULpods, and several other flavor promotions.

24.     Andrade saw JUUL's Vaporized promotions on Twitter, which included several advertisements featuring stylish young women holding JUUL products as well as images of from JUUL's launch parties.



25.     On the social media platform Snapchat, Andrade has been exposed to JUUL-related posts that normalize nicotine abuse among teenagers, promote websites that sell JUUL products and JUUL-compatible products and encourage other adolescents to create similar content.  These JUUL promotions often include hashtags from social media campaigns started or promoted by JUUL including #juulnation, #juul, and #juulvapor.

26.     On Instagram, Andrade saw JUUL's promotions of influencer Zayas. Andrade did not know that Zayas was being paid to use a JUUL and promote JUUL on Instagram.

27.     Andrade's favorite flavors are Cool Cucumber, Mango and Fruit Medley. Although she has tried every pod flavor, she has never purchased tobacco or menthol-flavored pods.

28.     Though Andrade is now over 18 and buys JUULpods legally, she is aware of multiple stores and gas stations in her area that sell JUULpods—often at significant markups—to minors without age verification. The nearest is a less than five-minute walk from her high school.

**C.  Jose Angullo**

29.     Jose Angullo is a 23 year old resident of Virginia.

30.     Plaintiff Angullo started using JUUL products in 2018 after hearing a radio commercial on station DC101, seeing advertisements in gas stations, and he also saw JUUL content on social media including Facebook, and received promotional emails from JUUL.

31.     Plaintiff bought JUUL to see what it was because the marketing made it seem like a safer alternative to smoking and did not contain any warnings.  He specifically saw this ad (available at https://bit.ly/2UbgJRo)



32.     Prior to using JUUL, Plaintiff Angullo used to smoke between 10-20 cigarettes per day.

33.     He now purchases JUUL at $17/per pack at the 7-11 convenience stores and smokes one JUUL pod per day, and sometimes more.

34.     Angullo noticed the 5% strength label on the JUUL pod and thought it meant it was 5% of the nicotine of a regular cigarette.

35.     JUUL's in-store displayed belied the true nature of the nicotine content



and delivery from JUUL. Plaintiff saw these displays before using the product:

36.     Plaintiff prefers to use the mango flavor, which is more palatable. He saw specific ads related to mango that downplayed the or omitted the harms of exposure to nicotine or warned of the content of nicotine in JUUL, including the following online and on Twitter and Instagram:







37.     Plaintiff has received promotional emails and online content from JUUL, none of which contained warnings explaining that JUUL pods contain and delivered more nicotine than a pack of cigarettes.

38.     He smokes JUUL within 5 minutes of waking up. JUUL is stuck on his mind more than cigarettes ever were and he feels completely addicted.

39.     Plaintiff coughs every day and has a persistent cough that never goes away.

40.     Plaintiff would never not have purchased JUUL products if he knew the true nature of nicotine content and delivery, including that content in relation to a pack of cigarettes.

**D.  B.C., a minor, through his Parent and Natural Guardian Mary Baker**

41.     Plaintiff B.C. and his Parent and Natural Guardian Mary Baker ("Baker") are residents of Huntington, West Virginia.

42.     B. C. used a JUUL for the first time in 2016 at the age of 14.

43.     Prior to his first JUUL use, B.C. had seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Starter Kit."  B.C. did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed.  The representations and omissions in JUUL's in-store promotions materially impacted B.C.'s assessment of, and eventual decision to use, JUUL products.

44.     JUUL's methods of promoting its products on social media platforms foreseeably triggered the viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUUL use. These promotions reached B.C. and B.C.'s social network, including classmates, leading to an increase in uptake on JUUL products and widespread misperceptions about the nature and risks of JUUL products. But for JUUL's social media advertising, B.C.

would not have been exposed to, and would not have used, JUUL products.

45.     When one of B.C.'s friends offered him his first puff of a JUUL, B.C. accepted.  Shortly thereafter, he started buying JUUL products of his own.  At this time, B.C. did not know that JUULpods contain nicotine and can cause nicotine addiction.  Had B.C. known that JUULpods have been formulated to deliver nicotine more effectively than a cigarette, he would not have started using JUUL products.

46.     Although well below the minimum legal age to purchase JUUL products, B.C. was nevertheless able to purchase JUUL products from local stores and classmates.

47.     B.C. was still below the legal age to purchase JUUL products when he obtained warranty service for his JUUL device from the JUUL website in 2018.

48.     Like many other students, B.C. has used his JUUL at school.  Due to this in-school JUUL use, B.C. was suspended from school three times in 2017 and two more times in 2018.

49.     Baker has sought assistance for B.C.'s nicotine addiction but, to date, B.C. is still hooked.

50.     B.C.'s currently consumes one JUULpod a day.  He takes his first puff of JUUL within 5 minutes of waking up.

**E.  Adam Banner**

51.     . Plaintiff Adam Clayton Banner ("Banner") is a resident of Asheville, North Carolina. When he used a JUUL for the first time in 2017, at the age of 33, Banner was a social smoker who smoked less than one pack of cigarettes a month, if that.

52.     Prior to using a JUUL, Banner saw JUUL advertising in stores that promoted JUUL's devices, JUULpods, flavors, and discounted Starter Kits. Those promotions did not disclose that the JUUL contained nicotine, warn of nicotine's

risks, or disclose that the JUUL could deliver more nicotine per puff than a cigarette and delivered that nicotine to the bloodstream faster than a cigarette. Had JUUL disclosed this information, Banner would not have used a JUUL.

53.     Prior to using a JUUL, Banner saw a significant amount of JUUL-related promotions and content on Instagram, Facebook and Twitter. These promotions presented JUUL as a high-tech lifestyle product for young adults like him, promoted JUUL's flavors, discounts on Starter Kits, and did not provide any meaningful information for smokers looking to switch about the nicotine content, delivery, or pharmacokinetics that JUUL had carefully engineered. Nor did the postings indicate that the JUUL's central function was to deliver doses of nicotine that could exceed that of a cigarette, that the JUUL contains at least 59 mg/mL nicotine, or that the JUUL's nicotine had been chemically altered to create nicotine impact that equals or exceeds a cigarette.

54.     Banner also saw JUUL content on social media including on Facebook, Twitter, and Instagram. This focus-flavored content encouraged Banner to try Mango JUULpods and "start [his] week with Cool Mint JUULpods." The "Cool" Mint advertisements did not disclose that the Mint pods contained up to 94 mg/mL nicotine – more than twice the "5% strength" labeling statement indicated.

55.     Many of JUUL's posts included what appeared to be user-generated posts from young adults sharing a "#JUULmoment." Banner does not recall seeing disclosures about nicotine or warnings about nicotine or nicotine addiction in any of JUUL's social media content.

56.     When Banner's brother, Zachary Shane Goforth, returned from college in the summer of 2017, he brought the JUUL he had begun using at the start of the year. Banner decided to try his brother's JUUL because the fruit flavors were appealing to him and his brother insisted he try JUULing instead of smoking

cigarettes.

57.     About two months later, Banner bought a discounted Starter Kit of his own similar to his brother's.

58.     Banner visited JUUL's website and soon thereafter began receiving emails from JUUL.  Banner did not see any disclosures on JUUL's website that JUUL's Mint pods contain at least 59 mg/mL nicotine and can exceed 90 mg/mL. The emails Banner received promoted JUUL's flavored pods and the lifestyle appeal of JUUL use. Nothing he saw on JUUL's website or in JUUL's emails indicated that the JUUL contained at least 59 mg/mL of nicotine, that the JUUL delivered at least as much nicotine per puff as a cigarette, or that the nicotine from a JUUL entered the bloodstream faster, or caused a higher peak blood-nicotine concentration than a cigarette. Instead, his impression was that the JUUL was a device for quitting smoking and therefore posed less risks of addiction than cigarettes.

59.     Banner saw and relied on the representation that a JUUL is equivalent to a pack of cigarettes, which is imprinted on JUULpod packaging, posted on JUUL's website, and posted by third parties in reviews and on social media. He assumed that a JUUL was delivering the same kind and amounts of nicotine as a cigarette. Had he known that the JUUL was chemically designed to deliver stronger nicotine impact than a cigarette or that the JUUL delivered more nicotine than a cigarette, he would not have bought a JUUL.

60.     Banner understood JUUL's labeling representation that it was an "alternative to cigarettes" to mean that the JUUL was a way to move away from smoking. Had he known that the JUUL could so rapidly foster an uncontrollable addiction to nicotine—a chemical he had been consuming in amounts he found manageable for approximately ten years—he would not have used or purchased a JUUL.

61.     Had Banner known that JUUL's "5% strength" labeling statement meant that Mint pods always contained at least 20% more nicotine than the label disclosed and sometimes nearly 100% nicotine than the label disclosed—he would not have purchased or used a JUUL.

62.     Soon after he started using JUUL, Banner found that he would smoke more than he used to when his JUUL was empty.

63.     Banner also found that his consumption rapidly increased and within a short period of time, he was consuming up to two "Cool" Mint JUULpods a day.

64.     Recognizing that his addiction had spiraled out of control, Banner switched to cigarettes because they were more economical than JUULpods and because he felt like cigarettes allowed him to control his addiction better than a JUUL.

65.     Banner now consumes at least half a JUULpod and one pack of cigarettes every day.

66.     Banner has repeatedly attempted to quit JUULing and smoking with no luck. After seeking medical help from his physician, Banner was prescribed Wellbutrin, which was not effective.

**F.   Tommy Benham**

67.     Plaintiff Tommy Benham is a resident of Michigan.

68.     Benham, who is 20 years old, purchased a JUUL starter kit at the age of 18.  He was a smoker prior to his purchase.  Benham decided to try JUUL products based on advertising that he saw in posters, magazines, and Facebook depicting JUUL e-cigarettes as a safe, less addictive alternative to smoking cigarettes. He was smoking a pack of cigarettes a day at the time and thought that the JUUL would help him quit smoking by weaning him from cigarettes.  He also found the variety of flavors appealing, and was attracted to the eye-catching colors and bold fonts used

in the JUUL ads.

69.     A number of the ads Benham saw on Facebook are archived on the web page for Stanford University Research into the Impact of Tobacco Advertising ("SRITA"). See http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st661.php&token1=fm_pods_img36435.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=Facebook (accessed December 17, 2018).

70.     Among the JUUL ads that Benham saw were numerous ads placed on Facebook as part of JUUL's "Switch" campaign.  These included testimonial ads touting the switch to JUUL as an improvement over cigarette smoking, similar to ADdvertisements 57 ("Switch") and 66 (testimonial). These ads led Benham to believe that using JUUL products would decrease his appetite for nicotine.

71.     Benham also saw a number of "Smoking Evolved" ads.  See, e.g., Appendix C, Advertisements 69-70.  Benham liked the sleek, high tech look of the device and the bright colors of the JUULpods.  The tag line "Smoking Evolved" led Benham to believe that the JUULpod had been designed to avoid unhealthy side effects and be less addictive than traditional cigarettes.

72.     Benham saw numerous JUUL ads on Facebook touting the various JUULpod flavors, including limited edition flavors such as mango (before it became a "permanent" flavor), menthol, and cool cucumber.  Id., Ads 24, 59, 62, and 71-73. The variety of flavors was a major factor in his use of JUUL, and he tried essentially every new flavor that came out.  JUUL's use of invitations to comment on "which flavor is your favorite" was also engaging to Benham, who commented on the various flavors in response to those ads. Benham also saw ads framing JUULpod flavors as something to be paired with foods, such as ads with "featured chef" pairings of JUULpod flavors with recipes.  Appendix C, Ad 76 ("Save Room for JUUL"

ad).

73.     Benham also saw numerous ads on Facebook that touted limited edition JUUL e-cigarettes in new colors such as Navy and Gold. *Id.*, Ads 74-75. Benham purchased these limited edition e-cigarettes because he felt they had more pizazz than a standard black JUUL e-cigarette.

74.     Benham also saw JUUL ads leveraging the fact that JUUL e-cigarettes would avoid "smelling like an ashtray."

75.     Among the ads discussed above that Benham saw were ads using discounts to promote new styles of e-cigarettes and JUULpod flavors.  He sometime purchased JUUL products at least in part in response to seeing these discounts. See, e.g., *Id.* at Ad 67 (point-of-sale poster with discount, similar to Facebook ads showing discounts).

76.     Benham also saw JUUL ads on Facebook with celebrity images, such as a 2016 ad showing Orlando Bloom and Katy Perry sharing a JUUL e-cigarette. Benham perceived these images as glamorizing JUUL products and making them seem trendy.

77.     Many of the ads that Benham saw, including those circulated prior to November 2017, contained no nicotine warning. Nor did any of the ads disclose the increased potency of nicotine salts or the relatively high concentrations of nicotine in JUULpods compared to other e-cigarette nicotine solutions.

78.     Although Benham thought JUUL would help him quit smoking, he has found it even more addictive than cigarettes, to the point where even tobacco is an inadequate substitute.  Benham now finds that he has to interrupt his routine throughout the day to vape with his JUUL, and that he is consuming at least eight JUULpod packs per week. Benham favors Cool-Mint flavored JUULpods. None of the ads mentioned above informed Benham that JUUL's nicotine salt formulation would

deliver higher, more potent doses of nicotine than cigarettes or other vaping solutions.  Had Benham known that the nicotine salts in JUULpods were more potent and addictive than traditional cigarettes, he would not have purchased JUUL products.

**G.  D.C. through his parent and natural guardian Kisha Chandler**

79.     D.C. and his mother Kisha Chandler ("Chandler") are residents of Williston Park, New York.

80.     Prior to using a JUUL for the first time in August 2017, at the age of 15, D.C.  D.C. had viewed increasing amounts of JUUL-related content on various social media platforms. He had also seen online JUUL advertisements promoting JUUL flavors.  None of this JUUL messaging disclosed that JUUL products contain at least 59mg/mL of nicotine and deliver nicotine to the bloodstream more effectively than cigarettes.

81.     When D.C. was offered a mango-flavored JUUL by one of his many high school friends who had taken up JUUL use, he had never smoked a cigarette before or used any other tobacco product. D.C. decided to try the JUUL because everything he had seen had led him to believe that JUUL was fun, harmless, and "cool." When Chandler caught her son with JUULpods in his bedroom, D.C. told her JUUL was safe and nicotine-free; he told his mom the JUULpods only contained water vapor.

82.     D.C. enjoyed the "buzzed" feeling he received from the JUUL's powerful nicotine hit, and he quickly became addicted to nicotine. D.C. and his friends obtained their JUULpods from nearby gas stations and a small local deli. Initially, the gas stations and deli sold JUUL products directly to D.C. and his friends. Thereafter, D.C. and his friends would approach adults and ask them to purchase the JUULpods for them.

83.     Chandler does not provide D.C. with cash; instead, if D.C. needs to

purchase something, D.C. uses apps on his phone, which are linked to Chandler's bank accounts. Thus, in order to obtain JUULpods, D.C. would trade food for JUULpods (i.e. "I'll give you $20 worth of Wendy's for a JUULpod).

84.    Even though Chandler has confiscated numerous JUUL devices and JUULpods from her son, D.C. has continued to find ways to obtain JUUL products. At his peak consumption, D.C. was consuming two (2) to three (3) JUULpods a day and spending hundreds of dollars each week on JUUL products.

85.    D.C.'s JUUL use has taken a significant toll on his physical and psychological health. Since D.C. started using JUUL, he has developed a chronic cough. D.C. also has severe ADHD. D.C.'s JUUL use counteracted with his ADHD medication to the point where D.C.'s psychiatrist had to increase the level of ADHD medication he was prescribed. Chandler also believes her son's JUUL use has increased his anxiety levels.

86.    Chandler fears D.C. will continue using JUUL when he returns home. D.C. has expressed to his mother that he wants to stop using JUUL, but he cannot because it makes him feel so good.

**H. Bradley Colgate**

87.    Plaintiff Bradley Colgate is a resident of California.

88.    In 2017, Bradley Colgate ("Colgate") purchased a JUUL e-cigarette and JUULpods at the age of 24 in an effort to curtail his nicotine addiction and quit smoking.  He had smoked Marlboros for approximately seven years, and hated being a smoker.

89.    In the summer and fall of 2017, Colgate started seeing JUUL ads across social media. He typically used Instagram and Facebook, and recalls seeing many JUUL ads on both platforms. In particular, he remembers seeing a series of Instagram posts that included testimonials from people who had switched from

cigarettes to JUUL. When logging into Instagram, he would see "Instagram sponsored stories," which were short one minute video advertisements, and often, he'd be presented with a JUUL sponsored story that was in the form of a testimonial. These testimonials typically involved people describing how JUUL helped them quit smoking cigarettes. While he did not watch the videos, he often observed the brief caption that appeared beneath the video, which typically encouraged him to "switch" from cigarettes to JUUL. While the precise testimonials that Colgate saw are no longer available online, Colgate recalls seeing testimonials that looked similar to Advertisement 66 of Appendix C. In particular, he recalled seeing in these testimonials phrases that described JUUL as an "alternative" to cigarettes, which he understood to mean not unhealthy and less addictive.  He also recalls seeing advertisements on both Instagram and Facebook that simply contained the word "SWITCH," including the advertisement appearing at image 57 of Appendix C.

90.     Around that same time, he also began seeing advertisements at stores. He noticed how large the store advertisements were, and was surprised to see the ads on display not just at smoke shops, but at convenience stores and gas stations, such as 7-11. He also noticed that these stores displayed JUUL on the counter, instead of behind it with the other cigarettes.

91.     Before Colgate purchased JUUL for the first time, he saw other JUUL advertisements on Facebook and Instagram. In particular, he recalls seeing Instagram advertisements 57 ("Switch"), 58 (JUUL with coffee); 59 (using JUUL like a toy to make cool visual patterns), and 60 (JUULpods displayed as Warhol-inspired pop art), 61 (enjoying a view), 62 (JUUL with coffee, nearly identical to Ad 24) of Appendix C. He also recalls seeing Facebook ads in September 2017 for a "Device Kit" and another on or around October 4, 2017 that encouraged him to "[c]ustomise a plan that fits your lifestyle." *Id*., Advertisements 63-64.  He believed that JUUL

would make it easier to stop being a smoker.

92.     On the basis of JUUL's advertising campaign, including the ads described in the previous paragraph, Colgate decided to purchase JUUL in or around October 2017. While he knew prior to purchasing JUUL for the first time that JUUL contained nicotine, he believed based on the advertisements that it contained less nicotine than cigarettes, and that it was akin to a nicotine chewing gum or other product designed to help people quit smoking. At no time was he informed that it had more nicotine than cigarettes. Had JUUL disclosed in the advertisements that it had more nicotine per pod than a pack of cigarettes, he would not have made the decision to purchase JUUL.

93.     Rather than weaning Colgate off of nicotine, the intense dosage of nicotine delivered by the JUUL products resulted in an increased nicotine addiction, and an increased consumption of nicotine and JUUL products by Colgate. Colgate found JUUL so addictive that he did not subscribe to JUUL's pod service, as he was concerned that by having so many pods in the house, he would smoke more than his typical pod a day due to its addictive nature.  Moreover, not only has the increased nicotine made JUUL harder to quit than regular cigarettes, but because of the way in which JUUL relentlessly continued to advertise to him on social media, Colgate has found quitting JUUL to be even more difficult than quitting cigarettes due to the fact that he is continuously reminded of it.

94.     Had Colgate known the truth of the matter about JUUL, he would not have purchased JUUL products.

**I.   Kaytlin McKnight**

95.     Kaytlin McKnight ("McKnight") is a resident of Arroyo Grande, San Luis Obispo County, California.

96.     In 2017, Class representative Kaytlin McKnight purchased a JUUL e-

cigarette and JUULpods. McKnight subsequently became addicted to nicotine salts. McKnight now consumes several JUULpods each week.

97.     Had McKnight known the truth of the matter about JUUL, she would not have purchased JUUL products.

**J.   Q.C. through his parent and natural guardian Anjie Comer**

98.     Q.C. and his mother and natural guardian Anjie Comer ("Comer") are residents of Fort Worth, Texas. Q.C. began using JUUL around March 2018 at the age of 16.

99.     Before Q.C. even tried JUUL, he viewed point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit-flavored pods. Q.C. did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted Q.C.'s assessment of, and eventual decision to use, JUUL products.

100.    When Q.C. was offered a JUUL by a friend at school, he had never smoked or used any other tobacco product; he decided to try a JUUL because the fruit flavors sounded intriguing, he believed the JUUL posed no serious risks, and JUULing had grown increasingly common at his school. Q.C. had seen advertisements for JUUL on social media and was led to believe JUUL did not contain any nicotine.

101.    Q.C. would not have started using JUUL if he knew it contained nicotine. Additionally, Q.C. would not have used a tobacco or menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

102.    Peer pressure and JUUL's narcotic effect of nicotine led Q.C. to use his friend's JUUL repeatedly over the course of the next few weeks. Using JUUL became

a social activity that Q.C. engaged with regularly with his friends during and after school.

103.   Comer has noticed that since her son began using JUUL, it has made him experience severe mood swings.

104.   Had Q.C. known the risks of using a JUUL or that the sudden popularity of JUUL was not because the JUUL was "cool" but because JUUL was using deceptive advertising tactics to lure teenagers to its powerfully addictive product, he would not have used a JUUL.

**K.  A.U., and her mother and natural guardian, Lisa Commitante**

105.   A.U. and her parent and legal guardian, Lisa Commitante, are residents of New York.

106.   A.U. began JUULing at the age of 14, after purchasing a JUUL and JUULpods at a smoke shop.  A.U. was attracted to the fruit flavors produced by the JUULpods, and did not realize that it contained nicotine.  She subsequently began consuming JUULpods, enticed by the fact that it looked cool and her friends were vaping JUUL products.  She used the JUUL frequently until her mother found and confiscated it.  A.U. would not have purchased the JUUL starter kit if she had known it contained nicotine.

**L.  D.C. and his mother and Natural Guardian Renee Deeter**

107.   Plaintiff D.C. and his mother and Natural Guardian Renee Deeter ("Deeter") are residents of Tucson, Arizona.

108.   When D.C. used a JUUL for the first time in 2015, he was 13. He had never smoked or used tobacco products before.  He also did not—and does not— understand that nicotine causes addiction or that he is addicted to nicotine.

109.   Because D.C. is convinced that JUUL use is safe and non-addictive, he does not share details of his use with his parents.

110.   D.C. maintains that nicotine is not addictive, even though he suffers withdrawal symptoms when he doesn't use JUUL.

111.   Deeter does not know what JUULpod flavor D.C. tried first, but she believes that he only consumes fruit-flavored JUUL products.

112.   D.C. actively uses Instagram, Snapchat, and YouTube where he is exposed to JUUL-related content from other adolescents and from JUUL-related accounts.

113.   D.C. typically purchases JUUL products from classmates.

114.   Other parents inform Deeter that they have seen JUUL-themed Snapchat posts posted by D.C. as well as videos of D.C. smoking JUULs, but Deeter does not have access to D.C.'s account to verify.

115.   D.C. begins JUUL within 30 minutes of waking up every morning. His preferred flavor is Fruit Medley. Deeter believes that D.C. consumes at least one JUULpod every two days.

**M. D.D. and C.D., minors, through their Parent and Natural Guardian Joseph DiGiacinto**

116.   Plaintiffs D.D. and C.D. and their Parent and Natural Guardian Joseph DiGiacinto are residents of Cotati, California.

117.   Before D.D. used a JUUL for the first time in 2015, he was not a smoker. As he told C.D. the night before he used a JUUL for the first time, his friends were peer pressuring him into using a JUUL because "everyone was doing it" at D.D.'s high school.

118.   D.D. continued using a JUUL and, like many of his classmates, became addicted to nicotine.

119.   D.D. eventually convinced C.D. to use a JUUL, too. Before C.D. had ever tried a JUUL, he had seen point-of-sale ("POS") promotional materials for JUUL

devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Starter Kit." C.D. did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted C.D.'s assessment of, and eventual decision to use, JUUL products.

 

120.    C.D. looked up to his brother D.D. and eventually bought a JUUL from a classmate who had a spare for sale.

121.    JUUL's methods of promoting its products on social media platforms foreseeably triggered the viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUUL use. These promotions reached C.D. and D.D.'s social network, including classmates, leading to an increase in uptake on JUUL products and widespread misperceptions about the nature and risks of JUUL products. But for JUUL's social media advertising, C.D. would not have been exposed to, and would not have used, JUUL products.

122.    D.D. and C.D. are both active on Instagram and Facebook.

123.    On Instagram, D.D. and C.D. were exposed to a significant amount of JUUL promotional content from third parties, including the Instagram accounts @Doit4JUUL and @JUULNation. These accounts led D.D. and C.D. to believe that

JUUL use was "cool," safe, and appropriate for minors.  The accounts also encouraged the unlawful purchase and use of JUUL products by youth. On YouTube, D.D. and C.D. saw numerous JUUL-themed videos from Donny Smokes and Supreme Patty.  On Snapchat, C.D. saw JUUL-themed content from EonSmoke and OG Nick, and even his own friends. This content was overtly youth-oriented and promoted nicotine abuse, downplayed or normalized addiction risks, encouraged JUUL use in school, provided guidance on how to conceal a JUUL, created the impression that JUUL use was more common than it was, and that JUULing was the "cool" thing to do. These accounts also sold JUUL products directly through Instagram and promoted websites that sold JUUL products with inadequate age verification procedures, if any at all. C.D. did not know that much of the content he saw was being created, distributed, and promoted by JUUL vendors or paid influencers whose aim was to promote JUUL use to adolescents and profit from their addiction. Had D.D. or C.D. known that they were being targeted by vendors of JUUL products, or that JUUL's own viral marketing had promoted and facilitated these accounts, D.D. and C.D. would have rejected offers to use a JUUL or would have made efforts to stop using JUUL sooner than they did.

124.    Although C.D. was, and is, under 18 years of age, he was able to continually acquire and use JUUL products through D.D. and countless other older high school students, and thus maintain his addiction to nicotine.  DiGiacinto does not know where D.D. buys JUUL products.

125.    Though C.D. is a minor, he has been receiving a steady stream of promotional e-mails from JUUL for months.

126.    C.D.'s Instagram and Snapchat streams are bombarded with advertisements for JUUL products and JUUL-related products.



127.     DiGiacinto has enlisted the aid of school administrators and his family doctor in efforts to halt C.D. and D.D.'s nicotine addiction. He has also attempted to keep C.D. and D.D. from associating with friends who use JUULs.  None of these efforts have been successful.

**N.  K.S. though his parent and Natural Guardian Rachelle Dollinger**

128.     K.S. and his mother and Natural Guardian Rachelle Dollinger are residents of Brownsburg, Indiana.

129.     In 2017, K.S. used a friend's JUUL for the first time. K.S. and his friend were both 13-year-olds in the eighth grade. K.S. was not a smoker and had not used tobacco products in the past.

130.     K.S. would not have used a JUUL if he were not offered a product in a candy-like flavor.

131.     Dollinger did not know what a JUUL was until one day K.S. told her. When Dollinger later found out that K.S. was using a

JUUL, K.S. told Dollinger that JUUL use was harmless and safe and did not contain nicotine. K.S. told Dollinger that he had reviewed JUUL's website, and that if Dollinger reviewed the website, she too would learn that JUUL use was harmless and safe.

132.    Although K.S. well below the minimum legal age to buy tobacco products, he is nevertheless able to purchase JUUL products from the local Speedway gas station.

133.    Like many high school students, K.S. is active on social media.  On Instagram and Facebook, he has seen JUUL advertisements inviting him to "start your week with Cool Mint JUULpods," to "experience a new kind of tropical getaway" with Mango JUULpods, or simply to "find your favorite flavor."  Other ads he has seen present JUUL products alongside cell phones, laptops, tablet computers, books and coffee cups, all items familiar to K.S.  None of these ads disclose that JUULpods contain at least 59mg/mL of nicotine and that they deliver nicotine to the bloodstream as effectively or more effectively than cigarettes. Rather, JUUL's ads led K.S. to conclude that JUUL is a tasty indulgence that he can enjoy without consequences.




134.    Dollinger recently found approximately 30 empty JUUL pods while cleaning K.S.'s room.  K.S. claimed that there are videos on YouTube that explain how to refill empty pods.

135.    At 14 years of age, K.S. is addicted to nicotine. According to Dollinger, he has a "meltdown" if he cannot get JUULpods.

**O.  J.D. through his parent and natural guardian Nicole Dramis**

136.    Plaintiff J.D. and his parent and natural guardian Nicole Dramis ("Dramis") reside in Miller Place, New York.

137.    J.D. began using JUUL in November 2017, at the age of 14. Prior to this, J.D. did not smoke cigarettes or use other tobacco products.

138.    Before using JUUL for the first time, J.D. had seen numerous JUUL Vaporized images online, which promoted JUULpod flavors and depicted fashionably dressed young people striking playful poses with JUUL devices in hand. See, e.g., Appendix C, Advertisement 46; see also https://inrejuul.myportfolio.com/vaporized. None of the advertisements J.D. saw disclosed the nature or addiction risks of JUUL's products, the existence or amount of nicotine in JUUL's products, or that the JUUL was engineered to deliver nicotine to the bloodstream more rapidly and in greater quantities than a cigarette.

139.    Before J.D. even tried JUUL, he also viewed point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit-flavored pods. J.D. did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted J.D.'s assessment of, and eventual decision to use, JUUL products.

140.    When offered a JUUL by a friend at school, J.D. accepted because he was interested in trying the fruit flavors. J.D. believed that JUULpods did not contain nicotine but were simply "fruit-flavored juice."

141.    JUUL's use of fruit-based flavors, fruit-based flavor names and fruit-based advertising images was a substantial factor in J.D.'s decision to use and continue using a JUUL. JUUL's fruit-based promotions misled J.D. about the nature of

JUUL's product and distorted the risks JUUL products posed. J.D. would not have started using JUUL if he knew it contained nicotine. Additionally, J.D. would not have used a tobacco or menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

142.    Peer pressure was also a significant contributing factor in J.D.'s decision to use and continue using a JUUL. J.D. has conveyed to Dramis that everyone at his high school was using JUUL, and he did not want to be the "odd man out."

143.    J.D. and his friends have purchased JUULpods from older students at school and at vape shops in the area.

144.    At his peak level of consumption, J.D. was consuming up to three JUULpods per day; he began using JUUL within five minutes of waking up in the morning and continued using JUUL throughout the day.

145.    J.D. began using JUUL regularly at school; he would leave class and take extended visits to the bathroom to use JUUL. Because of this, Dramis has received phone calls from J.D.'s teachers informing her of her son's absence from class.

146.    Dramis states J.D.'s JUUL use has had significant psychological and social effects on her son. Dramis says J.D. becomes very nasty and irritated when he cannot consume JUUL due to his severe addiction to nicotine. J.D. enjoys using JUUL because it gives him a high and makes him feel good.

147.    Socially, Dramis says her son has always been a nice, respectful child. However, since using JUUL, J.D. has started hanging out with a different crowd and veers the other way. J.D. has made friends with older kids that have easier access to JUUL.

148.    Dramis has made many efforts to get her son to stop using JUUL.

Dramis has grounded J.D., taken away his spending money, and banned him from hanging out with "bad influences." Dramis would like to send her son to a rehabilitation program in order to treat his addiction to nicotine and put a stop to his JUUL use.

**P.   Jillian Furey**

149.   Plaintiff Jillian Furey is 20 years old and a resident of Washington, D.C.

150.   Plaintiff Furey started using JUUL in 2018 because she heard of JUUL products as an alternative to cigarettes. JUUL's marketing, including in-store displays and radio advertisements, led her to believe JUUL was less risky and not addictive. She heard a JUUL ad on the radio station DC101 and 97.9FM during the class period telling her she could "switch."

151.   Plaintiff Furey used to smoke Marlboro lights, and she initially used one JUUL pod per week, but now uses up to 1 entire JUUL pod per day.

152.   She has purchased JUUL from gas stations and convenience stores and pays approximately $20 per pack of JUUL pods and up to $30 per day or every other day.

153.   She did not see any warnings in JUUL ads or on JUUL ads in gas stations or convenience stores.

154.   She used to smoke a few cigarettes per day (less than ten) and now smokes significantly more in nicotine in JUUL pods.

155.   She saw the JUUL packages said 5% nicotine, which to her represented a smaller amount of nicotine than cigarettes.

156.   JUUL's flavors played a significant role in her choosing to try JUUL, as she primarily smokes "Cool Mint".

157.   JUUL has increased her dependence on nicotine and aggravated her

addiction. She smokes JUUL within 5 minutes of getting up and finds herself far more addicted than when she smoked cigarettes. She has to use JUUL every 30 minutes.

158.    She has also been coughing significantly more often, and has been feeling sick on a regular basis, exhibiting symptoms such as shortness of breath and breathing issues.

159.    If she does not have her JUUL or cannot find it she becomes more agitated and anxious; she feels more better when she knows she has it on her and can use it at any time.

160.    Jillian would never have tried or purchased JUUL had she known the truth about its nicotine content and delivery, and the nature of its impact on her health.

## Q.  M.H., and her mother and natural guardian, Jennifer Hellman

161.    Plaintiff M.H. and her mother and natural guardian Jennifer Hellman ("Hellman") are residents of New Hope, Pennsylvania but lived in Robbinsville, New Jersey until July 2018.

162.    In 2016, M.H.'s older brother started using a JUUL along with many of his friends in high school.[1]

163.    M.H.'s brother told her what he believed to be true: the JUUL comes in fun flavors and he allowed her to use his JUUL.

164.    Prior to and after using a JUUL, M.H. saw and relied on JUUL's signs and promotions in local gas stations.

165.    When M.H. tried the JUUL, she liked the way it tasted and the buzz from nicotine. Because many of her friends had started using JUULs, too, M.H. found

---

[1] Due to an oversight by counsel, inaccurate allegations had been made in the First Amended Complaint that have now been corrected.

App'x A (Plf Allegations), 1st Consol. Compl.,          33
In re JUUL Prods. Lit.

herself using a JUUL.

166.     M.H. and her friends are active on social media, where M.H. saw posts from her and her brother's friends about JUUL use, saw posts that encouraged adolescent use of JUUL products and promoted using JUUL products at school.  This online content reinforced M.H.'s belief that the JUUL was a harmless product made for teenagers. M.H.'s mother saw posts from her daughter of M.H. using JUUL, mimicking what she had seen on other's social media.

   

167.     Now 17 years old, M.H's spending on JUULpods and JUUL devices has totaled at least $2000, some of which she earned herself and some of which Hellman provided through gifts of money, not realizing that she was funding M.H.'s addiction.

168.     All of M.H.'s friends in New Jersey were JUUL addicts. Although many of them are below the legal age to purchase JUUL products, they easily purchased JUULpods from local gas stations and other students at M.H.'s school.

169.     Hellman has spent in excess of $7,000 in her efforts to help M.H. with behavioral issues that coincided when M.H. began JUULing. In 2018, Hellman moved the family to Pennsylvania, where JUUL use is just as common in M.H.'s new high school. M.H. has tried cigarettes at times where she could not get JUULpods.

170.     Hellman had taught M.H. and her brother that smoking was dangerous, but she did not know to warn them about the JUUL—or what a JUUL

was—until it was too late. Schools educated M.H. and her brother about tobacco though the DARE program, but never addressed JUUL use.

171.    Though M.H. was not a smoker or a nicotine user before using a JUUL, her current consumption of nicotine is consistent and frequent.

172.    M.H. has tried repeatedly to quit JUUL use but has been unable to do so.

**R.  Austin Hester**

173.    Plaintiff Austin Hester ("Hester") lives in Roxboro, North Carolina but resided in St. Louis, Missouri when the transactions below occurred.

174.    . Prior to using a JUUL for the first time in 2016, at the age of 20, Hester did not smoke or use tobacco products because he knew that cigarettes cause addiction and can lead to serious illness or death. He also found the smell of cigarette smoke noxious.

175.    Although he had not yet tried a JUUL, Hester saw and relied on JUUL's point-of-sale ("POS") promotional materials, including JUUL signs and displays. The POS materials Hester saw promoted JUUL's fruit- and dessert-flavored pods. If the materials disclosed the existence or risks of nicotine in JUUL's products, Hester did not see them. The representations and omissions in JUUL's in-store promotions materially impacted Hester's assessment of the nature, risks and benefits of JUUL's products.

176.    When some of Hester's friends back from college offered him a JUUL in the summer of 2016, Hester, like his JUUL-using friends, was unaware of the addiction risks JUUL posed. Hester liked the taste of the Fruit Medley pods and continued to accept puffs from his friends when they socialized, which usually occurred a few times a week.

177.    Over the course of the summer, Hester continued to use his friends'

JUUL when he would see them. And Hester continued to see JUUL promotions in-store and online. JUUL's use of flavor-based nicotine pods and JUUL's flavor-based advertising images played a significant role in Hester's decision to use and continue using a JUUL. Had he known that JUUL's "Fruit Medley" product posed a risk of fostering a life-altering addiction, or could lead to smoking, he never would have used or purchased a JUUL.

178.    Hester also saw JUUL advertising content on @JUULvapor Instagram account and through the account of third parties discussing or promoting JUUL. Hester's friends and peers also posted about JUUL on Instagram and Snapchat. The social media content Hester saw led him to believe that JUUL products were made for non-smokers like him and posed little risk.

179.    When Hester's friends returned to school in the fall of 2016, Hester realized that he had become addicted to nicotine and purchased his own JUUL Starter Kit from the local QuikTrip store.

180.    Hester filled out the registration card that came in his "Starter Pack" and returned it to JUUL. Thereafter, Hester routinely received promotional emails, which, during the time period included discount offers, store locators, and flavor promotions, from JUUL, such as the email below promoting JUUL's Mango:



181.    Hester's budding addiction to nicotine quickly spiraled out of control, and Hester was soon consuming three JUULpods a day.

182.    Hester currently consumes one JUULpod a day.  He takes his first puff of JUUL within 5 minutes of waking up. He finds that the harshness or throat hit of the Mint flavor prevents him from excessive nicotine consumption.

183.    Hester tried the Mango pods but found the smoothness of the vapor, coupled with the flavor, led to an unwanted spike in usage.

**S.  Edgar Kalenkevich**

184.    Plaintiff Edgar Kalenkevich is a resident of Brooklyn, New York. When he used a JUUL for the first time in 2015, at the age of 25, he was a non-smoker.  He had tried cigarettes before but found them disgusting and rough on his throat.

185.     Plaintiff Edgar Kalenkevich is a resident of Brooklyn, New York. When he used a JUUL for the first time in 2015, at the age of 25, he was a non-smoker.  He had tried cigarettes before but found them disgusting and rough on his throat.

186.     Kalenkevich recalls that the JUUL brand appeared out of nowhere in New York City in the summer of 2015. Suddenly, all of his friends had JUUL devices and some of his friends spoke of attending events where free JUUL products were distributed.  Kalenkevich recalls seeing an invitation to a JUUL movie event in 2015 as well, in which JUUL promised free "starter kit" to each attendee.



187.     Although he had not as yet used a JUUL, Kalenkevich had seen advertisements from JUUL's "Vaporized" campaign.  These colorful ads featured fashionably dressed young people striking playful or seductive poses reminiscent of pop music idols, either with JUUL in hand or next to an enlarged image of a JUUL device.  Kalenkevich did not see any warnings about nicotine or addiction in these

ads.

188.    Prior to using a JUUL, Kalenkevich had also seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. Kalenkevich did not see any warnings or disclosures on these POS materials about JUUL's nicotine levels of the risks JUUL posed.  Instead, he saw claims that JUUL offered "intensely satisfying vapor" and promotions for fruit- and dessert-flavored pods.  These representations and omissions in JUUL's in store promotions materially impacted Kalenkevich's assessment of dessert-flavored JUUL he would later be offered.

189.    Kalenkevich also remembers seeing JUUL advertisements on his mobile phone in 2015.  None of the JUUL-related content Kalenkevich saw on his phone indicated that the JUUL contained nicotine, could deliver more nicotine than cigarettes, or posed at least the same risks of addiction as cigarettes.

190.    Kalenkevich had his first JUUL experience when his friend offered him a puff in a movie theater in the summer of 2015.   Kalenkevich enjoyed the Crème Brulee flavor and the feeling it gave him. Although he knew smoking to be dangerous and addictive, he thought that JUUL would not be dangerous, in part because the colorful pods and the sweet, candy-like flavors. Kalenkevich would not have used a tobacco- or menthol-flavored JUUL.

191.    After trying a JUUL, Kalenkevich visited JUUL's site where he saw a chart indicating that the JUUL delivered about 20% less nicotine than a cigarette. He assumed this meant that the JUUL was less addictive and less dangerous than a cigarette.



192.    Starting in June 2015, Kalenkevish frequently viewed JUUL's posts on Facebook and Instagram JUUL's use of food-based names, food-based advertising images, and food-based flavors was a substantial contributing factor in Kalenkevich's decision to start using and continue using a JUUL. JUUL's food-based promotions misled Kalenkevich about the nature of JUUL's products and distorted the risks JUUL's products posed. But for JUUL's flavorings and flavor-based promotions, Kalenkevich would not have started using a JUUL or would not have continued using a JUUL.

193.    On Facebook, he saw posts encouraging him to "start your week with Cool Mint JUULpods" as well as promotions for Mango pods and other JUUL flavors.

194.    When Kalenkevich's friends began posting or re-posting social media content related to JUUL, Kalenkevich started following some of the JUUL-related accounts, including @JUULnation and @doit4juul. Through these, and other, accounts Kalenkevich saw numerous JUUL-related posts featuring popular cartoon characters, teenagers using JUUL devices, teens combining JUUL with cigarettes, and JUUL as an essential – indeed irresistible – element of young adult life.

195.    JUUL's use of celebrities like Katy Perry and Orlando Bloom also influenced his decision to use JUUL products. These celebrities' endorsement led him to believe that JUUL was a safe product.



196.    Kalenkevich visited JUUL's website in 2015 and 2016 and began receiving promotional emails from JUUL. Nothing in those emails disclosed that JUUL contained at least 59 mg/mL nicotine or that the JUUL could deliver more nicotine per puff than a cigarette.

197.    Kalenkevich's JUUL use caused him to become addicted to nicotine.

Though cigarettes had disgusted him in the past, his addiction to nicotine was so intense that he started smoking when he did not have access to JUUL. Like many non-smokers who are introduced to nicotine through JUUL, Kalenkevich became a user of multiple tobacco products.

198.    Kalenkevich now smokes ten cigarettes and vapes at least half of a Cool Mint or Mango pod a day.  In his experience, the sweeter flavors generate more vapor and are smoother on the throat.

199.    But for JUUL's deceptive and unfair promotional practices, Kalenkevich would have never used a JUUL and would have never become a smoker.

**T.  David Kugler**

200.    Plaintiff David Kugler is a resident of Illinois.

201.    David is 18 years old, he turned 18 in January 2019.

202.    David. is addicted to JUUL, he started at age 15 in the summer of 2016; He had tried a cigarette before.

203.    JUUL seemed trendy or cool and "everyone was doing it" so he tried too.

204.    David Kugler has seen JUUL ads on social media, instagram, at gas stations, and smoke shops during the class period, including this ad and similar ads, which provide no warning:



205.    David Kugler first tried JUUL at a party and one of his classmates offered him to try using a JUUL device and JUUL pod that was "Cool Mint" flavor. D.K. did know what nicotine was and did not try nicotine before that point. There were no warnings on the device or pod.

206.    If David Kugler. had known how addictive JUUL was or how it worked, he would definitely not try it. At peak use in 2017, D.K. was smoking a pack of pods or $20-$25 per week.

207.    David Kugler was consistently struggling with addiction and withdrawl to JUUL, and it hurt his relationship with his parents.

208.    David prefers flavored JUUL pods, including mango. D.K. avoids tobacco or menthol flavored JUUL pods.

209.    David would never have used JUUL had it not been for the flavors.

210.    David had seen JUUL's packaging and advertisements in gas stations and on social media.

211.    David's mother Tracie Kugler does not sleep anymore because of her sons' condition.

212.    David saw online ads for JUUL skins and saw @juulnation on instagram. When mango first came out, he saw a lot of social media promotion over new appealing flavors. He has seen many memes such as people inhaling multiple JUULs at once. He saw a lot of online memes.

213.    David saw a photo of, Baker Mayfield the NFL quarterback, posted a photo with a JUUL devide.

214.    David purchased JUUL from a classmate who purchased pods in bulk off of the JUUL website. He also purchased JUUL pods through gas stations and smoke shops and through the help of some of his classmates who looked older.

215.    David lost weight (11lbs) and visited a physician, who recognized that

nothing was wrong with him except for his nicotine addiction.

216.    David's nicotine addiction has contributed to his slower athletic performance and has now diminished his opportunities to play college soccer.

217.    David had received help from a counselor and was eventually able to recover from his addiction in the summer of 2017. This program cost approximately $2,000.

218.    David would never have used JUUL had it not been for flavors and marketing that made him believe JUUL was safe.

**U.  Tracie Kugler, on behalf of her son, Z.K, a minor.**

219.    Kugler and Z.K. are residents of Illinois.

220.    Z.K., Kugler's son, is 15 years old.

221.    Z.K. is addicted to JUUL. Z.K. started at age 14 in 2017.

222.    Z.K. had ever tried a cigarette before trying JUUL.

223.    Z.K. saw JUUL ads on Facebook advertising JUUL's newest flavor, mango. He specifically saw this ad in early 2017 before he started smoking JUUL, which does not warn of any dangers of using JUUL, or the nature of nicotine content and delivery in the device:



224.    When Z.K. first tried JUUL, it was clear to him that he only liked flavored JUUL pods, including mango.

225.    Z.K. avoids tobacco or menthol flavored JUUL pods, finding them "digusting".

226.    Z.K. became addicted to JUUL in 2017 has been caught using JUUL at school multiple times in the past several years.

227.    Z.K. purchases JUUL on a regular basis through other people who obtain it from gas stations, online, or retailers.

228.    Z.K. has seen JUUL's packaging and advertisements in gas stations and on social media. He did see the 5% nicotine strength as well. None of the ads he saw, including specifically the one below, warned Z.K. of the true harms and nature of JUUL:



229.    Plaintiff Kugler does not sleep anymore because of Z.K.'s condition.

230.    Z.K. has been caught using JUUL three times in school. He has performed poorly in school due to his addiction, and had to be put in a drug rehab program mandated by the school.

231.    Z.K. was also caught using JUUL in a summer school program, after which he was placed in an out patient rehab facility that cost at least $4,000 and therapy that cost $160 per session with approximately 25 visits. Z.K. continued to use JUUL through the program due to his addiction.

232.    Z.K.'s mood has significantly changed and his nicotine addiction has contributed to anxiety and depression.

233.    Z.K.'s addiction has contributed to negative impacts on his negative health, and conflicts with parents and others.

234.    Z.K. would never have used JUUL had it not been for the flavors.

**V.  Kacie Ann Lagun (née Durham)**

235.    Plaintiff Kacie Ann Lagun (née Durham) is a resident of Pennsylvania.

236.    Lagun is a U.S. Army veteran and health sciences student.

237.    Lagun purchased a JUUL to help her quit smoking and as a healthy alternative to smoking.

238.     Lagun saw JUUL advertisements when she went to purchase
cigarettes, which led her to go to the JUUL web site for more information.  These ads
included discounts, and advertised to switch to JUUL.  She also saw point of sale
displays for JUUL, presenting a variety of flavors, each with its own bright primary
color.  Samples of such ads are shown below:





239.    On Defendant's web site, she saw the JUUL as a sleek, portable device with a variety of appealing flavors, particularly menthol. The devices were advertised using bright, primary colors in ads such as the one below:





240.   Lagun did not know at the time she purchased the JUUL that JUULpods deliver more nicotine than a regular cigarette.

241.   Lagun is now addicted to JUULpods.

242.   Had Lagun known that JUULpods were more addictive than cigarettes, she would not have purchased them.

**W. David Langan**

243.   Plaintiff David Langan is a resident of Massachusetts.

244.   Langan, who is now 24 years old, bought his first JUUL from a friend. Langan had been smoking 4-5 years before he purchased his first JUUL and had unsuccessfully tried to quit a few times. He particularly wanted to quit smoking because he had a child on the way, and did not want to smoke around his pregnant wife or infant.

245.   He felt like he had almost quit cigarettes when a friend introduced him to JUULpods in or about March 2017. Shortly afterwards, he purchased his JUUL.

246.   Langan had seen ads from JUUL's "Switch" campaign prior to his

purchase.  He also remembers seeing the slogan "Smoking Evolved."

247.    Langan remembers JUUL coming out of nowhere, and suddenly being everywhere, both in social media ads, gas station/point of sale ads and displays, and being used by friends, as well as many high school students in his neighborhood.  He remembers JUUL advertising being so widespread it became part of the subconscious backdrop of his every day life.

248.    At the time of his early JUUL purchases, Langan was active on Instagram and Facebook. He viewed Instagram "Switch" clips where JUUL users talked about their experiences switching to JUUL.

249.    Langan's first store purchase of JUULpods was a pack of the Cool Mint flavored pods, which was triggered by a poster advertising the Cool Mint flavor at his local gas station.  Langan saw advertising materials describing the fruity and menthol flavors of JUULpods, which influenced his purchase. Langan favors Menthol JUULpods, and has also purchased Mango-flavored and Cool Mint JUULpods that were advertised.

250.    Langan also received ads promoting JUUL from his local smoke shop, in the form of text messages.

251.    Based on what Langan had heard and seen, he was under the impression that JUUL was healthier than cigarettes.  He was also under the impression that JUULpods were not only no more addictive than cigarettes, but were actually useful as a means of weaning himself from nicotine.  He did not know that JUULpods actually contained a higher, more potent dose of nicotine than cigarettes, or that JUUL use would aggravate his nicotine addiction.

252.    Subsequently, he found that his nicotine addition increased significantly. When Langan lost his first JUUL, he could not go without one, so he bought a replacement.  Langan also found that if he did not have a working JUUL on

him, he felt compelled to ask for cigarettes from smokers around him. Had Langan

known that the nicotine salts in JUULpods were more potent and addictive than

traditional cigarettes, he would not have purchased JUUL products.

253.    If Langan had known the truth of JUULpods' nicotine content and

addictiveness, he would not have purchased the products.

## X.  Plaintiff Jonathan Mardis

254.    Plaintiff Jonathan Mardis is a twenty-four year old resident of

Mississippi.

255.    Plaintiff started using JUUL products in mid-2018. He learned about

JUUL from Facebook ads including those contained in JUUL's marketing led plaintiff to

believe that using JUUL was healthier than smoking cigarettes.

256.    Plaintiff purchased JUUL from Citco, a convenience store, for

approximately $17 for a pack. He did not see any warnings on the JUUL ads and posters

in the gas station, including the ads that said "JUUL was sold here" in gas stations in his

area.

257.    Plaintiff also saw JUUL content on Snapchat and Facebook, including the

images presented at the page http://www.classlawdc.com/2019/01/25/juul-images-2/.

258.    He used to smoke approximately 20 cigarettes every two days, and

smoked for 6.5 years before trying JUUL. Now Mardis is smoking a full JUUL pod per

day and still craving cigarettes.

259.    He smokes approximately 1.5 JUULpods per day and starts consuming

these as soon as he wakes up.

260.    On occasion Plaintiff gets bad headaches when he uses JUUL and other

consequences. He has spent a significant amount of money on JUUL and cannot kick his

addiction.

261.    Plaintiff only purchased JUUL because he thought it would help him end

his addiction, but instead, his addiction has gotten worse. He would have never purchased JUUL has he known the truth about the nature of its nicotine content, delivery, and the harms that it poses.

**Y.  M.C. through his Parent and Natural Guardian Jeannine Manning**

262.    Plaintiff M.C. and his Parent and Natural Guardian Jeannine Manning ("Manning") are residents of Walpole, Massachusetts.

263.    When M.C. used a JUUL for the first time in 2016, at the age of 14, he was not a smoker and had never used tobacco products.

264.    Prior to his first experience with a JUUL, M.C. had seen advertisements from JUUL's "Vaporized" campaign. One of the ads M.C. saw portrayed an attractive young woman with bleached hair, elevated boots, ripped jeans, a distressed denim jacket and a JUUL device in her hand. M.C. did not see any disclosures or warnings about nicotine or addiction in these advertisements.

265.    Prior to using a JUUL, M.C. had also seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. M.C. did not see any warnings or disclosures in these POS materials about the existence or amount of nicotine in a JUUL or the risks nicotine posed. Instead, he saw promotions for JUUL's fruit- and dessert-flavored pods. The representations and omissions in JUUL's in-store promotions materially impacted M.C.'s assessment of the JUUL he would later be offered by a friend at school.

266.    Though he was not a smoker, when M.C.'s classmate offered him his first puff of a JUUL, M.C. accepted it because he thought it would be safe and harmless.

267.    M.C. did not know that JUUL vapor contains nicotine and presents a risk of addiction.  To this day, though he is addicted to nicotine, M.C. thinks that JUUL use is "ok" and "safe."

268.    JUUL's use of food-based names, food-based advertising images, and food-based flavors played a substantial contributing factor to M.C.'s decision to start using and continue using a JUUL. JUUL's food-based promotions misled M.C. about the nature of JUUL's product and distorted the risks JUUL products posed. But for JUUL's flavorings and flavor-based promotions, M.C. would not have used a JUUL or would not have continued using a JUUL.

269.    JUUL's methods of promoting its products on social media platforms foreseeably triggered the viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUUL use. These promotions reached M.C. and M.C.'s social network and were intended to promote the JUUL brand and products to youth. But for JUUL's social media advertising, M.C. would not have been exposed to and would not have used a JUUL.

270.    M.C. and his friends are active on Instagram and Snapchat and follow a number of JUUL-promoting accounts.  Through these accounts, M.C. has seen content that encourages teenage JUUL use by depicting teens using JUUL, depicting "cool" cultural icons using JUUL and making light of teen dependence on JUUL. M.C. and his friends now post videos of themselves JUULing on SnapChat that are similar to the videos and images they see on Instagram.

271.    M.C. and his friends purchase JUUL products through classmates when they cannot purchase them through stores or online. Manning knows that M.C. has at least once purchased JUUL products online using a Visa gift card that he purchased with cash. But Manning does not know if M.C. bought them from JUUL or from a JUUL reseller. More recently, M.C. admitted to having purchased a JUUL device and 20 pods from a stranger he met on Snapchat.

272.    Like many of his friends and classmates, M.C. supports his JUUL

addiction by selling JUULpods to classmates at a markup.

273.    To date, Manning has confiscated at least 5 JUUL devices from M.C. Each time she does so, M.C. becomes extremely irritable, belligerent and verbally abusive due to nicotine withdrawal. Since he started using a JUUL, M.C.'s health and performance in school have suffered, with M.C. being more withdrawn and moody than he was before he became addicted to nicotine.

274.    MC's physician has not been able to help MC break his addiction. MC now sees a counselor because Manning found that he was vaping marijuana oil through his JUUL device. To date, Manning has spent in excess of $1150 on interventions to address M.C.'s JUUL addiction, but without success.

275.    M.C. currently consumes at least 1 fruit-flavored JUULpod (either Fruit Medley or Mango) per day.

**Z.  David Masessa**

276.    Plaintiff David Masessa is an adult citizen of New Jersey and resides in Chatham, NJ.

277.    In 2015, Mr. Masessa began using JUUL products in an effort to cease smoking cigarettes and wean himself from nicotine consumption.  He had been smoking from one half of a pack to a pack of cigarettes each day. He believed the JUUL pods would quench his desire for nicotine, allow him to stop smoking and using e-cigarettes, and allow him to cease consuming all nicotine products altogether.

278.    Prior to consuming JUUL pods, Mr. Masessa was exposed to and did see JUUL advertising, promotional and marketing materials in various online publications (such as Wired, Verge and Engadget), which caused him to believe that JUUL products would allow him to wean himself off of cigarettes and nicotine products. These materials sometimes included the word "Vaporized" and always featured attractive, youthful-

looing models, including specifically the following:



279.    Prior to consuming JUUL pods, he visited the JUUL website in June 2015, where he saw claims and representations about the product. He relied on those claims and representations when he then purchased the JUUL starter kit from the JUUL website. Such claims include the following graph, implying that JUUL contains less nicotine than cigarettes:



280.    At around this time, Mr. Masessa also saw posts on JUUL's Facebook page, including the following ad:



281.    After June 2015 when he purchased the JUUL started kit, he visited or came across additional posts from JUUL's facebook page, including a post that pictured a JUUL crème brulee-flavored pod next to a real crème brulee with the words "this JUULpod lets you indulge in dessert without the spoon", and a post with the word "SWITCH" in large letters across the face of the post along with the words "JUUL was designed with smokers in mind. Have you made the switch?"

282.    After June 2015, he also saw advertisements on social media for rooftop JUUL parties in Brooklyn and Manhattan, which further enticed him to begin using and to continue to use JUUL products. He saw the following ad and several others that were similar:



283.    He saw JUUL's representation of "5% strength" on JUUL packaging and believed that this meant the product contained 5% nicotine.

284.    After June 2015, he also saw JUUL's representation that one JUULpod is equivalent to one pack of cigarettes and believed this to mean that one JUULpod has a nicotine content equivalent to one pack of cigarettes.

285.    He also saw JUUL's representation that JUUL products were an "alternative for adult smokers" and believed this to mean that JUUL products were a smoking-cessation device that was a healthier alternative to cigarettes. Although he ultimately reduced, but did not cease, his consumption of cigarettes, he became addicted to JUULpods, which increased his anxiety and desire for nicotine. He experienced strong withdrawal symptoms when he did not use JUUL.

286.    He relied on these representations in deciding to use JUUL and in continuing to use JUUL.

287.    From the JUUL marketing materials and representations that he saw, he did not know that the JUUL contained 59mg/mL nicotine (6%); that the JUUL could deliver more nicotine per puff than a cigarette; or that the nicotine delivered by the JUUL entered the bloodstream faster than a cigarette. He believed that the nicotine salts in the JUUL broke down in the blood over a longer period of time than nicotine inhaled through a cigarette, and that this was supposed to reduce his desire for nicotine.

288.    He purchased JUUL products at convenience stores and local smoke shops near where he lives.  At those stores and in other locations, he saw JUUL advertisements and in-store signs, promotional materials, sales and discount information, and poster-sized enlargements of the product packaging.  He saw several displays including the following display, none of which warned him of the truth of JUUL's nicotine content and delivery:



289.    He has tried all of the JUUL flavors. He had seen JUUL advertisements touting all of the flavors it offered before trying those flavors, including advertisements that pictured real fruit next to the corresponding JUUL flavor, such as ripe mangoes next to a picture of the mango-flavored JUUL pod, crème brulee-flavored JUUL pods next to a cup of coffee as if those pods were a sweet dessert, and sliced cucumber next to the cucumber-flavored JUUL pod. His favorite flavor is Crème Brulee because it causes him the least amount of irritation and inflammation of his throat and mouth.

290.    Mr. Masessa on average consumed four to six JUUL pods every week.

291.    Since starting to consume JUUL pods, Mr. Masessa became addicted to the nicotine salts they contain. Indeed, JUULing was on his mind more than smoking cigarettes was, and not having a JUUL nearby caused him anxiety. Rather than weaning Mr. Masessa off of cigarettes and nicotine, the JUUL products delivered a high dose of nicotine that resulted in an increased nicotine addiction, an increased consumption of nicotine, and an increase in the number of JUUL products he consumed.

292.    Mr. Masessa would not have purchased JUUL products had he known that the nicotine salts in JUUL pods were highly addictive and more potent and addictive than the traditional cigarettes from which he was attempting to wean himself.

**AA.    Ron Minas**

293.    Ron Minas ("Minas") is a resident of Lebanon, Connecticut.

294.    Prior to using JUUL, Minas smoked about ten to 20 cigarettes daily.

295.    Minas first learned about JUUL from his brother. He later saw JUUL advertisements online and decided to buy a JUUL device. He hoped that the JUUL would help him stop smoking and break his addiction to nicotine.

296.    Minas first purchased mango-flavored JUULpods. Minas would not have used tobacco- or menthol-flavored JUUL.

297.    Before purchasing JUUL, Minas visited JUUL's website and began receiving promotional emails from JUUL. Neither JUUL's website nor JUUL's emails disclosed that the JUUL easily delivers more nicotine per puff than a cigarette or that the JUUL delivers nicotine to the bloodstream faster than a cigarette.

298.    Minas' nicotine consumption has increased since he switched to JUUL. Minas now consumes at least one JUULpod per day, sometimes more.

299.    Minas believes that using JUUL has only worsened his nicotine addiction, as he can consume JUUL anywhere; the JUUL device is constantly in his hand.

300.    Nothing on JUUL's labeling suggested to Minas that the nicotine levels of a JUUL would exceed those of a cigarette. Minas would not have purchased JUUL products if he had known that the JUUL delivered more nicotine than cigarettes and posed a risk of worsening his addiction to nicotine.

301.    Minas's JUUL use has also impacted his family. Minas once caught his 11-year-old son inhaling his mango-flavored JUULpods. Luckily, Minas was able to stop his son before he became addicted to nicotine, but the situation could have turned out very differently.

302.    Minas says he has tried to stop using JUUL, but he just cannot kick his nicotine addiction. Minas has tried to use a nicotine patch and received treatment at the V.A., as he is a veteran, but he cannot seem to shake it.

303.    If Minas had known how much nicotine JUULpods contained, he would never have started using the product and exposed himself to the risk of developing a more serious nicotine addiction.

**BB.    L.B., and her mother and natural guardian Jill Nelson**

304.    L.B. and her mother and natural guardian Jill Nelson are, and at all times relevant hereto were residents of San Diego, San Diego County, California.

305.    L.B. was introduced to JUUL products by her friends at school when she was in the eighth grade. The JUUL device bears no warning labels about nicotine or content, and L.B.'s friends did not warn of her of the risks of JUUL use. Had L.B. known, or understood, the risks that the JUUL posed, she would never have used it.

306.    L.B. would not have tried a JUUL but for the fruit flavors offered to her by her friends. The fruit flavored JUUL product her friends offered her led L.B. to believe that the product was safe to use. She did not know she was ingesting nicotine from a nicotine delivery system that delivered as much—or more—nicotine than a cigarette. She knew not to smoke but did not understand the risks of ingesting nicotine from ENDS.

307.    Through her use of her friends' JUULs, L.B. became addicted to nicotine and eventually purchased a JUUL of her own from an unknown source.

308.    L.B. has reported to Nelson that JUUL use is common at her high school, where older students sell individual pods to younger students for profit.

309.    L.B. told Nelson that the local gas stations readily sell JUUL pods to minors and that one young gas station employee even trades JUUL pods for fast food that children bring him.

310.    On at least one occasion, Nelson knows of L.B. purchasing JUULpods from eBay.

311.    In October 2017, L.B. also obtained a device directly from JUUL through the company's warranty department.

312.    L.B. also received promotional emails from JUUL, starting no later than October 2017.

313.    Nelson is unsure how much L.B. uses her JUUL but she constantly finds the orange and green caps of mango and "Cool" Mint JUULpods in L.B.'s room. Nelson has talked to L.B.'s doctor and other medical providers. None of them are trained, or equipped, to treat adolescents with severe addictions to nicotine caused by JUUL products.

314.    Since the filing of the First Amended Complaint, L.B. has been subject to disciplinary actions at school for truancy relating to JUUL usage and was put in a court-ordered program called Diversion as a result.

315.    In October, Nelson took away L.B.'s smartphone for disciplinary reasons. In doing so, she also removed L.B.'s access to her network of friends who are also addicted to JUUL. L.B.'s anger and panic caused her to flee the house and L.B. was apprehended for erratic behavior in public by the police.

316.    Nelson and L.B.'s father put L.B. in a one-month-long inpatient treatment program.

317.    The day after she returned from treatment, L.B. acquired another JUUL. She continues to JUUL daily.

318.    Because of her extended absence from school, L.B. is unable to complete her freshman year of high school with her classmates. She now attends an alternative school and is attempting to salvage her year.

**CC.   S.G., a Minor, through her Parent and Natural Guardian Ashley Noble**

319.   S.G. and her parent and Natural Guardian Ashley Noble are residents of Ocean Springs, Mississippi.

320.   When S.G. began using e-cigarettes in 2017, at the age of 14, she was not a smoker.  Nor did she understand the risks of ENDS or addiction.

321.   In 2018, JUULing became very popular at S.G.'s high school. When offered a fruit-flavored JUUL, she found that she liked the flavor and the fact that it gave her a far stronger "buzz" than her older brother's 1.8% nicotine ENDS she had used in the past.

322.   JUUL's use of flavors played a substantial contributing factor in S.G.'s decision to take up and continue using a JUUL. But for JUUL's dessert- and fruit-based nicotine flavors, and JUUL's promotion of those flavors, S.G. would not have used a JUUL.

323.   Though S.G. had used ENDS in the past, after her first JUUL experience, S.G. developed an uncontrollable addiction to nicotine, consuming up to 2 JUULpods a day in either "Cool" Mint or Mango flavor.

324.   Because S.G. had used ENDS before using a JUUL, she read and understood JUUL's labeling statement of "5% strength" to mean 5% nicotine by volume.  S.G. did not know that JUUL contained at least 5.9% nicotine—more than three times the potency of the solution she had used before—or that JUUL's Mint pods had been found to contain up to 9.4% nicotine.  JUUL's misleading labels also made it difficult for S.G. to find alternative ENDS to JUUL or understand what lower potency products might exist.

325.   Since becoming taking up a JUUL, S.G. has developed behavioral problems linked to her addiction.

326.   Noble has purchased urine cotinine screens, nicotine patches,

and nicotine gum as part of her efforts to understand and assist S.G. with her addiction. In addition to trying to help S.G. wean herself off of nicotine, Noble has sought professional treatment to no avail. Noble recently took away S.G.'s JUUL. The resulting nicotine withdrawal prompted S.G. to begin smoking cigarettes, which she could access more easily than a new JUUL.

327.    Prior to using a JUUL, S.G. had seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. S.G. did not see any warnings or disclosures about JUUL's nicotine levels or the risks a JUUL posed on those POS materials and instead saw promotions for JUUL's fruit- and dessert-flavored pods. The representations and omissions S.G. saw JUUL's in-store materially impacted S.G.'s assessment of the fruit-flavored JUUL she would be offered by a friend at school.

328.    Social media drove the popularity of JUUL at S.G.'s high school. Both before and after taking up JUUL use, S.G. saw a significant amount of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors with JUUL products, distorted and omitted the risks of JUUL use, and omitted or downplayed the nature and risks of JUUL use. These promotions including reached S.G. and S.G.'s social network, including classmates, leading to an increase in uptake on JUUL products and widespread misperceptions about the nature and risks of JUUL products.  S.G. has seen viral media content that normalizes the role of JUUL in teen life by, among other things, portraying teens using JUUL, portraying teens dressed in JUUL-themed costumes, depicting JUUL as an element of a "high school starter pack" and giving humorous treatment to teen dependence on JUUL products.  But for JUUL's viral marketing activity, S.G. would not have been exposed to and would not have used a JUUL.

 

329.    S.G. is very active on Instagram where she followed the account "@Doit4Juul" and "@JUULnation." S.G. routinely saw promoted images of adolescents her age using JUUL products and believed that JUULing was the cool thing to do and would help her fit in with her peers.

330.    On SnapChat, S.G. has seen content from the JUUL influencers DonnySmokes and Supreme Patty.  S.G. and her friends and classmates mimic the mannerisms and techniques they observe copying the tricks and content. In effect, they are imitating within their social circles the activity they see on "DoIt4Juul," and similar social media accounts. Through SnapChat, S.G. can also readily purchase JUULpods from classmates or other peers.

331.    S.G. currently consumes at least one Crème Brulee JUULpod a day and smokes cigarettes when she cannot use a JUUL.

**DD.    D.O. through her mother and natural guardian Atoyia Orders**

332.    D.O. and his mother and natural guardian Atoyia Orders ("Orders") are residents of London, Ohio.

333.    D.O. began using JUUL around June 2016, at the age of 16.

334.    When D.O. was offered a JUUL by a friend at school, he had never smoked or used any other tobacco product; he decided to try a JUUL because the

mint flavor sounded appealing, he believed the JUUL posed no serious risks, and JUULing had grown increasingly common at his school. D.O. had seen advertisements for JUUL on social media and was led. to believe JUUL did not contain any nicotine.

335.   Before D.O. even tried JUUL, he also viewed point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit-flavored pods. D.O. did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted D.O.'s assessment of, and eventual decision to use, JUUL products.

336.   D.O. told Orders that smoking JUUL was "smooth and easy" and eased his anxiety.

337.   Shortly after trying his friend's JUUL at school, D.O. purchased a JUUL "starter pack" from a local gas station and consumed all the JUULpods contained therein.

338.   D.O. now consumes two or three JUULpods each day.

339.   D.O. attempted to quit using JUUL. However, because he was highly addicted to nicotine, D.O. turned to cigarettes. Now, D.O. uses JUUL and cigarettes.

340.   Orders says D.O.'s JUUL use has had significant physical, financial, and social effects on her son. D.O. has his JUUL in hand "24/7" and becomes very fidgety and irritated when he cannot use JUUL. D.O. has also lost a significant amount of weight since he started using JUUL.

341.   Financially, D.O.'s JUUL use consumes a large portion of his budget, as he spends a significant amount of money on JUULpods each week. D.O. now works to feed his nicotine addiction, but before he started working, he would steal money

from his mother in order to purchase JUULpods.

342. Socially, Orders says her son now hangs out with the "wrong crowd," as he spends most of his time with friends that also use JUUL incessantly.

343. Orders is confident that D.O. would not have started using JUUL if he had known that JUUL contained nicotine and put him at a serious risk of developing a debilitating nicotine addiction.

**EE.  Jack Roberts**

344. Plaintiff Jack Roberts is a resident of Kentucky.

345. Before Roberts used a JUUL for the first in November 2017, at the age of 17, he had seen numerous JUUL displays, signs and promotions in local gas stations. These materials promoted JUUL's flavors, JUUL's discounted Starter Kits, and "Limited Edition" JUUL flavors and devices. Roberts does not recall seeing any disclosures or warnings on those promotional materials including disclosures or warnings that the JUUL was an age-restricted product, could deliver larger doses of nicotine than a cigarette, and was at least as pharmacokinetically potent as a cigarette.

346. When Roberts was offered a JUUL by a friend at school, he had never smoked or used any other tobacco product.  He decided to try a JUUL because the Cool Mint flavor sounded appealing, he believed the JUUL posed no serious risks, and JUULing had grown increasingly common at his school. Roberts would not have used a tobacco or menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

347. The JUUL's narcotic effect of nicotine and the peer reinforcement accompanying it led Roberts to use his friend's JUUL repeatedly over the course of the next few weeks. Deciding that he wanted to try different flavors, Roberts bought his own JUUL "Starter Kit" through an 18-year-old classmate. Roberts consumed the

Fruit Medley, Crème Brulee and "Cool" Mint pods included in the Starter Kit over the course of a week. Roberts gave away the Tobacco pod. After finishing his Starter Kit, Roberts bought a box of Mango JUULpods from a classmate and continued purchasing Mango pods from that point forward.

348.    When Roberts sent in the registration card for the JUUL device in his Starter Kit, JUUL began sending Roberts promotional emails, including an invitation to combat federal efforts to regulate ENDS flavors by writing the FDA to report how JUUL's flavors played an important role in Roberts' journey as a smoker.  The email also contained a survey inviting Roberts to list which JUUL flavors he had used.

349.    Roberts saw and relied on JUUL promotional materials, Instagram account, website, and emails heavily promoting JUUL's Mango. Though Roberts knew the JUUL contained nicotine, JUUL's promotion of its flavors led him to believe that JUUL use posed minimal risks and was appropriate for him to use.

350.    Roberts quickly developed a pod-a-day nicotine addiction, which cost about $40 a week to maintain. In an attempt to save money, Roberts purchased bottles of nicotine salt e-liquid from a local store, which he used to refill empty JUULpods. Relying on JUUL's labeling, Roberts purchased bottles of 5% nicotine salt e-liquid to refill his empty JUULpods. Because JUULpods contain at least 5.9% nicotine, the third party e-liquids Roberts purchased were not potent enough to satisfy his addiction, leading Roberts to discard the bottle and purchase Defendant's premium-priced JUULpods.

351.    Once he turned 18, Roberts, like many other JUUL-addicted seniors in his high school, supported his addiction by legally purchasing packages of JUULpods at local gas stations and reselling the pods to younger students at a markup. Though Roberts deeply regrets this decision now, he justified it at the time as him "helping out" younger classmates in the same way that older classmates had "helped" him

before he turned 18.

352.    On social media, Roberts saw a significant amount of JUUL promotion from third parties, some of which include Instagram accounts by: @Doit4JUUL, @JUUL_break, @JUULwraps,  @Juulzi.co, @DonnyK17, and @SupremePatty. Many of the posts from these accounts promoted or included JUUL's name and hashtags that JUUL promoted, including #juul, #juulvapor, and #juulnation. On SnapChat and YouTube, Roberts followed or saw content from Donny Smokes, including the JUUL Challenge, and other "tricks" that Roberts and his friends mimicked.  All of these JUUL-related promotions created the impression that JUUL was more popular than it was, JUUL was made for teenagers, and that JUUL use was for "cool" kids.

353.    These JUUL-promoting accounts promoted nicotine abuse, downplayed or normalized addiction risks, encouraged JUUL use in school and provided guidance on how to conceal a JUUL, created the impression that JUUL use was more common than it was, and that JUULing was the "cool" thing to do. These accounts also sold JUUL products directly through Instagram and promoted websites that sold JUUL products with inadequate age verification procedures, if any at all. These accounts also encouraged viral content creation by encouraging viewers to post their own JUUL-related content, including selfies, nicotine abuse "tricks" like inhaling ten JUULs at once, memes normalizing addiction and adolescent use of JUUL products, and imagery suggesting that JUUL use might improve a person's dating prospects.

354.    Roberts did not know that much of the content he saw was being created, distributed, and promoted by JUUL vendors whose aim was to promote JUUL use to adolescents and profit off of their addiction. Had Roberts known the truth, he would have rejected offers to use a JUUL or would have attempted to stop using a JUUL far sooner than he did.

355.    JUUL's viral marketing campaign ensnared Roberts, who shared his own JUUL-themed "promposal" in the spring of 2018. Had Roberts known that his creation of JUUL-related content was the result of JUUL's efforts to turn young JUUL users into unpaid youth advertisers for JUUL's products, Roberts would not have posted the content or would not have consented to being used to promote JUUL to other adolescents.



356.    In or around the summer of 2018, Roberts joined "JUUL Talk."  An "exclusive insights community" developed by Defendant, JUUL Talk's welcome email warned that any information shared by JUUL Talk was "<u>confidential</u> (subject to the non-disclosure agreement) and not to be shared with others."

357.    Within days of joining, Roberts received his first JUUL Talk survey

invitation, which was purportedly designed to help JUUL "design activities and experiences that are relevant and valuable to you."

358.    On November 20, 2018, after JUUL announced that it would remove flavored JUULpods from gas stations, JUUL Talk sent Roberts the first of three separate emails he would receive, urging him to complete a survey detailing how the removal of Mango and other flavored JUULpods from gas stations would impact him.

359.    Had Roberts known the truth about JUUL or its marketing activities, he would not have joined JUUL Talk or submitted any other information about himself to JUUL.

360.    Now a freshman in college, Roberts still consumes at least one JUULpod a day. He sleeps with his JUUL next to him on a nightstand and begins using his JUUL as soon as he wakes up each morning. He has been unable to quit or taper down to less potent e-liquids than the JUUL. He estimates that his JUUL addiction has cost him thousands of dollars since 2017.

361.    Roberts recently learned that his younger brother, who is a freshman at Roberts' former high school, is now using a JUUL, too.

362.    Had Roberts known the risks of using a JUUL or that the sudden popularity of JUUL was not because the JUUL was "cool" but because JUUL was using deceptive advertising tactics to lure teenagers to its powerfully addictive product, he would not have used a JUUL.

## FF.    W.T. and A.R.T., both minors, through their parent and Natural Guardian Tonya Rowan

363.    Plaintiffs W.T. and A.R.T, and their mother and Natural Guardian Tonya Rowan ("Rowan"), are residents of Red Wing, Minnesota.

364.    W.T. used a JUUL for the first time in 2016 at the age of 13. A.R.T used a JUUL for the first time in 2017 at the age of 16.

365.    Before using a JUUL, neither W.T. nor A.R.T. had ever smoked a cigarette or used other tobacco products.

366.    Prior to their first JUUL use, both W.T. and A.R.T. had seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL "Starter Kit." Neither W.T. nor A.R.T. saw any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risk of addiction JUUL posed.  The representations and omissions in JUUL's in-store promotions materially impacted W.T. and A.R.T.'s assessment of, and eventual decisions to use, JUUL products.

367.    Both W.T. and A.R.T. had their first JUUL experience when offered a puff from a friend's JUUL device.

368.    Both W.T. and A.R.T. started purchasing their own JUUL products within a short time after their first JUUL experience.

369.    Although W.T. and A.R.T. are still below the minimum legal age to buy tobacco products, they have always been able to buy JUUL products from their friends and classmates.

370.    Both W.T. and A.R.T. became addicted to nicotine within a short time after they started JUULing.

371.    Although they had never smoked before, both W.T. and A.R.T. now smoke cigarettes to satisfy their nicotine addiction when they do not have access to JUUL.

372.    Rowan reports that, without nicotine, W.T. and A.R.T. become "crazy and ornery."

373.    W.T. currently consumes one JUULpod per day and A.R.T. consumes one JUULpod every 2 or 3 days.  They both start JUULing within 5 minutes of waking

up.

**GG.    Amber Royce**

374.    Amber Royce ("Royce") is a resident of Lebanon, Connecticut.

375.    Royce began using JUUL in 2017 after seeing advertisements for JUUL products at gas stations and hearing about JUUL from friends and family. She first tried JUUL her cousin.

376.    Prior to using JUUL, Royce was a daily cigarette smoker. She hoped that the JUUL would help her stop smoking and break her addiction to nicotine.

377.    Initially, Royce believed that JUUL did not contain any nicotine. After she started purchasing JUUL products, she read on JUUL's label that it was "5% strength," but she did not understand this meant JUUL contained at least 59mg/mL nicotine. Royce did not know that JUUL was engineered to deliver nicotine to the bloodstream more rapidly and in greater quantities than a cigarette.

378.    Royce began purchasing JUUL products online and at local gas stations and vape shops. She started consuming at least (1) JUULpod per day.

379.    Royce believes she is now even more addicted to nicotine than in the past when she was only smoking cigarettes. She uses JUUL continuously throughout the day and night, and the JUUL device is constantly in her hand. There have been occasions where Royce has fallen asleep and later woken up with her JUUL device, still gripped in her hand.

380.    Royce has tried to wean herself off JUUL by using a nicotine patch, but her attempts have been unsuccessful.

381.    If Royce had known how much nicotine JUULpods contained, she would never have started using the product and exposed herself to the risk of developing a more serious nicotine addiction.

**HH.   D.S., a minor, through his Parent and Natural Guardian Amber Selfridge**

382.   Plaintiff D.S. and his mother and Natural Guardian Amber Selfridge ("Selfridge") are residents of Butler, Pennsylvania. When D.S. used a JUUL for the first time in 2018, at the age of 16, he was not a smoker and had never tried cigarettes.

383.   Prior to using a JUUL for the first time, D.S. had seen numerous JUUL advertisements online. Some of these JUUL advertisements depicted fashionably dressed young people striking playful poses with JUUL devices in hand. Other online JUUL ads promoted JUULpod flavors, encouraging D.S. to "start your week with Cool Mint JUULpods" or to "indulge in dessert without the spoon" with Crème Brulee JUULpods. None of the advertisements D.S. saw disclosed the nature or addiction risks of JUUL's products, the existence or amount of nicotine in JUUL's products, or that the JUUL was engineered to deliver nicotine to the bloodstream more rapidly and in greater quantities than a cigarette.

384.   Prior to using a JUUL, D.S. had also seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. D.S. did not see any warnings or disclosures about JUUL's nicotine levels or the risks a JUUL posed on those POS materials and instead saw promotions for JUUL's fruit- and dessert-flavored pods. The representations and omissions in JUUL's POS promotions materially impacted S.G.'s assessment of the fruit-flavored JUUL he would later be offered.

385.   When offered a JUUL by a friend, D.S. accepted because he was interested in trying the fruit flavors. JUUL's use of food-based flavors, food-based flavor names and food-based advertising images was a substantial contributing factor in S.C's decision to use and continue using a JUUL. JUUL's food-based promotions misled D.S. about the nature of JUUL's product and distorted the risks

JUUL products posed. Were it not for JUUL's flavorings and flavor-based promotions, D.S. would not have used a JUUL or would not have continued using a JUUL.

386.    D.S. liked the sweet flavor of the first JUUL product he used and he continued to take puffs of his friends' JUULs until he purchased his own.

387.    After purchasing his own JUUL device, D.S.'s JUUL consumption increased so rapidly that he soon found himself going through 4 JUULpods a day.

388.    Reasoning that he would not be able to smoke the equivalent of 4 JUULpods a day in combustible tobacco products, D.S. tried to switch from JUUL to cigarettes.

389.    JUUL's methods of promoting its products on social media platforms foreseeably triggered the viral spread of JUUL-promotional content that encouraged teens to take up JUUL use, promoted drug-like behaviors, distorted and omitted the risks of JUUL use, and misled youth about the nature and risks of JUUL use. These promotions reached D.S. and D.S.'s social network, including classmates, leading to an increase in uptake on JUUL products and widespread misperceptions about the nature and risks of JUUL products. But for JUUL's social media advertising, D.S. would not have been exposed to and would not have used a JUUL.

390.    D.S. and his friends followed many of the popular JUUL accounts on Instagram.  Among the posts D.S. saw were those that encouraged, among other things, consuming massive quantities of JUUL vapor, using multiple JUUL devices at the same time and using JUUL in conjunction with combustible cigarettes.

391.    D.S. has posted social media content about JUUL, mimicking the JUUL-related content he has seen on other accounts.

392.    D.S. still consumes more than 1 JUULpod a day, in addition to at least half a pack of cigarettes.  He takes his first puff of JUUL within 5 minutes of waking up.  His favorite JUULpod flavor is Cucumber..

**II.  Laura Staller**

393.    Plaintiff Laura Staller lives in Germantown, Wisconsin.

394.    Plaintiff began using JUUL in September of 2017 as an alterative to smoking, and saw marketing that led her to believe it was a better alternative and that it would be one way to quit smoking altogether. Around that time and before she started she saw the following in-store display, among others:



395.    Plaintiff Staller believed there would be less nicotine in JUUL than in cigarettes, because she thought the "5% strength" on the label indicated that the amount of nicotine content of JUUL pods was significantly less than a pack of cigarettes.

396.    Before she started, she saw in-store displays and advertisements that indicated the strength but failed to include any warning, including this display:



397.    Plaintiff also heard ads about JUUL on the radio station 97.3FM and saw ads on gas stations, none of which warned her of JUUL's dangerous levels of nicotine or potential harms it could cause.

398.    Plaintiff went on JUUL's website when she first started looking into it. The website indicated that it was a better alternative to smoking and would help her quit smoking.

399.    Plaintiff uses one and one half JUULpods a day which is equivalent to more than a pack and a half of cigarettes a day. When she was using cigarettes, she was using less than a pack a day.  So she is now consuming much more nicotine because of JUUL.

400.    Plaintiff has had unusual fainting spells since using JUUL and has noticed that her ability to take deep breaths and her endurance has decreased since using JUUL. She has had to wear a heart monitor for 48 hours. The only thing in her lifestyle that has changed has been her use of JUUL.

401.    Plaintiff's use of JUUL seems to be affecting her respiratory health worse than when she was smoking.

402.    Plaintiff uses the mango JUULpods, which feel easier to breathe in than a cigarette. She started with Tobacco flavor and didn't like it.

403. Laura has not been able to quit and it has been over one and a half years. She was hoping to quit in 2018, but she is addicted.

404. Plaintiff was led to believe JUUL would help her quit her nicotine addiction, instead of becoming more addicted to another product.

405. Laura saw advertising from JUULs online, which never warned of how addictive it was. Not on the website, or anywhere else.

406. Laura would never have purchased JUUL if she had known the true nature of nicotine content and delivery.

**JJ. Anthony Smith**

407. Anthony Smith obtained his first JUUL e-cigarette and JUULpods in an effort to curtail his nicotine addiction and quit smoking.

408. In early 2015, Smith was 17 and he began seeing JUUL advertised via Twitter and Instagram. In particular, he remembers seeing Advertisement 65 of Appendix C on Twitter. He recalls that many of the ads had images of young people—young enough to be in high school—who often looked like his friends, and they appeared to be having fun, vaping and enjoying a hip, cool activity.

409. Smith also recalls seeing an ad highly similar to Advertisement 66 (young woman promoting switch to JUUL) of Appendix C on Instagram. In particular, he recalls a young, blond woman that reminded him of a good friend of his, except that the ad he recalls seeing did not include a disclaimer about the nicotine content. It was Smith's typical habit to scroll through images on Instagram quickly, and he rarely paused to open posts to read any content, thus had any such disclaimer been there, he would not have seen it. Because of the model's similarity to his good friend, that ad in particular piqued his curiosity about JUUL. He also began noticing JUUL's ads for their flavored pods, which also made him interested. In general, the ads touted JUUL products as a safe, healthy alternative to smoking,

which Smith believed meant it was delivering less nicotine.

410.    Shortly after viewing the advertisement with the blond woman, Smith visited a Circle K. He saw a large advertisement there for a JUUL starter pack, which included the device and four different flavored pods. The advertisement was similar to Advertisement 67 of Appendix C (poster using discount to promote JUUL starter kit).  However, he did not see any warning that the product contained nicotine, or that one pod contained more nicotine than a pack of cigarettes. He reasoned that a starter pack would allow him to try several flavors for a lower price, so he decided to try it. The starter pack was purchased for approximately $29.

411.    Smith began using the product, noticed that he would get a quick nicotine buzz that was more intense than cigarettes, but he attributed that to the fact that it was a vapor instead of a smoke. Rather than weaning Anthony Smith off of nicotine, the intense dosage of nicotine delivered by the JUUL products resulted in an increased nicotine addiction, and an increased consumption of nicotine and JUUL products, upping his consumption of one JUULpod per day.  The fact that the mint flavor of the JUULpods is pleasant has also played a role in his continued use of JUUL products.

412.    At the age of 18, Anthony Smith switched to use exclusively of JUULpods as a source of nicotine.  Until approximately the spring of 2018, Anthony Smith had consumed JUULpods on a daily basis for over three years, and found it far more addictive than traditional cigarettes, to the point where he spent several years unable to make it through a day without JUULing. At times, he would try to quit, but found it difficult due to the fact that the advertising was continually being delivered to him via social media. At one point, he did quit, and then he saw an ad for a new mango flavored pod, see Appendix C, Advertisement 68, which caused him to purchase more pods and begin using JUUL again.

413.    If Anthony Smith had known that the JUULpods contained a nicotine salt that delivered a more potent dose of nicotine than a traditional cigarette, he would not have purchased the JUUL product.

**KK.    Corey Smith**

414.    Corey Smith is 18 years old, and started consuming JUULpods when he was 17.  Corey Smith saw JUUL advertisements prior to his purchase, especially on social media such Instagram, where he saw ads posted by JUUL.  Corey found the JUUL products appealing based on those advertisements, which did not convey the fact that nicotine salts deliver an effective dose of nicotine higher than a traditional cigarette.  Corey Smith also found the USB-drive shape of the JUUL appealing based on its sleek design. Corey Smith was also attracted by the fruit-like flavors and the Cool Mint flavor in particular. Corey Smith is now addicted to JUULpods, and consumes a pack of JUULpods per week.

415.    If Corey Smith had known that JUUL's use of nicotine salts deliver an effective dose of nicotine higher than a traditional cigarette, he would not have purchase JUUL products.

**LL.    T.B.T. through his parent and Natural Guardian Marlene Thomseth-Belcher**

416.    Plaintiff T.B.T. and his parent and Natural Guardian Marlene Thomseth-Belcher ("Thomseth-Belcher") reside in Minneapolis, Minnesota.

417.    Prior to using a JUUL for the first time in 2017, at the age of 15, T.B.T. had seen JUUL signs and displays in local stores promoting JUUL flavors and offering discounts on JUUL "Starter Kits."  He had also seen online JUUL advertisements promoting JUUL flavors.  None of this JUUL messaging disclosed that JUUL products contain at least 59mg/mL of nicotine and deliver nicotine to the bloodstream more effectively than cigarettes.

418.    In the time leading up to his first JUUL experience, T.B.T. saw increasing amounts of JUUL-related content on the social media platforms Instagram and Snapchat.  This content, which often featured young people performing "tricks" with exhaled JUUL vapor, led T.B.T. to believe that using JUUL was a "cool" activity that would improve his social status.

419.    When one of T.B.T.'s friends offered him a JUUL, he accepted. He enjoyed the "buzzed" feeling he received from the JUUL's powerful nicotine hit. He does not recall which flavor he tried first, but he knows it was not tobacco. T.B.T. would not have tried JUUL if it were only available in tobacco flavor.

420.    Shortly after he started using JUUL, T.B.T. began experimenting with marijuana. He continued to use marijuana until late 2018.

421.    Now 17, T.B.T. acknowledges that he is addicted to nicotine.

422.    Despite being below the minimum legal age to purchase JUUL products, T.B.T. is able to buy JUUL products from local stores.  Although Thomseth-Belcher has asked, T.B.T. refuses to disclose which stores sell him JUUL products.

423.    T.B.T. gets money to pay for JUUL products by selling items for cash. He also resells JUUL products to finance his own habit.

424.    T.B.T. has, from time to time, refilled his JUULpods with e-liquid from other manufacturers. However, most commercial e-liquid contains far less nicotine than the e-liquid in JUULpods and thus fails to satisfy T.B.T.'s nicotine addiction. Therefore, T.B.T. continues to use JUULpods with their original JUUL-manufactured e-liquid.

425.    The online social media content that T.B.T. has seen, and continues to see, online normalizes teen JUUL use by, for example, presenting the JUUL device alongside earbuds, cellphones and other common items that comprise a "high school starter pack."

426.    T.B.T.'s spent 5 months in an outpatient addiction program that cost several thousand dollars.  The program proved ineffective and T.B.T. is still addicted to nicotine.

427.    T.B.T. currently consumes more than 1 JUULpod per day.  He starts JUULing within 5 minutes of waking up.

428.    Thomseth-Belcher has asked T.B.T. to move out of the family home so his JUUL and marijuana use will not provide a bad example for his younger sibling.

**MM.   Michael Viscomi**

429.    Plaintiff Michael Viscomi is a citizen of Pennsylvania and resides in Bethlehem, PA.

430.    In 2014, Mr. Viscomi smoked a pack of cigarettes each day, which he started to reduce to a few cigarettes each day. Prior to March, 2018, he had reduced his cigarette consumption down to several cigarettes per day through the use of alternative products, such as nicotine gum, chewing tobacco and non-JUUL vaping products.

431.    On March 1, 2018, Mr. Viscomi switched from smoking cigarettes to consuming JUUL pods in an attempt to quit smoking cigarettes completely and wean himself off of his nicotine addiction. At that time, Mr. Viscomi believed that one JUUL pod would supply him with the same quantity of nicotine as one pack of cigarettes.

432.    Prior to consuming JUUL pods, Mr. Viscomi was exposed to and did see JUUL advertising, promotional and marketing materials, particularly in the form of JUUL Instagram posts featuring young, attractive people using the product. He specifically followed @SupremePatty on Instagram. He also visited the JUUL website and thereafter regularly and consistently received JUUL emails. Specifically, he saw the following image asking him to "Find [His] Favorite Flavor" and others similar ads:



433.    Some of these social media posts show abuse of JUUL and encourage

youth to smoke JUUL, or multiple JUULs at once, including these post that Mr. Viscomi

saw during the class period:

 

434.    Prior to consuming JUUL pods, Mr. Viscomi was not aware of the actual

amount or potency of nicotine that JUUL products would deliver into his body or that the

product was developed to maximize the effects on him of the nicotine it contained. He

did see JUUL's representation of "5% strength" on its packaging and thought that meant

5% nicotine content. He also saw JUUL's statement that a JUULpod is equivalent to a

pack of cigarettes and understood that to mean "equivalent nicotine content." He also saw

JUUL's representation that "1 JUULPOD = 1 pack of cigarettes" and "alternative for

adult smokers" and believed those to mean that JUUL is a less addictive alternative to

cigarettes.

435.    After March 1, 2018, Mr. Viscomi continued to be exposed to and saw

JUUL advertising, promotional and marketing materials in the form of JUUL Instagram posts and radio advertisements.

436.   Since that time, Mr. Viscomi began consuming JUUL consistently and constantly at a rate of at least one JUUL pod each day, or taken approximately 200 hits from his JUUL device each day. He has consumed every flavor JUUL offers, including purchasing and consuming a JUUL starter kit, which contains all of the flavors offered.

437.   Based on the JUUL marketing, advertising and promotional mateirals to which he was exposed, Mr. Viscomi was not aware that JUUL could deliver more nicotine per puff than a cigarette, or that the nicotine delivered by the JUUL entered the bloodstream faster than a cigarette

438.   In fact, the JUUL marketing Mr. Viscomi saw contained no warnings, either on JUUL's website, in-store displays, or on the packaging itself, including the following ads which Mr. Viscomi saw during the class period, among many others:



439.   Since starting to consume JUUL pods, Mr. Viscomi has become addicted to the cool mint JUULpods and the nicotine salts they contain, an addiction he considers worse than his previous addiction to cigarettes.  Indeed, JUULing (the commonly used phrase among users of JUUL products to mean the use of JUUL products) is on his mind more than smoking cigarettes was. Rather than weaning Mr. Viscomi off of cigarettes

and nicotine, the JUUL products delivered a high dose of nicotine that resulted in an increased nicotine addiction, an increased consumption of nicotine, and an increase in the number of JUUL products he consumed.

440.    Mr. Viscomi purchases his JUUL products at gas stations, Wawa and Sheetz at an approximate price of $23 per pack of four pods.

441.    Mr. Viscomi would not have purchased JUUL products had he known that the nicotine salts in JUUL pods were highly addictive and more potent and addictive than the traditional cigarettes from which he was attempting to wean himself.

**NN.    O.V. through her parent and natural guardian Tanya Viti**

442.    O.V. and her mother Tanya Viti ("Viti") are residents of Dedham, Massachusetts.

443.    O.V. first started using JUUL at the age of twelve, while in sixth grade. D.C. actively uses Instagram, Snapchat, and YouTube where she is exposed to JUUL-related content from other adolescents and from JUUL-related accounts.

444.    On Instagram, O.V. saw a significant amount of JUUL promotional content from third parties, including the Instagram accounts @Doit4JUUL and @SupremePatty.  On YouTube and SnapChat, O.V. saw numerous JUUL-themed videos from EonSmoke and Supreme Patty. This content was overtly youth-oriented and encouraged JUUL use, depicting JUULing as the "cool" thing to do. O.V. did not know that much of the content she saw was being created, distributed, and promoted by JUUL vendors or paid influencers whose aim was to promote JUUL use to adolescents and profit from their addiction.

445.    Before O.V. even tried JUUL, she also viewed point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored, flavored pods. O.V. did not see any warnings or disclosures in these POS materials about JUUL's

nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted O.V.'s assessment of, and eventual decision to use, JUUL products.

446.    After discovering JUUL on social media and in stores, O.V. sought out friends in neighboring towns that were already using JUUL. When O.V. started using JUUL, she had no idea the product contained nicotine. When Viti confronted her daughter about her JUUL use, O.V. told her mother JUULpods were "flavored juice," which is what she was led to believe based on the advertisements she had viewed. Even after Viti informed her daughter that JUUL contained nicotine, O.V. chose to follow her perception of JUUL, cultivated from an overload of advertisements, versus the advice of her mother.

447.    After trying JUUL with friends, O.V. quickly became addicted to nicotine and started using JUUL regularly. Once O.V. entered seventh grade, JUUL use had become rampant in her school. O.V. told her mother that kids in her school would hide JUUL devices in their shoes and try to use them while in class; it was considered "cool" to be able to smoke JUUL in class and get away with it. According to O.V., there are very few students in her school that do not use JUUL.

448.    O.V. and her friends regularly posted photographs of themselves with JUUL on social media. In October 2018, O.V. was suspended from school after her and a friend posted an image of themselves "JUULing" in the bathroom on social media.

449.    O.V. has admitted to her mother that she is addicted to nicotine. Recently, Viti found a jar of nicotine in O.V.'s bedroom.

450.    O.V. has suffered academically due to her JUUL use. In addition to her suspension from school, O.V. went from being an "A-student" to receiving all "F"s.

451.    O.V. has also experienced severe physical, financial, psychological, and social repercussions from her JUUL use and severe nicotine addiction.

452.   Physically, O.V. now experiences acute headaches and stomachaches and becomes visibly irritated and fidgety when she cannot consume nicotine.

453.   Financially, O.V.'s JUUL use has had a significant impact on her parents. O.V. has stolen large quantities of money from her parents to purchase JUUL products.

454.   Viti has confiscated numerous JUUL devices and JUULpods from O.V. Unfortunately, none of her efforts have been successful. O.V. has told her parents that she will just use a friend's JUUL device as soon as she gets to school.

**OO.   S.W. through his parent and natural guardian Joe Weibel**

455.   S.W. and his father and natural guardian Joe Weibel ("Weibel") are residents of Chadwicks, New York.

456.   Before S.W. even tried JUUL, he also viewed point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. These promotional materials featured images of JUUL's multicolored fruit-flavored pods. S.W. did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed. The representations and omissions in JUUL's in-store promotions materially impacted S.W.'s assessment of, and eventual decision to use, JUUL products.

457.   S.W. did not understand the risks of nicotine when he used a JUUL for the first time, or the effects it could have on him. JUUL use is rampant in S.W.'s town and high school. S.W. has told Weibel that his basketball team even uses JUUL in the locker room, which his coaches cannot detect because JUUL products release no odor or visible smoke.

458.   Older students at S.W.'s high school sell individual pods to younger students for profit. S.W.'s older sister has even encouraged S.W. to start selling JUULpods.

459.   Even though Weibel has forbidden S.W. from using JUUL products,

Weibel believes he continues to sneak JUUL. Weibel's 19-year-old daughter is also highly addicted to JUUL; Weibel believes his daughter purchases JUULpods from local gas stations and shares them with S.W. Weibel believes his children spend a significant amount of money on JUUL products each week.

460.    When S.W. started using JUUL, he believed that JUUL products were safe and non-addictive.

461.    S.W. would not have started using JUUL if he knew it contained nicotine. Additionally, S.W. would not have used a tobacco or menthol-flavored JUUL because he associates both of those flavors with cigarettes, which he knew to avoid.

462.    Weibel is confident that had S.W. or his 19-year-old daughter known the risks that the JUUL posed, they would never have used it.

**PP.    J.Y., a Minor, through his Parent and Natural Guardian Barbara Yanucci**

463.    Plaintiff Barbara Yanucci is the mother of J.Y., a minor who is a citizen of Florida, residing in Port St. Lucie.

464.    J.Y. is presently 16 years old and began using JUUL pods at the age of 15 because he thought it was fun.

465.    Prior to using a JUUL, J.Y. had also seen point-of-sale ("POS") promotional materials for JUUL devices and products, including signs and displays. J.Y. did not see any warnings or disclosures in these POS materials about the existence or amount of nicotine in a JUUL or the risks nicotine posed. Instead, he saw promotions for JUUL's fruit- and dessert-flavored pods. The representations and omissions in JUUL's in-store promotions materially impacted J.Y. assessment of the JUUL he would later try. Specific representations J.Y. saw are available at http://www.classlawdc.com/2019/01/25/juul-images-2/.

466.    When he first tried a JUUL, J.Y., as a minor, could not appreciate the dangers posed by the nicotine and other chemicals contained in the JUUL, and was not

aware how much nicotine a JUUL contained or that the JUUL had specifically been developed to maximize the addictive effects of the nicotine it contained and to put extremely high doses of nicotine into the bloodstream.

467.    J.Y. states that many of his friends in high school were consuming JUUL products at the time he began using JUUL and continue to do so. JUUL products were and still are popular, ubiquitous and easy to obtain.

468.    J.Y., a minor, has himself purchased JUUL products at a Wawa convenience store.

469.    J.Y. now considers himself addicted to JUUL pods and has consumed JUUL pods up to 12 times per day. His favorite flavor is mint. His craving for nicotine has increased while using the JUUL pods, and he now uses vaping devices that deliver even more nicotine than JUUL.

470.    J.Y. is not aware of any label on JUUL packaging indicating that the product contains nicotine or warning of the dangers of the nicotine because he does not read the packaging.

471.    J.Y. initially concealed his use of JUUL from his mother and Natural Guardian Barbara Yannucci, who, after learning that JUUL products contain nicotine and appreciating the dangers of nicotine, has done and continues to do everything in her power to get her son to quit using JUUL products. She has not been successful to date.