1
2
3
4

UNITED STATES DISTRICT COURT

5

NORTHERN DISTRICT OF CALIFORNIA

6
7

BRADLEY COLGATE, et al.,

Case No. 18-cv-02499-WHO

Plaintiffs,

8
9

v.

10

JUUL LABS, INC., et al.,

**ORDER GRANTING MOTION TO DISMISS IN PART AND DENYING IN PART; DENYING MOTION TO COMPEL; DISCOVERY LETTER; MOTION TO SEAL**

Defendants.

11

Re: Dkt. No. 98, 99, 115, 116

12

Defendant JUUL Labs, Inc. ("JUUL") produces an electronic nicotine delivery system

13

("ENDS") consisting of an electronic cigarette and a nicotine cartridge called a JUULpod ("pod").

14

Consolidated Class Action Complaint ("CAC") [Dkt. No. 82].  According to plaintiffs, forty-four

15

individuals from twenty-two different states, JUUL has used research from the tobacco industry to

16

target youth and design a product that delivers more nicotine and is more addictive than

17

combustible cigarettes.  Plaintiffs seek to represent a nationwide class and numerous subclasses in

18

claims for false advertising, fraud, unjust enrichment, several forms of product liability, several

19

types of negligence, violation of Magnuson-Moss Warranty Act, breach of express and implied

20

warranty, and violation of the unfair and unlawful prongs of various state consumer protection

21

statutes.

22

JUUL moves to dismiss the CAC and to compel certain plaintiffs to arbitrate their claims.

23

Defendant JUUL Labs, Inc.'s Motion to Dismiss Plaintiffs' Consolidated Amended Complaint

24

("MTD") [Dkt. No. 99]; Defendant JUUL Labs, Inc.'s Notice of Motion and Motion [to] Compel

25

Arbitration ("MTC") [Dkt. No. 98].  For the reasons stated below, JUUL's motion to dismiss is

26

granted in part and denied in part.  Its motion to compel arbitration is denied because plaintiffs did

27

not have inquiry or actual notice of the arbitration provision.

28

United States District Court
Northern District of California

**BACKGROUND**

## I.   PROCEDURAL BACKGROUND

On October 30, 2018, I partially granted JUUL's motion to dismiss and denied its motion to strike as premature. Order Partially Granting Motion to Dismiss and Denying Motion to Strike ("Order") [Dkt. No. 66]. I found that some but not all of the plaintiffs' claims were preempted by the Federal Food, Drug, and Cosmetic Act ("FDCA") as amended by the Tobacco Control Act, 21 U.S.C. § 387 et seq. ("TCA"), which provides the Food and Drug Administration ("FDA") with exclusive authority to promulgate regulations on ENDS labeling. *Id.* at 7-11. Specifically, I held that only claims based on the allegation that the JUUL's labelling fails to warn consumers that its nicotine formulation is more addictive than other methods of nicotine ingestion were expressly preempted, and dismissed those claims with prejudice. *Id.* at 10-11. But claims based on the mislabeling of the percentage of nicotine per pod were not preempted because the plaintiffs had sufficiently alleged that plaintiff Bradley Colgate relied on JUUL's representation that the pods contained a formulation of 5% nicotine when the pods were alleged to contain a formulation of 6.2% nicotine. *Id.* In addition, a clause in the TCA expressly excepts advertisements from preemption, so claims based on JUUL's advertisements failure to warn consumers about the potency and addictiveness of JUUL's benzoic acid and nicotine salt formulation or the amount of nicotine could be repleaded. *Id.*

I also dismissed claims based on JUUL's advertising for failure to meet Rule 9(b)'s pleading requirements, claims based on unidentified state consumer protection laws, and the breach of express warranty claim. *Id.* at 11-14, 18. Plaintiffs sufficiently stated claims based on identified state consumer protection statutes, unjust enrichment, design defect, manufacturing defect, breach of implied warranty of merchantability, and negligent misrepresentation. *Id.* at 13-19.

On January 30, 2019, the plaintiffs filed the CAC.[1] Its allegations span 118 pages. They

---

[1] On November 27, 2018, by stipulation, this case C*olgate et al. v. JUUL Labs, Inc. and PAX Labs, Inc.*, No. 3:18-cv-02499-WHO, was related to and consolidated with *Viscomi et al. v. JUUL Labs, Inc. and PAX Labs, Inc.*, No. 5:18-cv-03760 (E.D. Pa.) and *J.Y. v. JUUL Labs, Inc.*, No. 2:18- cv-14416 (S.D. Fla.). [Dkt. No. 71].

United States District Court
Northern District of California

1    also include an 88 page appendix of individual plaintiff's allegations.  Individual Plaintiff

2    Allegations ("IPA") attached to CAC as Appendix A [Dkt. No. 88-2].

3    **II.        FACTUAL BACKGROUND[2]**

4          JUUL's ENDS consist of an e-cigarette and a pod.  JUUL's e-cigarette is about the size

5    and shape of a pack of chewing gum.  CAC at ¶ 22.  Each pod is a plastic enclosure containing 0.7

6    milliliters of JUUL's patented nicotine liquid and a coil heater.  *Id.*  The pods are sold in four-

7    packs in a variety of flavors, including mango, cool cucumber, fruit medley, cool mint, and crème

8    brulee.  *Id.* at ¶ 25.  When a sensor in the e-cigarette detects the movement of air caused by suction

9    on the pod, the battery in the e-cigarette activates the heating element and converts the nicotine

10   solution into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene

11   glycol.  *Id.* at ¶ 22.  A light embedded in the JUUL device serves as a battery level indicator and

12   lights up in a "party mode" display of rainbow of colors when the device is waved around.  *Id.*

13   According to some reports as of March 2018, JUUL represented 54.6% of the e-cigarette

14   traditional retail market.  CAC at ¶ 16.

15        **A.       JUUL's Use of Tobacco Company Marketing Playbooks**

16          The CAC alleges that JUUL has intentionally copied the strategies and methods

17   previously used by tobacco companies to market cigarettes to minors and young people.  *Id.* at ¶

18   19.  Tobacco companies are no longer allowed to use certain of those marketing methods pursuant

19   to the Family Smoking Prevention and Tobacco Control Act of 2009 and Master Settlement

20   Agreement ("MSA") reached between the tobacco industry, governmental officials, and injured

21   smokers.  *Id.*  These strategies include:  (i) using outdoor advertising such as billboards; (ii)

22   sponsoring events; (iii) giving free samples; (iv) paying any person to use, display, make reference

23   to or use as a prop any Tobacco Product or Tobacco Product package in any media, which

24   includes any motion picture, television show, theatrical production or other live performance, and

25   any commercial film or video; (v) paying any third party to conduct any activity which the tobacco

26   manufacturer is prohibited from doing; (vi) selling flavored cigarettes; and (vii) selling cigarettes

27

28   _____
     [2] I construe the allegations in the CAC as true for the purposes of this order.

*United States District Court*
*Northern District of California*

to minors, tobacco-brand sponsorships of sports and entertainment events or other social or cultural events, and free giveaways of sample cigarettes and brand-name non-tobacco promotional items. *Id.* at ¶¶ 103-105.

The MSA made these strategies, published in tobacco industry documents and board meeting minutes, public. *Id.* at ¶ 19. JUUL's founder James Monsees has stated: "It became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes." *Id.* Plaintiffs allege that although JUUL markets itself as a device targeted toward people who already smoke cigarettes, it actually employed the tobacco industry's playbook to sell its product to a new audience of non-smokers. *Id.* at ¶ 17.

### B.     JUUL's Nicotine Salt Formulation

Nicotine is an addictive substance whose pleasurable effects diminish with use, requiring the user to consume it in increasing amounts to achieve the same effect. *Id.* at ¶¶ 27-28. Once a user is addicted to nicotine, the user will experience withdrawal if she is unable to consume more or enough nicotine. *Id.* at ¶ 30. It is a carcinogen and a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems. *Id.* at ¶ 31 (citing Mishra, A., et al., HARMFUL EFFECTS OF NICOTINE, Indian J. Med. Paediatr. Oncol., 36(1): 24–31 (Jan.-Mar. 2015), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4363846/). According to plaintiffs, because vaping introduces foreign substances into the lungs, prolonged use of vaping products is believed to produce chronic obstructive pulmonary disease, like traditional cigarette smoke, and to trigger immune responses associated with inflammatory lung diseases. *Id.* As adolescents' brains are still developing, they are particularly vulnerable to addiction. *Id.* at 33-34. Plaintiffs cite the National Institutes of Health for the proposition that the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." *Id.* at ¶ 35.

JUUL's pods use a nicotine salt formula derived from R.J. Reynolds Tobacco Company ("RJR") that enhances the amount and speed of nicotine delivery. *Id.* at ¶¶ 35-37. Pax Labs (the

United States District Court
Northern District of California

former parent company of JUUL) owns U.S. patent No. 9,215,895 ("the '895 Patent"), which describes a process for combining benzoic acids with nicotine to produce nicotine salts. *Id.* This formulation mimics the nicotine salt additive developed and patented by RJR, such as the use of nicotine benzoate to increase nicotine delivery in cigarette smoke. *Id.* JUUL's formulation is more addictive and dangerous than a normal cigarette because it delivers more nicotine up to four times faster. *Id.* at ¶¶ 45, 55.

JUUL's formula also makes ENDS easier to use because it causes less throat irritation or "throat hit." *Id.* at ¶¶ 38-41, 56. Throat hit is part of the body's natural feedback mechanism for inhaling harmful substances. *Id.* at ¶ 43. Plaintiffs allege that JUUL's formulation makes it easier for non-smokers to use JUUL's products without negative side effects like coughing and irritation, something that would not be important to users who already smoke cigarettes but is crucial to appealing to non-smokers and generally enables compulsive use. *Id.* at ¶ 42. JUUL's formulation accomplishes this by containing almost no freebase (non-salt form) nicotine. *Id.* This means that JUUL's liquid formulation would cause the same amount of irritation as a non-salt liquid formulation with one-twentieth of the amount of nicotine. *Id.*

Plaintiffs cite studies that show that JUUL's formulation delivers doses of nicotine that are materially higher than combustible cigarettes. *Id.* at ¶¶ 46-48. The same studies show that JUUL's pods contain a concentration of 6.2% nicotine salt (about 60 mg/mL), rather than the 5% nicotine (about 50 mg/mL) advertised along with more benzoic acid than listed in the '895 patent.[3] *Id.* This would produce higher nicotine absorption than expected for the advertised formulation. *Id.* Available data suggests that JUUL delivers about 30% more nicotine per puff than a traditional cigarette. *Id.* at ¶ 49. JUUL has not disclosed to users that its products deliver a particularly potent puff of nicotine. *Id.* at ¶¶ 51, 57. Instead, in a media blitz prior to its release, JUUL provided data to claim that it delivered approximately 25% less nicotine to the blood than a cigarette, creating the false impression that it is less addictive. *Id.* at ¶¶ 52-54.

Plaintiffs claim that statements on JUUL's website, and some of its advertisements, that a

---

[3] Plaintiffs also cite to other studies showing strengths between 6.16% to 9.42% strength. *Id.* at ¶¶ 71-72.

5

"JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs" is false and seriously misleading because JUUL knows that what is important is the amount of nicotine that enters the bloodstream. *Id.* at ¶ 59. Citing various studies, plaintiffs allege that because of differences in the way that nicotine from combustible cigarette smoke and vaporized nicotine salts are absorbed by the body, the actual amount of nicotine consumed via one of JUUL's pods is as much as twice as high as that via a pack of cigarettes. *Id.* at ¶¶ 60-63. This is made worse because all twenty cigarettes in a pack must be separately lit, while JUUL's ENDS can be inhaled continuously. *Id.* at ¶ 64. It can also be used indoors without detection, eliminating the need for smoke breaks. *Id.*

Taken together, JUUL's liquid formulation delivers a higher amount of nicotine at a higher speed than a freebase formulation, but with less of a throat hit, making it easier to use (and abuse). According to plaintiffs, this renders JUUL's "Switch" advertising campaign misleading because JUUL's ENDS is not an effective smoking cessation device, or a cost-effective alternative to smoking. *Id.* at ¶¶ 73-79. The addictive nature of the product renders false the statement that customers of JUUL's autoship policies can "cancel anytime." *Id.* at ¶¶ 80-84.

**C.     JUUL's Marketing**

JUUL has encouraged and taken advantage of viral marketing on social media and elsewhere to sell its product to young and underage consumers. *Id.* at ¶¶ 85-86. Plaintiffs describe viral marketing as having four features: "(1) a simple message—typically implied by an image—that elicits an emotional response; (2) the strategic use of marketing platforms, especially social media, to reach and engage the target audience; (3) use of content that invites participation and engagement; and (4) use of third parties to magnify the impact of a message." *Id.* at ¶ 88. Because teenagers tend to use social media more than adults, and are also more susceptible to peer pressure, viral marketing has helped JUUL attract underage users. *Id.* at ¶ 91. Plaintiffs liken JUUL's use of viral marketing to the tobacco industry's strategy of marketing to young people to form their next generation of customers. *Id.* at ¶¶ 93-99.

Plaintiffs state that JUUL is guilty of: "(i) intentionally designing a campaign that was

6

simple and would trigger an emotional response, particularly with young people; (ii) intentionally designing flavored products that would appeal to teenagers and young adults; (iii) directing its advertising to teenagers and young adults on social media; (iv) utilizing third party influencers to amplify its message around the internet; (v) utilizing other social media tools, such as hashtags, to encourage participation and word-of-mouth messaging by its customers; (vi) amplifying the message through off-line advertising; and (vii) using a pricing and distribution model designed to put the product within reach of youth." *Id.* at ¶ 110.  Through this campaign, JUUL persuaded consumers, in particular teenagers and young adults, that its product was cool, while hiding material information about the dangers associated with using the product. *Id.*  Even after the deactivation of its social media accounts, JUUL's marketing continued to reach youth because of its viral nature. *Id.*

To announce JUUL's release, it launched its "Vaporized" advertising campaign using stylish young models, bold colors, and memorable imagery. *Id.* at ¶ 114.  Like the ads tobacco companies used to produce, the campaign highlighted themes of sexual attractiveness, thinness, independence, rebelliousness, and being "cool." *Id.* at ¶ 115.  The campaign did not include any visible or prominent disclaimers about the dangers of nicotine. *Id.* at ¶ 118.  It featured a major display in New York City's Times Square that would have been unlawful for a cigarette company under the MSA. *Id.* at ¶ 120.  JUUL also ran ads on social media and in youth magazines, such as Vice. *Id.* at ¶¶ 121, 124.  To the extent that the ads disclosed that JUUL's products contained nicotine, it was in small print against low contrast backgrounds. *Id.* at ¶ 127.  Had the ads been for cigarettes, warnings would have been required in a high contrast black and white box comprising 30% of the image. *Id.*

JUUL's ads portrayed its products as status symbols and traded on the look and feel of advertisements by Apple, Google, and similar tech companies with progressive and modern reputations. *Id.* at ¶ 133.  JUUL consistently compared its product to the iPhone through statements like "the iPhone of e-cigarettes," which JUUL posted on its website, distributed through social media, and disseminated through its email campaign. *Id.* at ¶ 135.  Its ads also frequently included pictures of iPhones and other desirable Apple devices, including iPads,

expensive headphones, and laptops. *Id.* This presented its product as "must have" technology and a status symbol. *Id.* Plaintiffs claim that the simple lines and color palettes of these ads would have stood out to teens on social media, while disclaimers related to the nicotine in JUUL's products would have been hidden based on how smartphones display content. *Id.* at ¶¶ 137-139. For instance, Facebook and Instagram typically only present to users the image and the first few lines of text. *Id.* at ¶ 138. A viewer who would want to see the portion of the text containing the disclaimer would need to click on the ad to reveal the remaining text. *Id.* JUUL's point of sale displays in gas stations reinforced this aesthetic. *Id.* at ¶¶ 162-166.

JUUL also hosted a number of live events that would have been prohibited under the MSA if JUUL were a tobacco company. *Id.* at ¶ 121. This included a series of pop-up "JUUL bars" in Los Angeles, New York City, and the Hamptons, imitating pop-up restaurants and bars popular among young urban consumers. *Id.* at ¶ 121. JUUL also sponsored at least 25 live social events in California, Florida, New York, and Nevada, where invitations promised attendees free JUUL starter kits, live music, and/or slumber parties. *Id.* at ¶ 125. There is evidence to suggest that JUUL gave away over 5,000 starter kits, each containing one e-cigarette and four pods. *Id.* at ¶ 128. Plaintiffs claim that JUUL's pricing model was designed to be affordable compared to cigarettes to make it more accessible to young people. *Id.* at ¶¶ 240-44. They also allege that JUUL has sought out retail locations near schools and asked that its products be displayed within arm's reach, not behind the counter. *Id.* at ¶¶ 245-50.

### 1. Use of Flavored Pods and Food Imagery

The FDA banned flavored tobacco because of its appeal to young smokers. *Id.* at ¶ 144. JUUL pods are sold in a number of flavors such as mango, "cool" cucumber, fruit medley, "cool" mint, and crème brulee. *Id.* at ¶ 25. JUUL paired its flavors with ads using tag lines such as "save room for JUUL" and "indulge in dessert without the spoon." *Id.* at ¶ 142. There is evidence to show that 81% of youth aged 12-17 who tried an e-cigarette first used a flavored e-cigarette and that 85.3% percent of current youth e-cigarette users had used a flavored e-cigarette in the past month. *Id.* at ¶ 145. 81.5% of current youth e-cigarette users said they used them "because they come in flavors I like." *Id.* Plaintiffs point to research that shows that when youth see flavored

United States District Court
Northern District of California

ENDS liquids advertisements, they believe the advertisements and products are intended for them. *Id.* In a recent study, 74% of youth surveyed indicated that their first use of JUUL's particular ENDS involved a flavored pod. *Id.* at ¶ 148.

Outside of its youth-directed marketing, JUUL also hired celebrity chefs to provide pairing suggestions for JUUL flavors and ran ads pairing it with coffee, other caffeinated drinks, and desserts. *Id.* at ¶¶ 152-56. According to plaintiffs, viewers were conditioned to associate JUUL with those foods and drinks and to trigger food-based physiological arousal, including increased salivation and heart rate, making JUUL appealing for reasons relating to flavor (not switching from smoking). *Id.*

Plaintiffs state that in response to litigation (such as this case) and mounting public pressure, JUUL announced in November 2018 that it had "stopped accepting retail orders" for many of its flavored JUULpods, such as mango, crème brulee, and cucumber. *Id.* at ¶ 159. But JUUL's promise is misleading because it still manufactures and sells flavored JUULpods on its website and in retail shops in Canada. *Id.* JUUL also continues to sell "Cool" Mint, a popular flavor with youth, in gas stations. *Id.*

### 2. JUUL's Social Media Accounts and Advertising

JUUL maintains active accounts on a number of social media platforms, including Instagram, Facebook, and Twitter. *Id.* at ¶ 168. Plaintiffs state that while JUUL continues to tweet, in around November 2018, it deleted nearly all the content from its Instagram and Facebook pages in response to this lawsuit. *Id.* Plaintiffs describe JUUL's social media content as either unpaid or paid advertising. *Id.* at ¶ 169. Unpaid advertising consists of JUUL posting its advertisements directly to its own page. *Id.* Paid advertising involves JUUL targeting specific demographics of people to receive its ads. *Id.* Most of JUUL's unpaid advertising on social media was done via Instagram. *Id.* at ¶ 170.

JUUL also engaged in unpaid advertising through its use of hashtags on Instagram, Facebook, and Twitter. *Id.* at ¶ 172. The CAC describes hashtags as "simple phrases preceded by a #, and they operate as a way of cataloguing posts. Authors of posts use hashtags if they want their posts to be discovered and seen by people outside of their networks. On most social media

United States District Court
Northern District of California

1    platforms, users can find information by doing a search for a hashtag with that key word." *Id.*

2    Plaintiffs believe that JUUL's hashtag marketing played a central role in the viral spread of online

3    JUUL content among teens. *Id.* at ¶ 173.

4    With regards to paid advertising, social media companies let advertisers such as JUUL

5    engage in micro-targeting in a way that allows them to show ads to precise demographics of

6    people based on the information the social media companies have about their users. *Id.* at ¶ 175.

7    Because minors saw JUUL's paid advertising, plaintiffs believe that JUUL did not narrow its

8    target audience to adult smokers. *Id.* at ¶ 176.

9    ### 3.    Third Party Influencers and Affiliates

10    JUUL paid "influencers" to advertise its product. *Id.* at ¶ 178. In the social media

11    landscape, influencers are "high-social net worth" individuals who have developed large social

12    media followings. *Id.* People follow influencers because they are known to be trend-setters and

13    tend to post high quality, interesting photos and content. *Id.* Companies pay influencers to use

14    and post about their products in a similar fashion to "product placement" in traditional media. *Id.*

15    at ¶ 179. Plaintiffs identify a number of influencers JUUL used to market its products on social

16    media. *Id.* at ¶¶ 181-84.

17    JUUL also encouraged its distributors, wholesalers, and other resellers—either explicitly

18    or implicitly—to hire affiliates and influencers to promote JUUL's brand and products. *Id.* at ¶

19    185. Plaintiffs cite a number of YouTube videos by influencers who are sponsored by websites

20    that sell JUUL's products. *Id.* at ¶¶ 186-90. JUUL only took action to remove unlawful JUUL

21    promotions by third party influencers in response to FDA scrutiny in 2018. *Id.* at ¶ 191. Plaintiffs

22    also allege that JUUL did not monitor the sales activities of its distributors in a way that fostered

23    sales to minors. *Id.* at ¶¶ 251-54.

24    JUUL offered influencers and other bloggers the option to make additional money by

25    posting links to JUUL's website. *Id.* at ¶ 193. Those who chose to participate received a unique

26    hyperlink to JUUL's site that would credit the influencer for any sales originating from that link.

27    *Id.* at ¶¶ 193-94. The relationship between JUUL and many of these influencers was not disclosed

28    to viewers. *Id.* at ¶¶ 196-199. JUUL would also promote images of celebrities, such as Katy

Perry, using its products. *Id.* at ¶ 200. As with many of JUUL's other advertising strategies, this would be unlawful for a tobacco company. *Id.* at ¶ 203.

### 4.     Social Media Promotion by JUUL's Customers and Third Parties

JUUL not only used hashtags to get people to find its content, according to the CAC it also created hashtags that encouraged social media users to create their own content. *Id.* at ¶¶ 206-12. This allowed content about JUUL to reach minors because they might be friends with people over the age of 18 or might follow adult influencers who were using these same hashtags. *Id.* Because JUUL was likely monitoring the use of its hashtags, it would have seen the tens of thousands of posts made by minors using JUUL related hashtags like #juul and #juulmoment. *Id.* at ¶ 213.

JUUL could have moved to enforce its trademark and take down these posts or infringing accounts such as @doit4juul and @JUULgirls. *Id.* at ¶ 214. Some of these accounts, such as one named @JUULnation on Instagram, posted tips on how to conceal JUUL devices in school supplies and content that would only be relevant to school age users. *Id.* at ¶¶ 219-20. @JUULnation also promoted the sale of JUUL's pods directly through Instagram. *Id.* at ¶ 221. Rather than move to end @JUULnation's youth-targeted activity, JUUL began to use the #JUULnation hashtag in its own posts. *Id.* at ¶¶ 224-26. Although the @JUULnation account has been deleted, the #JUULnation hashtag continues to appear in posts promoting JUUL use (abusive or otherwise) and unlawful sales of JUUL's pods. *Id.* at ¶ 230.

### 5.     Non Age-Restricted Emails

JUUL also promoted itself via an email subscription list that was not age-restricted. *Id.* at ¶ 217. According to the CAC, the list included users who failed the age verification requirements on JUUL's purchase page. *Id.* These people were nevertheless added to JUUL's mailing list and emailed a coupon for a discount on a starter kit. *Id.* JUUL also used emails to distribute surveys that were not age-restricted. *Id.* at ¶ 218. Thus plaintiffs believe that JUUL collected data from minors and paid them (and other customers) up to $30 to complete certain surveys. *Id.* The CAC also states that JUUL tracked the efficacy of its youth marketing in other unspecified ways. *Id.* at ¶¶ 232-35. This fits a pattern of ineffective age verification on JUUL's website that has allowed minors to purchase JUUL's products and obtain warranty service from the site. *Id.* at ¶¶ 255-59.

United States District Court
Northern District of California

### D.    The Youth Vaping Epidemic

The above allegations have led to what the CAC describes as a youth vaping epidemic in America.  *Id.* at ¶¶ 260-62.  On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 report stated that increases in adolescent ENDS use from 2017 to 2018 were the "largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S."  *Id.* at ¶ 262.  The percentage of 12th grade students who reported vaping almost doubled between 2017 to 2018, rising from 11% to 21%.  *Id.* at ¶ 263.  Because JUUL controls over 50% of the e-cigarette market, plaintiffs believe that these increases are attributable to JUUL.  *Id.*  FDA Commissioner Dr. Scott Gottlieb has described the increase in e-cigarette consumption as an "almost ubiquitous—and dangerous—trend" that is responsible for an "epidemic" of nicotine use among teenagers; Surgeon General Dr. Jerome Adams has warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."  *Id.* at ¶¶ 264-65.  Anecdotal evidence from the website Reddit, an internet forum popular with young people, suggest that this is true nationwide.  *Id.* at ¶¶ 266-68.  Approximately 3.6 million middle and high school students are vaping regularly.  *Id.* at ¶ 277.

Plaintiffs cite a recent study of JUUL's sales and marketing strategies that concluded that the Vaporized ad campaign was incredibly successful, leading to retail stores selling out of JUUL's products and JUUL's own site having difficulty meeting demand.  *Id.* at ¶ 270.  The study also found that JUUL marketed its products across social media platforms in an apparently coordinated fashion that included smaller targeted campaigns and affiliate marketing, all of which caused the authors to question whether JUUL was paying for positive reviews and JUUL-related social media content.  *Id.* at ¶ 272.

According to the CAC, JUUL's success marketing its products is the result of exploiting regulatory loopholes that would prevent tobacco companies from doing the same things.  *Id.* at ¶¶ 285-89.  Plaintiffs claim that JUUL knew that it would eventually be regulated and sought to addict as many young customers as possible while it could still plausibly deny that it was not violating any FDA regulations.  *Id.*  In December 2018, Altria, which owns the Philip Morris

company, obtained at 35% stake in JUUL.  *Id.* at ¶ 290.  Although Altria is subject to the MSA, it now has access to JUUL's data while JUUL has access to Altria's lobbying and marketing expertise.  *Id.* at ¶¶ 291-94.

### E.    Class Allegations and Subclasses

Plaintiffs bring this action on behalf of a proposed class defined as "all persons who purchased, in the United States, a JUUL e-cigarette and or JUULpods."  *Id.* at ¶ 296.  They also propose nine other subclasses and reserve the right to propose additional subclasses based on evidence uncovered in discovery.  *Id.* at ¶¶ 297-305.  The CAC brings fifteen causes of action for claims related to false advertising, fraud, unjust enrichment, several forms of product liability, several types of negligence, violation of Magnuson-Moss Warranty Act, breach of express and implied warranty, and violation of the unfair and unlawful prongs of various state consumer protection statutes.  *Id.* at ¶¶ 319-505.  They seek actual or compensatory damages, restitution, injunctive relief, statutory damages, punitive damages, and fees and costs associated with this action.  *Id.* at 117.

## LEGAL STANDARD

### I.    MOTION TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss if a claim fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the claimant must allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  While courts do not require "heightened fact pleading of specifics," a claim must be supported by facts sufficient to "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555, 570.

Under Federal Rule of Civil Procedure 9(b), a party must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of

United States District Court
Northern District of California

the misconduct charged." *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (internal quotation marks omitted).  However, "Rule 9(b) requires only that the circumstances of fraud be stated with particularity; other facts may be pleaded generally, or in accordance with Rule 8." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984, 992 (9th Cir. 2011).

In deciding a motion to dismiss for failure to state a claim, the court accepts all of the factual allegations as true and draws all reasonable inferences in favor of the plaintiff.  *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  But the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

## II.       MOTION TO COMPEL ARBITRATION

The Federal Arbitration Act ("FAA") governs the motion to compel arbitration.  9 U.S.C. §§ 1 *et seq*.  Under the FAA, a district court determines: (i) whether a valid agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue.  *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004).  "To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts."  *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks and citation omitted).  If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement."  9 U.S.C. § 4.  "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

## DISCUSSION

## I.  MOTION TO DISMISS

### A.  Preemption

JUUL claims that plaintiffs have attempted to re-allege preempted labeling claims in contravention of my prior Order.  MTD at 5-6.  In support of its argument, JUUL cites to the CAC and certain allegations in the IPA.  *Id.*  JUUL believes that allegations related to its point-of-sale

14

United States District Court
Northern District of California

1    ("POS") displays, are also preempted by the TCA and should be dismissed with prejudice. *Id.* I

2    disagree.

3          As plaintiffs argue, their consumer protection claims are based on advertisements, not

4    labelling, and my Order held that claims based on advertisements were not preempted. Plaintiffs'

5    Opposition to Second Motion to Dismiss at 19-20 ("MTD. Oppo.") [Dkt. No. 108] (citing Order at

6    11). Pointing to the IPAs, plaintiffs assert that although plaintiff Adam Banner "understood

7    JUUL's labeling representation that it was an 'alternative to cigarettes' to mean that the JUUL was

8    a way to move away from smoking[,]" he was actually referring to claims in JUUL's ads, social

9    media, and emails. *Id.* (citing IPA at ¶ 60). The other examples refer to allegations that JUUL's

10   pods are actually stronger than a pack of cigarettes or contain more than 5% nicotine, something I

11   ruled was not preempted. IPA at ¶¶ 228, 300, 324, 377, 381. Plaintiffs also contend that when

12   plaintiff David Kugler alleged that he was unaware that JUUL's products contained nicotine and

13   that there was no warning on the device or pod, this was meant to make clear that JUUL's

14   deception in its advertising was never cured by any labels on the products themselves. MTD

15   Oppo. at 20 (citing IPA at ¶ 205). None of these allegations are preempted because they are either

16   about advertisements or about the strength of JUUL's nicotine liquid that I have ruled are not

17   preempted.

18         Other courts have considered arguments similar to JUUL's concerning POS displays and

19   concluded that POS displays do not constitute labeling because they are "not attached to the

20   immediate container of a product and will not accompany the product during the period of use."

21   *In re Fontem US, Inc.*, No. 15-01026, 2016 WL 6520142, at *7 (C.D. Cal. Nov. 1, 2016) (citing

22   *Chem. Specialties Mfrs. Ass'n, Inc. v. Allenby*, 958 F.2d 941, 946 (9th Cir. 1992)). JUUL's

23   citation to *Kordel v. United States*, 335 U.S. 345, 349 (1948) is unhelpful because it concerned

24   pamphlets, not point of sale displays such as the ones at issue here. MTD at 6. The above

25   allegations do not run afoul of my previous order and I deny JUUL's motion to strike.

26         **B.      Rule 9(b)**

27         I dismissed plaintiffs' "false advertising, CLRA and laws of similar states, fraud, and UCL

28   and laws of similar states claims" for failure to meet Federal Rule of Civil Procedure Rule 9(b)'s

15

United States District Court
Northern District of California

1  heightened pleading requirements for claims sounding in fraud in my prior Order. Order at 11-13.

2  JUUL argues that the allegations in the CAC and IPA still do not meet Rule 9(b)'s standard. MTD

3  at 6-8. Although plaintiffs have added new allegations and attached an appendix with pictures of

4  approximately fifty of JUUL's advertisements, JUUL contends that plaintiffs have still not

5  pleaded their claims with the requisite amount of specificity. *Id.* It points to eighteen plaintiffs

6  who have not identified which specific advertisements they saw or even what text they remember

7  reading. *Id.* With regards to the plaintiffs who identified the ads they saw, JUUL asserts that they

8  did not explain how the ads were false or misleading. *Id.* It also states that even though the CAC

9  includes references to misstatements on its website or materials, there are no allegations that any

10  individual plaintiff actually viewed those statements. *Id.*

11  Plaintiffs counter that the CAC has provided sufficient notice through its representative

12  samples because the purpose of Rule 9(b) is to provide defendants sufficient notice to defend

13  against a charge and not just deny that they have done anything wrong. *Id.* at 16-18. They argue

14  that they are not required to allege what specific text they remember reading. *Id.* at 17. Plaintiffs

15  describe the "who," "what," "when," "where," and "how" as follows:

16        The "who" is JUUL. The "what" are the statements and omissions
17        described in section III.D.1, pp. 13- 14. The "when" is the period from
         JUUL's introduction to the present.  Dkt.# 66, pp. 12-13.  The
18        "where" is on JUUL's social media postings, emails, POS materials,
         magazine ads, and website, examples of which were attached to the
19        CAC as Appendix C. The "how" is that the misrepresentations and
         omissions were likely to mislead reasonable consumers about the
20        nicotine content, addictiveness, and healthiness of its products.

21  *Id.* They also contend that Rule 9(b) is relaxed for omission claims because requiring a plaintiff to

22  identify the precise time, place, and content of an event that did not occur would effectively gut

23  state laws prohibiting fraud-by-omission. *Id.* (citing *In re Whirlpool Prods. Liab. Litig.*, 684 F.

24  Supp. 2d 942, 961 (N.D. Ohio 2009).

25  I agree with plaintiffs that their allegations regarding the "who," "what," "when," and

26  "how" are sufficient to meet Rule 9(b)'s requirements. But many of the allegations still fall short

27  on the question of "where." That the "who" is JUUL and the "when" is the period from the

28  introduction of JUUL's products to the present is undisputed. As to the "what," plaintiffs

1  sufficiently plead that JUUL has materially omitted the difference between the pharmacokinetic

2  effects of its nicotine solution as compared to combustible cigarettes.  CAC at ¶¶ 35-58.

3  Specifically, they allege that JUUL's products contain more nicotine salt than advertised, its

4  formulation delivers 30% more nicotine per puff than a combustible cigarette, it delivers this

5  nicotine up to four times faster than a combustible cigarette, and because of the differences in the

6  way that nicotine from combustible cigarette smoke and vaporized nicotine salts are absorbed by

7  the body, the actual amount of nicotine absorbed from vaping an entire JUULpod is twice as high

8  as that via a pack of cigarettes.  *Id.* at ¶¶45-49, 51, 55, 57, 59, 60-63.  These omissions, if true, are

9  material.

10  But many of the plaintiffs have still not described which ads they saw, and plaintiffs'

11  authority does not persuade me that these representative ads are sufficient.  Plaintiffs citation to

12  *Fed. Trade Comm'n v. Lunada Biomedical, Inc.*, is unhelpful because there the plaintiff was the

13  Federal Trade Commission ("FTC"), not an individual or collection of individuals.  No. 15-cv-

14  3380, 2016 WL 4698938, at *4 (C.D. Cal. Feb. 23, 2016).  The FTC does not bring suit because it,

15  as an agency, was misled; rather it brings suit to protect members of the public.  That a court

16  allowed it to show representative advertisements does not help plaintiffs here.  Plaintiffs also cite

17  *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 849-50 (N.D. Cal. 2018) (Orrick, J.) and *Astiana v.*

18  *Ben & Jerry's Homemade, Inc.*, No. 10-cv-4387-PJH, 2011 WL 2111796, at *6 (N.D. Cal. May

19  26, 2011) for the proposition that Rule 9(b)'s requirements are relaxed for omission claims.  But

20  neither of these cases lower the standard on the "where" prong and in both cases it was pleaded

21  with specificity.  *Zeiger*, 304 F. Supp. 3d at 849-50 (identifying the product label); *Astiana*, 2011

22  WL 2111796, at *6 (same).

23  Only the following twelve plaintiffs have identified specific ads or content on JUUL's

24  website:  Liliana Andrade, IPA at ¶ 24; Jose Angullo IPA at ¶¶ 31, 36; Adam Banner, IPA at ¶¶

25  59-60; Bradley Colgate, IPA at ¶ 91; Austin Hester, IPA at ¶ 180; Edgar Kalenkevich, IPA at ¶¶

26  186, 191; David Kugler, IPA at ¶ 204; Tracie Kugler, on behalf of her son, Z.K., a minor, IPA at

27  ¶¶ 223, 228; David Masessa, IPA at ¶¶ 278, 279, 280, 282; Laura Staller, IPA at ¶¶ 394, 396;

28  Anthony Smith, IPA at ¶ 408; and Michael Viscomi, IPA at ¶¶ 432, 438.  Plaintiffs Jonathan

Mardis and J.Y. state that they saw unspecified images that are reposted on http://www.classlawdc.com/2019/01/25/juul-images-2/, but that page contains over 200 images of JUUL's advertisements.  IPA at ¶¶ 257, 465.  Besides the twelve plaintiffs above who satisfy Rule 9(b), the remaining plaintiffs have failed to allege the "where" prong with sufficient detail.

### C.      State False Advertising, Deceptive Trade Practices, Fraud, Or Negligent Misrepresentation Theories

JUUL moves to dismiss plaintiffs' state false advertising, deceptive trade practices, fraud, or negligent misrepresentation theories on three grounds.  First, plaintiffs did not identify the state laws at issue with requisite specificity.  MTD at 8-9.  Second, plaintiffs failed to allege exposure to any misleading representations.  *Id.* at 9-11.  And third, plaintiffs failed to plead reasonable reliance of a likelihood of deception.  *Id.* at 11-13.

#### 1.   Identification of Relevant State Laws

In my previous order, I dismissed plaintiff's claims for violation of the Consumer Legal Remedies Act of California and similar consumer protection laws of other states for failure to identify the relevant subsections of those state consumer protection laws.  Order at 13-14. Plaintiffs have now attached a table of deceptive trade practices statutes in all 50 states and the District of Columbia.  Chart of 50 States and Washington D.C.'s Deceptive Trade Practices Statute attached as Appendix D to CAC ("DTP Table") [Dkt. No. 81-5].  JUUL argues that this table cites every conceivable subdivision of every possible state consumer statute without any explanation as to how the elements are satisfied, and that on its face, many of the elements are not satisfied.  *Id.* at 8-9.  In response, plaintiffs argue that they have selected the relevant sections of the consumer protection laws that they allege to be at issue.  MTD Oppo. at 16.  I am satisfied by the specificity of the table and find that it complies with my directive in the previous Order.

#### 2.   Exposure to Misleading Representations

JUUL argues that plaintiffs have not plausibly alleged that they have been misled.  MTD at 9-11.  They claim that while their ads might resemble prior cigarette advertising, the use of "bright" colors, "clean lines," "minimal text," "eye-catching graphics," FDA-regulated flavors, attractive adult models, and other common advertising practices are not grounds for a

18

1    misrepresentation claim.  *Id.*  It contends that unlike the cases involving combustible cigarettes,

2    there are no allegations of similar misrepresentations of concealment here and that there are only

3    conclusory allegations that it has represented its products as safe, not addictive, or helpful to

4    people trying to quit nicotine.  *Id.*  JUUL also argues that plaintiffs' claims about the alleged

5    omissions are insufficient because there is no duty to warn beyond the FDA's labeling

6    requirements and the State of California's Prop 65 requirement because the risks of nicotine have

7    been well known for decades.  *Id.*  It says that it did identify its products' nicotine content and

8    explained that it was roughly equivalent to a pack of cigarettes.  *Id.*  According to JUUL, many of

9    the plaintiffs were already smokers before trying JUUL's products and would know that nicotine

10   is addictive.  *Id.*

11          Plaintiffs respond that JUUL's advertising contained both affirmative representations and

12   omissions likely to mislead reasonable consumers about the nicotine content, addictiveness, and

13   health risks of its products.  MTD Oppo. at 13.  Plaintiffs point to JUUL's allegedly misleading

14   claim that a JUULpod contains nicotine "equivalent to 1 pack of cigarettes or 200 puffs," or that

15   "JUUL's ads portray JUUL as a healthy, hip, fun activity, while omitting (or failing to

16   conspicuously disclose) that JUUL delivers extremely potent and addictive doses of nicotine, is

17   harmful to health, and is especially harmful to adolescents."  *Id.* at 13, 14.  They also claim that

18   the "switch" campaign misleads consumers into believing that JUUL is a smoking cessation

19   device and a cost-effective "alternative to cigarettes," and that the "cancel anytime" statement, in

20   conjunction with JUUL's autoship service, misleads consumers into believing that they will not be

21   too addicted to cancel their subscription.  *Id.*  Plaintiffs also point out that JUUL paid third party

22   promoters without disclosing their payments.  *Id.*

23          As I have stated above, plaintiffs have sufficiently stated an omission claim and an

24   affirmative misrepresentation with regards to JUUL's claim that one pod has as much nicotine as a

25   pack of cigarettes.  Although the dangers of nicotine are known to the community, it would go too

26   far to say that JUUL need not to warn consumers that using JUUL's product will cause their

27   bodies to absorb twice as much nicotine as they would from a pack of cigarettes.  It is also

28   irrelevant that certain plaintiffs were smokers before using JUUL.  Being a smoker of combustible

cigarettes would not impart knowledge that JUUL's liquid nicotine formulation might be twice as potent.  The motion to dismiss the false advertising, deceptive trade practices, fraud, or negligent misrepresentation theories is denied as to claims related to JUUL's pharmacokinetics.[4]

### 3.    Reasonable Reliance and Likelihood of Deception

JUUL contends that plaintiffs are unable to plead that they reasonably relied on any of its representations.  First, it points out that fourteen of the plaintiffs switched to JUUL's ENDS after previously smoking cigarettes and would have known that nicotine is addictive.  MTD at 11-12.  It argues that these plaintiffs cannot plausibly allege that they would have been better off not switching.  *Id.*  Next, it argues that the claims of the non-smokers are also defective because it has not concealed that it contains nicotine and that its packaging includes the California Prop 65 warning and the FDA-mandated nicotine warnings.  *Id.* at 14.

I have rejected both of these arguments above.  That smokers and nonsmokers alike might be aware that nicotine is addictive does not mean that they were not entitled to rely on JUUL's representation that its pod contained the same amount of nicotine as a pack of cigarettes.  Plaintiffs have alleged that the pods both contain more nicotine than a pack of cigarettes and that the form of the nicotine is twice as potent.  JUUL's motion to dismiss plaintiffs' claims based on omissions contained in its advertisements is denied.

### D.    Product Liability

JUUL moves to dismiss plaintiffs' product liability claims on four grounds.  MTD at 14. First, they are preempted where they seek additional warnings on the risks of consuming nicotine

---

[4] For the parties' guidance, JUUL's use of common advertising practices and its ads that follow the predominant marketing aesthetic of the last few years ("bright" colors, "clean lines," "minimal text," "eye-catching graphics,") would not by itself constitute any sort of misrepresentation.  Also, claims based on themes and vague terms in JUUL's advertising are, as JUUL argues, nothing more than non-actionable puffery.  *In re Fontem*, 2016 WL 11503066, at *9 ("Courts enter dangerous territory when they consider representations actionable based not on what they actually say, but on what plaintiffs claim defendants seem to be stating.  This goes beyond viewing the allegations in the light most favorable to the plaintiff.")  Additionally, plaintiffs have not stated a claim based on JUUL's statement that a user may cancel the autoship service at any time because none of the plaintiffs allege that they used the service.  Only one plaintiff, Hasnat Ahmad, even claimed that he was aware of the service.  IPA at ¶ 2.

or the pharmacokinetic properties of JUUL ENDS.  *Id.*  Second, plaintiffs have only pleaded the elements of California product liability claims and California law does not apply to non-California plaintiffs.  *Id.*  Third, plaintiffs' failure to warn and negligent marketing claims fail because JUUL had no duty to provide additional warnings and plaintiffs do not allege proximate cause.  *Id.* Fourth, plaintiffs' design and manufacturing defect claims do not allege a cognizable defect or proximate cause.  *Id.*  I have rejected JUUL's claims related to preemption above and turn to its other arguments.

### 1. Choice of Law

JUUL states that plaintiffs do not cite the different product liability laws of each state in the CAC, so they must be seeking to bring their product liability claims under only California law. *Id.*  It argues that this is improper because plaintiffs have failed to engage in the requisite choice of law analysis to determine if California product liability law should apply to non-California plaintiffs as well.  *Id.* (citing *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012)). Plaintiffs counter that they have stated all the elements necessary to prove their claims in any state. MTD Oppo. at 20.  In support of their argument, plaintiffs attached another table to their opposition purporting to list the elements of different product liability claims for every state. Exhibit B ("Product Liability Chart"), attached to MTD Oppo. [Dkt. No. 108-2].  JUUL replies that this impermissibly uses an opposition brief to raise claims or allegations not raised in the CAC.  Defendant JUUL Labs, Inc.'s Reply in Support of Motion to Dismiss Plaintiffs' Consolidated Amended Complaint ("MTD Reply") at 10-11 [Dkt. No. 112].

JUUL is correct that new allegations contained in an opposition motion may not be properly considered in ruling on a motion to dismiss.  *Schneider v. California Dep't of Corr.*, 151 F.3d 1194, 1197 n.1 (9th Cir. 1998).  Even if I considered the table, it is unhelpful.  Certain boxes use check marks while others use stars.  Some of the stars correspond to information in the column titled "other" while some stars do not.  *See* Product Liability Chart at 8, 13.  Further, the chart appears to underscore that the fifty states do not share similar product liability laws and that plaintiffs' product liability claims may not be suitable for resolution as a class action.

That said, I decline to address the *Mazza* issues at the pleading stage.  I expect more

United States District Court
Northern District of California

1   dedicated briefing on this point should this case proceed to class certification.  Plaintiffs may

2   amend their complaint to include the product liability chart, or an improved version of it, if they

3   wish to pursue these claims.

### 2.   Failure to Warn

5          Assuming that plaintiffs are proceeding on only the California-law product liability claims

6   of the California plaintiffs, a defendant can be held strictly liable for failure to warn if the plaintiff

7   proves the following:  "(1) the defendant manufactured, distributed, or sold the product; (2) the

8   product had potential risks that were known or knowable at the time of manufacture or

9   distribution, or sale; (3) that the potential risks presented a substantial danger to users of the

10  product; (4) that ordinary consumers would not have recognized the potential risks; (5) that the

11  defendant failed to adequately warn of the potential risks; (6) that the plaintiff was harmed while

12  using the product in a reasonably foreseeable way; (7) and that the lack of sufficient warnings was

13  a substantial factor in causing the plaintiff's harm."  *Rosa v. City of Seaside*, 675 F. Supp. 2d 1006,

14  1011 (N.D. Cal. 2009) (Fogel, J.).  Under a negligence theory, the "manufacturer has a duty to use

15  reasonable care to give warning of the dangerous condition of the product or of facts which make

16  it likely to be dangerous to those whom he should expect to use the product or be endangered by

17  its probable use, if the manufacturer has reason to believe that they will not realize its dangerous

18  condition."  *Artiglio v. General Elec. Co.*, 61 Cal. App. 4th 830, 835 (Cal. Ct. App. 1998).  In

19  other words, "[n]egligence law in a failure-to-warn case requires a plaintiff to prove that a

20  manufacturer or distributor did not warn of a particular risk for reasons which fell below the

21  acceptable standard of care, i.e., what a reasonably prudent manufacturer would have known and

22  warned about."  *Carlin v. Superior Court*, 13 Cal. 4th 1104, 1112 (Cal. 1996).  However, a

23  manufacturer is under no duty to warn against obvious or generally known or recognized dangers.

24  *See Krawitz v. Rusch*, 209 Cal. App. 3d 957, 966 (Cal. Ct. App. 1989).

25         JUUL argues that the failure to warn claims brought under strict liability (claim 4) and

26  negligence (claim 5) fail because JUUL has no duty to provide warnings beyond those already

27  required by the FDA and California's Prop 65 because of the obvious risks involved with the use

28  of its ENDS and because of the well-known risks of nicotine.  *Id.*  It also contends that under the

United States District Court
Northern District of California

1   CAC, it did warn that its products contained nicotine and about the risks inherent in the use of its

2   ENDS.  *Id.* (citing CAC at ¶ 67 ("[t]he original JUUL product labels had a California Proposition

3   65 warning indicating that the product contains a substance known to cause cancer, and a warning

4   to keep JUULpods away from children and pets.")).  It points to its website's warnings that its

5   products contain nicotine, have potential health impacts, and should not be used by minors.  *Id.*  It

6   argues that none of the named California plaintiffs plausibly allege that JUUL's failure to warn

7   was the proximate cause of their harm.  *Id.*

8          I have already addressed a number of these arguments above.  Plaintiffs have adequately

9   alleged that JUUL has a duty to warn that its nicotine formulation is stronger than the 5% nicotine

10  on the label and that a pod contains more nicotine than a pack of cigarettes.  The CAC adequately

11  alleges that JUUL failed to meet this duty in its advertising, social media communications, and on

12  its product label.  I have also found that with regards to JUUL's advertisements (but not its

13  labelling), plaintiffs have sufficiently alleged that JUUL has failed to inform its customers about

14  the risks created by the pharmacokinetics of its liquid nicotine formulation, specifically that users

15  will absorb up to twice as much nicotine than they would from combustible cigarettes with the

16  same amount of nicotine.  While the risks of nicotine in general may be known in the community,

17  the risks of JUUL's formulation are not.  Although the parties attempt to distinguish what adults

18  and adolescents in the community know, e-cigarettes are a new technology and do not fall under

19  California's obvious danger rule.

20         Turning to reliance, Colgate is the only California plaintiff who has specifically identified

21  an advertisement that may serve as the basis of his failure to warn claim on JUUL's

22  pharmacokinetics.[5]  IPA at ¶ 89.  Minor plaintiffs D.D. and C.D. have not identified any specific

23  ads or POS materials that they relied on.  C.D. alleges that "he had seen [POS] promotional

24  materials for JUUL devices and products, including signs and displays" featuring "images of

25  JUUL's multicolored fruit- and dessert-flavored pods and offers of discounts on the JUUL 'Starter

26

27  [5] Plaintiff Kaytlin McKnight is one of the California plaintiffs.  On June 14, 2019, I issued an
    order to show cause why her case should not be dismissed for failure to prosecute.  [Dkt. No. 127].

28  McKnight has failed to appear or provide any response by the deadline set in the order and she is
    dismissed without prejudice.

Kit.' " *Id.* at ¶ 119.  He "did not see any warnings or disclosures in these POS materials about JUUL's nicotine levels or the risks JUUL posed [and the] representations and omissions in JUUL's in-store promotions materially impacted C.D.'s assessment of, and eventual decision to use, JUUL products." *Id.*  This is not specific enough.  D.D. and C.D. point to promotional content created by third parties about JUUL, rather than statements by JUUL itself.  *Id.* at ¶ 123.  Even if this third party content could be attributed to JUUL, and plaintiffs have not sufficiently alleged that it can, D.D. and C.D. do not identify what particular third party content they saw.

> L.B. does not identify any ads by JUUL and states:
>
>> L.B. was introduced to JUUL products by her friends at school when she was in the eighth grade.  The JUUL device bears no warning labels about nicotine or content, and L.B.'s friends did not warn of her of the risks of JUUL use.  Had L.B. known, or understood, the risks that the JUUL posed, she would never have used it.
>>
>> L.B. would not have tried a JUUL but for the fruit flavors offered to her by her friends.  The fruit flavored JUUL product her friends offered her led L.B. to believe that the product was safe to use.  She did not know she was ingesting nicotine from a nicotine delivery system that delivered as much—or more—nicotine than a cigarette. She knew not to smoke but did not understand the risks of ingesting nicotine from ENDS.

*Id.* at ¶¶ 305-06.  Here, L.B. appears to only base her failure to warn claims on a lack of labelling. Such a claim is preempted.  Both C.D. and L.B. may be able to plead reliance based on statements contained in promotional emails they allegedly received from JUUL.  *Id.* at ¶¶ 125, 312.  But they do not do so and do not describe the content of any promotional emails.  JUUL's motion to dismiss the failure to warn claims against Colgate is denied.  It is granted as to D.D., C.D., and L.B.

### 3.   Negligent Marketing

JUUL moves to dismiss plaintiffs' negligent marketing claim by arguing that it is subsumed into the negligent failure to warn claim.  MTD at 14.  Plaintiffs counter that negligent marketing claims have been allowed to proceed in cases involving gun and slingshot manufacturers.  MTD Oppo. (citing *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53 (Conn. 2019); *Ileto v. Glock Inc.*, 349 F.3d 1191 (9th Cir. 2003); *Moning v. Alfono*, 400 Mich. 425 (Mich. 1977)).  JUUL responds that when a party raises both negligent marketing and product liability

1    claims regarding the same product and conduct, courts hold that the negligent marketing claims

2    are subsumed by the product liability claims.  MTD Reply at 13-14 (citing *Pooshs v. Phillip*

3    *Morris USA, Inc.*, No. 04-cv-1221-PJH, 2013 WL 2252471, at *7 (N.D. Cal. May 22, 2013);

4    *Merrill v. Navegar, Inc.*, 26 Cal. 4th 465, 481 (Cal. 2001).

5         I agree with JUUL; the reasoning in *Pooshs* is persuasive.  There, the court found that the

6    claims of negligent marketing, advertising, distribution, and selling were subsumed by the

7    misrepresentation and failure-to-warn claims because "the purported 'breaches' of the 'duty of due

8    care' listed in plaintiff's opposition to the present motion largely serve[d] only to restate the claims

9    of negligent design, negligent misrepresentation, and negligent failure to warn[.]"  2013 WL

10   2252471, at *7.  Here, the negligent marketing claim essentially restates the negligent failure to

11   warn claim and negligent design claims.  The negligent marketing claim even states that JUUL

12   was in breach by "designing and manufacturing a product that, due to its ease of inhalation,

13   deceptive flavoring and nicotine potency, is hazardous to foreseeable users, namely minors."

14   CAC at ¶ 428.  The negligent marketing claim is dismissed.

### 4.    Design and Manufacturing Defect

16        JUUL moves to dismiss plaintiffs' design and manufacturing defect claims on the ground

17   that the nicotine contained in its pods is not a defect but instead the purpose of its products.  MTD

18   at 18-21.  It also argues that the fruit flavors, reduced throat hit, and the youthful and trendy

19   packaging are not cognizable defects because they align with JUUL's goal of providing a more

20   satisfying product to adult smokers.  *Id.*  It contends that the law does not ban flavors for adult

21   products or require any particular amount of throat hit absent government regulation.  *Id.*  Rather,

22   product defect claims are based on a product's safety, not its desirability, and only the FDA has

23   the power to impose product standard regulations regarding flavors or features that affect "throat

24   hit."  *Id.*  It claims that the FDA has stated that flavors may be desirable to adults and help them

25   switch from cigarettes, and it has indicated that it intends to place certain restrictions on channels

26   through which flavored products may be sold.  *Id.*  It argues that the FDA's "product standards"

27   requirements preempt state law under the TCA. 21 U.S.C. § 387p(a)(2)(A).  It notes that plaintiffs'

28   failure to allege which design defect theory (consumer expectations or risk-benefits) they are

United States District Court
Northern District of California

25

1   pursuing is fatal to their claim under California law.  *Id.*  Finally, it points out that plaintiffs have

2   not alleged how any defect was the proximate cause of their injury.  *Id.*

3   　　　　Plaintiffs divide their counterarguments on behalf of all class members and on behalf of

4   minors.

5   　　　　　　　　a.　　　On Behalf of All Class Members

6   　　　　Plaintiffs assert that the defect in JUUL's products is that they are more addictive than

7   consumers would expect and that the lack of throat hit was engineered to mask this greater

8   addictive potential, not that they simply contain nicotine.  MTD Oppo. at 21-22.  Under the risk

9   utility test, plaintiffs claim that JUUL could have created a safer product by using a less addictive

10   freebase nicotine.  *Id.*  They argue that the risks of the challenged design outweigh any of its

11   potential benefits since JUUL claims its purpose is to provide a cigarette alternative for adult

12   smokers for whom an extra "nicotine kick" and the elimination of throat hit are unnecessary.  *Id.*

13   They bolster their argument with *Izzarelli v. R.J. Reynolds Tobacco Co.*, 136 A.3d 1232, 1251-54

14   (Conn. 2016) (*Izzarelli I*), where the court collected cases from numerous jurisdictions that applied

15   some form of the risk-utility test to design defect claims against cigarette manufacturers in which

16   plaintiffs identified specific defects to the cigarette brand at issue and/or a reasonably safer

17   alternative.  *Id.*

18   　　　　JUUL contends that plaintiffs' arguments fail because they ask it to make a "less satisfying

19   and fundamentally different product when the alleged 'defects' are inherent in the product."  MTD

20   Reply at 12-13.  It claims that if its pods contained less nicotine per puff, users would compensate

21   by simply taking more puffs until they are satisfied.  *Id.*

22   　　　　JUUL misses the point.  Plaintiffs allege that each puff has more nicotine than a puff from

23   a combustible cigarette.  CAC at ¶ 49.  The issue is not creating a puff that is necessarily

24   satisfying, but one that is not stronger than necessary and more addictive than the equivalent puff

25   from a combustible cigarette.  Moreover, the cases JUUL cites for its compensation theory involve

26   consideration of facts after trial and on summary judgment.  *Boeken v. Philip Morris Inc.*, 127 Cal.

27   App. 4th 1640 (Cal. Ct. App. 2005) (appeal from jury verdict); *Grisham v. Philip Morris, Inc.*, 670

28   F. Supp. 2d 1014 (C.D. Cal. 2009) (summary judgment).  As this motion is based solely on the

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1   pleadings, JUUL's authority is unhelpful.  Additionally, JUUL's preemption argument fails

2   because the TCA expressly does not preempt claims under state product liability law.  21 U.S.C. §

3   387p(b),

4          Plaintiffs have plausibly stated a claim for manufacturing and design defect.  They have

5   sufficiently alleged that JUUL's products are more addictive than necessary to provide an

6   alternative to combustible cigarettes and that the risk of higher levels of addiction do not outweigh

7   the benefits of a nicotine formulation that the body absorbs at twice the rate of a pack of

8   combustible cigarettes with the same amount of nicotine.  JUUL's motion to dismiss the

9   manufacturing and design defect claims is denied.[6]

10                **b.      On Behalf of Minor Class Members**

11          The minor plaintiffs argue that they have sufficiently pleaded product defect claims under

12   both the consumer expectation and risk-utility tests.  MTD Oppo. at 22-23.  They contend that

13   even if a product is reasonably safe for adults, its design can still be dangerous to youth.  *Id.*

14          Plaintiffs rely on two cases.  The first is the Second Circuit's decision in *Izzarelli v. R.J.*

15   *Reynolds Tobacco Co.*, 701 F. App'x 26, 30 (2d Cir. 2017) (*Izzarelli II*), where the plaintiff

16   claimed that R.J. Reynolds had defectively designed its Salem Kings cigarettes to attract young

17   smokers.  The court held that plaintiff's evidence to show that Salem Kings were designed in part

18   to "attract young, new smokers, who disliked the bitterness of nicotine and preferred flavorful

19   cigarettes" was relevant to the consumer expectation test because "the youth marketing evidence

20   indicated that minors—who compose the bulk of new smokers and have strong brand loyalty—

21   were Salem Kings' target demographic."  *Id.*  Plaintiffs' claims are similar here.  They have

22   alleged that minors were the intended users of JUUL's products and that due to the inability of

23   minors to fully appreciate the risks of using JUUL's ENDS, the products are defective under the

24   consumer expectations test.  CAC at ¶ 363.

25          Turning to the risk-utility test, plaintiffs argue that instead of designing a product that

26

27   ───────────────

28   [6] In my previous order, I denied JUUL's motion to dismiss the manufacturing and design defect
     claims based on the allegation that JUUL's pods contained more nicotine than users expected.
     Order at 15-16.

would be resistant to use by minors, JUUL did the opposite.  It designed its products to encourage use by minors by "offering candy-like flavors; manipulating nicotine content to increase addictiveness and reduce 'throat hit'; adding a light up 'party mode' feature; and utilizing a sleek, stylish—and easily concealable—design popular with youth."  MTD Oppo. at 22-23.  At minimum plaintiffs claim that it was reasonably foreseeable that these design elements would appeal to youth and that nicotine is more harmful to minors than to adults because their brains are still developing.  *Id.*  Plaintiffs contend that JUUL could have easily designed a safer, alternative product without these features, as none of them are needed for current adult smokers to switch from cigarettes. CAC ¶¶ 414-422.

These allegations are sufficient to state a claim by the minor plaintiffs under the risk-utility test.  The CAC also plausibly alleges that even if JUUL did not foresee that minors would use its products, it is inconceivable that the company was unaware of how its products were being used by minors, based on the amount of social media content minors posted of themselves using JUUL's ENDS.  CAC at ¶¶ 188, 205, 212, 213, 223, 235.  It is reasonable to infer that companies such as JUUL with large social media presences assiduously monitor the use of popular hashtags involving their name.  It would have seen numerous posts of minors using their product.

**E.    Negligence Per se**

JUUL argues that plaintiffs allege no facts to support their negligence per se claim based on JUUL's alleged failure to obtain licenses to sell its products in certain states.  MTD at 21-22.  Rather, plaintiffs state a legal conclusion based solely on information and allege no facts to support their belief.  *Id.*  JUUL contends that even if it did not have a license to sell its products, this would not support a negligence per se claim because the licensing requirement is only an administrative obligation to the state.  *Id.*  It asserts that because plaintiffs do not allege a violation of any substantive standard of care related to licensing, or any facts suggesting that JUUL's failure to hold a license injured them, it cannot be the proximate cause of their injuries.  *Id.*

In opposition, plaintiffs argue that violations of state licensing statutes constitute negligence per se because the statutes are intended to promote public health and safety and that the plaintiffs are within the group intended to be protected.  MTD Oppo. at 30.  They say that JUUL's

United States District Court
Northern District of California

1    proximate cause argument fails because it implicates a factual dispute and it is reasonable to infer

2    that plaintiffs would not have acquired JUUL products without JUUL selling them in states where

3    it had no license.  *Id.*

4           Although there is no Ninth Circuit precedent on point, I will follow the Fourth Circuit in

5    *Talley v. Danek Med., Inc.*, 179 F.3d 154 (4th Cir. 1999).  "[W]here a statutory provision does not

6    define a standard of care but merely imposes an administrative requirement, such as the

7    requirement to obtain a license or to file a report to support a regulatory scheme, violation of such

8    requirement will not support a negligence per se claim."  *Id.* at 159.  In *Talley*, the court held that

9    "[e]ven if the regulatory scheme as a whole is designed to protect the public or to promote safety,

10   the licensing duty itself is not a standard of care, but an administrative requirement." *Id.*

11   Plaintiffs' negligence per se claim based on a lack of licensure fails because they do not identify a

12   standard of care contained in any of the state licensing statutes to which they cite.  MTD Oppo. at

13   30.

14          Plaintiffs rely on two cases that are inapposite because neither features a defendant

15   operating without a license: both involve licensed defendants violating duties imposed by the

16   licensing regime.  *See Hetherton v. Sears, Roebuck & Co.*, 593 F.2d 526, 529-30 (3d Cir. 1979)

17   (licensing statute required gun retailers to collect certain information); *Jarrett v. Woodward Bros.*,

18   751 A.2d 972, 987 (D.C. 2000) (legislature intended to impose a duty on tavern keepers to not

19   serve intoxicated underage patrons).  Neither *Hetherton* nor *Jarrett* involve liability to members of

20   the public for failure to hold a license.  Rather, they involve violations by licensees.  Accordingly,

21   plaintiffs' negligence per se claim is dismissed.

22          **F.      Breach of Warranty**

23              **1.    The Express Warranty Claim**

24          JUUL moves to dismiss the express warranty claim as precluded by its limited warranty.

25   MTD at 22-23.  It states that its one-year warranty expressly covers only "defects in materials and

26   workmanship" for the JUUL e-cigarette device, but not the "JUULpods themselves", and provides

27   that "[e]xcept as stated herein, JUUL Labs makes no other express warranty."  *Id.* (citing JUUL 1

28   Year Limited Warranty attached as Exhibit D to the Declaration of Austin V. Schwing [Dkt. No.

United States District Court
Northern District of California

United States District Court
Northern District of California

99-6]).  According to JUUL, every state besides Louisiana has adopted Section 2-316 of the

Uniform Commercial Code, which allows merchants to limit the terms of their express warranties.

*Id.*  Therefore, plaintiffs' express warranty claim based on the nicotine concentration in JUUL's

pods is outside the scope of the limited warranty and must be dismissed.  *Id.*  JUUL also contends

that plaintiffs' express warranty claim should be dismissed for failure to provide the required pre-

suit notice.  *Id.*  It states that plaintiffs' conclusory allegation that they "have met all requirements

for pre-suit notice" is insufficient.  *Id.*

Plaintiffs respond that they have adequately alleged a breach of express warranty claim

because JUUL's affirmations of fact about the nicotine content were part of the basis of the

bargain.  MTD Oppo. at 27-28.  They claim that JUUL expressly warranted that  "1 JUULpod

contains ~.7ml with 5% nicotine by weight;" that JUULpods are "5% Strength;" that a JUULpod

is equivalent to "1 pack of cigarettes or 200 puffs;" and that JUUL use causes less, or at least no

more, nicotine to enter the bloodstream than a cigarette.  *Id.* (citing CAC at ¶¶ 467-71).  According

to plaintiffs, JUUL's argument about its limited warranty, by its own terms, applies solely to

JUUL's e-cigarette, not its pods, and that even if the limited warranty applied, it would be valid

only if the buyer had knowledge or was chargeable with notice of the disclaimer before the

bargain was completed.  *Id.*  They state that JUUL has not shown that prior to purchase, any

plaintiff viewed the warranty contained only on JUUL's website.  *Id.*

I agree with JUUL that its limited warranty, which expressly disclaims any other express

warranty, precludes plaintiffs' express warranty claim based on JUUL's nicotine formulation.  It is

immaterial that the warranty states that JUUL's pods are not covered by the limited warranty; the

categorical disclaimer still applies.  *Accurate Transmissions, Inc. v. Sonnax Indus., Inc.*, No. 04-

cv-7441, 2007 WL 1773195, at *7 (N.D. Ill. June 14, 2007) (holding that a warranty for specific

parts was "in lieu of any other warranties" and that no warranties extended beyond the limited

warranty).  Plaintiffs' citation to *Bohac v. Gen. Mills, Inc.*, No. 12-cv-05280-WHO, 2014 WL

1266848, at *3 (N.D. Cal. Mar. 26, 2014) is inapplicable because there was no limited warranty at

issue there.

Turning to the argument that the limited warranty only applies if the buyer had knowledge

30

or was chargeable with notice of the disclaimer before the bargain was completed, the limited

warranty was available online and plaintiffs can be charged with notice of it.  Their citation to

*Clark v. LG Elecs. U.S.A., Inc.*, No. 13-cv-485, 2013 WL 5816410, at *15 (S.D. Cal. Oct. 29,

2013) is unpersuasive.  In *Clark*, the express warranty was not posted on the refrigerator

purchased by the plaintiff and it was not mentioned to her at the time of purchase.  *Id.*  The

plaintiff could only view the warranty once she received the refrigerator because it was contained

in the manual that was packed inside the refrigerator box and was not provided to her until after

purchase.  *Id.* at *12.  There was no evidence that the *Clark* plaintiff could have viewed the

warranty online before purchase.  Here, the limited warranty was available for view on JUUL's

website before purchase and plaintiffs can be charged with knowledge of it.  Honig Decl. at ¶ 4.

The express warranty claim is dismissed.

### 2.    The Implied Warranty Claim

In my previous order, I found that plaintiffs had sufficiently pleaded an implied warranty

claim based on the allegation that JUUL's pods contain 6.2% nicotine rather than the 5% JUUL

represents on its packaging.  Order at 17.  JUUL states that it does not challenge this theory but

instead argues that no plaintiff has pleaded facts under this theory, and that only plaintiffs Banner,

Masessa, and Royce come close.  MTD at 23-24.  According to JUUL, Banner and Royce lack

privity with JUUL and Masessa belongs in arbitration.[7]  *Id.*  Otherwise, JUUL contends that the

other plaintiffs cannot show that JUUL's ENDS lack a basic degree of fitness for ordinary use, or

that it does not conform to the representations made on the label.  *Id.*  It claims that its products

are a fit alternative to cigarettes and that plaintiffs' broad "unfit for use" claim is implausible

because that the FDA, American Cancer Society, and millions of consumers have recognized that

ENDS, and JUUL's products in particular, offer a less harmful alternative to combustible

cigarettes.  *Id.*

Plaintiffs counter that in addition to their claims regarding the strength of JUUL's pods,

they have also stated a breach of implied warranty claim based on the pharmacokinetics of

---

[7] As discussed below, I deny JUUL's motion to compel Masessa to arbitrate.

United States District Court
Northern District of California

JUUL's nicotine salt formulation.  MTD Oppo. at 28-29.  They have alleged that JUUL's formulation is "far more addictive than cigarettes, worsens or aggravates nicotine addiction, and can serve as a gateway to cigarette use." *Id.* (citing CAC at ¶¶ 479-93).  JUUL's argument that it is not unfit for use simply because it contains nicotine mischaracterizes plaintiffs' claims. *Id.*

As an initial matter, Masessa has adequately alleged that he relied on JUUL's representation that its products contain 5% nicotine.  IPA at ¶¶ 283-86.  The implied warranty claim remains viable as to the percentage of nicotine in each pod.  I also agree with plaintiffs' other argument that the allegations about the pharmacokinetics of JUUL's formulation sufficiently allege that JUUL's products do not "possess even the most basic degree of fitness for ordinary use." *Mocek v. Alfa Leisure, Inc.*, 114 Cal.App. 4th 402, 406 (Cal. Ct. App. 2003) (citing Cal. Comm. Code § 2314(2)).  Again, the issue is not that JUUL's products contain nicotine; it is that JUUL's products are alleged to cause more than twice as much nicotine to be absorbed by the body than a pack of combustible cigarettes with the same amount of nicotine.  CAC at ¶ 63.  A product that causes the body to absorb twice as much nicotine as a combustible cigarette cannot fairly be considered a cigarette replacement as a matter of law.  I deny JUUL's motion to dismiss the implied warranty claim.

### 3.     Privity

JUUL argues that the express and implied warranty claims also fail to the extent that they are brought by plaintiffs who did not purchase JUUL's products directly from JUUL or who live in states that require privity between parties to state a claim for breach of warranty. [8]  MTD at 24.  JUUL identifies only four Plaintiffs—Ahmad, B.C., L.B., and Masessa—who allege purchasing directly from JUUL's website. *Id.*

Plaintiffs claim that each state makes an exception to the privity requirement for representations made by means of labels or advertisements.  MTD Oppo. at 29.  While the label/advertisement exception may be true in the sixteen states that require vertical privity for

---

[8] I do not discuss the privity requirement related to plaintiff's breach of express warranty claim because it is dismissed.

implied warranty claims, JUUL argues that plaintiffs have only identified this exception as applying in Arizona, California, and Florida.[9]  MTD Reply at 16-17.  It also points out that, as discussed above, most of the plaintiffs have not alleged what advertisements and representations they relied upon with sufficient specificity.  MTD Reply at 17.

I agree with JUUL that in order to overcome the vertical privity requirement in the identified states, plaintiffs must identify the other states that follow the advertising and labelling exception that plaintiffs have identified in Arizona, California, and Florida.  They also need to identify the ads and representations the relevant plaintiffs relied on with greater specificity.

### 4.   Magnuson-Moss Warranty Act

JUUL contends that plaintiffs' federal Magnuson-Moss Warranty Act ("MMWA") claim fails because their express and implied warranty claims fail.  MTD at 24-25.  It also argues that plaintiffs' "express" MMWA claim fails because plaintiffs do not identify a "written warranty" as defined by the MMWA.  *Id.*  And to the extent plaintiffs challenge labeling statements, JUUL argues that these claims are "otherwise governed by federal law"—i.e., the TCA and the FDA's rules—and cannot support a claim under the MMWA.  *Id.*

JUUL's arguments fail because plaintiffs have sufficiently alleged breach of an obligation imposed by state law.  Because their breach of implied warranty claim survives in part (at least), so does their MMWA claim.  *In re Sony Grand Wega KDF-E A10/A20 Series Rear Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1101 (S.D. Cal. 2010) (citing 15 U.S.C. § 2301(7); *Stearns v. Select Comfort Retail Corp.*, No. 08-cv-2746-JF, 2009 WL 1635931, at *9 (N.D. Cal. June 5, 2009) ("The Magnuson–Moss Act provides a federal cause of action for state law express and implied warranty claims.").  The motion to dismiss plaintiffs' MMWA claim is denied.

### G.   The Unfair And Unlawful Prongs Of Unfair And Deceptive Trade Practices Statutes

#### 1.  The Unlawful Prong

---

[9] The states identified by plaintiffs are Alabama, Arizona, California, Connecticut, Florida, Georgia, Idaho, Illinois, Kentucky, New York, North Carolina, Ohio, Oregon, Tennessee, Washington, and Wisconsin.  *See* State Statutes Adopting U.C.C. § 2-314's Provisions on Implied Warranties attached as Appendix G to the CAC [Dkt. No. 81-8].

United States District Court
Northern District of California

United States District Court
Northern District of California

1    California's unfair competition laws incorporate other laws and treats violations of those

2    laws as independently actionable unlawful business practices under state law.  *Chabner v. United*

3    *Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000).  Violation of almost any federal, state,

4    or local law may serve as the basis for a claim under the unlawful prong of the UCL.  *Saunders v.*

5    *Superior Ct.*, 27 Cal.App.4th 832, 838-39 (Cal. Ct. App. 1994).  Because the CAC has sufficiently

6    pleaded multiple claims as described above, plaintiffs have also stated a claim under the unlawful

7    prong of California's UCL.

### 2.    The Unfair Prong

9    JUUL argues that plaintiffs cannot state a claim under the unfair prong of the UCL or

10   similar statutes because the claims that sound in fraud fail to meet the requirements of Rule 9(b) or

11   plausibly allege actual reliance and the plaintiffs do not plausibly allege a substantial injury that

12   outweighs any countervailing benefits and could not have reasonably been avoided.[10]  *Id.*  Neither

13   argument has merit.

14   Plaintiffs assert that an unfair claim does not necessarily sound in fraud and that under the

15   "*Sperry*" test an act is unfair if it (1) offends public policy; (2) is immoral, unethical, oppressive,

16   or unscrupulous; or (3) causes substantial injury to consumers.  MTD Oppo. at 5 (citing *Morrison*

17   *v. Toys "R" Us, Inc.*, 806 N.E.2d 388, 392 (Mass. 2004); *accord Rohrer v. Knudson*, 203 P.3d

18   759, 763-64 (Mont. 2009) (collecting cases adopting *Sperry* because of "abundant precedent in

19   other jurisdictions").  In California, the unfairness standard "is currently in flux." *Id.* (citing *In re*

20   *Adobe Sys. Privacy Litig.*, 66 F. Supp. 3d 1197, 1226 (N.D. Cal. 2014) (Koh, J.)).  Some

21   California courts follow *Sperry*, while others follow a "tethering" test that requires the public

22   policy at issue to "be tethered to specific constitutional, statutory, or regulatory provisions."  *Id.*

23   Plaintiffs contend that JUUL's intentional targeting of minors satisfies either test for

24   unfairness because its violates public policy against promoting youth nicotine addiction.  MTD

25   Oppo. at 5-9.  This policy is tethered to state statutes prohibiting the sale of e-cigarettes to minors.

26   *Id.*  Plaintiffs argue that targeting minors is oppressive and unscrupulous because:  (i) it exploits

27

28   _____

[10] JUUL's argument that plaintiffs' alleged injuries were readily avoidable because JUUL's
products disclose that they contain nicotine has been addressed above and found unpersuasive.

United States District Court
Northern District of California

1    them by luring them into addiction before they are mature enough to make an informed decision

2    whether vaping is worth it; (ii) minors are often accorded more protection under the law than

3    adults; (iii) minors are particularly injured by nicotine because it causes "substantial neural

4    remodeling" in adolescent brains with life-long effects on cognitive functions, as well as other

5    health problems; and (iv) there is a current vaping epidemic among non-smoking youth.  *Id.*; CAC

6    at ¶¶ 31-34.

7          Plaintiffs characterize JUUL's development of its nicotine solution and its particular

8    pharmacokinetics as an unfair business practice because it rendered its products more addictive

9    than cigarettes, which is not "common knowledge" or disclosed by JUUL.  *Id.*  Finally, they assert

10   that the problem is not that JUUL has copied some elements of tobacco ads, but that JUUL copied

11   the tobacco industry's youth-oriented marketing strategy when its product was even more

12   addictive than traditional cigarettes.  *Id.*

13         Plaintiffs rely heavily on *Mangini v. R.J. Reynolds Tobacco Co.*, 21 Cal. Rptr. 2d 232, 240-

14   02 (Cal. Ct. App. 1993), *overruled on other grounds by In re Tobacco Cases II*, 41 Cal. 4th 1257

15   (Cal. 2007).  In *Mangini*, the court applied the *Sperry* test to find that RJR's targeting of youth

16   through the Old Joe Camel cartoon character constituted an unfair business practice under the

17   UCL.  *Id.*  The court found that the first *Sperry* factor was met because "the targeting of minors in

18   cigarette advertising offends public policy" since "it is unlawful to sell or furnish cigarettes to

19   persons under the age of 18 years, and it is unlawful for minors to purchase or receive cigarettes."

20   *Id.* at 241 (citing Cal. Pen. Code, § 308, subds. (a), (b)).  The court reasoned, "[c]igarette

21   advertising directed to minors contravenes the statutory policy of keeping children from starting

22   on the road to tobacco addiction."  *Id.*  The second *Sperry* factor was met because "exploit[ing]

23   minors by luring them into an unhealthy and potentially life-threatening addiction before they

24   have achieved the maturity necessary to make an informed decision whether to take up smoking

25   despite its health risks" was oppressive and unscrupulous.  *Id.*  The third *Sperry* factor was met

26   because the "targeting of minors causes substantial physical injury to them" since the "earlier a

27   child begins to use tobacco products, the more likely it is that the child will be unable to quit."  *Id.*

28   (citing Health & Saf. Code, § 25967, subd. (a)(5)).  And "[s]moking is the single most important

source of preventable disease and premature death in California." *Id.* (citing Health & Saf. Code, § 25967, subd. (a)(1)). The plaintiff alleged that since the introduction of Old Joe Camel, teenage smokers accounted for a much larger amount of Camel cigarette sales, "implicitly suggesting such advertisements have harmed a great many teenagers by luring them into extended use of and addiction to tobacco products." *Id.*

JUUL points out that *Mangini* was overruled by *In re Tobacco Cases II* and that restrictions on commercial speech must be narrowly tailored to achieve the desired objective. But *In re Tobacco Cases II* overruled *Mangini* as preempted by the Federal Cigarette Labeling and Advertising Act ("FCLAA") 15 U.S.C. § 1331 et seq., which regulates cigarette advertising. 41 Cal. 4th at 1276. The FCLAA does not apply to JUUL's products because it defines cigarette as "any roll of tobacco wrapped in paper or in any substance not containing tobacco," and "any roll of tobacco wrapped in any substance containing tobacco which, because of its appearance, the type of tobacco used in the filler, or its packaging and labeling, is likely to be offered to, or purchased by, consumers as a cigarette." 15 U.S.C. § 1332(1). *In re Tobacco Cases II* did not hold that *Mangini's Sperry* analysis was in error.

The analysis in *Sperry* is both analogous and persuasive. Plaintiffs have stated an "unfair" claim under state consumer protection law because they have sufficiently alleged that JUUL's targeting of minors meets the requirements of *Sperry*. The allegations also state an unfair claim under the tethering test because the public policy at issue is tethered to state laws prohibiting the sale of e-cigarettes to minors.

### 3.    The Acts of Third Parties

Plaintiffs claim that JUUL ratified the unfair and unlawful conduct of third parties that were promoting and selling its products to minors and is vicariously liable for those acts. *Id.* They state that JUUL ratified the acts of third party @JUULnation (the username of an unidentified third party on Instagram) by knowingly accepting the benefits of @JUULnation's conduct or through willful ignorance. *Id.* @JUULnation posted tips on how to conceal JUUL devices in school supplies; ridiculed efforts to combat use in schools; promoted videos of JUUL influencers; sold JUULpods directly through its Instagram account; and promoted other sites

36

selling JUUL products to its 650,000 mostly teenage followers.  *Id.*; CAC at ¶¶ 220-21, 229.

Because @JUULnation used JUUL's hashtags in its posts, JUUL, which monitors its hashtags,

was aware of @JUULnation's conduct and could have stopped and condemned @JUULnation's

youth-targeted activity.  *Id.*, CAC at ¶¶ 214, 222-23.  Instead, JUUL repeatedly promoted

@JUULNation's hashtag ("#JUULnation") through its own social media accounts, giving an

externally observable indication that it consented to @JUULnation's activities and reaped the

benefits of free marketing and increased sales.  *Id.*; CAC at ¶¶ 222-226.

Plaintiffs' ratification theory fails; it does not apply when an actor is not an agent and does

not purport to be one.  MTD Reply at 6.  "An act is ratifiable if the actor acted or purported to act

as an agent on the person's behalf."  *Kristensen v. Credit Payment Servs. Inc.*, 879 F.3d 1010,

1014 (9th Cir. 2018) (citing Restatement (Third) of Agency § 4.03).  "Therefore, [w]hen an actor

is not an agent and does not purport to be one, the doctrine of ratification does not apply."  *Id.*

Plaintiffs do not allege that @JUULnation was, or purported to be, an agent of JUUL. They cite

*Henderson v. United Student Aid Funds, Inc.*, 918 F.3d 1068, 1074 (9th Cir. 2019), but it is

distinguishable.  In *Henderson*, the court found that certain debt collectors "pretended and

demonstrably assumed to act" as the agent of the creditor by calling debtors and telling them that

they were calling about a loan owned by the creditor.  *Id.*  The debt collectors then, without

needing the creditors approval, negotiated, deferred, and took payments on the creditor's behalf.

That is not the case here.  Plaintiffs cannot state an unfair claim against JUUL based on the

conduct of @JUULnation.

### 4.    Abstention

JUUL argues that I should dismiss the UCL claims under the doctrine of judicial

abstention because plaintiffs' claims would require the imposition of additional regulations on the

ENDS industry that neither the legislature, the FDA, nor state regulatory agencies have chosen to

enact.  MTD at 26-27.  It relies on *Winans by & through Moulton v. Emeritus Corp.*, No. 13-cv-

03962-SC, 2014 WL 970177, at *7 (N.D. Cal. Mar. 5, 2014), where the court abstained from the

plaintiffs' claims for equitable relief to the extent that they were predicated on a regulation related

to residential care facilities for the elderly.  The court found that it would have to assume the role

United States District Court
Northern District of California

1    of a state regulatory agency to provide relief.  *Id.*

2          JUUL's authority is inapplicable.  There is no regulation here that plaintiffs are attempting

3    to enforce.  Abstention is reserved for cases involving "complex economic policy" or burdensome

4    monitoring of an injunction.  It is not warranted here.

5          **H.     Claims Brought by Minors**

6          JUUL moves to dismiss all of the minor plaintiffs' claims because the wrongful conduct of

7    third parties supersedes any action taken by JUUL.  MTD at 27-28.  It analogizes to a number of

8    cases about alcohol consumption by minors to argue that the alleged illegal acts of third parties,

9    such as individuals and retailers selling or giving age restricted products to minors, breaks the

10   chain of causation.[11]  *Id.*  It states: (a) it is unlawful to sell JUUL products, or any ENDS, to

11   minors; (b) JUUL does not control to whom third-party retailers or individuals sell JUUL

12   products; (c) JUUL's e-commerce site uses an age-verification system; and (d) JUUL's website

13   and product labeling warn that its products should be kept away from children.  *Id.*  JUUL points

14   to plaintiffs' allegations of minors obtaining its products from unscrupulous third parties and notes

15   that much of the social media content related to JUUL is generated by third parties.  *Id.*

16         As an initial matter, some of the minor plaintiffs' claims do not stem from JUUL's

17   allegedly targeted ads.  Minor plaintiffs who were allegedly injured by the pharmacokinetics of

18   JUUL's ENDS under theories of product liability, implied warranty, and failure to warn are not

19   implicated by JUUL's argument.

20         With respect to the other claims, I agree with plaintiffs that the alcohol-related cases can be

21   distinguished, at least at the pleading stage, because the acts of the third parties here are plausibly

22

23   _____

24   [11] JUUL also cites  a number of cases involving minors purchasing alcohol to support this
     proposition.  *Id.* (citing *Eisenberg v. Anheuser-Busch, Inc.*, No. 04-cv-1081, 2006 WL 290308, at

25   *16 (N.D. Ohio Feb. 2, 2006), *vacated and remanded sub nom. Alston v. Advanced Brands &
     Importing Co.*, 494 F.3d 562 (6th Cir. 2007); *Bertovich v. Advanced Brands & Importing, Co.*, No.

26   05-cv-74, 2006 WL 2382273, at *11 (N.D.W. Va. Aug. 17, 2006); *Goodwin v. Anheuser-Busch
     Cos., Inc.*, No. BC310105, 2005 WL 280330, at *5 (Cal. Super. Ct. Jan. 28, 2005); Reply at 8

27   (citing *Kreft v. Adolph Coors Co.*, 170 P.3d 854, 856 (Colo. App. 2007); *Alston v. Advanced
     Brands & Importing Co.*, No. 05-cv-72629, 2006 WL 1374514, at *9 (E.D. Mich. May 19, 2006),
     *vacated and remanded*, 494 F.3d 562 (6th Cir. 2007); *Hakki v. Zima Co.*, No. 03-cv-9183, 2006

28   WL 852126, at *3 (D.C. Super. Ct. Mar. 28, 2006).  None of these cases are controlling.  As
     discussed below, I come to a different conclusion regarding foreseeability .

alleged to be foreseeable and therefore did not constitute an intervening cause. "A superseding cause must be something more than a subsequent act in a chain of causation; it must be an act that was not reasonably foreseeable[.]" *USAir Inc. v. U.S. Dep't of Navy*, 14 F.3d 1410, 1413 (9th Cir. 1994) (internal citation omitted). According to the allegations of the CAC, JUUL specifically targeted minors. Given the vast amount of social media content organized under JUUL related hashtags, the use and trade of JUULs products among minors was foreseeable. *In re Nat'l Prescription Opiate Litig.*, No. 17-MD-2804, 2018 WL 6628898, at *19 (N.D. Ohio Dec. 19, 2018) ("When there is a flood of highly addictive drugs into a community it is foreseeable—to the point of being a foregone conclusion—that there will be a secondary, "black" market created for those drugs."). Plaintiffs' allegations, if proven, are sufficient to show that JUUL had reason to know that its conduct would encourage illegal use and trade of its products; thus, the allegedly illegal activity was foreseeable and not an intervening cause. The motion to dismiss the minor plaintiffs' claims based on intervening causes by third parties is denied.

## II.    MOTION TO COMPEL ARBITRATION

JUUL has identified at least five named plaintiffs (David Masessa, Ron Minas, Jack Roberts, Hasnat Ahmad, and Michael Viscomi) who it believes should be compelled to arbitrate their claims individually based on an arbitration agreement on JUUL's website. MTC at 1. According to JUUL, when those plaintiffs created or logged into online accounts on JUUL's website, they agreed to JUUL's Terms and Conditions that included an arbitration agreement requiring them to individually "resolve any claim, dispute, or controversy . . . by binding arbitration by JAMS." *Id.* (citing Declaration of Jake Honig attached as Exhibit C to MTC at §16 [Dkt. No. 98-5]). The agreement states that it is governed by California law. *Id.*

Plaintiffs argue that they are not bound by the arbitration agreement because they were not provided notice of it. Plaintiffs' Opposition to Defendant's Motion to Compel Arbitration ("MTC Oppo.") at 6-14 [Dkt. No. 109]. They assert that: JUUL has not provided sufficient evidence that Ahmad agreed; Ahmad and Roberts lacked capacity to enter into the arbitration agreement; JUUL's notice did not appear on Minas' smartphone; JUUL's website does not put users seeking warranty service on notice; Roberts and Masessa did not agree to the terms and conditions as

United States District Court
Northern District of California

1    returning users; Ahmad and Roberts' claims accrued before they allegedly agreed to the terms and

2    conditions; and, several other contract defenses apply.  *Id.* at 14-25.

3        **A.  Clickwrap, Browsewrap or Sign-Up Wrap**

4        "In determining whether a valid arbitration agreement exists, federal courts apply ordinary

5    state-law principles that govern the formation of contracts." *Nguyen v. Barnes & Noble Inc.*, 763

6    F.3d 1171, 1175 (9th Cir. 2014) (internal quotation marks omitted).  Under California law,

7    "[t]here is no contract until there is mutual consent of the parties.  The manifestation of mutual

8    consent is generally achieved through the process of offer and acceptance." *Deleon v. Verizon*

9    *Wireless, LLC*, 207 Cal.App. 4th 800, 813 (Cal. Ct. App. 2012) (internal citations omitted).

10   Whether the mutual consent necessary for contract formation exists "is determined under an

11   objective standard applied to the outward manifestations or expressions of the parties, i.e., the

12   reasonable meaning of their words and acts, and not their unexpressed intentions or

13   understandings." *Id.*  "Although mutual consent is a question of fact, whether a certain or

14   undisputed state of facts establishes a contract is a question of law for the court." *Id.* (internal

15   quotation marks and citations omitted).

16       Because "the outward manifestation or expression of assent is the controlling factor," an

17   offeree, "knowing that an offer has been made to him but not knowing all of its terms, may be held

18   to have accepted, by his conduct, whatever terms the offer contains." *Windsor Mills, Inc. v.*

19   *Collins & Aikman Corp.*, 25 Cal.App.3d 987, 992-93 (Cal. Ct. App. 1972) (internal citations

20   omitted).  But contracts cannot be formed on the basis of stealth drafting:  "when the offeree does

21   not know that a proposal has been made to him this objective standard does not apply.  Hence, an

22   offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous

23   contractual provisions of which he was unaware, contained in a document whose contractual

24   nature is not obvious." *Id.*; *see also Specht v. Netscape Commc'ns. Corp.*, 306 F.3d 17, 29-30 (2d

25   Cir. 2002) (applying California law and quoting *Windsor Mills*).

26       "Arbitration agreements are no exception to the requirement of manifestation of assent,"

27   and "[c]larity and conspicuousness of arbitration terms are important in securing informed assent."

28   *Specht*, 306 F.3d at 30. "If a party wishes to bind in writing another to an agreement to arbitrate

40

1    future disputes, such purpose should be accomplished in a way that each party to the arrangement

2    will fully and clearly comprehend that the agreement to arbitrate exists and binds the parties

3    thereto." *Id.* (quoting *Commercial Factors Corp v. Kurtzman Bros.*, 131 Cal.App.2d 133, 134-35

4    (Cal. Ct. App. 1955)).

5            There are two main types of contracts formed on the internet.  "Clickwrap" (or "click-

6    through") agreements require website users to click on an "I agree" box after being presented with

7    a list of terms and conditions of use.  *Nguyen*, 763 F.3d 1175-76.  "Browsewrap" agreements exist

8    where a website's terms and conditions of use are generally posted on the website via a hyperlink

9    at the bottom of the screen.  *Id.* at 1176 (internal citations omitted).  Unlike a clickwrap

10   agreement, a browsewrap agreement does not require an express manifestation of assent to the

11   terms and conditions.  *Id.*  Rather, a party gives its assent by simply using the website.  *Id.*

12   (internal citations omitted).  "The defining feature of browsewrap agreements is that the user can

13   continue to use the website or its services without visiting the page hosting the browsewrap

14   agreement or even knowing that such a webpage exists." *Id.* (citing *Be In, Inc. v. Google Inc.*, No.

15   12-cv-03373-LHK, 2013 WL 5568706, at *6 (N.D. Cal. Oct. 9, 2013).  Some internet contracts

16   are a blend of the two, and have been called a "hybrid design," "modified clickwrap", or "sign-in

17   wrap" agreement.  "Sign-in-wrap" agreements are those in which a user signs up to use an internet

18   product or service, and the signup screen states that acceptance of a separate agreement is required

19   before the user can access the service.  *Selden v. Airbnb, Inc.*, No. 16-cv-00933, 2016 WL

20   6476934, at *4 (D.D.C. Nov. 1, 2016).

21           JUUL's website utilizes a sign-in wrap agreement.  The website requires customers to first

22   create an online account in order to process transactions.  MTC at 3-4.  The sign-in page contains

23   fields and a button to login, and below that, fields and a button to "sign up."  Sign-Up/Log-In page

24   as it appeared from February 1, 2018 to June 30, 2018 ("Earlier Sign-Up Page") attached as Ex. A

25   to Honig Decl. [Dkt. No. 98-3]; Sign-Up/Log-in page as it appeared from June 30, 2018 to August

26   9, 2018 ("Later Sign-Up Page") attached as Ex. B to Honig Decl. [Dkt. No. 98-4].  Below the

27   "sign up" button the page states:  "By registering with JUUL Labs, Inc., you agree to our Terms

28   and Conditions and Privacy Policy."  *Id.*  According to JUUL, the "Terms and Conditions" and

United States District Court
Northern District of California

"Privacy Policy" portions of the above sentence are hyperlinks to their respective pages.  MTC at 3-4.

Courts considering similar agreements have found them valid where the existence of the terms was reasonably communicated to the user.  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 76 (2d Cir. 2017) (collecting cases).  Plaintiffs attest that they were not on actual notice of the hyperlink to the Terms of Service or the arbitration provision itself, and defendants do not point to evidence from which a jury could infer otherwise.  Therefore, the question is whether the plaintiffs were on inquiry notice of the arbitration provision by virtue of the hyperlink to the Terms of Service on the sign-up page and manifested their assent to the agreement by clicking "sign up."  *Id.* at 76-77.

**B.      The Earlier Login Screen**

According to the declaration of Jake Honig, plaintiffs Masessa, Roberts, Viscomi, and Ahmad saw a different version of the sign up screen than Minas because they accessed JUUL's website at an earlier date.  Honig Decl. at ¶ 3.  JUUL attached the following screen shot of the Earlier Sign-Up Page:

United States District Court
Northern District of California

1    Earlier Sign-Up Page at 2.  Plaintiffs argue that the hyperlink to the terms and conditions is

2    inconspicuous on its own and within the context of the Early Sign-Up Page's general design.

3    MTC Oppo. at 8-10.  They point out that the hyperlink to the Terms and Conditions was not a

4    different color, underlined, italicized, or in any way visually distinct from the surrounding text.

5    *Id.*

6              I agree.  The hyperlink to the terms and conditions on the Earlier Sign-Up Page was not

7    conspicuous enough to put Masessa, Roberts, Viscomi, and Ahmad on inquiry notice.  Courts

8    have found more conspicuous hyperlinks to be insufficient.  *See Cullinane v. Uber Techs., Inc.*,

9    893 F.3d 53, 62-63 (1st Cir. 2018) (gray rectangular box with the language "Terms of Service &

10   Privacy Policy" displayed in a larger font, in bold, contrasting in color, and highlighted by the box

11   around it was not reasonably conspicuous); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466-67

12   (S.D.N.Y. 2017) (hyperlink in smallest font on the screen but colored in light blue on a white

13   background insufficient to provide notice).  Here, the hyperlink is wholly indistinguishable from

14   the surrounding text.  Users cannot be reasonably expected to click on every word of the sentence

15   in case one of them is actually a link.

16             JUUL's cited authority is distinguishable.  In *Meyer,* the Second Circuit found a hyperlink

17   that was highlighted, underlined, and with the operative text in all caps to be sufficient.  868 F.3d

18   77-78.  In *Fteja v. Facebook, Inc.*, the hyperlink was underlined.  841 F. Supp. 2d 829, 835

19   (S.D.N.Y. 2012).  In *Cordas v. Uber Techs., Inc.*, the phrase "Terms & Conditions and Privacy

20   Policy" was displayed in a clickable box.  228 F. Supp. 3d 985, 988 (N.D. Cal. 2017) (Seeborg,

21   J.).  In *Cairo, Inc. v. Crossmedia Servs., Inc.*, the hyperlink was underlined and highlighted.  No.

22   04-cv-04825-JW, 2005 WL 756610, at *2 (N.D. Cal. Apr. 1, 2005).  The hyperlink in *Swift v.*

23   *Zynga Game Network, Inc.* was colored blue.  805 F. Supp. 2d 904, 908 (N.D. Cal. 2011)

24   (Laporte, J.).

25             Here, JUUL's hyperlink on its Earlier Sign-Up Page was not highlighted, underlined, in all

26   caps, or in a separate box.  It would not have served to put a reasonable user of the internet on

27   inquiry notice of the arbitration provision.  Plaintiffs Masessa, Roberts, Viscomi, and Ahmad

28   lacked inquiry notice.

United States District Court
Northern District of California

### C.    The Later Login Screen

The only remaining plaintiff is Minas.  According to JUUL, the sign-up page that Minas would have seen was different than the other plaintiffs.  Honig Decl. at ¶ 3.  The key difference is that the hyperlinks to "Terms and Conditions" and "Privacy Policy" are now highlighted:



Later Sign-Up Page at 2.

I am not convinced that the mere change in color of the hyperlinks, without more, is enough.  In the cases JUUL cites above, besides *Swift*, the hyperlinks are also underlined, highlighted, in all caps, or in a box.  Additionally, as plaintiffs note, the other hyperlink on the page is formatted differently.  MTC Oppo. at 8-10.  The hyperlink to the password recovery page is bolded, underlined, and appears to be in a larger font size than the hyperlink at issue.  *Id.*  Taken together, Minas was not on inquiry notice merely because JUUL changed the color of the terms and conditions hyperlink.  A reasonable user scanning the page would first see the "Forgot Password?" hyperlink and would observe that it is a different color, underlined, and of a particular font size.  That user would not then see the "Terms and Conditions" and "Privacy Policy"

44

1    hyperlinks and conclude that they were clickable.  They are not underlined, they are the same size

2    as the sentence they are in, and the color is different from the initial hyperlink they would see.

3    Minas lacked inquiry notice.

4         Because I do not find that Masessa, Roberts, Viscomi, Ahmad, and Minas had inquiry or

5    actual notice of the arbitration provision, there has been no manifestation of assent to its terms.

6    They are not bound by it.  I need not address the parties' other arguments and the motion to

7    compel the above plaintiffs to arbitrate their claims individually is denied.

8    **III.    DISCOVERY LETTER AND MOTION TO SEAL**

9         On May 28, 2019, the parties also filed a joint discovery letter.  [Dkt. No. 115-4].  The

10   letter related to my August 28, 2018 order stating that written discovery could be served but that

11   the parties did not need to respond until I issued a further order.  [Dkt. No. 56].  At the June 12,

12   2019 hearing on the above motions, I lifted the limitation on discovery.  It may proceed.

13        JUUL seeks to redact one word from the discovery letter related to what entities it has

14   produced documents to in response to investigatory demands.  [Dkt. No. 115].  It also seeks to

15   redact several paragraphs and a footnote from the declaration of its attorney in support of its

16   motion to seal.  [Dkt. No. 116].

17        Records attached to non-dispositive motions are not subject to the strong presumption of

18   access.  *See Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179-80 (9th Cir. 2006).

19   Because the documents attached to non-dispositive motions "are often unrelated, or only

20   tangentially related, to the underlying cause of action," parties moving to seal must meet the lower

21   "good cause" standard of the Federal Rules of Civil Procedure Rule 26(c).  *Id.* (internal quotation

22   marks omitted).  The "good cause" standard requires a "particularized showing" that "specific

23   prejudice or harm will result" if the information is disclosed.  *Phillips ex rel. Estates of Byrd v.*

24   *Gen. Motors Corp.*, 307 F.3d 1206, 1210-11 (9th Cir. 2002) (internal quotation marks omitted);

25   see Fed. R. Civ. P. 26(c).  "Broad allegations of harm, unsubstantiated by specific examples of

26   articulated reasoning" will not suffice.  *Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 476

27   (9th Cir. 1992).  Because the discovery letter is a non-dispositive motion, the good cause standard

28   applies.

United States District Court
Northern District of California

45

JUUL argues that there is good cause to seal here because the entity that issued the investigative demand has indicated that its investigation is non-public. [Dkt. 116-3]. JUUL states that the entity's own operating manual treats information submitted to or developed by it as confidential because release could result in reputational harm. *Id.* JUUL asks that I give deference to the entity's procedures and not unduly interfere with their investigation. *Id.* At this stage on a non-dispositive motion, I grant the motion to seal.

### CONCLUSION

JUUL's motion to dismiss is granted in part as described above. Plaintiffs' claims of negligence per se and breach of express warranty are dismissed without leave to amend. Any other amendment is permitted within 20 days of this Order. JUUL's motion to compel arbitration is denied. Its motion to seal is granted.

**IT IS SO ORDERED.**

Dated: August 23, 2019

William H. Orrick
United States District Judge